# UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Richard K. Eaton, Senior Judge

| | |
|---|---|
| LA MOLISANA S.P.A., | |
|     Plaintiff | |
|     And | |
| VALDIGRANO DI FLAVIO PAGANI SRL, | |
|     Consolidated Plaintiff, | |
|     v. | Consol. Ct. No. 21-00291 |
| UNITED STATES, | |
|     Defendant. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE
RULE 56.2 MOTION OF CONSOLIDATED PLAINTIFFS
LA MOLISANA S.P.A. AND VALDIGRANO DI FLAVIO PAGANI SRL
FOR JUDGMENT UPON THE AGENCY RECORD**

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
    Counsel for Plaintiffs

Dated: December  28, 2021

# *Table of Contents*

Table of Contents ...................................................................................................i

Table of Authorities ............................................................................................ ii

I.     INTRODUCTION ....................................................................................1

II.    STATEMENT PURSUANT TO RULE 56.2(c) .......................................2

       A.    Administrative Determination Under Review .......................2

       B.    Issues of Law ..........................................................................2

       C.    Summary Of Arguments .........................................................3

       D.    Statement Of Facts .................................................................6

III.   STANDARD OF REVIEW .....................................................................16

IV.    ARGUMENT: COMMERCE'S TREATMENT OF THE
       PROTEIN CODING IS  UNSUPPORTED BY SUBSTANTIAL
       EVIDENCE ............................................................................................20

       A.    Contrary to Commerce's Position, Pasta with a Protein
             Content of 12.5% is Standard Pasta in Both the United States
             and Italy .................................................................................20

       B.    Contrary to Commerce's Position, the Minimum Protein
             Requirement for Premium Semolina is 13.5%.......................32

       C.    Commerce's Protein Coding Causes Physically Dissimilar
             Products in the Two Markets to be Treated as Identical, and
             Causes Physical Identical Products to be Treated as
             Dissimilar ..............................................................................33

       D.    The Court Determination in *Ghigi 1870 S.p.A. et al. v.
             United States* has No Impact on This Matter .......................40

V.     ARGUMENT:  COMMERCE'S REFUSAL TO ADJUST THE
       PROTEIN CONTENT FOR SCALAR DIFFERENCES IS
       UNSUPPORTED BY SUBSTANTIAL EVIDENCE .................................42

       A.    Commerce Must Compare Products Using the Same Scale ..............42

VI.    ARGUMENT: COMMERCE CANNOT IGNORE THE IMPACT
       OF THE FDA NUTRITION ROUNDING RULES .....................................46

VII.   ARGUMENT:  THE RATE APPLIED TO VALDIGRANO WAS
       UNLAWFUL............................................................................................51

VIII.  CONCLUSION.........................................................................................51

# Table of Authorities

## *Case Law*

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012)...............................................................................19,50

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ....17,18,31,50

*Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974)................................20

*Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367 (Fed. Cir. 2012) ........................................................20

*Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)..........................................................................16

*China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States*, 771 F. Supp. 407 (Ct. Int'l Trade 1991) .............................................................................30

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)................................17

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 19  (1938) .........................31

*Diversified Products Corp. v. United States*, 6 CIT 155 (1983) .............................17

*Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262  (Ct. Int'l Trade 2006) ..........................................................................18

*Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008)................................................................28,37,38,39

*Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034 (Fed. Cir. 1996)........................16

*Gerald Metals, Inc. v. United States*, 132 F.3d 716  (Fed. Cir. 1997)....................18

*Ghigi 1870 S.p.A. et. al. v. United States*, Slip Op. 21-159 (November 30, 2021) ...........................................................................4, 40,42

*Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369 (Fed. Cir. 2003)...........................................................................31

*Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183 (Ct. Int'l Trade 2009).........................................................................18,50

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009)....................19

*Matsushita Elec. Indus. Corp. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)..........................................................................31,33,46

*Mitsubishi Materials Corp. v. United States*, 17 CIT 301, 820 F. Supp. 608 (Ct. Int'l Trade 1993)..............................................................................31

*Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016) ....................................................................................................18,45,50

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ....................31

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) ....................30

*Novosteel SA v. United States*, 284 F. 3d 1261 (Fed. Cir. 2002)............................19

*Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372 (Fed. Cir. 2001)..............................................................................................16, 27

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)..............18,50

*Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57 (Ct. Intl Trade 1993) ...................................................................................19,51

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376 (Fed. Cir. 2001)...........................................................18,50

*SKF USA, Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) ..........................20

*Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077 (Fed. Cir. 2001)...................................................................................19,39

*Tung Mung Dev. Co., v. United States*, 354 F.3d 1371 (Fed. Cir. 2004) ...............20

*Universal Camera Corp. v. NLRB*, 340 U.S. 474  (1951) .......................................17

*USX Corp. v. United States*, 11 CIT 82,  655 F. Supp. 487 (1987).......................17

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998).................17

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013).......................................................................................18,50

**Statutes and Regulations**

*The Nutrition and Labeling and Education Act*, PL 101-535 (1990).....................47

19 U.S.C. § 1516a(a)(2)(B)(iii)...................................................................................2

19 U.S.C. §1516a(b) ................................................................................................16

19 U.S.C. §1673d(c)(5)............................................................................................16

19 U.S.C. §1677(16)(A)......................................................................................34,39

19 U.S.C. §1677(16)(B)..................................................................................28,38,39

21 CFR §101.9(c)(7)................................................................................................43

21 CFR §101.1 ................................................................47

21 CFR §101.9 ................................................................47

21 CFR §101.9(c)(7) .........................................................48

*Administrative Determinations*

*Certain Pasta From Italy: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018– 2019*, 85 Fed. Reg. 74,676 (Dep't Commerce Nov. 23, 2020) .........................................................................6

*Final Results of the 22nd Administrative Review of the Antidumping Duty Order on Pasta from Italy; 2017-2018*, 85 Fed. Reg. 2714 (Dep't Commerce Jan. 16, 2020), sub judice, *Zara S.p.A. et al. v. United States*, C.I.T. Consol. Ct. No. 20-00023 ........................37

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019) ...................6

*Pasta from Italy: Antidumping Duty Order*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996) ..............................................6

*Pasta From Italy: Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010–2011*, 78 Fed. Reg. 9,364 (Dep't Commerce Feb. 8, 2013) ...........................................12,35

*Pasta from Italy: Final Results of Twelfth Administrative Review*, 75 Fed. Reg. 6,352 (Dep't Commerce Feb. 9, 2010) .........................12

*Pasta from Italy: Preliminary Results of Twelfth Antidumping Duty Administrative Review*, 74 Fed. Reg. 39,285 (Dep't Commerce Aug. 6, 2009) ..............................................................12

I.  **INTRODUCTION**

This is an appeal from the 2018/19 administrative review of the antidumping order on pasta from Italy.  Plaintiff La Molisana S.P.A. ("La Molisana") was a mandatory respondent in the review, and Consolidated Plaintiff Valdigrano Di Flavio Pagani Srl ("Valdigrano") was a non-mandatory respondent in the review. La Molisana was a party to the proceeding, having submitted numerous questionnaire responses and comments, as well as a case brief.  Valdigrano was a party to the proceeding having filed a case brief.

The Plaintiffs assert the following errors in the Commerce Department's ("Commerce's") margin calculations:

- Erroneous coding for protein content in the physical characteristics of the subject merchandise in La Molisana's sales and cost databases;

- Failure to adjust the protein content to a uniform standard, resulting in a comparison of dis-similar units;

- Failure to take into account the impact of FDA mandated rounding in determining the content of nutrition fact labels resulting in classification of identical product under different CONNUM's solely the result of the FDA mandated rounding; and

- Failure to apply a lawful rate to Valdigrano by reason of the errors set forth above.

1

## II.   STATEMENT PURSUANT TO RULE 56.2(c)

### A. Administrative Determination Under Review

This action is brought pursuant to 19 U.S.C. § 1516a (a)(2)(B)(iii) to contest Commerce's *Certain Pasta From Italy: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019* ("*Final Results*") PR 278 and PR 282[1] and accompanying Issues and Decision Memorandum ("IDM") (PR 277).[2]   In the Final Results, Commerce calculated a margin of 15.72% for La Molisana, and applied the same rate to Valdigrano as a non-mandatory respondent.[3]

### B. Issues of Law

The Plaintiffs present the following issues.  In each instance, Commerce's decision was not based on substantial evidence on the record, and was arbitrary and capricious, an abuse of discretion, and not otherwise in accordance with law. The issues are:

---

[1] This brief uses the following abbreviations: **PR** = Public Record; **CR** = confidential record; **AR** = administrative review; **AFA** = adverse facts available; **BOM** = bill of materials; **COP** = cost of production; **HM** = home market; **QR** = questionnaire response; **SQR** = supplemental QR; **CONNUM** = control number.

[2] The 2018/19 review was the 23rd administrative review of the dumping order on pasta from Italy; we refer to this below as AR-23.

[3] Affiliated respondents Ghigi 1870 S.p.A. and Pasta Zara ("Ghigi/Zara") were assigned a rate of 91.76%, as AFA. *Id*. This aspect of the Final Result is not before the Court.

1. **Protein Coding.**   Whether Commerce's rejection of La Molisana's proposed coding for the physical characteristic, "protein," was unlawful, insofar as unrebutted substantial evidence showed that pasta with protein content 12.5% was standard pasta, not premium pasta, in both the U.S. market and the Italian market.

2. **Failure to Adjust to a Uniform Standard.**   Whether the Department's failure to calculate protein values using a uniform standard resulted in inaccurate comparisons between product and resulted in identical product reporting different protein values and whether the failure to adjust to a uniform standard masks the true protein content and resulted in a comparison that was neither "transparent" or "consistent".

3. **Failure to Take into Account FDA Rounding Rules.**   Whether the Department's failure to take into account the FDA rounding rules for food nutrition labels which resulted in a situation where, simply because of rounding, product with physical characteristics of one category are always categorized in a different category and resulted in a comparison that was neither "transparent" or "consistent".

## C. <u>Summary Of Arguments</u>

- The Department of Commerce's treatment of protein coding in determining the Protein factor in the CONNUM is unsupported by substantial evidence.
  - Contrary to Commerce's position, pasta with a protein content of 12.5% is standard pasta in both the United States and Italy.
    - The Department of Commerce has consistently implemented

the 12.5% protein breakpoint for pasta based solely on the practice of the Italian Commodity Exchanges with regard to the classification of standard semolina versus premium semolina.

- ▪ The unrefuted and unchallenged market report place on the record in this review establish that 12.5% protein is standard quality pasta.

- o The minimum required protein required for premium pasta is 13.5%
  - ▪ The unrefuted and unchallenged market report establishes the practice at the Italian Commodity Exchanges

- o Commerce's Protein Coding causes physically dissimilar products in two markets to be treated as identical
  - ▪ The Department should base its protein content on the physical characteristics of the goods
  - ▪ The Department intended to compare identical products, but failed to take into account the different conversion factors in the Italian and U.S. market
  - ▪ The Department's current classification results in inaccurate comparisons between goods
  - ▪ A goal of "transparency and consistency" cannot override the primary goal of accuracy

- o The Court determination in *Ghigi 1870 S.p.A. et. al. v. United States* has no impact on this matter
  - ▪ In *Ghigi* the issue as to protein coding was not raised until the filing of case briefs
  - ▪ In this matter, the issue as to protein coding was raised early in the administrative process

- The Department's refusal to adjust protein content for scalar differences is unsupported by substantial evidence
  - o Commerce must compare different products using the same scale
    - ▪ In Italy and in the United States different scales are used to calculate the number of grams of protein in a physical article
    - ▪ An accurate comparison requires the comparison of these materials using the same scale
    - ▪ Converting numbers reported on a package to a uniform scale does not mean that the numbers are not being used – rather such numbers are simply being adjusted to a common scale for purposes of comparison
    - ▪ The Department converts, or directs the parties to convert, other reported values to a uniform scale – whether weights and measures or currency

- - Numbers converted using a scientifically fixed constant are correct as a mathematical and factual matter, numbers on different scales that are not converted are necessarily not correct as a mathematical and factual matter
- The Department's refusal to take into account the impact of rounding on the calculation of the protein content is arbitrary
    - Nutrition Fact Panels were established by the FDA to provide general information to the U.S. Consumer, not to provide detailed and exact data as to the contents of a package
        - The FDA requires that Protein be reported to the nearest Full Gram calculated using 6.25 multiplied by the nitrogen content.
        - The FDA artificially sets the serving size for pasta at 56 grams, even though a pound technically divides into a serving size of 56.74 grams
        - A rounded value of 7 grams applied to the rounded service size of 56 grams produces exactly 12.5%.   An unrounded value of 6.51 grams applied to the rounding service size of 56 grams produces a protein percentage of 11.63%
        - In order to create a rounded value of 6 grams, the unrounded value would need to be less than 6.49 grams.
        - A rounded value of 6 grams applied to the rounded service size of 56 grams produces a protein ratio of 10.71%.   An unrounded value of 6.49 grams applied to the rounding service size of 56 grams produces a protein percentage of 11.58%
        - It is impossible for pasta with a protein content of between 11.6% and 12.49% to be categorized as normal pasta
- The Department Must Adjust the Rate for Valdigrano
    - Valdigrano fully participated in the review
        - Valdigrano received a rate based on the rate assigned to those mandatory respondents that did not receive a rate based solely on adverse facts.
        - If the rate for La Molisana, a mandatory respondent that did not receive a rate based solely on adverse facts, is adjusted as a result of this Court case, the rate for Valdigrano should also be adjusted.

**D. <u>Statement Of Facts</u>**

The antidumping order on pasta from Italy was published in 1996, *Pasta from Italy*: *Antidumping Duty Order*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996).  This appeal concerns the 23rd administrative review, AR-23,  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019).  In the segment of the proceeding under appeal, Commerce issued its preliminary results as  *Certain Pasta From Italy: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2018– 2019*, 85 Fed. Reg. 74,676 (Dep't Commerce Nov. 23, 2020) ("AR-23P"), accompanied by Commerce's *Decision Memorandum for Preliminary Results of Antidumping Duty Administrative Review:  Certain Pasta from Italy; 2018-2019* (Nov. 17, 2020) ("AR-23 PDM"), PR 243.  Commerce's Final Results and final IDM were issued as set forth in the "Administrative Determination Under Review," *supra*.

By way of background, in the margin-calculation program, Commerce must compare products in three databases, U.S. sales, home market (HM) sales, and cost of production. It links the products in the three databases by creating "computer control numbers" ("CONNUMs"), which categorize merchandise according to its physical characteristics.  Here, the CONNUM is a concatenation of the codes for six physical characteristics, namely,

| FIELD NAME | DESCRIPTION | CODING |
|---|---|---|
| SHAPE | Product shape | 1 = long cuts (e.g., linguine, spaghetti)<br>2 = specialty long cuts (e.g., capellini, fioccini)<br>3 = nested/folded/coiled<br>4 = lasagna<br>5 = short cuts (e.g., fagiolini, medium shells)<br>6 = specialty short cuts (e.g., mezzanelli, pasta mista)<br>7 = soupettes (e.g., ditali, corallini)<br>8 = combination of shapes (specify) |
| WHEATSP | Wheat species | 1 = Durum wheat<br>2 = Emmer wheat<br>3 = Other (specify wheat species) |
| MILLFORM | Milling form | 1 = Made from 97-100 percent semolina<br>2 = Made from whole wheat<br>3 = Blend of semolina and other (e.g., flour, with less than 97 percent semolina) |
| PROTEIN | Percent protein content "as stated on the label of the respective product" | 1 = 12.5 percent or higher protein in finished pasta<br>2 = 10.00 - 12.49 percent protein in the finished pasta |
| ADDIH | Additives | 1 = no additives<br>2 = vegetable additive (includes garlic, peppers, spices)<br>3 = egg white (less than or equal to 2%)<br>5 = combo (specify) |
| ENRICH | Enrichment | 1 = non-enriched<br>2 = vitamin-enriched<br>3 - n = Specify additional categories as required |

The physical characteristic on which we focus in this part of the brief is the coding for protein content, PROTEIN.

La Molisana made the following submissions containing information pertinent to this appeal:

- Sections B and C questionnaire response ("§§BC QR") (Jan. 3, 2020), CR 74-80, PR 120-124. In particular, Exhibit B-2 of this response relates to the protein field of the physical characteristics that form the computer control number ("CONNUM") by which all three databases are compared. We attach this exhibit to the present brief at Attachment A.

- On April 8, 2020 La Molisana expressly requested that the Department respond to specific questions about protein content. (PR 182)

- La Molisana requested that the Department allow it to file "alternative" data bases, but the Department did not allow La Molisana to do so, and expressly rejected the alternate databases filed by the other mandatory respondent. See Letter of Department of December 20, 2019 (PR111)

- In its September 30, 2020 response to the Department's Third Supplemental Questionnaire, La Molisana noted that its arguments on Semolina based on protein type had not been addressed by the Department. (Third Supplemental at 15) CR 437-446, PR 239.

- In its September 10, 2020, response to petitioner's letter of September 2, 2020, La Molisana stated in relevant part:

  > Finally, La Molisana notes that both La Molisana and Zara, at the onset of this review, requested that the Department address the protein issue in light of numerous issues as to the Department's calculation. In the previous review, the Department stated that it was unable to address the protein issue as such issue was not raised at the start of the review, but rather was raised late in the process. La Molisana (and Zara) raised this issue early in the review, but the Department has not responded to such issue beyond refusing to allow parties to put the alternate data on the record. As the Department has not permitted parties to place alternate data on the record in the event that the Department agrees with the case set forth by La Molisana and Zara, it is effectively denying La Molisana with the ability to address such issue. Accordingly, we submit that the Department must provide La Molisana with the opportunity to provide alternate data setting forth the changes which would result if La Molisana's position on protein were accepted. PR 232. (Emphasis Added).

- In La Molisana's Supplemental B&C Questionnaire response of January 27, 2020 CR 200-202, PR 147-148, La Molisana stated in relevant part:

  > Accordingly, La Molisana renews its request, as set forth in its Section B and C questionnaire response, that the Department reconsider its protein methodology, which, based on the requirements of the FDA, if properly implemented on the product label, effectively prevents the supermajority of U.S. product as being categorized as "standard" pasta as no pasta containing more than 11.6% protein can ever be properly labeled as such in a properly constructed FDA nutrition facts panel.

9

- In La Molisana's letter of January 16, 2020, PR 137. La Molisana stated in relevant part:

  In these exhibits La Molisana set forth the reasons why it believed that the Department's methodology was in error and requested that the Department reconsider its methodology. Quite contrary to "ignoring" these reporting requirements, La Molisana followed the Department's stated requirements and, during the questionnaire stage raised the "latent ambiguity" and requested that the Department reconsider its actions.

  \* \* \*

  La Molisana formally requests that the Department confirm that La Molisana has properly identified those shapes not listed on the Department list and to **reconsider its protein content requirements in light of the numerous flaws identified in the current method**.

Commerce's questionnaire has the following instruction for reporting the protein content of pasta, La Molisana §B QR (Jan. 6, 2020) at B-11, CR 75-80, PR 120-124:

> FIELD NUMBER 3.4: Protein Content
> FIELD NAME:          PROTEINH
> 1 = 12.5 percent or higher protein in finished pasta
> 2 = 10.00 - 12.49 percent protein in the finished pasta
> NARRATIVE: Identify the percentage of protein in the pasta sold, as stated on the label of the respective product, as stated on the label of the respective product {*sic*}.

La Molisana responded, *id*.:

> La Molisana has used the protein content declared on the product label. La Molisana notes several additional points about Protein and the calculation of protein content in Exhibit B-2. CR 75-80, PR 120-124.

We provide La Molisana's §B QR Exh. B-2 as Attachment A hereto. The Department failed to address these until the final results.

The record contains an extensive report concerning the protein content of pasta vis-à-vis the physical characteristics requirements of the questionnaire, the "Market Report." We provide the Market Report as Attachment B hereto. The Market Report was originally submitted by respondents Ghigi/Zara, in their December 12, 2019, response to section B of the questionnaire. PR 94-101, CR 41-48 at Exh. B-13. The Market Report is discussed in further detail below; for current purposes, it suffices to explain that −

- Through an analysis of actual purchases of pasta from four supermarkets in the Washington, DC area, it was clear that pasta with a protein content of 12.5% was standard pasta; in fact, 12.5% protein was the *minimum* accepted protein content among supermarket sellers. Moreover, pasta with a protein content greater than 12.5% was consistently sold as premium pasta.

- In its original implementation of the protein breakpoint, in AR-12,[4] Commerce relied solely on the practices of the Italian commodity exchanges, which classified semolina (the raw material for pasta) with a protein content of 12.5% or higher as premium semolina. However, during the present period of review, AR-23, the Bologna (Italy) commodity exchange set the minimum protein content for premium semolina at 13.5%. Thus, according to the Market Report, Commerce's 12.5% breakpoint no longer reflects the practice of the Italian commodity market.

- Italy and the United States have different laboratory protocols for measuring the protein content of foodstuffs, and these protocols govern the protein ratios that are required to appear on the nutrition panel of foods sold at retail. Market Report at 1-3. Consequently, pasta sold in Italy with a protein content of 12.5% on the label has a different *physical* protein content than pasta sold in the United States with a protein content of 12.5% on the label. In fact, pasta with a protein content of 12.5% on an Italian label is physically identical to a pasta with a protein content of

---

[4] *Pasta from Italy: Preliminary Results of Twelfth Antidumping Duty Administrative Review*, 74 Fed. Reg. 39,285 (Dep't Commerce Aug. 6, 2009) ("AR-12P") ; *Pasta from Italy: Final Results of Twelfth Administrative Review*, 75 Fed. Reg. 6,352 (Dep't Commerce Feb. 9, 2010) ("AR-12F"), ID Memo at comment 1 ("AR 12F IDM").

11.4% on the label of a U.S. product[5].  Therefore, as explained in the Market Report, Commerce's physical characteristic "protein" results in a *mis*match of products between markets; that is, goods with the same protein code in the two markets do not, in fact, contain the same amount of protein.

- The Market Report also sets forth the history of the protein reporting in the *Pasta Italy* cases, explaining that Commerce has been aware since at least AR-14 (2009/10) that the protein content of pasta is measured by its observed nitrogen content (Market Report Exh. 4), and that the protocols for converting the nitrogen content to protein content relied on different conversion factors in the United States and Italy, and that this was again brought to Commerce's attention in comments on Commerce's proposal regarding protein coding for CONNUM purposes submitted − and ignored by the agency − in AR-15 (Market Report Exh. 5).

The Market Report was unrebutted.  It was submitted near the outset of the proceeding, and the petitioners had ample opportunity to submit rebuttal factual evidence.  Instead, petitioners were silent.

In its preliminary results, *supra*, AR-23P, and preliminary decision memo, AR-23 PDM, *supra*, Commerce makes no mention of the protein coding issue, nor

---

[5] This is masked by the FDA Rounding rules.

does it acknowledge or reference the Market Report. *See, e.g., id.* at 15, where the "Product Comparison" analysis is devoid of any mention of either the protein coding issue or the Market Report.

La Molisana and Valdigrano both argued at length that Commerce should revisit the protein-coding issue in the final results and should adopt the schematization advocated in the Market Report. La Molisana case brief, CR 492 at 3-12, PR 259; Valdigrano case brief, PR 257, *passim*.

In the Final Results, Commerce rejected the conclusions of the Market Report, stating (IDM at 11-12):

> The Market Report data cited to in the case brief consist of pasta purchases from four supermarkets in a small geographic region of the United States. No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products. As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.

Commerce also rejected the change in practice of the Bologna Commodity Exchange, which has reset the minimum protein content for premium semolina at 13.5%, stating (IDM at 12):

> For Italy, Valdigrano cites to a screenshot in the Market Report of the Bologna Grain Exchange's website defining "superior" semolina as having 13.5 percent or greater protein content to assert that the industry standard for defining premium and standard semolina

has changed and, thus, that there is a "compelling reason," {citation omitted} for Commerce to change the breakpoint for reporting protein content. … We find that the Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina and thus that it is not a compelling reason to change the instructions for reporting protein content.

Commerce also rejected the assertion that its protein coding resulted in mismatches between U.S. and Italian pasta because the two countries have different protein-measurement standards, stating (IDM at 11, footnotes omitted):

Commerce has considered and rejected the claims regarding rounding and nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product (i.e., CONNUM), which in turn implicates the accuracy of the product comparisons (i.e., the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

Plaintiffs assert that Commerce's rationales for rejecting the proposed changes in protein coding are unsupported by substantial evidence and are arbitrary and capricious, for the reasons set forth below.

III.   **STANDARD OF REVIEW**

The Court will hold unlawful Commerce determinations that are unsupported by substantial evidence on the record or are not otherwise in accordance with law.   19 U.S.C. §1516a(b). To determine whether Commerce's interpretation and application of 19 U.S.C. §1673d(c)(5) is "in accordance with law," the courts review the statute to determine whether "Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 842 (1984).

If the statute is silent or ambiguous with respect to the specific issue, the Federal Circuit has held that *Chevron* deference is owed Commerce's statutory interpretations as to appropriate methodology. *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir. 2001). That analysis entails determining whether Commerce's construction of an ambiguous statute is "permissible." *See Chevron,* 467 U.S. at 843. A "permissible" construction is understood in terms of reasonableness; only reasonable interpretations will be upheld by the Court. *See Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996) (*'Chevron* requires us to defer to the agency's interpretation of its own statute as long as the interpretation is reasonable.").   To determine reasonableness, courts look to the express terms of the statute, the objectives of the

statute, and the objectives of the statutory scheme as a whole. *Wheatland Tube Co.*

*v. U.S.,* 495 F.3d 1355, 1361 (Fed. Cir. 2007).

Substantial evidence is "more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion."

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951), *quoting*

*Consolidated Edison Corp. v. Labor Board*, 305 U.S. 197, 229 (1938).

Furthermore, "substantial evidence" must be measured by the record as a whole,

"including whatever fairly detracts from the substantiality of the evidence."

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)

(quotations omitted).  Thus, "it is appropriate to set aside the ITA's decision when

the court 'cannot conscientiously find that the evidence supporting that decision is

substantial, when viewed in the light that the record in its entirety furnishes,

including the body of evidence opposed to {that} view.'"  *Diversified Products*

*Corp. v. United States*, 6 CIT 155, 161 (1983) *quoting Universal Camera*, 340 U.S.

at 488.

Moreover, Commerce's determination cannot be based on "isolated tidbits

of data which suggest a result contrary to the clear weight of the evidence."  *USX*

*Corp. v. United States*, 11 CIT 82, 84, 655 F. Supp. 487, 489 (1987).   The

substantial evidence standard requires more than mere assertion of 'evidence

which in and of itself justified {the determination}, without taking into account

contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (citation omitted).

Commerce also must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.")  *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

Commerce is required to objectively evaluate all data on the record.  Thus, the agency must hold its preferences to the same test as it uses to evaluate respondent's proffered data.  *See, e.g., Dorbest Ltd v. United States*, 462 F. Supp. 2d 1262, 1302 (Ct. Int'l Trade 2006) (holding that Commerce must justify its decisions).

In addition, Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information.  *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). In *Nan Ya Plastics Corp. v. United States*, 810 F.3d

1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a <u>mathematical and factual matter</u>…" (Emphasis added). To achieve this required accuracy, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) (".. .the Department has honored one of the fundamental principles underlying the trade statute –accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").

Moreover, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available…." *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001). Additionally, "to avoid distortions, the Department must consider all relevant factors, including those not present in most antidumping determinations." *Id*.

Moreover, when substantial evidence is not utilized, such action is tantamount to the use of speculation in making a determination. *See Lucent Techs., Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1327 (Fed. Cir. 2009) ("It is well established that speculation does not constitute 'substantial evidence.'" (quoting *Novosteel SA*

*v. United States,* 284 F. 3d 1261, 1276 (Fed. Cir. 2002) (internal quotation marks omitted)).

Further, it is axiomatic that Commerce may not exert its authority in an arbitrary or capricious manner.  *See, e.g., Tung Mung Dev. Co., v. United States*, 354 F.3d 1371, 1378 (Fed. Cir. 2004).  Commerce's decision will be set aside if it is arbitrary and capricious. *See, e.g., SKF USA, Inc. v. United States.* 254 F.3d 1022, 1028 (Fed. Cir. 2001). "{A} reviewing court must apply both standards {substantial evidence, and arbitrary and capricious or contrary to law}, while  "an agency's finding may be supported by substantial evidence," yet "nonetheless reflect arbitrary and capricious action." *Changzhou Wujin Fine Chem. Factory Co., Ltd. v. United States*, 701 F.3d 1367, 1377 (Fed. Cir. 2012) (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 284, 95 S. Ct. 438, 42 L. Ed. 2d 447 (1974).

## IV.   ARGUMENT: COMMERCE'S TREATMENT OF THE PROTEIN CODING IS  UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A. Contrary To Commerce's Position, Pasta with a Protein Content Of 12.5% Is Standard Pasta in Both the United States and Italy

Historically, Commerce implemented the 12.5% protein breakpoint for pasta based *solely* on the practice of the Italian commodity exchanges with regard to classification of standard semolina *versus* premium semolina.  *See*, AR-12 Final IDM, discussed *supra*.  Thus, Commerce's protein coding was done entirely

without reference to practices in the production, distribution, or sale of the finished product under review, namely, pasta.  The applicability of the semolina protein breakpoint to the finished product, pasta, is particularly questionable because the production of pasta always involves the blending of more than one semolina. *Id*. at comment 1 ("The different types of semolina are generally kept in separate storage facilities. For each batch of pasta being produced, the companies select which type of semolina to use, which regularly included blending more than one type of semolina, based on the recipe for the finished pasta.').

In light of the complete absence of any evidence in any administrative review, including AR-12, concerning the significance of pasta protein in the marketplace, the designer of the Market Report chose to tabulate representative purchases of pasta in the retail marketplace to ascertain the breakpoint between standard and premium pasta in terms of protein content, and to compare protein content against price in the marketplace.

The Market Report demonstrates that pasta with a protein content, per the label, of 12.5%, is standard pasta.

In the Market Report, the researcher bought pasta from four supermarkets in the Washington, DC suburban area, namely, Giant, Safeway, Harris Teeter, and Balducci's.  The first three supermarkets are ordinary retail chains, while Balducci's supermarket is a high-end retailer focused on the upscale market.

At each store, the researcher purchased a short cut and a long cut of each available brand.  Within the short cuts, the researcher purchased a normal short cut and a specialty short cut (e.g., farfalle), as defined by Commerce's SHAPE codes. Here is a summary of those purchases:

| Store | Brand | LONG/SHORT | Shape |
|---|---|---|---|
| **GIANT** | **(GIANT)** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | SHELLS |
| | **BARILLA** | LONG | FETTUCCINE |
| | | | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | RIGATONI |
| | **DE CECCO** | LONG | SPAGHETTI |
| | | SHORT | FUSILLI |
| | **SAN GIORGIO** | LONG | SPAGHETTI |
| | | SHORT | CAVATAPPI |
| | | | ZITI |
| **SAFEWAY** | **BARILLA** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ROTINI |
| | **DE CECCO** | LONG | SPAGHETTI |
| | | SHORT | CAVATAPPI |
| | **SAN GIORGIO** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ROTINI |
| | **SIGNATURE (SAFEWAY BRAND)** | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ROTINI |
| **HARRIS TEETER** | **BARILLA** | LONG | LINGUINE |
| | | SHORT | PENNE |
| | | | ROTINI |
| | **COLAVITA** | LONG | SPAGHETTI |
| | | SHORT | FUSILLI |
| | | | PENNE |

| Store | Brand | LONG/SHORT | Shape |
|---|---|---|---|
| | DE CECCO | LONG | LINGUINE |
| | | SHORT | PENNE RIG. |
| | HARRIS TEETER | LONG | SPAGHETTI |
| | | SHORT | BOWTIES |
| | | | ROTINI |
| | MUELLER'S | LONG | SPAGHETTI |
| | | SHORT | BOWTIES |
| | | | PENNE |
| | PRIVATE SEL (H/T PRIV LAB) | LONG | SPAGHETTI |
| | | SHORT | FARFALLE |
| | | | ZITI |
| BALDUCCI'S | BARILLA | SHORT | ZITI |
| | CELLINO | SHORT | PENNE |
| | DE CECCO | SHORT | FUSILLI |
| | DI MARTINO | LONG | LINGUINE |
| | | SHORT | FARFALLE |
| | | | PACCHERI |
| | LA MOLISANA | SHORT | RIGATONI |
| | RUSTICHELLA | LONG | LINGUINE |
| | | SHORT | PENNE |

The researcher tabulated the protein content of each purchase according to the label, and the price of each purchase.  Exhibits N−Q of the Market Report contain photographs of the packages, the nutrition panels,[6] and the register tapes of each transaction.

---

[6] Under U.S. labeling rules, the protein content is given in grams per serving.  The serving size for this measurement is 56 grams.  *See*, Market Report Exh. N at 3.  If the protein content is 7 grams, this is equivalent to 12.5% (7/56=12.5%).  As discussed herein this is an artificial number based, in part, on FDA rounding rules.

There was not a single pasta in any of the stores with a protein content of less than 12.5%.  See Market Report Exh. M at 2, showing:

| | A | B | C | D | E | F | G | H | I | J |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | ID | Store | Brand | Shape | LONG/SHORT | Weight/pack (OZ) | Protein, grams per serving | Protein % | Price, USD/LB | Price, USD/pkg |
| 4 | 01 | GIANT | SAN GIORGIO | CAVATAPPI | SHORT | 16 | 7 | 0.125 | 1.49 | 1.49 |
| 5 | 02 | GIANT | SAN GIORGIO | ZITI | SHORT | 16 | 7 | 0.125 | 1.49 | 1.49 |
| 6 | 03 | GIANT | (GIANT) | FARFALLE | SHORT | 12 | 7 | 0.125 | 1.32 | 0.99 |
| 7 | 04 | GIANT | (GIANT) | SHELLS | SHORT | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 8 | 05 | GIANT | BARILLA | FARFALLE | SHORT | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 9 | 06 | GIANT | BARILLA | RIGATONI | SHORT | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 10 | 07 | GIANT | DE CECCCO | FUSILLI | SHORT | 16 | 8 | 0.143 | 1.99 | 1.99 |
| 11 | 08 | GIANT | DE CECCCO | SPAGHETTI | LONG | 16 | 8 | 0.143 | 1.99 | 1.99 |
| 12 | 09 | GIANT | BARILLA | FETTUCCINE | LONG | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 13 | 10 | GIANT | BARILLA | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.59 | 1.59 |
| 14 | 11 | GIANT | (GIANT) | SPAGHETTI | LONG | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 15 | 12 | GIANT | SAN GIORGIO | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.49 | 1.49 |
| 16 | 13 | SAFEWAY | BARILLA | ROTINI | SHORT | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 17 | 14 | SAFEWAY | SIGNATURE (SAFEWAY BRND) | FARFALLE | SHORT | 12 | 7 | 0.125 | 1.72 | 1.29 |
| 18 | 15 | SAFEWAY | SIGNATURE (SAFEWAY BRND) | ROTINI | SHORT | 16 | 7 | 0.125 | 1.29 | 1.29 |
| 19 | 16 | SAFEWAY | BARILLA | FARFALLE | SHORT | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 20 | 17 | SAFEWAY | DE CECCCO | CAVATAPPI | SHORT | 16 | 8 | 0.143 | 2.99 | 2.99 |
| 21 | 18 | SAFEWAY | SAN GIORGIO | FARFALLE | SHORT | 12 | 7 | 0.125 | 2.39 | 1.79 |
| 22 | 19 | SAFEWAY | SAN GIORGIO | ROTINI | SHORT | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 23 | 20 | SAFEWAY | SAN GIORGIO | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 24 | 21 | SAFEWAY | DE CECCCO | SPAGHETTI | LONG | 16 | 8 | 0.143 | 2.99 | 2.99 |
| 25 | 22 | SAFEWAY | BARILLA | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 26 | 23 | SAFEWAY | SIGNATURE (SAFEWAY BRND) | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.29 | 1.29 |
| 27 | 24 | HARRIS TEETER | MUELLER'S | PENNE | SHORT | 16 | 7 | 0.125 | 1.69 | 1.69 |
| 28 | 25 | HARRIS TEETER | MUELLER'S | BOWTIES | SHORT | 12 | 7 | 0.125 | 2.25 | 1.69 |
| 29 | 26 | HARRIS TEETER | DE CECCCO | PENNE RIG. | SHORT | 16 | 8 | 0.143 | 3.19 | 3.19 |
| 30 | 27 | HARRIS TEETER | BARILLA | PENNE | SHORT | 16 | 7 | 0.125 | 1.89 | 1.89 |
| 31 | 28 | HARRIS TEETER | HARRIS TEETER | BOWTIES | SHORT | 12 | 7 | 0.125 | 1.32 | 0.99 |
| 32 | 29 | HARRIS TEETER | HARRIS TEETER | ROTINI | SHORT | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 33 | 30 | HARRIS TEETER | BARILLA | ROTINI | SHORT | 16 | 7 | 0.125 | 1.89 | 1.89 |
| 34 | 31 | HARRIS TEETER | PRIVATE SEL (H/T PRIV LAB) | ZITI | SHORT | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 35 | 32 | HARRIS TEETER | PRIVATE SEL (H/T PRIV LAB) | FARFALLE | SHORT | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 36 | 33 | HARRIS TEETER | COLAVITA | PENNE | SHORT | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 37 | 34 | HARRIS TEETER | COLAVITA | FUSILLI | SHORT | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 38 | 35 | HARRIS TEETER | BARILLA | LINGUINE | LONG | 16 | 7 | 0.125 | 1.89 | 1.89 |
| 39 | 36 | HARRIS TEETER | DE CECCCO | LINGUINE | LONG | 16 | 8 | 0.143 | 3.19 | 3.19 |
| 40 | 37 | HARRIS TEETER | MUELLER'S | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.69 | 1.69 |
| 41 | 38 | HARRIS TEETER | HARRIS TEETER | SPAGHETTI | LONG | 16 | 7 | 0.125 | 0.99 | 0.99 |
| 42 | 39 | HARRIS TEETER | COLAVITA | SPAGHETTI | LONG | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 43 | 40 | HARRIS TEETER | PRIVATE SEL (H/T PRIV LAB) | SPAGHETTI | LONG | 16 | 7 | 0.125 | 1.79 | 1.79 |
| 44 | 41 | BALDUCCI'S | CELLINO | PENNE | SHORT | 16 | 7.6 | 0.136 | 2.49 | 2.49 |
| 45 | 42 | BALDUCCI'S | RUSTICHELLA | PENNE | SHORT | 17.64 | 7.56 | 0.135 | 5.44 | 5.99 |
| 46 | 43 | BALDUCCI'S | DI MARTINO | FARFALLE | SHORT | 16 | 8 | 0.143 | 3.29 | 3.29 |
| 47 | 44 | BALDUCCI'S | DI MARTINO | LINGUINE | LONG | 16 | 8 | 0.143 | 3.29 | 3.29 |
| 48 | 45 | BALDUCCI'S | RUSTICHELLA | LINGUINE | LONG | 17.64 | 7.56 | 0.135 | 5.44 | 5.99 |
| 49 | 46 | BALDUCCI'S | DI MARTINO | PACCHERI | SHORT | 17.6 | 8 | 0.143 | 3.29 | 3.29 |
| 50 | 47 | BALDUCCI'S | LA MOLISANA | RIGATONI | SHORT | 16 | 8 | 0.143 | 2.49 | 2.49 |
| 51 | 48 | BALDUCCI'S | BARILLA | ZITI | SHORT | 16 | 7 | 0.125 | 1.99 | 1.99 |
| 52 | 49 | BALDUCCI'S | DE CECCCO | FUSILLI | SHORT | 16 | 8 | 0.143 | 2.99 | 2.99 |

Furthermore, there was a clear relationship between protein content and price, *id.* at 1:



The figure shows that all of the pasta with 12.5% protein sold at under $2.40/lb, with the preponderance at less than $2.00/lb, while the higher-protein pasta, at 14.25%, sold predominantly *above* $2.40/lb.  There is an undeniable breakpoint between the 12.5% pasta and the greater-than-12.5% pasta.  And there is no pasta with protein content under 12.5%.  In fact, as discussed below, because of the rounding rules, any pasta with a protein content of more than 11.6% would round to 12.5%.

Thus, the Market Report shows that, in the four DC-area supermarkets, pasta with a protein content of 12.5% is standard pasta and indeed, 12.5% is the minimum protein content for retail pasta.

The petitioners had ample opportunity to provide a rebuttal factual submission. If the petitioners had reason to believe that the DC-area supermarkets were not representative of the United States as a whole, they were welcome to provide such a rebuttal submission. If they had reason to believe that the protein content of 12.5% does not reflect standard pasta in the United States, they were welcome to provide supporting documentation. If they had any methodological concerns regarding the researcher's approach, they were welcome to provide those concerns in comments for the record. Petitioners provided no such material. *See generally*, Petitioners' letter of December 19, 2020, PR 105, 108-110. Petitioners' failure to provide any rebuttal factual information or comments affirms the reliability and accuracy of the Market Report.

The issue was fully briefed by the parties. Valdigrano explained in detail the methods and conclusions of the Market Report, while La Molisana presented its parallel argument concerning the protein field. CR 492, PR 257 (Valdigrano case brief); PR 259 (La Molisana case brief). In their rebuttal brief, the petitioners did not question the accuracy or substance of the Market Report, but, rather, urged

Commerce to retain its protein coding on grounds of "transparency" and "consistency."  Petitioners' rebuttal brief for Valdigrano, *passim*, PR 263.

In its final IDM, Commerce explained (at 11-12, footnotes omitted):

> The U.S. section of the Market Report consists of labels and receipts for pasta purchased from Washington DC metro area supermarkets along with charts illustrating the relationship between protein content and price. Valdigrano asserts that these data show 12.5 percent protein content is a floor for pasta sold in the U.S. market, and that the true breakpoint between standard and premium pasta is 13.5 percent protein content. We do not find this evidence sufficient to change our existing coding for protein content. The Market Report data cited to in the case brief consist of pasta purchases from four supermarkets in a small geographic region of the United  States. No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products. As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.

Commerce's reasons for declining to implement the consequences of the Market Report constitute an arbitrary and capricious refusal to acknowledge undisputed facts of record and the absence of any facts to the contrary.

In *Pesquera Mares Australes Ltda. v. United States,* 266 F.3d 1372, 1379 (Fed. Cir. 2001), the Court held that "merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if

those minor differences are not commercially significant."   Thus, "commercial significance" is the principal criterion by which to decide whether differences between products are "minor."   The Market Report makes it clear that the protein content of pasta is commercially significant, and that there is a clear pricing breakpoint between pasta with a protein content of 12.5% and pasta with a protein content above 12.5%.

In *Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275 (Ct. Int'l Trade 2008), the Court upheld Commerce's practice "not to modify {a given model-match} methodology in subsequent reviews unless there are 'compelling reasons' to do so."   Among those compelling reasons is "greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…"  577 F. Supp. 2d at 1277.  A further compelling reason is "that the existing model-match criteria 'are not reflective of the merchandise in question…'" *Id*.

Commerce asserts that there are no "compelling reasons" to change the protein coding such that pasta with 12.5% protein is considered standard, rather than premium, pasta, because purchases from only four supermarkets in a single geographic area may not be "reflective of the entire U.S. market" (IDM at 11) and because the Market Report fails "to address the potential for manipulation in choice of purchases."  *Id*.  Neither rationale satisfies the applicable criteria.

As for whether the purchases in the Market Report reflect the entire U.S. market, Commerce's suggestion that the DC suburban supermarkets might operate under some schematization of pasta pricing different from other parts of the United States is pure speculation. The petitioners never proposed such a proposition of fact, nor did the petitioners exercise their right to impugn the geographic representativeness of the Market Report by making a similar analysis of other metropolitan markets − New York or Chicago or anywhere else. There was no secret to the methodology of the Market Report: simply send someone to a sample of local supermarket chains, buy one long cut, one short cut and one specialty short cut from each, and tabulate the results. This was surely not beyond the petitioners' capabilities; after all, the petitioners consist of the U.S. industry and, as such, they are selling into every market in the United States.

Commerce must abide by the fact that petitioners did not provide any rebuttal factual information. Commerce's supposition that the Market Report may not be representative of the U.S. market as a whole is unsupported by any evidence whatsoever. Indeed, if Commerce, itself, had any questions about the representativeness of the Report, it could have asked the parties to provide further information, say, relating to other geographic areas. What Commerce cannot lawfully do is sit back and do nothing, then − in the final results, with no analysis of the issue in the preliminary results, no supplemental questions, and no apparent

attention to the issue throughout the review − *ipse dixit* find that the data in the Market Report might not reflect the United States as a whole.

As for whether the author of the Market Report may have manipulated the selection of pasta purchased, Commerce provides no evidence of any such manipulation. In fact, the Report shows that the research bought one short cut, one specialty short cut, and one long cut of each brand in each supermarket. Commerce's speculation that there could have been some manipulation in this selection is entirely unfounded. In any event, if the Market Report had relied on a manipulation of selections, petitioners could readily have provided rebuttal factual information to show this to be the case. In the absence of such information, Commerce cannot lawfully claim that the selections of the Report might have been manipulated. Commerce may not rely on speculation when making factual determinations. *See, China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771 F. Supp. 407 (Ct. Int'l Trade 1991) (*CNART*).

Substantial evidence review requires that the court assess whether the agency action is reasonable given the record as a whole. *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006). The record as a whole contains the Market Report and absolutely no evidence to the contrary. The Final Results fail the *Nippon Steel* test.

Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Huaiyin Foreign Trade Corp. (30) v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Commerce cites no evidence whatsoever to support its speculation that the DC suburban supermarkets might not be representative of the U.S. retail environment as a whole vis-à-vis pasta pricing and the undisputed fact that pasta with 12.5% protein is standard pasta, not premium.

In determining whether substantial evidence supports the agency's determination, the court must consider "the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)); *Mitsubishi Materials Corp. v. United States*, 17 C.I.T. 301, 304, 820 F. Supp. 608, 613 (1993).  Here, there is no evidence whatsoever that detracts from the substantiality of the evidence in the Market Report.

The Court's function is not to re-weigh the evidence, but to ascertain whether the agency's determination is supported by substantial evidence on the record. *Matsushita Elec. Indus. Corp. v. United States*, 750 F.2d 927, 936 (Fed. Cir. 1984).  Here, it is straightforward for the Court to make this determination. Commerce's does not even pretend to have any authority other than *ipse dixit* to

support its assertion that the author of the Market Report may have manipulated the selection of products purchased or that the DC suburbs are somehow discontinuous from the U.S. pasta market as a whole.   Commerce's approach compels the conclusion that the Final Results are not supported by substantial evidence on the record and are arbitrary and capricious.

**B. <u>Contrary To Commerce's Position, The Minimum Protein Requirement for Premium Semolina Is 13.5%</u>**

Historically, Commerce set the 12.5% breakpoint for premium pasta based on the breakpoint between standard semolina (with a protein content of less than 12.5%) and premium semolina (with a protein content of 12.5% or higher) utilized by three Italian commodity exchanges at the time of the AR-12 review, as discussed *supra*.

The Market Report at Exh. K provides proof that the current (AR-23) minimum protein content for premium semolina is 13.5%.   Petitioners failed to make any rebuttal submission nor to provide evidence that would impugn the exhibit in the Market Report.

Commerce's conclusion that "the Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina" (IDM at 12) is unsupported by substantial evidence and therefore arbitrary and capricious.   Commerce cites no evidence in the current

record − nor in any other record − to support its speculation that the practice of the Bologna commodity exchange is not representative of the Italian commodity exchanges overall. Petitioners' failure to provide any evidence of such different treatment in different commodity exchanges compels Commerce to accept the finding of the Market Report. There is simply no reason to disbelieve the exhibit in the Market Report, and indeed, Commerce does not dispute its correctness. Nor − contrary to Commerce's speculation − is there any reason to believe that a different standard prevails in any other commodity exchange.

The legal arguments are the same as those in the previous section. This Court has an obligation to determine whether Commerce's conclusion is based on substantial evidence. *Matsushita, supra.* Since there is no evidence at all supporting Commerce's position that the researcher of the Market Report may have manipulated the selection of items for the study and there is affirmative evidence that the selection was reasonable, plaintiffs ask this Court to find Commerce's decision unsupported by substantial evidence.

### C. Commerce's Protein Coding Causes Physically Dissimilar Products in The Two Markets to Be Treated as Identical, And Causes Physically Identical Products to Be Treated as Dissimilar

The law requires Commerce to base its comparisons among prices and costs on the *physical characteristics* of the goods. Here, Commerce's protein coding

practice causes dissimilar goods to be treated as identical and causes identical goods to be treated as dissimilar in the respective markets.

The statute provides:

> The term "foreign like product" means merchandise in the first of the following categories in respect of which a determination for the purposes of subtitle B of this title can be satisfactorily made:
>
> (A) The subject merchandise and other merchandise, which is identical in *physical characteristics* with, and was produced in the same country by the same person as, that merchandise.

19 U.S.C. §1677(16)(A) (emphasis added). Thus, the statute speaks in terms of "physical characteristics" of the goods under consideration, not linguistic descriptions.

In the AR-15 ID Memo, where the current practice of reporting PROTEIN strictly per the label on the goods was first implemented, Commerce explains that reporting per the label is intended to ensure that goods that are *physically identical* will have the same protein code:

> {Respondent} Rummo argues that, pursuant to the statute, 19 U.S.C. §1677(16)(A), the Department is required to consider physical characteristics in determining which comparison market sales to match to U.S. sales and asserts that a packaging label is not a physical characteristic of the pasta. Rummo's argument is misplaced. The Department did not say that a label is itself a physical characteristic; rather *the Department relies on the protein content information reported on the label to identify the physical characteristic of protein.*

*Pasta From Italy: Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010–2011*, 78 Fed. Reg. 9,364 (Dep't Commerce Feb. 8, 2013), ID Memo at comment 4 (emphasis added) ("*AR-15F IDM*").

Thus, the statement of protein content on the label is not an end in itself; it is a proxy for the physical characteristic of protein in the pasta.

In both the United States and Italy, the protein content of foods, including pasta, is calculated according to the observed amount of nitrogen in the article, following the laboratory discoveries of Danish chemist Johan Kjeldahl in 1883. *See*, Market Report at 1-2 and exhibits cited therein.  In the United States, the protein content is measured as N (the nitrogen content) times 6.25, while in Italy, the protein content is measured as N times 5.7 (*id*.):

$Protein_{Italy} = N * 5.7$

$Protein_{USA} = N * 6.25$

Thus, pasta with a nitrogen content of 1.2 would have a protein content of 6.84 (1.2 * 5.7 = 6.84) grams under the Italian protocol and of 7.5 (1.2* 6.25 = 7.5) grams under the U.S. protocol.  Applying this to the 56-gram serving size produces a percentage of 12.21% ( 6.84/56 = .1221) under the Italian protocol and a percentage of 13.39% (7.5/56 = .1339) under the U.S. protocol.  The identical

merchandise would thus have different protein content and different classifications based on the ingredient panels in the two markets.

These respective protein measurements are used to report the protein content on the nutrition panel which the law requires on foodstuffs sold at retail. Consequently, these measurement protocols underlie the protein coding of the antidumping questionnaire, since the questionnaire requires reporting "as stated on the label of the respective product," *supra*.

The difference in measurement protocols causes goods with the same *physical* protein content to be reported with *different* protein coding in the U.S. and HM sales databases. This results in comparisons between databases in which identical products are treated as dissimilar and dissimilar products are treated as identical. Such differences result in a comparison which is neither transparent nor consistent.

Commerce has long been aware of this disparity in protein measurements between markets but has consistently chosen to ignore it. In AR-14 − two periods of review after Commerce first implemented the PROTEIN reporting field − respondent Tomasello provided a detailed explanation of the disparity in protein measurement protocols between the U.S. and Italian markets, supported by a 10-page exhibit containing technical information about the Kjeldahl measurement process and the difference in protocols between the two markets. Market Report

Exh. D.  In AR-15 − the very same review in which Commerce decided that protein content must be reported in accordance with the information on the nutrition panel of the retail package − respondent Granoro provided detailed comments explaining why this methodology would result in the treatment of identical goods as dissimilar.  Market Report Exh. E.  Granoro provided those comments in response to Commerce's requests for comments on precisely this issue in AR-15.  *Id.*  Notably, in neither of the IDMs of the two reviews did Commerce make any mention of this issue.  *AR-12F IDM, supra; AR-15F IDM, supra.*

Thus, for nearly a decade, Commerce has been apprised of the inconsistency arising from its protein coding practice, but it has nevertheless continued to ignore the issue whenever possible and to reject any change − on the ironic ground of the need for consistency − when ignoring the issue was impossible.  *See*, *Final Results of the 22nd Administrative Review of the Antidumping Duty Order on Pasta from Italy; 2017-2018,* 85 Fed. Reg. 2714 (Dep't Commerce Jan. 16, 2020), *sub judice*, *Zara S.p.A. et al. v. United States,* C.I.T. Consol. Ct. No. 20-00023, IDM at comment 1.

In *Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270, 1275 (Ct. Int'l Trade 2008), the Court upheld Commerce's practice "not to modify {a given model-match} methodology in subsequent reviews unless there are 'compelling

reasons' to do so."   Among those compelling reasons is "greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…"  577 F. Supp. 2d at 1277.  A further compelling reason is "that the existing model-match criteria 'are not reflective of the merchandise in question…'" *Id*.

In the IDM under appeal, Commerce decided against changing its protein coding on the following rationale (IDM at 10, footnotes omitted):

> Commerce has considered and rejected the claims regarding … nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product (i.e., CONNUM), which in turn implicates the accuracy of the product comparisons (i.e., the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

Thus, it is Commerce's position that "transparency and consistency" are more important than accuracy.   This, however, cannot possibly be a correct statement of the law; in *Fagersta*, the Court explained that the coding of physical characteristics must "be reflective of the merchandise in question."  Moreover, a

"compelling reason" to change the model-matching reporting is presented when a change would result in a "greater accuracy in comparing foreign like product to the single most similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…"

In this appeal, we must take Commerce at its word: the agency's decision to rely on the figure on the ingredient panel is made for reasons of "transparency and consistency." Commerce has proffered no other rationale. But this rationale is inconsistent with the requirement of 19 U.S.C. 19 U.S.C. §1677(16)(A) that product comparisons reflect the "physical characteristics" of the goods, and it is likewise inconsistent with *Fagersta*, according to which compelling reasons to change a coding field for physical characteristics include "greater accuracy" and consistency between the coding and the physical attributes of the goods in question. As we summarized above, identity between labels is not the goal of the coding; the identity between labels is intended to reflect an identity between the physical content of the packages. Because the labels have different meanings in the two markets, the labels are not an apt proxy for the product.

As the Federal Circuit has explained, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available…." *Thai Pineapple, supra*, 273 F.3d 285. This is precisely the case here. As in *Thai Pineapple*, it is the role of the Court to

determine whether Commerce's "application of a particular methodology" is reasonable. Here, it is plainly unreasonable for Commerce to rely on "transparency and consistency" as justifying a methodology that results in the treatment of physically identical goods as dissimilar and dissimilar goods as if they were identical. Commerce's methodology is arbitrary and capricious and cannot stand.

Plaintiffs therefore ask this Court to find that Commerce's instruction for protein coding is unlawful insofar as it results in physically identical goods being reported as dissimilar and in dissimilar goods being reported as identical, in violation of the statute and precedent.

### D. The Court Determination in *Ghigi 1870 S.p.A. et al. v. United States*, Has No Impact on This Matter

The Court of International Trade issued a decision on November 30, 2021 in *Ghigi 1870 S.p.A. et al. v. United States*, Slip Op. 21-159 (Nov. 30, 2021) in which the plaintiffs had raised the issue of protein content in their pleadings before the Court. The issue had not been raised in the Administrative action until after verification. (Slip Op. at 7-8). The Court ultimately did not consider the substance of the argument as such argument had not been raised in a timely fashion. (Slip Op. at 22-23). This tracked the adminsitrative determination in which the Department rejected protein issue as it was not raised in the questionnaire stage. The Department stated:

It is Commerce's long-standing policy to uphold transparent and consistent definitions for physical characteristics. It was incumbent upon Ghigi/Zara to raise the issue of a "latent ambiguity" in Commerce's coding of physical characteristics regarding protein content at the questionnaire stage, not in protest later in the review in response to a verification request for accurate sales data.

*Issues and Decisions Memorandum* for the 7/1/17 – 6/30/18 Administrative Review (Bar Code 3929321 at page 9).

In contrast, in this review, the protein issue was presented early in the review, raised by both La Molisana, in La Molisana's initial questionnaire response and by the other mandatory respondent, early in the questionnaire process.   In other words, both mandatory respondents, aware of the Department's admonishment in the prior review, raised this "latent ambiguity" in the questionnaire stage. Furthermore, La Molisana did not simply present and drop this issue, but rather continued to file comments on this issue and continued to press the Department to address this issue.  As noted above, La Molisana raised this issue with the Department no less than 7 times.   Notwithstanding these substantial efforts, the Department did not address this issue until the final results. While La Molisana did not present an alternate data base with the alternate protein classifications, this is because the Department had rejected such alternate classification data supplied by the other mandatory respondent at the threat of AFA and the domestic industry falsely asserted to the Department that La Molisana had

ignored the protein and shape requirements.[7]

Accordingly, as the protein issue was not properly before the Court in **Ghigi** as the underlying facts were different, the **Ghigi** decision has no impact on this case, quite to the contrary, the Ghigi decision supports the proposition that this issue has not previously been considered by the Court.

## V.    ARGUMENT:    COMMERCE'S REFUSAL TO ADJUST THE PROTEIN CONTENT FOR SCALAR DIFFERENCES IS UNSUPPORTED BY SUBSTANTIAL EVIDENCE

### A.    Commerce Must Compare Products Using the Same Scale

In the issues and decisions memorandum, the Department stated in relevant part:

> Commerce has considered and rejected the claims regarding rounding and nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," **we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product** (i.e., CONNUM), which in turn implicates the accuracy of the product comparisons (i.e., the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

---

[7]  See Letter from petitioner to the Department of January 15, 2020.

The Department's statement displays a fundamental misunderstanding as the operation of "scales" and "measures".   As discussed below, adjusting protein values to the same scale **is not**, in fact, relying on values not shown on the packaging label, but rather is simply converting such values to a uniform measure. In other words, even with the conversion to a uniform scale, the reported value is still the value reported on the label.

This is, ultimately, a very simple issue as to comparing products using the same scale.  Specifically, as discussed above, the U.S. FDA rules[8] calculate protein content by multiplying the nitrogen content by 6.25 while the Italian standard calculates protein content by multiplying the same nitrogen content by 5.7.  Thus, a product with 1.2 nitrogen, would be found to have "7.5" grams of Protein using the U.S. standard and "6.84" grams of protein using the EU standard.

We submit that an accurate comparison is between the actual **physical** properties, and not simply comparing numbers generated on two different measuring scales.  We submit that in comparing two or more products, the same measuring scale must be used.   In this case, the common factor with respect to protein is, ultimately, the **nitrogen content**.  This is readily identifiable, and the physical properties can be readily ascertained and compared.   The Department

---

[8] 21 CFR 101.9(c)(7)

must adjust the calculation of the CONNUM to ensure that comparisons are made using the same scale.

This is not a difficult concept. The conversion factors from nitrogen content to grams of protein are long established by science. Such conversions are similar to other conversions of information to the same scale for weights and measures and temperature. For example, simply reporting that substance A has a temperature of 32 degrees and substance B has a temperature of 32 degrees does not mean that these two substances have the same physical temperature. 32 degrees using the Fahrenheit scale is freezing. 32 degrees using the Celsius scale is nearly 90 degrees Fahrenheit, the temperature of a summer day in New York City.

The Department also converts, or requires parties to convert, weights from the Metric system to the Avoirdupois (English) system and vice versa. (See Initial Questionnaire at page G-4). There is no rational reason for the Department to refuse to convert the protein content by applying a similar constant.

No usable analysis would compare substances measured using different scales without ascertaining the scale and comparing the substances using a common scale. However, as with the adjustments for quantity or temperature, the adjustment is a simple mathematical application of a known constant. There is no rational reason for the Department to convert weights to and from the Metric

system to the Avoirdupois (English) system, but to refuse perform similar conventions for protein content applying a similar constant.  Simply put, the purpose of the Department analysis is to accurately characterize the product and provide appropriate comparisons.  By not adjusting for the difference in scale, the comparison is as accurate as claiming that the freezing point and the temperature of a summer day in New York City are the same.   They are clearly not, and in a similar fashion, a comparison of protein levels without a scalar adjustment is inaccurate, and frankly, valueless.

As noted by the Federal Circuit in **Nan Ya Plastics Corp. v. United States**, 810 F.3d 1333 (Fed. Cir. 2016) "Our case law and the statute thus teach that a Commerce determination (1) is "accurate" if it is correct as a **mathematical and factual matter** . . ." **Nan Ya** at 1344 (Emphasis Added).  In this case, refusing to convert the protein to the same scale means that the protein content used in the analysis is not correct as a mathematical and factual matter, but rather is necessarily different.

Accordingly, the Department's refusal to take into account these scalar differences and rely upon unadjusted numbers of different scales is simply not correct.  The Department's model match methodology cannot ignore basic laws of physics.  In this case, the common factor with respect to protein is, ultimately, the nitrogen content.  To the extent that the Department continues to set a standard for

protein based on the percentage of protein, it must first adjust the reported grams of protein to a common scale just as the Department requires the adjustment of weight to a single scale – whether the avoirdupois system (pounds/ounces) or the metric system (kilograms/grams). Absent such adjustment, the absurd circumstance will exist where identical product will be treated differently purely because of scalar differences. Such conversion would retain the use of the values on the Nutrition Fact Panel of the label, the stated goal of the Department, and would be no less transparent or consistent and would at the same time be more accurate.

The legal arguments are the same as those in the previous section. This Court has an obligation to determine whether Commerce's conclusion is based on substantial evidence. *Matsushita, supra.* Since there is no evidence at all supporting Commerce's position that protein is calculated using the same standards there is overwhelming evidence that the decision not to adjust protein content to the same scale was not reasonable, plaintiffs ask this Court to find Commerce's decision unsupported by substantial evidence.

## VI.   ARGUMENT: COMMERCE CANNOT IGNORE THE IMPACT OF THE FDA NUTRITION ROUNDING RULES.

When the Department required respondents to use the Nutrition Facts Panel values for reporting protein content, the Department failed to take into account the

impact of FDA rounding rules. While, at first glance, the Nutrition Facts Panel (NFP) would appear to provide sufficient information on which to base a protein content determination, the actual rounding rules and reporting requirements result in significant distortion. Critically, such rounding masks the true protein content and results in comparisons which are not transparent and consistent. Due to rounding and the limitations of the NFP, the NFP does not, in fact, provide an accurate basis for determining the protein content of the pasta.

As part of an FDA initiative, standardized food labeling is now required for food products sold at retail. This standardized labeling includes requirements for both the "Principal Display Panel" ("PDP") and the "Food Nutrition Panel" ("FNP")[9]. These requirements are the result of "The Nutrition Labeling and Education Act (NLEA)".[10] As part of this, the law and implementing regulations both standardized serving sizes by establishing reference amounts and set forth specific rules for rounding of nutritional values to ensure the reported data is clear to the customer. In the case of Pasta, the reference amount has been set at 2 ounces/56 grams and in the case of protein, the rule is that the number of grams per serving must be rounded to **the nearest whole gram** and that **fractional grams**

---

[9] See 21 C.F.R. 101.1 and 21 C.F.R. 101.9
[10] Public Law 101-535, 1990.

**cannot be reported**[11].   This means that it is impossible to classify pasta as type 2 if it has a protein percentage, based on the U.S. NFP,  from 11.6 to 12.48% as Type 2[12].   All such pasta, solely due to rounding rules, is reported with a protein content of 7 grams per each 56-gram serving which the Department has interpreted as 12.5% and as Type 1.   In other words, by not taking into account the FDA rounding rules, the Department has effectively moved the dividing line for standard and premium pasta from 12.5 grams to 11.6 grams rather than adjusting the dividing line to 13 or 13.5% as discussed above.

This is illustrated by the following table:

| Serving Size | 56 g | 56 g | 56g | 56g | 56g |
|---|---|---|---|---|---|
| Actual Grams | 6.51 | 6.99 | 7.49 | 7.51 | 7.99 |
| Actual Percentage | 11.63% | 12.48% | 13.37% | 13.41% | 14.27% |
| Reported as grams | 7 | 7 | 7 | 8 | 8 |
| Reported Percentage | 12.50% | 12.50% | 12.5% | 14.3% | 14.3% |

[11] The relevant regulation states:

(7) "Protein": **A statement of the number of grams of protein in a serving, expressed to the nearest gram**, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. * * * Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used. (21 CFR 101.9(c)(7) (Emphasis Added).

[12] To phrase it another way, under the FDA labeling rules, Pasta with a 12% protein content would contain 6.72 grams of protein.  Under FDA rules, such value would necessarily be rounded up to 7 grams for reporting on the label and the result would be a reported 12.5% protein level.

| Actual Protein Code | 2 | 2 | 1 | 1 | 1 |
| Department Protein Code | 1 | 1 | 1 | 1 | 1 |

This rounding error in grams of protein is further magnified by the fact that the "serving size" on the package is also a rounded number. One pound contains 453.592 grams. Divided into 8 equal servings, this is a value of 56.74 grams. Using 56.74 grams (or a rounded up 57 grams) also changes the results as illustrated as follows:

| Serving Size | 56.74 g | 56.74 g | 56.74g | 56.74g |
|---|---|---|---|---|
| Actual Grams | 6.51 | 6.99 | 7.51 | 7.99 |
| Actual Percentage | 11.47% | 12.32% | 13.24% | 14.08% |
| Reported as grams | 7 | 7 | 8 | 8 |
| Reported Percentage Using Reported Protein | 12.34% | 12.34% | 14.10% | 14.10% |
| Actual Protein Code | 2 | 2 | 1 | 1 |
| Department Protein Code | 1 | 1 | 1 | 1 |

It is thus clear that the use of the FDA nutrition facts standards because of rounding is neither transparent nor consistent and produces results which mask the true protein content and which, without adjustment, produces inaccurate and unreliable results that do not reflect the actual protein content. As is clear from the data, the FDA rounding rules result in the actual "break point" between standard and premium pasta as 11.6%, rather than 12.5% as it is impossible, using the FDA rounding rules, for pasta with a protein percentage of greater than 11.6% to be classified as standard pasta.

Commerce must make its decision based on a fair and balanced comparison of the data.  A comparison which is not fair or balanced is inherently arbitrary and capricious.  Commerce also must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.")  *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

The law and precedent also make it clear that Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information.  *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013). In *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a mathematical and factual matter…"  (Emphasis added).  To achieve this required accuracy, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir.

2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) ("...the Department has honored one of the fundamental principles underlying the trade statute –accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").

## VII.   ARGUMENT: THE DEPARTMENT MUST ADJUST THE RATE FOR VALDIGRANO

The Department must adjust the rate which applies to non-mandatory respondent Valdigrano.   In its determination, the Department decided to apply the rate assigned to mandatory respondent La Molisana to Valdigrano as this was the only rate calculated in this review which was not 0% or AFA.   In the event that this matter is remanded to the Department, and a new rate is calculated for La Molisana, such rate should also be assigned to Validigrano.   The inclusion of the rate for the other mandatory respondent in the calculation of the rate for Validgrano would not be appropriate as it was calculated solely on the basis of adverse facts.

## VIII.   CONCLUSION

La Molisana and Valdigrano therefore respectfully request that this Court grant its motion for Judgment on the Agency Record and remand this case to Commerce with instructions consistent with the points set forth in this memorandum.  Specifically, the Court should find:

That the Department's calculation of the protein content for purposes of the CONNUM is inaccurate as it does not properly reflect the protein content of standard and premium pasta;

That the Department's refusal to adjust the protein content for scalar differences is unsupported by substantial evidence as absent such adjustment, the calculation is not "correct as a mathematical and factual matter";

That the Department's refusal to take into account impact of the FDA nutrition rounding rules results in comparisons that are not correct to a "mathematical and factual matter" and effectively changes the standard from 12.5% to 11.6% solely because of such rounding; and

That the Department must recalculate the rate for non-selected respondent Valdigrano based on any revised rate which should apply to La Molisana as a result of this litigation.

By making these changes, the Court will correct clear errors made by the Department in its calculation of the final results for La Molisana.

Respectfully submitted,

/s/ David Craven
David Craven

Counsel to *La Molisana S.p.A.* and *Valdigrano di Flavio Pagani S.r.L.*

Dated: December 28, 2021,

## **List of Attachments**

| Att. No. | Name |
|---|---|
| A | Exhibit B-2 from La Molisana's Section B Questionnaire Response of January 6, 2020 |
| B | Exhibit B-13 from Zara/Ghigi Section B Questionnaire Response of 12/13/2019 |

Exhibit B-2 from La Molisana's Section B
Questionnaire Response of January 6, 2020

Exhibit B-2
Protein Content

Public
Version

Exhibit B-2

Protein Content

For purposes of the initial response, La Molisana has used the nutrition facts panel on the package to calculate the protein percentages.   However, as discussed herein, due to the nature of the nutrition facts panel and other incontrovertible facts,  this is not necessarily an accurate representation of the Protein Content.   The Department should consider these arguments and determine whether an adjustment to the method of calculation is warranted.  These comments are divided into two areas --   Accuracy of Nutrition Facts Panel Information and Methods of Calculating Protein.  These are two independent sets of information that warrant a change in Department practice.

Nutrition Facts Panel:

As part of an FDA initiative under *The Nutrition Labeling and Education Act* (NLEA)(Public Law 101-535)(1990) standardized food labeling is now required for food products sold to the consumer at retail.   This standardized labeling includes requirements for both the "Principle Display Panel" ("PDP") and the "Food Nutrition Panel" ("FNP").       As part of this, the law both standardized serving sizes by establishing reference amounts for various food products and set forth specific rules for the declaration of nutritional values.

In the case of Pasta, the reference amount has been set at 2 ounces[1] and in the case of protein, the rule is that the number of grams per serving must be rounded to the nearest whole

---

[1] The reference amount is set at 2 ounces.  For purposes of the Nutrition Fact Panel, 2 ounces is designated as being 56 grams.  The regulation states:
   viii) For nutrition labeling purposes, a teaspoon means 5 milliliters (mL), a tablespoon means 15 mL, a cup means 240 mL, 1 fl oz means 30 mL, and 1 oz in weight means 28 g.  21 CFR 101.9(b)(viii).

Exhibit B-2
Protein
Page 2

gram[2] and that fractional grams cannot be reported.    As explained below, this means that it is

actually impossible for a seller of pasta to sell pasta, using such established values, to report Pasta

with a protein percentage from 11.6 to 12.48% as Type 2[3].    All such pasta is reported with a value

which the Department has interpreted as 12.5% and as Type 1.

This is illustrated by the following table:

| Serving Size | 56 g | 56 g | 56g | 56g |
|---|---|---|---|---|
| Actual Grams | 6.51 | 6.99 | 7.51 | 7.99 |
| Actual Percentage | 11.63% | 12.48% | 13.41% | 14.27% |
| Reported as grams | 7 | 7 | 8 | 8 |
| Reported Percentage | 12.50% | 12.50% | 14.3% | 14.3% |
| Actual Protein Code | 2 | 2 | 1 | 1 |
| Department Protein Code | 1 | 1 | 1 | 1 |

        This error is further magnified by the fact that the "serving size" on the package is also a

rounded number.   One pound contains 453.592 grams.    Divided into 8 equal servings, this is a

value of 56.74 grams.    Using 56.74 grams also changes the results as illustrated as follows:

| Serving Size | 56.74 g | 56.74 g | 56.74g | 56.74g |
|---|---|---|---|---|
| Actual Grams | 6.51 | 6.99 | 7.51 | 7.99 |
| Actual Percentage | 11.47% | 12.32% | 13.24% | 14.08% |

---

[2] The relevant regulation states:
(7) "Protein": **A statement of the number of grams of protein in a serving, expressed to the nearest gram**, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. * * * Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used. (21 CFR 101.9(c)(7) (Emphasis Added).
[3] To phrase it another way, under the FDA labeling rules, Pasta with a 12% protein content would contain 6.72 grams of protein.  Under FDA rules, such value would necessarily be rounded up to 7 grams and the result would be a reported 12.5% protein level.

Exhibit B-2
Protein
Page 3

| Reported as grams | 7 | 7 | 8 | 8 |
|---|---|---|---|---|
| Reported Percentage | 12.34% | 12.34% | 14.10% | 14.10% |
| Actual     Protein Code | 1 | 1 | 1 | 1 |
| Department Protein Code | 1 | 1 | 1 | 1 |

It is thus clear that the use of the FDA label data without adjustment produces inaccurate results.   This is further illustrated by consideration of the protein code for the same product sold in the U.S. and other markets.   The brand [brand] is produced from the type 02 Semolina.   The nutrition information on the [brand] brand sold to other markets is reported per 100 grams, and shows that the [brand] brand has a protein content of 12%.   The same product sold to the U.S. market in U.S. packaging would result in a reported rounded protein of 7 grams or 12.5%.   Thus the same product would be in different CONNUM's based merely on the rounding rules for the packages.

This situation also exists for product which bears a non-U.S. label, but which is sold to the U.S. market and has a U.S. label added.  Such product could have the anomalous situation of having the Non-U.S. Nutrition information placing the product in category 2 while the U.S. added label would place the product in category 1.  Placing the product sold to the U.S. market with a 7 gram protein reported in the NFP would create the absurd situation where the bag would bear on it accurate information placing the product in two different protein categories.

Thus, based on the foregoing, it is clear that the use of the NFP and the standardized serving size results in inconsistencies and inaccuracies in the determination of pasta quality and results in errors in comparing CONNUM's.  This can be adjusted by either allowing the use of the actual

Exhibit B-2
Protein
Page 4

protein content (and adjusting the grams per KG) or by using the actual 2 ounce weight rather than

a uniform weight.

***Testing Standard***

In addition to the very serious issue raised by the FDA labeling issues, a second serious

issue is raised by the different standards for determining Protein levels.   This has been discussed

in copious detail by the other mandatory respondent in this review – Ghigi/Zara – and we adopt

by reference their argument and only provide a brief summary of the argument.   The essence of

the argument is that U.S. rules calculate protein for purposes of the NFP by multiplying the

nitrogen content by 6.25[4] while the Italian standard measures the same nitrogen content by 5.7.

The net result is that the two different standards result in different nitrogen "levels" for the same

product and that in order to compare the Metaphorical Apple to the Metaphorical Apple, the

numbers should be place on the same scale.  This is not a foreign concept.   A temperature of 30

degrees has very different impacts if measured in Kelvin, Fahrenheit, Celsius or Rankine[5].    The

comparison of two numbers without scalar adjustments would produce absurd results.

Based on the foregoing, La Molisana submits that the Department needs to reconsider its

methodology for determining the protein code in order to increase the accuracy of any margin and

otherwise avoid the issues raised by the current methodology.

---

[4] See 21 CFR 101.9(c)(7).
[5] 30 Degrees Celsius is 88 degrees Fahrenheit, 545 degrees Rankine and 303 Kelvin.  In contrast, 30 Kelvin is -243 degrees Celsius, -405 degrees Fahrenheit and 54 degrees Rankine.

Exhibit B-13 from Zara/Ghigi Section B
Questionnaire Response of 12/13/2019

Exhibit B-13

PROTEIN DISCUSSION

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

**LAW OFFICES OF DAVID L. SIMON, PLLC**
1025 Connecticut Avenue, NW, Suite 1000
Washington, DC 20036 USA
Tel. 202-481-9000        Fax 202-481-9010
e-mail: DLSimon@DLSimon.com

**December 8, 2019**

TO:    DE KIEFFER & HORGAN, PLLC
       JOHN J. KENKEL, ESQ.

RE:    PASTA PHYSICAL CHARACTERISTICS; PROTEIN

This memorandum addresses issues related to the physical characteristics of pasta in the context of the antidumping order on pasta from Italy.

### EXECUTIVE SUMMARY

The principal conclusion of this study is that a protein content of 7 grams per serving (12.5% protein) is the *minimum* protein content accepted by the marketplace. All private-label "house brands" (the brands owned by the supermarket chains) have 12.5% protein, and the vast majority of branded pasta sold in the U.S. market has 12.5% protein.  Pasta with a protein content of 12.5% or less must be considered "standard" pasta and not "premium" pasta.

### ANALYSIS

In the United States, the identity standard for pasta is governed by FDA regulations, specifically, 21 CFR Part 139, provided in Exhibit A.

- Section 139.110 is the overall identity standard for pasta ("macaroni products") in general.  This standard does not contain any specification for protein content.

- Section 139.115 is the standard for pasta enriched with vitamins.  This standard does not contain any specification for protein content.

- Section 139.117 is the standard for enriched pasta "with fortified protein."  In this standard, the pasta is identified as having protein additive, and the pasta must have a protein content of at least 20%, measured by multiplying the nitrogen content of the finished goods (at 13% humidity) times 6.25.  Pasta "with fortified protein" is a commercially negligible product.

Since pasta is a food, it is subject to FDA regulations governing nutrition labeling, 21 CFR §101.9, provided in Exhibit B.  Of particular relevance is section 101.9(c)(7), which governs the methodology by which protein is to be measured for purposes of nutrition labeling:

> A statement of the number of grams of protein in a serving, expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. … Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," ….

Thus, FDA regulations specify that protein is to be measured as the nitrogen content multiplied by 6.25 for all foods, including pasta,

The identity standard for semolina, which is the raw material for pasta, is set forth in 21 CFR §137.320, provided in Exhibit C.  The semolina standard does not contain a minimum protein content, nor does it prescribe a methodology for measurement of protein.  However, 21 CFR §137.105 ("flour") contains the following concerning protein measurement protocol (see Exhibit C at 3):

> Protein is 5.7 times the nitrogen as determined by the method prescribed in section 2.057, "Improved Kjeldahl Methods for Nitrate-Free Samples (20)—Official Final Action," AOAC, 13th Ed. (1980), which is incorporated by reference. The availability of this incorporation by reference is given in paragraph (a) of this section. Protein is calculated to a moisture-free basis by subtracting the percent of moisture in the flour from 100, dividing the remainder into the percent of protein, and multiplying the quotient by 100.

We provide the ""Improved Kjeldahl Methods for Nitrate-Free Samples (20)—Official Final Action," AOAC, 13th Ed. (1980)," referenced above, in Exhibit C at 4.

The Kjeldahl method for measuring nitrogen, which is the marker by which protein content is ascertained, is well known.  Respondent Tomasello provided an exhibit explaining the Kjeldahl method in administrative review (AR) 14 (2009/10), provided in Exhibit D.

In AR 15, respondent Granoro, responding to the Commerce Department's request for comments on this issue, provided the same study; see <mark>Exhibit</mark> E.  Note that, in this submission, Granoro explained that it had converted its reported U.S. label protein to the same protein-measurement protocol as its HM physical characteristics.  Granoro was verified in AR 15 and the antidumping order was revoked in that year, following this verification.  See *Certain Pasta From Italy: Notice of Final Results of 15th Antidumping Duty Administrative Review, Final No Shipment Determination and Revocation of Order, in Part; 2010–2011*, 78 FR 9364 (Feb. 8, 2013).

The Italian standard of identity for semolina and pasta is provided in <mark>Exhibit</mark> F.  According to the Italian standard, semolina must have a "minimum" protein content of 10.5% (N*5.7), equivalent to 11.5% (N*6.25), and "low grade semolina" ("semolato" in the Italian original) must have a "minimum" protein content of 11.5% (N*5.7), equivalent to 12.6% (N*6.25).  *Id*. at art. 2 ¶5.  These same protein minimum protein contents apply to pasta; *id*. ¶6.3.

Pasta is included in the "grains" (a/k/a/ carbohydrates) group of the food pyramid; see <mark>Exhibit</mark> G.

Pasta is not considered an important dietary source of protein (it is not in the "protein" group), but the protein content of pasta is an important determinant of the quality of the product.  See <mark>Exhibit</mark> H.

The protein content of pasta is a principal determinant of quality because, in the high-temperature drying phase of the manufacturing process, the protein forms a lattice structure that keeps the starch from leaching out of the pasta.  See <mark>Exhibit</mark> I.  At pages 15-16, the authors explain that the protein and starches of semolina are interspersed when the semolina is raw, but, when the product is cooked, the proteins form a "fibrillar network," while the starches are dissolved; the fibrillar network holds the starches in the product.  The authors explain:

> It is easy to understand why a high protein content is favorable to good quality; the polypeptide chains are more numerous and the chances for proteins to interact and form a resistant network are higher.

There is, therefore, a technical basis for the Italian grain exchanges to differentiate between standard and premium semolina, as the Department has noted during the development of the protein reporting practice. See Exhibit J.

In the period since the development of the reporting practice, the Italian Bologna commodity exchange has updated the breakpoint between standard and premium semolina, which now occurs at 13.5% protein content. See Exhibit K. This casts doubt on the continued viability of the Commerce Department's 12.5% breakpoint, which was based entirely on Italian commodity exchange semolina protein content.

The Commerce Department's reliance on the now-obsolete Italian commodity exchange breakpoint of 12.5% protein between standard and premium semolina, as the sole determinant of the PROTEINH/U fields of the questionnaire, has been criticized as having failed to consider the market situation in Italy and the United States for finished goods, *i.e.,* pasta. See Exhibit J. To fill the latter gap, we have undertaken an analysis of the relationship between protein content and price in the two markets, discussed below.

We provide an analysis of the price-protein relationship in Italy in Exhibit L. Notably:

- Of the 13 purchases, only two had a protein content of ≤ 12.0%; none were at 12.5%; and the 11 remaining samples were all ≥13.0% protein.
- There is a clear relationship between protein content and price, with an apparent pricing breakpoint at a protein content of 13.0%.

The examples in Exhibit L were purchased from Pam Panorama SpA on Nov. 24, 2019; see *id*. at 3. We provide scans of all the product packages, to support the tabulation on page 2, at pages 4-21. Pam Panorama is an Italian food retailer chain; *id*. at 22.

In the United States, we purchased representative samples of pasta from four retailers in the same geographic area, namely, the suburbs of Washington, DC. The overall summary is provided in Exhibit M. The salient points are as follows:

- Of the 49 samples, not a single sample had a protein content of less than 12.5%.
- Of the 49 samples, 32 had a protein content of 12.5% (7 grams of protein per 56-gram serving).
- Of the 49 samples, 17 had a protein content of more than 12.5%; specifically,

- o   two were at 13.5% (7.56 grams per serving), both of which were
       Rustichella from Balducci's, sold in a package based on Italian weight;

- o   one, Cellino from Balducci's, was at 13.6% (7.6 grams of protein per
       serving);

- o   the remaining 14 were at 14.3% protein (8 grams per serving).  Prominent
       among these were seven examples of De Cecco, sold at all four retailers
       from which samples were purchased.

We provide the following documentation to support the figures in Exhibit M:

- Purchases from Safeway – Exhibit N.
- Purchases from Giant – Exhibit O.
- Purchases from Harris Teeter – Exhibit P.
- Purchases from Balducci's – Exhibit Q.

The foregoing study of the U.S. retail market shows that –

- **<u>12.5% protein content (7 grams per serving) is the minimum protein for the
  marketplace;</u>** every "house" brand (*i.e.,* brands owned by the supermarket chain
  selling it) has a protein content of 12.5 (Signature (Safeway brand), Giant
  brand, Harris Teeter brand, and Private Select (Harris Teeter import house brand).

- **<u>Premium pasta generally has 14.3% protein (8 grams per serving).</u>**  This is
  the protein content of De Cecco, which is sold as a premium brand in every one of
  the four retailers sampled.

- Some Italian specialty imports (Cellino and Rustichella) have protein content that
  is neither 7 nor 8 grams per serving.  These are a small part of the market (only
  sold at Balducci's) and represent essentially specialty Italian products.  In any
  event, the protein content for this pasta is over 12.5% (>7 grams).

*<span style="color:red">It is therefore clear that pasta with 7 grams protein per serving is not premium pasta; it
is standard pasta.</span>*

The study has other ramifications that the Department may wish to consider. In
particular, the U.S. market clearly has "line pricing"; that is, there is no price difference (and

hence no commercial difference) between short cuts and so-called specialty short cuts; in particular, cuts that the Department has historically considered specialty short cuts, such as rotini or cavatappi, are priced the same as standard short cuts such as rigatoni.  While there may be other rationales for maintaining a difference among certain shapes – for example, farfalle and orecchiette are stamped while virtually all other short cuts are extruded – there does not appear to be any commercial difference among these cuts at the retail level.

The Commerce Department may wish to reconsider the SHAPEH/U codes in this context.

*2019 PZ protein study*

## CERTIFICATION

I,  David L. Simon, of the LAW OFFICES OF DAVID L. SIMON, PLLC, a contractor to De Kieffer & Horgan
PLLC,  certify that I have read the attached memorandum  of December 8, 2019, in the antidumping
administrative review of pasta from Italy, Case No. A-475-818, for the period July 1, 2018 through June
30, 2019.  In my capacity as a preparer or reviewer of this submission, I certify that the information
contained in this submission is accurate and complete to the best of my knowledge.  I am aware that U.S.
law (including, but not limited to, 18 U.S.C. §1001) imposes criminal sanctions on individuals who
knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware
that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the
Department may preserve this submission, including a business proprietary submission, for purposes of
determining the accuracy of this certification.  I certify that I am filing a copy of this signed certification
with this submission to the U.S. Department of Commerce and that I will retain the original for a five-
year period commencing with the filing of this document.  The original will be available for inspection by
U.S. Department of Commerce officials.

December 8, 2019

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

| EXHIBIT LIST | |
|---|---|
| EXH A | 21 CFR 139, US PASTA IDENTITY STANDARD |
| EXH B | 21 CFR 101.9, NUTRITION LABELING |
| EXH C | 21 CFR 137, SEMOLINA AND FLOUR |
| EXH D | AR 14 TOMASELLO AC SQR#2 PUBLIC |
| EXH E | AR 15 GRANORO PROTEIN COMMENTS |
| EXH F | ITALIAN SEMOLINA AND PASTA STANDARDS (2001) |
| EXH G | FOOD GROUPS |
| EXH H | PASTA NOODLE TECH - WHEAT, SEMO & PASTA QUALITY |
| EXH I | DURUM CHEM TECH - PROTEINS AND ENZYMES |
| EXH J | EXCERPTS FROM AR 22 CASE BRIEF GZ (PUBLIC) |
| EXH K | CURRENT PROTEIN PCT, BOLOGNA COMMODITY EXCHANGE |
| EXH L | PRICE-PROTEIN RELATIONSHIP, ITALY |
| EXH M | SUMMARY OF US PRICE-PROTEIN, USA |
| EXH N | SAFEWAY COMBINED |
| EXH O | GIANT COMBINED |
| EXH P | HARRIS TEETER COMBINED |
| EXH Q | BALDUCCI'S COMBINED |

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH A    21 CFR 139, US PASTA IDENTITY STANDARD

';

# Title 21 Part 139

Title 21 → Chapter I → Subchapter B → Part 139

Electronic Code of Federal Regulations e-CFR

---

Title 21 Part 139

e-CFR data is current as of October 3, 2019

Title 21 (/Title-21/) → Chapter I (/Title-21/chapterI) → Subchapter B (/Title-21/CIsubchapB) → Part 139

Browse Previous (pt21.2.137) | Browse Next (pt21.2.145)

Title 21: Food and Drugs

---

# PART 139—MACARONI AND NOODLE PRODUCTS

Contents

Subpart A [Reserved]

Subpart B—Requirements for Specific Standardized Macaroni and Noodle Products

§139.110   Macaroni products.
§139.115   Enriched macaroni products.
§139.117   Enriched macaroni products with fortified protein.
§139.120   Milk macaroni products.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

§139.121   Nonfat milk macaroni products.
§139.122   Enriched nonfat milk macaroni products.
§139.125   Vegetable macaroni products.
§139.135   Enriched vegetable macaroni products.
§139.138   Whole wheat macaroni products.
§139.140   Wheat and soy macaroni products.
§139.150   Noodle products.
§139.155   Enriched noodle products.
§139.160   Vegetable noodle products.
§139.165   Enriched vegetable noodle products.
§139.180   Wheat and soy noodle products.

Authority: 21 U.S.C. 321, 341, 343, 348, 371, 379e.

Source: 42 FR 14409, Mar. 15, 1977, unless otherwise noted.

Back to Top

# Subpart A [Reserved]

Back to Top

# Subpart B—Requirements for Specific Standardized Macaroni and Noodle Products

Back to Top

# §139.110   Macaroni products.

(a) Macaroni products are the class of food each of which is prepared by drying formed units of dough made from semolina, durum flour, farina, flour, or any combination of two or more of these, with water and with or without one or more of the optional ingredients specified in paragraphs (a) (1) to (6), inclusive, of this section.

(1) Egg white, frozen egg white, dried egg white, or any two or all of these, in such quantity that the solids thereof are not less than 0.5 percent and not more than 2.0 percent of the weight of the finished food.

(2) Disodium phosphate, in a quantity not less than 0.5 percent and not more than 1.0 percent of the weight of the finished food.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

(3) Onions, celery, garlic, bay leaf, or any two or more of these, in a quantity which seasons the food.

(4) Salt, in a quantity which seasons the food.

(5) Gum gluten, in such quantity that the protein content of the finished food is not more than 13 percent by weight. The finished macaroni product contains not less than 87 percent of total solids as determined by the method prescribed in "Official Methods of Analysis of the Association of Official Analytical Chemists," 13th Ed. (1980), in section 14.133, under the heading "Vacuum Oven Method—Official Final Action," which is incorporated by reference. Copies may be obtained from the AOAC INTERNATIONAL, 481 North Frederick Ave., suite 500, Gaithersburg, MD 20877, or may be examined at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal__register /code__of__federal__regulations/ibr__locations.html.

(6) Concentrated glyceryl monostearate (containing not less than 90 percent monoester), in a quantity not exceeding 2 percent by weight of the finished food.

(b) Macaroni is the macaroni product the units of which are tube-shaped and more than 0.11 inch but not more than 0.27 inch in diameter.

(c) Spaghetti is the macaroni product the units of which are tube-shaped or cord-shaped (not tubular) and more than 0.06 inch but not more than 0.11 inch in diameter.

(d) Vermicelli is the macaroni product the units of which are cord-shaped (not tubular) and not more than 0.06 inch in diameter.

(e) The name of each food for which a definition and standard of identity is prescribed by this section is "Macaroni product"; or alternatively, the name is "Macaroni", "Spaghetti", or "Vermicelli", as the case may be, when the units of the food are of the shapes and sizes specified in paragraph (b), (c), or (d), respectively, of this section.

(f)(1) When disodium phosphate is used the label shall bear the statement "Disodium phosphate added for quick cooking".

(2) When any ingredient specified in paragraph (a)(3) of this section is used the label shall bear the statement "Seasoned with ____", the blank being filled in with the common name of the ingredient; or in the case of bay leaves the statement "Spiced", "Spice added", or "Spiced with bay leaves".

(3) When the ingredient specified in paragraph (a)(6) of this section is used, the label shall bear the statement "Glyceryl monostearate added" or the statement "With added glyceryl monostearate".

(4) Wherever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase, the words and statements prescribed in this section, showing the optional ingredients used, shall immediately and conspicuously precede or follow, or in part precede and in part follow, such name, without intervening written, printed, or graphic matter.

(g) Label declaration. Each of the ingredients used in the food shall be declared on the label as required by the applicable sections of parts 101 and 130 of this chapter.

[42 FR 14409, Mar. 15, 1977, as amended at 47 FR 11828, Mar. 19, 1982; 49 FR 10099, Mar. 19, 1984; 54 FR 24894, June 12, 1989; 58 FR 2878, Jan. 6, 1993; 63 FR 14035, Mar. 24, 1998]

Back to Top



# §139.115   Enriched macaroni products.

(a) Description. Enriched macaroni products are the class of food each of which conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients, prescribed for macaroni products by §139.110(a), (f), and (g), except that:

(1) Each such food contains in each pound not less than 4.0 milligrams (mg) and not more than 5.0 mg of thiamin, not less than 1.7 mg and not more than 2.2 mg of riboflavin, not less than 27 mg and not more than 34 mg of niacin or niacinamide, not less than 0.9 mg and not more than 1.2 mg of folic acid, and not less than 13 mg and not more than 16.5 mg of iron (Fe);

(2) Each such food may also contain as an optional ingredient added vitamin D in such quantity that each pound of the finished food contains not less than 250 U.S.P. units and not more than 1000 U.S.P. units of vitamin D.

(3) Each such food may also contain as an optional ingredient added calcium in such quantity that each pound of the finished food contains not less than 500 mg. and not more than 625 mg. of calcium (Ca);

(4) Each such food may also contain as an optional ingredient partly defatted wheat germ but the amount thereof does not exceed 5 percent of the weight of the finished food;

(5) Each such food may be supplied, wholly or in part, with the prescribed quantity of any substance referred to in paragraphs (a) (1), (2), and (3) of this section through the use of dried yeast, dried torula yeast, partly defatted wheat germ, enriched farina, or enriched flour, or through the direct additions of any of the substances prescribed in paragraphs (a) (1), (2), and (3) of this section.

Iron and calcium may be added only in forms which are harmless and assimilable. The substances referred to in paragraphs (a) (1) and (2) of this section may be added in a harmless carrier which does not impair the enriched macaroni product, such carrier being used only in the quantity reasonably necessary to effect an intimate and uniform distribution of such substances in the finished enriched macaroni product.

(b) Enriched macaroni is the enriched macaroni product the units of which conform to the specifications of shape and size prescribed for macaroni by §139.110(b).

(c) Enriched spaghetti is the enriched macaroni product the units of which conform to the specifications of shape and size prescribed for spaghetti by §139.110(c).

(d) Enriched vermicelli is the enriched macaroni product the units of which conform to the specifications of shape and size prescribed for vermicelli by §139.110(d).

(e) The name of each food for which a definition and standard of identity is prescribed by this section is "Enriched Macaroni product"; or alternatively, the name is "Enriched macaroni", "Enriched spaghetti", or "Enriched vermicelli", as the case may be, when the units of the food comply with the requirements of paragraphs (b), (c), or (d) respectively of this section.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993; 61 FR 8797, Mar. 5, 1996]

Back to Top



Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# §139.117   Enriched macaroni products with fortified protein.

(a)(1) Each of the foods for which a standard of identity is prescribed by this section is produced by drying formed units of dough made with one or more of the milled wheat ingredients designated in §§139.110(a) and 139.138(a), and other ingredients to enable the finished food to meet the protein requirements set out in paragraph (a)(2)(i) of this section. Edible protein sources, including food grade flours or meals made from nonwheat cereals or from oilseeds, may be used. Vitamin and mineral enrichment nutrients are added to bring the food into conformity with the requirements of paragraph (b) of this section. Safe and suitable ingredients, as provided for in paragraph (c) of this section, may be added. The proportion of the milled wheat ingredient is larger than the proportion of any other ingredient used.

(2) Each such finished food, when tested by the methods described in the cited sections of "Official Methods of Analysis of the Association of Official Analytical Chemists," 13th Ed. (1980), which is incorporated by reference (copies may be obtained from the AOAC INTERNATIONAL, 481 North Frederick Ave., suite 500, Gaithersburg, MD 20877, or may be examined at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal__register /code__of__federal__regulations/ibr__locations.html.), meets the following specifications:

(i) The protein content (N × 6.25) is not less than 20 percent by weight (on a 13 percent moisture basis) as determined by the method in section 14.142. The protein quality is not less than 95 percent that of casein as determined on the cooked food by the method in sections 43.212 through 43.216 of the official methods.

(ii) The total solids content is not less than 87 percent by weight as determined by the method in section 14.133 of the official methods.

(b)(1) Each food covered by this section contains in each pound 5 milligrams of thiamin, 2.2 milligrams of riboflavin, 34 milligrams of niacin or niacinamide, and 16.5 milligrams of iron.

(2) Each pound of such food may also contain 625 milligrams of calcium.

(3) Iron and calcium may be added only in forms which are harmless and assimilable. The enrichment nutrients may be added in a harmless carrier used only in a quantity necessary to effect a uniform distribution of the nutrients in the finished food. The requirements of paragraphs (b) (1) and (2) of this section shall be deemed to have been met if reasonable overages, within the limits of good manufacturing practice, are present to assure that the prescribed levels of the vitamins and mineral(s) are maintained throughout the expected shelf life of the food under customary conditions of distribution.

(c) The safe and suitable ingredients referred to in paragraph (a) of this section are ingredients that serve a useful purpose, e.g., to fortify the protein or facilitate production of the food, but they do not include color additives, artificial flavorings, artificial sweeteners, chemical preservatives, or starches. Ingredients deemed suitable for use by this paragraph are added in amounts that are not in excess of those reasonably required to achieve their intended purposes. Ingredients are deemed to be safe if they are not food additives within the meaning of section 201(s) of the Federal Food, Drug, and Cosmetic Act, or in case they are food additives, if they are used in conformity with regulations established pursuant to section 409 of the act.

(d)(1) The name of any food covered by this section is "Enriched Wheat ___ Macaroni Product—with Fortified Protein", the blank being filled in with appropriate word(s) such as "Soy" to show the source of any flours or meals

used that were made from nonwheat cereals or from oilseeds. In lieu of the words "Macaroni Product" the word "Macaroni", "Spaghetti", or "Vermicelli", as appropriate, may be used if the units conform in shape and size to the requirements of §139.110 (b), (c), or (d).

(2) When any ingredient, not designated in the part of the name prescribed in paragraph (d)(1) of this section, is added in such proportion as to contribute 10 percent or more of the quantity of protein contained in the finished food, the name shall include the statement "Made with ____", the blank being filled in with the name of each such ingredient, e.g., "Made with nonfat milk".

(3) When, in conformity with paragraph (d) (1) or (2) of this section, two or more ingredients are listed in the name, their designations shall be arranged in descending order of predominance by weight.

(4) In the case of a food made to comply with another section of this part, but which also meets the compositional requirements of this section, it may alternatively bear the name set out in that other section.

(e) Label declaration. Each of the ingredients used in the food shall be declared on the label as required by the applicable sections of parts 101 and 130 of this chapter.

[42 FR 14409, Mar. 15, 1977, as amended at 47 FR 11829, Mar. 19, 1982; 49 FR 10099, Mar. 19, 1984; 54 FR 24894, June 12, 1989; 58 FR 2878, Jan. 6, 1993; 63 FR 14035, Mar. 24, 1998]

Effective Date Note: Section 139.117 was stayed in its entirety at 43 FR 11695, Mar. 21, 1978.

Back to Top

# §139.120   Milk macaroni products.

(a) Milk macaroni products are the class of food, each of which conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients prescribed for macaroni products by §139.110(a), (f)(2), (f)(3), and (g), except that:

(1) Milk is used as the sole moistening ingredient in preparing the dough; or in lieu of milk one or more of the milk ingredients specified in paragraph (f) of this section is used, with or without water, in such quantity that the weight of milk solids therein is not less than 3.8 percent of the weight of the finished milk macaroni product; and

(2) None of the optional ingredients permitted by §139.110(a) (1) and (2) is used. When the optional ingredient gum gluten (§139.110(a)(5)) is added, the quantity is such that the protein derived therefrom, together with the protein derived from semolina, durum flour, farina, flour, or any combination of these used, does not exceed 13 percent of the weight of the finished food.

(b) Milk macaroni is the milk macaroni product the units of which conform to the specifications of shape and size prescribed for macaroni by §139.110(b).

(c) Milk spaghetti is the milk macaroni product the units of which conform to the specifications of shape and size prescribed for spaghetti by §139.110(c).

(d) Milk vermicelli is the milk macaroni product the units of which conform to the specifications of shape and size prescribed for vermicelli by §139.110(d).

(e) The name of each food for which a definition and standard of identity is prescribed by this section is "Milk Macaroni Product"; or alternatively, the name is "Milk macaroni", "Milk spaghetti", or "Milk vermicelli", as the case may

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

be, when the units of the food comply with the requirements of paragraph (b), (c), or (d), respectively, of this section.

(f) The milk ingredients referred to in paragraph (a)(1) of this section are concentrated milk, evaporated milk, dried milk, and a mixture of butter with skim milk, concentrated skim milk, evaporated skim milk, nonfat dry milk (dried skim milk), or any two or more of these, in such proportion that the weight of nonfat milk solids in such mixture is not more than 2.275 times the weight of milk fat therein.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.121   Nonfat milk macaroni products.

(a) Each of the macaroni products made with nonfat milk for which a definition and standard of identity is prescribed by this section conforms to the definition and standard of identity, and is subject to the requirements for label statement of ingredients, prescribed for macaroni products by §139.110(a), (f)(2), (f)(3), (f)(4), and (g), except that:

(1)(i) In preparing the dough, nonfat dry milk or concentrated skim milk, or a mixture of these, is used in an amount such that the finished macaroni product made with nonfat milk contains by weight not less than 12 percent and not more than 25 percent of milk solids-not-fat. Carrageenan or salts of carrageenan conforming to the requirements of §§172.620 and 172.626 of this chapter may be used in a quantity not in excess of 0.833 percent by weight of the milk solids-not-fat used.

(ii) When the ingredient carrageenan or the salts of carrageenan specified in paragraph (a)(1)(i) of this section is used, the label shall bear the statement, "Carrageenan added" or "Salts of carrageenan added" or the statement "With added carrageenan" or "With added salts of carrageenan", in the manner further prescribed by §139.110(f)(4).

(2) None of the optional ingredients permitted by §139.110(a) (1), (2), and (5) are used.

(b) The name of each food for which a definition and standard of identity is prescribed by this section is "Macaroni products made with nonfat milk" or, alternatively, the name is "Macaroni made with nonfat milk", "Spaghetti made with nonfat milk" or "Vermicelli made with nonfat milk", as the case may be when the units of the food conform to the specifications of shape and size prescribed by §139.110 (b), (c), or (d), respectively.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.122   Enriched nonfat milk macaroni products.

(a) Each of the enriched macaroni products made with nonfat milk for which a definition and standard of identity is prescribed by this section conforms to the definition and standard of identity, and is subject to the requirements for label statement of ingredients, prescribed for macaroni products by §139.110(a), (f)(2), (f)(3), (f)(4), and (g), except that:

(1)(i) In preparing the dough, nonfat dry milk or concentrated skim milk, or a mixture of these, is used in an amount

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

such that the finished enriched macaroni product made with nonfat milk contains by weight not less than 12 percent and not more than 25 percent of milk solids-not-fat. Carrageenan or the salts of carrageenan conforming to the requirements of §172.620 and §172.626 of this chapter may be used in a quantity not in excess of 0.833 percent by weight of the milk solids-not-fat used.

(ii) When the ingredient carrageenan or the salts of carrageenan specified in paragraph (a)(1)(i) of this section is used, the label shall bear the statement, "Carrageenan added" or "Salts of carrageenan added" or the statement "With added carrageenan" or "With added salts of carrageenan", in the manner further prescribed by §139.110(f)(4).

(2) None of the optional ingredients permitted by §139.110(a) (1), (2), and (5) are used.

(3) Each such food contains in each pound not less than 4.0 milligrams (mg) and not more than 5.0 mg of thiamin, not less than 1.7 mg and not more than 2.2 mg of riboflavin, not less than 27 mg and not more than 34 mg of niacin or niacinamide, not less than 0.9 mg and not more than 1.2 mg of folic acid, and not less than 13 mg and not more than 16.5 mg of iron (Fe). These substances may be added through direct addition or wholly or in part through the use of dried yeast, dried torula yeast, partly defatted wheat germ (as provided for in paragraph (a)(4) of this section), enriched farina, or enriched flour. They may be added in a harmless carrier, such carrier being used only in the quantity reasonably necessary to effect an intimate and uniform distribution of such substances in the finished food. Iron may be added only in a form that is harmless and assimilable.

(4) Each such food may also contain as an optional ingredient partly defatted wheat germ, but the amount thereof does not exceed 5 percent by weight of the finished food.

(b) The name of each food for which a definition and standard of identity is prescribed by this section is "Enriched macaroni product made with nonfat milk" or, alternatively, the name is "Enriched macaroni made with nonfat milk", "Enriched spaghetti made with nonfat milk," or "Enriched vermicelli made with nonfat milk," as the case may be when the units of the food conform to the specifications of shape and size prescribed by §139.110 (b), (c), or (d), respectively.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.125   Vegetable macaroni products.

(a) Vegetable macaroni products are the class of food each of which conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients prescribed for macaroni products by §139.110(a), (f)(2), (f)(3), and (g), except that:

(1) Tomato (of any red variety), artichoke, beet, carrot, parsley, or spinach is added in such quantity that the solids thereof are not less than 3 percent by weight of the finished vegetable macaroni product (the vegetable used may be fresh, canned, dried, or in the form of puree or paste); and

(2) None of the optional ingredients permitted by §139.110(a) (1) and (2) is used. When the optional ingredient gum gluten (§139.110(a)(5)) is added, the quantity is such that the protein derived therefrom, together with the protein derived from the semolina, durum flour, farina, flour or any combination of these used, does not exceed 13 percent of the weight of the finished food.

(b) Vegetable macaroni is the vegetable macaroni product the units of which conform to the specifications of shape

and size prescribed for macaroni by §139.110(b).

(c) Vegetable spaghetti is the vegetable macaroni product the units of which conform to the specifications of shape and size prescribed for spaghetti by §139.110(c).

(d) Vegetable vermicelli is the vegetable macaroni product, the units of which conform to the specifications of shape and size prescribed for vermicelli by §139.110(d).

(e) The name of each food for which a definition and standard of identity is prescribed by this section is "___ macaroni product", the blank being filled in with the name whereby the vegetable used is designated in paragraph (a) of this section; or alternatively, the name is "___ macaroni", "___ spaghetti", or "___ vermicelli", as the case may be, when the units of the food comply with the requirements of paragraph (b), (c), or (d) of this section, respectively, the blank in each instance being filled in with the name whereby the vegetable used is designated in paragraph (a) of this section.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.135   Enriched vegetable macaroni products.

(a) Each of the macaroni products for which a definition and standard of identity is prescribed by this section conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients prescribed for macaroni products by §139.110(a), (f), and (g), and in addition is enriched to meet the requirements prescribed for enriched macaroni products by §139.115 and contains a vegetable ingredient in compliance with the requirements prescribed for vegetable macaroni products by §139.125.

(b) The name of each food for which a definition and standard of identity is prescribed by this section is "Enriched ___ macaroni product", or, alternatively, the name is "Enriched ___ macaroni", "Enriched ___ spaghetti", or "Enriched ___ vermicelli", when the units comply with the shape and size requirements prescribed for macaroni, spaghetti, or vermicelli in §139.110 (b), (c), or (d). The blank in each instance is filled in with the name of the vegetable used, as specified in §139.125(a). For example, the name of an enriched macaroni product containing the prescribed amount of spinach and made in units not conforming in shape and size to the requirements for macaroni, spaghetti, or vermicelli is "Enriched spinach macaroni product".

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.138   Whole wheat macaroni products.

(a) Whole wheat macaroni products are the class of food each of which conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients, prescribed for macaroni products by §139.110(a), (f)(2), (f)(3), and (g), except that:

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

(1) Whole wheat flour or whole durum wheat flour or both are used as the sole wheat ingredient; and

(2) None of the optional ingredients permitted by §139.110(a) (1), (2), and (5) is used.

(b) Whole wheat macaroni is the whole wheat macaroni product the units of which conform to the specifications of shape and size prescribed for macaroni by §139.110(b).

(c) Whole wheat spaghetti is the whole wheat macaroni product the units of which conform to the specifications of shape and size prescribed for spaghetti by §139.110(c).

(d) Whole wheat vermicelli is the whole wheat macaroni product the units of which conform to the specifications of shape and size prescribed for vermicelli by §139.110(d).

(e) The name of each food for which a definition and standard of identity is prescribed by this section is "Whole wheat macaroni product"; or alternatively, the name is "Whole wheat macaroni", "Whole wheat spaghetti", or "Whole wheat vermicelli", as the case may be, when the units of the food comply with the requirements of paragraph (b), (c), or (d), respectively, of this section.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.140   Wheat and soy macaroni products.

(a) Wheat and soy macaroni products are the class of food each of which conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients, prescribed for macaroni products by §139.110(a), (f)(2), (f)(3), and (g), except that:

(1) Soy flour is added in a quantity not less than 12.5 percent of the combined weight of the wheat and soy ingredients used (the soy flour used is made from heat-processed, dehulled soybeans, with or without the removal of fat therefrom); and

(2) None of the optional ingredients permitted by §139.110(a) (1) and (2) is used. When the optional ingredient gum gluten (§139.110(a)(5)) is added, the quantity is such that the protein derived therefrom, together with the protein derived from semolina, durum flour, farina, flour or any combination of these used, does not exceed 13 percent of the weight of the finished food.

(b) Wheat and soy macaroni is the wheat and soy macaroni product the units of which conform to the specifications of shape and size prescribed for macaroni by §139.110(b).

(c) Wheat and soy spaghetti is the wheat and soy macaroni product the units of which conform to the specifications of shape and size prescribed for spaghetti by §139.110(c).

(d) Wheat and soy vermicelli is the wheat and soy macaroni product the units of which conform to the specifications of shape and size prescribed for vermicelli by §139.110(d).

(e) The name of each food for which a definition and standard of identity is prescribed by this section is "Wheat and soy macaroni product", "Wheat and soybean macaroni product", "___ and soy macaroni product", or "___ and soybean macaroni product", the blank in each instance being filled in with the name whereby the wheat ingredient used is designated in §139.110(a); or alternatively, the name is "Wheat and soy macaroni", "Wheat and soybean macaroni", "___ and soy macaroni", or "___ and soybean macaroni" when the units of the food comply with the

requirements of paragraph (b) of this section; or "Wheat and soy spaghetti", "Wheat and soybean spaghetti", "___ and soy spaghetti", or "___ and soybean spaghetti" when such units comply with the requirements of paragraph (c) of this section; or "Wheat and soy vermicelli", "Wheat and soybean vermicelli", "___ and soy vermicelli", or "___ and soybean vermicelli" when such units comply with the requirements of paragraph (d) of this section, the blank in each instance being filled in with the name whereby the wheat ingredient used is designated in §139.110(a).

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2878, Jan. 6, 1993]

Back to Top

# §139.150   Noodle products.

(a) Noodle products are the class of food each of which is prepared by drying formed units of dough made from semolina, durum flour, farina, flour, or any combination of two or more of these, with liquid eggs, frozen eggs, dried eggs, egg yolks, frozen yolks, dried yolks, or any combination of two or more of these, with or without water and with or without one or more of the optional ingredients specified in paragraphs (a) (1) to (4) of this section inclusive:

(1) Onions, celery, garlic, bay leaf, or any two or more of these, in a quantity which seasons the food.

(2) Salt, in a quantity which seasons the food.

(3) Gum gluten, in such quantity that the protein derived therefrom, together with the protein derived from semolina, durum flour, farina, flour or any combination of these used, does not exceed 13 percent of the weight of the finished food.

(4) Concentrated glyceryl monostearate (containing not less than 90 percent monoester) in a quantity not exceeding 3 percent by weight of the finished food.

The finished noodle product contains not less than 87 percent of total solids as determined by the method prescribed in "Official Methods of Analysis of the Association of Official Analytical Chemists," 13th Ed. (1980), in section 14.133, under the heading "Vacuum Oven Method—Official Final Action," which is incorporated by reference. Copies may be obtained from the AOAC INTERNATIONAL, 481 North Frederick Ave., suite 500, Gaithersburg, MD 20877, or may be examined at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal__register /code__of__federal__regulations/ibr__locations.html. The total solids of noodle products contains not less than 5.5 percent by weight of the solids of egg, or egg yolk.

(b) Noodles, egg noodles, is the noodle product the units of which are ribbon-shaped.

(c) Egg macaroni is the noodle product the units of which are tube-shaped and more than 0.11 inch but not more than 0.27 inch in diameter.

(d) Egg spaghetti is the noodle product the units of which are tube-shaped or cord-shaped (not tubular) and more than 0.06 inch but not more than 0.11 inch in diameter.

(e) Egg vermicelli is the noodle product the units of which are cord-shaped (not tubular) and not more than 0.06 inch in diameter.

(f) The name of each food for which a definition and standard of identity is prescribed by this section is "Noodle product" or "Egg noodle product"; or alternatively, the name is "Noodles" or "Egg noodles", "Egg macaroni", "Egg

spaghetti", or "Egg vermicelli", as the case may be, when the units of the food are of the shapes and sizes specified in paragraph (b), (c), (d), or (e), respectively, of this section.

(g)(1) When any ingredient specified in paragraph (a)(1) of this section is used, the label of the noodle product shall bear the statement "Seasoned with ___", the blank being filled in with the common name of the ingredient; or in the case of bay leaves, the statement "Spiced", "Spice added", or "Spiced with bay leaves".

(2) When the ingredient specified in paragraph (a)(4) of this section is used, the label shall bear the statement "Glyceryl monostearate added" or the statement "With added glyceryl monostearate".

(h) Wherever the name of the food appears on such label so conspicuously as to be easily seen under customary conditions of purchase, the words and statements prescribed in this section, showing the ingredients used shall immediately and conspicuously precede or follow, or in part precede and in part follow, such name without intervening written, printed, or other graphic matter.

(i) Label declaration. Each of the ingredients used in the food shall be declared on the label as required by the applicable sections of parts 101 and 130 of this chapter.

[42 FR 14409, Mar. 15, 1977, as amended at 47 FR 11829, Mar. 19, 1982; 49 FR 10099, Mar. 19, 1984; 54 FR 24894, June 12, 1989; 58 FR 2879, Jan. 6, 1993; 63 FR 14035, Mar. 24, 1998]

Back to Top

# §139.155   Enriched noodle products.

(a) Enriched noodle products are the class of food each of which conforms to the definition and standard of identity, and is subject to the requirements for label statement of ingredients, prescribed for noodle products by §139.150 (a), (g), and (i), except that:

(1) Each such food contains in each pound not less than 4 milligrams (mg) and not more than 5 mg of thiamin, not less than 1.7 mg and not more than 2.2 mg of riboflavin, not less than 27 mg and not more than 34 mg of niacin or niacinamide, not less than 0.9 mg and not more than 1.2 mg of folic acid, and not less than 13 mg and not more than 16.5 mg of iron (Fe);

(2) Each such food may also contain as an optional ingredient added vitamin D in such quantity that each pound of the finished food contains not less than 250 U.S.P. units and not more than 1000 U.S.P. units of vitamin D;

(3) Each such food may also contain as an optional ingredient added calcium in such quantity that each pound of the finished food contains not less than 500 mg. and not more than 625 mg. of calcium (Ca);

(4) Each such food may also contain as an optional ingredient partly defatted wheat germ, but the amount thereof does not exceed 5 percent of the weight of the finished food;

(5) Each such food may be supplied, wholly or in part, with the prescribed quantity of any substance referred to in paragraphs (a) (1), (2), and (3) of this section through the use of dried yeast, dried torula yeast, partly defatted wheat germ, enriched farina, or enriched flour, or through the direct additions of any of the substances prescribed in paragraphs (a) (1), (2), and (3) of this section.

Iron and calcium may be added only in forms which are harmless and assimilable. The substances referred to in paragraphs (a) (1) and (2) of this section may be added in a harmless carrier which does not impair the enriched

noodle product, such carrier being used only in the quantity reasonably necessary to effect an intimate and uniform distribution of such substances in the finished enriched noodle product.

(b) Enriched noodles, enriched egg noodles are the enriched noodle products the units of which conform to the specifications of shape and size prescribed for noodles in §139.150(b).

(c) Enriched egg macaroni is the enriched noodle product the units of which conform to the specifications of shape and size prescribed for egg macaroni in §139.150(c).

(d) Enriched egg spaghetti is the enriched noodle product the units of which conform to the specifications of shape and size prescribed for egg spaghetti in §139.150(d).

(e) Enriched egg vermicelli is the enriched noodle product the units of which conform to the specifications of shape and size prescribed for egg vermicelli in §139.150(e).

(f) The name of each food for which a definition and standard of identity is prescribed by this section is "Enriched noodle product" or "Enriched egg noodle product"; or alternatively, the name is "Enriched noodles", or "Enriched egg noodles", "Enriched egg macaroni", "Enriched egg spaghetti", or "Enriched egg vermicelli", as the case may be, when the units of the food comply with the requirements of paragraph (b), (c), (d), or (e) respectively of this section.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2879, Jan. 6, 1993]

Back to Top

# §139.160   Vegetable noodle products.

(a) Vegetable noodle products are the class of food each of which conforms to the definition and standard of identity, and is subject to the requirements for label statement of ingredients, prescribed for noodle products by §139.150(a), (g), and (i), except that tomato (of any red variety), artichoke, beet, carrot, parsley, or spinach is added in such quantity that the solids thereof are not less than 3 percent by weight of the finished vegetable noodle product (the vegetable used may be fresh, canned, dried, or in the form of puree or paste).

(b) Vegetable noodles, vegetable egg noodles, is the vegetable noodle product the units of which are ribbon-shaped.

(c) Vegetable egg macaroni is the vegetable noodle product the units of which conform to the specifications of shape and size prescribed for egg macaroni by §139.150(c).

(d) Vegetable egg spaghetti is the vegetable noodle product the units of which conform to the specifications of shape and size prescribed for egg spaghetti by §139.150(d).

(e) Vegetable egg vermicelli is the vegetable noodle product the units of which conform to the specifications of shape and size prescribed for egg vermicelli by §139.150(e).

(f) The name of each food for which a definition and standard of identity is prescribed by this section is "___ noodle product" or "___ egg noodle product", the blank being filled in with the name whereby the vegetable used is designated in paragraph (a) of this section; or alternatively, the name is "___ noodles" or "___ egg noodles", "___ egg macaroni", "___ egg spaghetti", or "___ egg vermicelli", as the case may be, when the units of the food comply with the requirements of paragraph (b), (c), (d), or (e) of this section, respectively, the blank in each instance being filled in with the name whereby the vegetable is designated in paragraph (a) of this section.

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2879, Jan. 6, 1993]

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

Back to Top

# §139.165   Enriched vegetable noodle products.

(a) Each of the noodle products for which a definition and standard of identity is prescribed by this section conforms to the definition and standard of identity and is subject to the requirements for label declaration of ingredients prescribed for noodle products by §139.150 (a), (g), (h), and (i), and in addition is enriched to meet the requirements prescribed for enriched noodle products by §139.155 and, except as hereinafter provided, contains a vegetable ingredient in compliance with the requirements prescribed for vegetable noodle products by §139.160. Because they are apt to impart an egg-yolk color, carrots are not used in enriched vegetable noodle products.

(b) The name of each food for which a definition and standard of identity is prescribed by this section is "Enriched ___ noodle product", "Enriched ___ egg noodle product", or, alternatively, the name is "Enriched ___ noodles", or "Enriched ___ egg noodles", "Enriched ___ egg macaroni", "Enriched ___ egg spaghetti", or "Enriched ___ egg vermicelli", when the units comply with the size and shape requirements for noodles, macaroni, spaghetti, or vermicelli in §139.150 (b), (c), (d), or (e). The blank in each instance is filled in with the name of the vegetable used, as specified in §139.160(a).

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2879, Jan. 6, 1993]

Back to Top

# §139.180   Wheat and soy noodle products.

(a) Wheat and soy noodle products are the class of food each of which conforms to the definition and standard of identity and is subject to the requirements for label statement of ingredients prescribed for noodle products by §139.150(a), (g), and (i), except that soy flour is added in a quantity not less than 12.5 percent of the combined weight of the wheat and soy ingredients used (the soy flour used is made from heat-processed, dehulled soybeans, with or without the removal of fat therefrom).

(b) Wheat and soy noodles, wheat and soy egg noodles, is the wheat and soy noodle product the units of which are ribbon-shaped.

(c) Wheat and soy egg macaroni is the wheat and soy noodle product the units of which conform to the specifications of shape and size prescribed for egg macaroni by §139.150(c).

(d) Wheat and soy egg spaghetti is the wheat and soy noodle product the units of which conform to the specifications of shape and size prescribed for egg spaghetti by §139.150(d).

(e) Wheat and soy egg vermicelli is the wheat and soy noodle product the units of which conform to the specifications of shape and size prescribed for egg vermicelli by §139.150(e).

(f) The name of each food for which a definition and standard of identity is prescribed by this section is "Wheat and soy noodle product", "Wheat and soy egg noodle product", "Wheat and soybean noodle product", "Wheat and soybean egg noodle product", "___ and soy noodle product", "___ and soy egg noodle product", "___ and soybean

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

noodle product", or "___ and soybean egg noodle product", the blank in each instance being filled in with the name whereby the wheat ingredient used is designated in §139.150(a); or alternatively, the name is "Wheat and soy noodles", "Wheat and soy egg noodles", "Wheat and soybean noodles", "Wheat and soybean egg noodles", "___ and soy noodles", "___ and soy egg noodles", "___ and soybean noodles", or "___ and soybean egg noodles" when the units of the food comply with the requirements of paragraph (b) of this section; or "Wheat and soy egg macaroni", "Wheat and soybean egg macaroni", "___ and soy egg macaroni", or "___ and soybean egg macaroni" when such units comply with the requirements of paragraph (c) of this section; or "Wheat and soy egg spaghetti", "Wheat and soybean egg spaghetti", "___ and soy egg spaghetti", or "___ and soybean egg spaghetti" when such units comply with the requirements of paragraph (d) of this section; or "Wheat and soy egg vermicelli", "Wheat and soybean egg vermicelli", "___ and soy egg vermicelli", or "___ and soybean egg vermicelli", when such units comply with the requirements of paragraph (e) of this section, the blank in each instance being filled in with the name whereby the wheat ingredient used is designated in §139.150(a).

[42 FR 14409, Mar. 15, 1977, as amended at 58 FR 2879, Jan. 6, 1993]

Back to Top

© e-CFR (https://ecfr.io) 2019

FR (https://thefederalregister.org/) | USC (https://uscode.ecfr.io) | CFR (https://gov.ecfr.io) | eCFR (https://ecfr.io)



Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH B    21 CFR 101.9, NUTRITION LABELING

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of December 5, 2019

Title 21 → Chapter I → Subchapter B → Part 101 → Subpart A → §101.9

Title 21: Food and Drugs
PART 101—FOOD LABELING
Subpart A—General Provisions

---

### §101.9   Nutrition labeling of food.

(a) Nutrition information relating to food shall be provided for all products intended for human consumption and offered for sale unless an exemption is provided for the product in paragraph (j) of this section.

(1) When food is in package form, the required nutrition labeling information shall appear on the label in the format specified in this section.

(2) When food is not in package form, the required nutrition labeling information shall be displayed clearly at the point of purchase (e.g., on a counter card, sign, tag affixed to the product, or some other appropriate device). Alternatively, the required information may be placed in a booklet, looseleaf binder, or other appropriate format that is available at the point of purchase.

(3) Solicitation of requests for nutrition information by a statement "For nutrition information write to _____ " on the label or in the labeling or advertising for a food, or providing such information in a direct written reply to a solicited or unsolicited request, does not subject the label or the labeling of a food exempted under paragraph (j) of this section to the requirements of this section if the reply to the request conforms to the requirements of this section.

(4) If any vitamin or mineral is added to a food so that a single serving provides 50 percent or more of the Reference Daily Intake (RDI) for the age group for which the product is intended, as specified in paragraph (c)(8)(iv) of this section, of any one of the added vitamins or minerals, unless such addition is permitted or required in other regulations, e.g., a standard of identity or nutritional quality guideline, or is otherwise exempted by the Commissioner, the food shall be considered a food for special dietary use within the meaning of §105.3(a)(1)(iii) of this chapter.

(b) Except as provided in §101.9(h)(3), all nutrient and food component quantities shall be declared in relation to a serving as defined in this section.

(1) The term *serving* or *serving size* means an amount of food customarily consumed per eating occasion by persons 4 years of age or older which is expressed in a common household measure that is appropriate to the food. When the food is specially formulated or processed for use by infants or by toddlers, a serving or serving size means an amount of food customarily consumed per eating occasion by infants up to 12 months of age or by children 1 through 3 years of age, respectively.

(2) Except as provided in paragraphs (b)(3), (b)(4), and (b)(6) of this section and for products that are intended for weight control and are available only through a weight-control or weight-maintenance program, serving size declared on a product label shall be determined from the "Reference Amounts Customarily Consumed Per Eating Occasion * * * *" (reference amounts) that appear in §101.12(b) using the procedures described below. For products that are both intended for weight control and available only through a weight-control program, a manufacturer may determine the serving size that is consistent with the meal plan of the program. Such products must bear a statement, "for sale only through the ___ program" (fill in the blank with the name of the appropriate weight-control program, e.g., Smith's Weight Control), on the principal display panel. However, the reference amounts in §101.12(b) shall be used for purposes of evaluating whether weight-control products that are available only through a weight-control program qualify for nutrient content claims or health claims.

(i) For products in discrete units (e.g., muffins, sliced products, such as sliced bread, or individually packaged products within a multiserving package) and for products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is in discrete units (e.g., pancakes and syrup), the serving size shall be declared as follows:

(A) If a unit weighs 50 percent or less of the reference amount, the serving size shall be the number of whole units that most closely approximates the reference amount for the product category;

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

(B) If a unit weighs more than 50 percent, but less than 67 percent of the reference amount, the manufacturer may declare one unit or two units as the serving size;

(C) If a unit weighs 67 percent or more, but less than 200 percent of the reference amount, the serving size shall be one unit;

(D) If a unit weighs at least 200 percent and up to and including 300 percent of the applicable reference amount, the serving size shall be the amount that approximates the reference amount. In addition to providing a column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values per serving size, the manufacturer shall provide a column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values per individual unit. The first column would be based on the serving size for the product and the second column would be based on the individual unit. The exemptions in paragraphs (b)(12)(i)(A), (B), and (C) of this section apply to this provision.

(E) The serving size for maraschino cherries shall be expressed as 1 cherry with the parenthetical metric measure equal to the average weight of a medium size cherry.

(F) The serving size for products that naturally vary in size (e.g., pickles, shellfish, whole fish, and fillet of fish) may be the amount in ounces that most closely approximates the reference amount for the product category. Manufacturers shall adhere to the requirements in paragraph (b)(5)(vi) of this section for expressing the serving size in ounces.

(G) For products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is in discrete units (e.g., pancakes and syrup), the serving size may be the number of discrete units represented as the main ingredient plus proportioned minor ingredients used to make the reference amount for the combined product determined in §101.12(f).

(H) For packages containing several individual single-serving containers, each of which is labeled with all required information including nutrition labeling as specified in §101.9 (that is, are labeled appropriately for individual sale as single-serving containers), the serving size shall be 1 unit.

(ii) For products in large discrete units that are usually divided for consumption (e.g., cake, pie, pizza, melon, cabbage), for unprepared products where the entire contents of the package is used to prepare large discrete units that are usually divided for consumption (e.g., cake mix, pizza kit), and for products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is a large discrete unit usually divided for consumption (e.g., prepared cake packaged with a can of frosting), the serving size shall be the fractional slice of the ready-to-eat product (e.g., $\frac{1}{12}$ cake, $\frac{1}{8}$ pie, $\frac{1}{4}$ pizza, $\frac{1}{4}$ melon, $\frac{1}{6}$ cabbage) that most closely approximates the reference amount for the product category, and may be the fraction of the package used to make the reference amount for the unprepared product determined in §101.12(c) or the fraction of the large discrete unit represented as the main ingredient plus proportioned minor ingredients used to make the reference amount for the combined product determined in §101.12(f). In expressing the fractional slice, manufacturers shall use $\frac{1}{2}$, $\frac{1}{3}$, $\frac{1}{4}$, $\frac{1}{5}$, $\frac{1}{6}$, or smaller fractions that can be generated by further division by 2 or 3.

(iii) For nondiscrete bulk products (e.g., breakfast cereal, flour, sugar, dry mixes, concentrates, pancake mixes, macaroni and cheese kits), and for products which consist of two or more foods packaged and presented to be consumed together where the ingredient represented as the main ingredient is a bulk product (e.g., peanut butter and jelly), the serving size shall be the amount in household measure that most closely approximates the reference amount for the product category and may be the amount of the bulk product represented as the main ingredient plus proportioned minor ingredients used to make the reference amount for the combined product determined in §101.12(f).

(3) The serving size for meal products and main dish products as defined in §101.13 (l) and (m) that comes in single-serving containers as defined in paragraph (b)(6) of this section shall be the entire content (edible portion only) of the package. Serving size for meal products and main dish products in multiserving containers shall be based on the reference amount applicable to the product in §101.12(b) if the product is listed in §101.12(b). Serving size for meal products and main dish products in multiserving containers that are not listed in §101.12(b) shall be based on the reference amount according to §101.12(f).

(4) A variety pack, such as a package containing several varieties of single-serving units as defined in paragraph (b)(2)(i) of this section, and a product having two or more compartments with each compartment containing a different food, shall provide nutrition information for each variety or food per serving size that is derived from the reference amount in §101.12(b) applicable for each variety or food and the procedures to convert the reference amount to serving size in paragraph (b)(2) of this section.

(5) For labeling purposes, the term *common household measure* or *common household unit* means cup, tablespoon, teaspoon, piece, slice, fraction (e.g., $\frac{1}{4}$ pizza), ounce (oz), fluid ounce (fl oz), or other common household equipment used to package food products (e.g., jar, tray). In expressing serving size in household measures, except as specified in paragraphs

(b)(5)(iv), (b)(5)(v), (b)(5)(vi), and (b)(5)(vii) of this section, the following rules shall be used:

(i) Cups, tablespoons, or teaspoons shall be used wherever possible and appropriate except for beverages. For beverages, a manufacturer may use fluid ounces. Cups shall be expressed in 1/4- or 1/3-cup increments. Tablespoons shall be expressed as 1, 1 1/3, 1 1/2, 1 2/3, 2, or 3 tablespoons. Teaspoons shall be expressed as 1/8, 1/4, 1/2, 3/4, 1, or 2 teaspoons.

(ii) If cups, tablespoons or teaspoons are not applicable, units such as piece, slice, tray, jar, and fraction shall be used.

(iii) If paragraphs (b)(5)(i) and (b)(5)(ii) of this section are not applicable, ounces may be used with an appropriate visual unit of measure such as a dimension of a piece, e.g., 1 oz (28 g/about ½ pickle). Ounce measurements shall be expressed in 0.5 oz increments most closely approximating the reference amount.

(iv) A description of the individual container or package shall be used for single serving containers and for individually packaged products within multiserving containers (e.g., can, box, package). A description of the individual unit shall be used for other products in discrete units (e.g., piece, slice, cracker, bar).

(v) For unprepared products where the entire contents of the package is used to prepare large discrete units that are usually divided for consumption (e.g., cake mix, pizza kit), the fraction or portion of the package may be used.

(vi) Ounces with an appropriate visual unit of measure, as described in paragraph (b)(5)(iii) of this section, may be used for products that naturally vary in size as provided for in paragraph (b)(2)(i)(F) of this section.

(vii) As provided for in §101.9(h)(1), for products that consist of two or more distinct ingredients or components packaged and presented to be consumed together (e.g. dry macaroni and cheese mix, cake and muffin mixes with separate ingredient packages, pancakes and syrup), nutrition information may be declared for each component or as a composite. The serving size may be provided in accordance with the provisions of paragraphs (b)(2)(i), (b)(2)(ii), and (b)(2)(iii) of this section, or alternatively in ounces with an appropriate visual unit of measure, as described in paragraph (b)(5)(iii) of this section (e.g., declared as separate components: "3 oz dry macaroni (84 g/about ⅔ cup)" and "1 oz dry cheese mix (28 g/about 2 tbsp);" declared as a composite value: "4 oz (112 g/about ⅔ cup macaroni and 2 tbsp dry cheese mix)").

(viii) For nutrition labeling purposes, a teaspoon means 5 milliliters (mL), a tablespoon means 15 mL, a cup means 240 mL, 1 fl oz means 30 mL, and 1 oz in weight means 28 g.

(ix) When a serving size, determined from the reference amount in §101.12(b) and the procedures described in this section, falls exactly half way between two serving sizes, e.g., 2.5 tbsp, manufacturers shall round the serving size up to the next incremental size.

(6) A product that is packaged and sold individually that contains less than 200 percent of the applicable reference amount must be considered to be a single-serving container, and the entire content of the product must be labeled as one serving. In addition to providing a column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values per serving, for a product that is packaged and sold individually that contains more than 150 percent and less than 200 percent of the applicable reference amount, the Nutrition Facts label may voluntarily provide, to the left of the column that provides nutrition information per container (*i.e.*, per serving), an additional column that lists the quantitative amounts and percent Daily Values per common household measure that most closely approximates the reference amount.

(7) A label statement regarding a serving shall be the serving size expressed in common household measures as set forth in paragraphs (b)(2) through (b)(6) of this section and shall be followed by the equivalent metric quantity in parenthesis (fluids in milliliters and all other foods in grams) except for single-serving containers.

(i) For a single-serving container, the parenthetical metric quantity, which will be presented as part of the net weight statement on the principal display panel, is not required except where nutrition information is required on a drained weight basis according to §101.9(b)(9). However, if a manufacturer voluntarily provides the metric quantity on products that can be sold as single servings, then the numerical value provided as part of the serving size declaration must be identical to the metric quantity declaration provided as part of the net quantity of contents statement.

(ii) The gram or milliliter quantity equivalent to the household measure should be rounded to the nearest whole number except for quantities that are less than 5 g (mL). The gram (mL) quantity between 2 and 5 g (mL) should be rounded to the nearest 0.5 g (mL) and the g (mL) quantity less than 2 g (mL) should be expressed in 0.1-g (mL) increments.

(iii) In addition, serving size may be declared in ounce and fluid ounce, in parenthesis, following the metric measure separated by a slash where other common household measures are used as the primary unit for serving size, e.g., 1 slice (28 g/1 oz) for sliced bread. The ounce quantity equivalent to the metric quantity should be expressed in 0.1 oz increments.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

(iv) If a manufacturer elects to use abbreviations for units, the following abbreviations shall be used: tbsp for tablespoon, tsp for teaspoon, g for gram, mL for milliliter, oz for ounce, and fl oz for fluid ounce.

(v) For products that only require the addition of water or another ingredient that contains insignificant amounts of nutrients in the amount added and that are prepared in such a way that there are no significant changes to the nutrient profile, the amount of the finished product may be declared in parentheses at the end of the serving size declaration (e.g., ½ cup (120 mL) concentrated soup (makes 1 cup prepared)).

(vi) To promote uniformity in label serving sizes in household measures declared by different manufacturers, FDA has provided a guidance document entitled, "Guidelines for Determining the Gram Weight of the Household Measure." The guidance document can be obtained from the Office of Nutritional Products, Labeling and Dietary Supplements (HFS-800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740.

(8) Determination of the number of servings per container shall be based on the serving size of the product determined by following the procedures described in this section.

(i) The number of servings shall be rounded to the nearest whole number except for the number of servings between 2 and 5 servings and random weight products. The number of servings between 2 and 5 servings shall be rounded to the nearest 0.5 serving. Rounding should be indicated by the use of the term *about* (e.g., about 2 servings, about 3.5 servings).

(ii) When the serving size is required to be expressed on a drained solids basis and the number of servings varies because of a natural variation in unit size (e.g., maraschino cherries, pickles), the manufacturer may state the typical number of servings per container (e.g., usually 5 servings).

(iii) For random weight products, manufacturers may declare "varied" for the number of servings per container provided the nutrition information is based on the reference amount expressed in the appropriate household measure based on the hierarchy described in paragraph (b)(5) of this section. Random weight products are foods such as cheeses that are sold as random weights that vary in size, such that the net contents for different containers would vary. The manufacturer may provide the typical number of servings in parentheses following the "varied" statement.

(iv) For packages containing several individual single-serving containers, each of which is labeled with all required information including nutrition labeling as specified in §101.9 (that is, are labeled appropriately for individual sale as single-serving containers), the number of servings shall be the number of individual packages within the total package.

(v) For packages containing several individually packaged multiserving units, the number of servings shall be determined by multiplying the number of individual multiserving units in the total package by the number of servings in each individual unit.

(9) The declaration of nutrient and food component content shall be on the basis of food as packaged or purchased with the exception of raw fish covered under §101.42 (see 101.44), packaged single-ingredient products that consist of fish or game meat as provided for in paragraph (j)(11) of this section, and of foods that are packed or canned in water, brine, or oil but whose liquid packing medium is not customarily consumed (e.g., canned fish, maraschino cherries, pickled fruits, and pickled vegetables). Declaration of nutrient and food component content of raw fish shall follow the provisions in §101.45. Declaration of the nutrient and food component content of foods that are packed in liquid which is not customarily consumed shall be based on the drained solids.

(10) Another column of figures may be used to declare the nutrient and food component information:

(i) Per 100 g or 100 mL, or per 1 oz or 1 fl oz of the food as packaged or purchased;

(ii) Per one unit if the serving size of a product in discrete units is more than 1 unit.

(iii) Per cup popped for popcorn in a multiserving container.

(11) If a product is promoted on the label, labeling, or advertising for a use that differs in quantity by twofold or greater from the use upon which the reference amount in §101.12(b) was based (e.g., liquid cream substitutes promoted for use with breakfast cereals), the manufacturer shall provide a second column of nutrition information based on the amount customarily consumed in the promoted use, in addition to the nutrition information per serving derived from the reference amount in §101.12(b), except that nondiscrete bulk products that are used primarily as ingredients (e.g., flour, sweeteners, shortenings, oils), or traditionally used for multipurposes (e.g., eggs, butter, margarine), and multipurpose baking mixes are exempt from this requirement.

(12)(i) Products that are packaged and sold individually and that contain at least 200 percent and up to and including 300

percent of the applicable reference amount must provide an additional column within the Nutrition Facts label that lists the quantitative amounts and percent Daily Values for the entire package, as well as a column listing the quantitative amounts and percent Daily Values for a serving that is less than the entire package (*i.e.*, the serving size derived from the reference amount). The first column would be based on the serving size for the product and the second column would be based on the entire contents of the package.

(A) This provision does not apply to products that meet the requirements to use the tabular format in paragraph (j)(13)(ii)(A)(*1*) of this section or to products that meet the requirements to use the linear format in paragraph (j)(13)(ii)(A)(*2*) of this section.

(B) This provision does not apply to raw fruits, vegetables, and seafood for which voluntary nutrition labeling is provided in the product labeling or advertising or when claims are made about the product.

(C) This provision does not apply to products that require further preparation and provide an additional column of nutrition information under paragraph (e) of this section, to products that are commonly consumed in combination with another food and provide an additional column of nutrition information under paragraph (e) of this section, to products that provide an additional column of nutrition information for two or more groups for which RDIs are established (*e.g.*, both infants and children less than 4 years of age), to popcorn products that provide an additional column of nutrition information per 1 cup popped popcorn, or to varied-weight products covered under paragraph (b)(8)(iii) of this section.

(ii) When a nutrient content claim or health claim is made on the label of a product that uses a dual column as required in paragraph (b)(2)(i)(D) or (b)(12)(i) of this section, the claim must be followed by a statement that sets forth the basis on which the claim is made, except that the statement is not required for products when the nutrient that is the subject of the claim meets the criteria for the claim based on the reference amount for the product and the entire container or the unit amount. When a nutrient content claim is made, the statement must express that the claim refers to the amount of the nutrient per serving (*e.g.*, "good source of calcium per serving" or "per X [insert unit]_serving") or per reference amount (*e.g.*, "good source of calcium per [insert reference amount (*e.g.*, per 8 ounces)]), as required based on §101.12(g). When a health claim is made, the statement shall be "A serving of _ounces of this product conforms to such a diet."

(c) The declaration of nutrition information on the label and in labeling of a food shall contain information about the level of the following nutrients, except for those nutrients whose inclusion, and the declaration of amounts, is voluntary as set forth in this paragraph. No nutrients or food components other than those listed in this paragraph as either mandatory or voluntary may be included within the nutrition label. Except as provided for in paragraphs (f) or (j) of this section, nutrient information shall be presented using the nutrient names specified and in the following order in the formats specified in paragraphs (d) or (e) of this section.

(1) "Calories, total," "Total calories," or "Calories": A statement of the caloric content per serving, expressed to the nearest 5-calorie increment up to and including 50 calories, and 10-calorie increment above 50 calories, except that amounts less than 5 calories may be expressed as zero. Energy content per serving may also be expressed in kilojoule units, added in parentheses immediately following the statement of the caloric content.

(i) Caloric content may be calculated by the following methods. Where either specific or general food factors are used, the factors shall be applied to the actual amount (i.e., before rounding) of food components (e.g., fat, carbohydrate, protein, or ingredients with specific food factors) present per serving.

(A) Using specific Atwater factors (*i.e.*, the Atwater method) given in table 13, USDA Handbook No. 74 (slightly revised, 1973),

(B) Using the general factors of 4, 4, and 9 calories per gram for protein, total carbohydrate, and total fat, respectively, as described in USDA Handbook No. 74 (slightly revised, 1973) pp. 9-11;

(C) Using the general factors of 4, 4, and 9 calories per gram for protein, total carbohydrate (less the amount of non-digestible carbohydrates and sugar alcohols), and total fat, respectively, as described in USDA Handbook No. 74 (slightly revised, 1973) pp. 9-11. A general factor of 2 calories per gram for soluble non-digestible carbohydrates shall be used. The general factors for caloric value of sugar alcohols provided in paragraph (c)(1)(i)(F) of this section shall be used;

(D) Using data for specific food factors for particular foods or ingredients approved by the Food and Drug Administration (FDA) and provided in parts 172 or 184 of this chapter, or by other means, as appropriate;

(E) Using bomb calorimetry data subtracting 1.25 calories per gram protein to correct for incomplete digestibility, as described in USDA Handbook No. 74 (slightly revised, 1973) p. 10; or

(F) Using the following general factors for caloric value of sugar alcohols: Isomalt—2.0 calories per gram, lactitol—2.0 calories per gram, xylitol—2.4 calories per gram, maltitol—2.1 calories per gram, sorbitol—2.6 calories per gram, hydrogenated starch hydrolysates—3.0 calories per gram, mannitol—1.6 calories per gram, and erythritol—0 calories per gram.

(ii) "Calories from saturated fat" or "Calories from saturated" (VOLUNTARY): A statement of the caloric content derived from saturated fat as defined in paragraph (c)(2)(i) of this section in a serving may be declared voluntarily, expressed to the nearest 5-calorie increment, up to and including 50 calories, and the nearest 10-calorie increment above 50 calories, except that amounts less than 5 calories may be expressed as zero. This statement shall be indented under the statement of calories as provided in paragraph (d)(5) of this section.

(2) "Fat, total" or "Total fat": A statement of the number of grams of total fat in a serving defined as total lipid fatty acids and expressed as triglycerides where fatty acids are aliphatic carboxylic acids consisting of a chain of alkyl groups and characterized by a terminal carboxyl group. Amounts shall be expressed to the nearest 0.5 ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(i) "Saturated fat," or "Saturated": A statement of the number of grams of saturated fat in a serving defined as the sum of all fatty acids containing no double bonds, except that label declaration of saturated fat content information is not required for products that contain less than 0.5 gram of total fat in a serving if no claims are made about fat, fatty acid, or cholesterol content, and if "calories from saturated fat" is not declared. Except as provided for in paragraph (f) of this section, if a statement of the saturated fat content is not required and, as a result, not declared, the statement "Not a significant source of saturated fat" shall be placed at the bottom of the table of nutrient values. Saturated fat content shall be indented and expressed as grams per serving to the nearest 0.5 gram ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(ii) "Trans fat" or "Trans": A statement of the number of grams of trans fat in a serving, defined as the sum of all unsaturated fatty acids that contain one or more isolated (*i.e.*, nonconjugated) double bonds in a trans configuration, except that label declaration of trans fat content information is not required for products that contain less than 0.5 gram of total fat in a serving if no claims are made about fat, fatty acid or cholesterol content. The word "trans" may be italicized to indicate its Latin origin. Trans fat content shall be indented and expressed as grams per serving to the nearest 0.5 ( ½ )-gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content, when declared, shall be expressed as zero. Except as provided for in paragraph (f) of this section, if a statement of the trans fat content is not required and, as a result, not declared, the statement "Not a significant source of trans fat" shall be placed at the bottom of the table of nutrient values.

(iii) "Polyunsaturated fat" or "Poly-unsaturated" (VOLUNTARY): A statement of the number of grams of polyunsaturated fat in a serving defined as cis,cis-methylene-interrupted polyunsaturated fatty acids may be declared voluntarily, except that when monounsaturated fat is declared, or when a claim about fatty acids or cholesterol is made on the label or in labeling of a food other than one that meets the criteria in §101.62(b)(1) for a claim for "fat free," label declaration of polyunsaturated fat is required. Polyunsaturated fat content shall be indented and expressed as grams per serving to the nearest 0.5 ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(iv) "Monounsaturated fat" or "Monounsaturated" (VOLUNTARY): A statement of the number of grams of monounsaturated fat in a serving defined as cis-monounsaturated fatty acids may be declared voluntarily except that when polyunsaturated fat is declared, or when a claim about fatty acids or cholesterol is made on the label or in labeling of a food other than one that meets the criteria in §101.62(b)(1) for a claim for "fat free," label declaration of monounsaturated fat is required. Monounsaturated fat content shall be indented and expressed as grams per serving to the nearest 0.5 ( ½ ) gram increment below 5 grams and to the nearest gram increment above 5 grams. If the serving contains less than 0.5 gram, the content shall be expressed as zero.

(3) "Cholesterol": A statement of the cholesterol content in a serving expressed in milligrams to the nearest 5-milligram increment, except that label declaration of cholesterol information is not required for products that contain less than 2 milligrams cholesterol in a serving and make no claim about fat, fatty acids, or cholesterol content, or such products may state the cholesterol content as zero. Except as provided for in paragraph (f) of this section, if cholesterol content is not required and, as a result, not declared, the statement "Not a significant source of cholesterol" shall be placed at the bottom of the table of nutrient values in the same type size. If the food contains 2 to 5 milligrams of cholesterol per serving, the content may be stated as "less than 5 milligrams."

(4) "Sodium": A statement of the number of milligrams of sodium in a specified serving of food expressed as zero when the serving contains less than 5 milligrams of sodium, to the nearest 5-milligram increment when the serving contains 5 to 140 milligrams of sodium, and to the nearest 10-milligram increment when the serving contains greater than 140 milligrams.

(5) "Fluoride" (VOLUNTARY): A statement of the number of milligrams of fluoride in a specified serving of food may be declared voluntarily, except that when a claim is made about fluoride content, label declaration shall be required. Fluoride content shall be expressed as zero when the serving contains less than 0.1 milligrams of fluoride, to the nearest 0.1-milligram increment when the serving contains less than or equal to 0.8 milligrams of fluoride, and the nearest 0.2 milligram-increment when a serving contains more than 0.8 milligrams of fluoride. Bottled water that bears a statement about added fluoride, as permitted by §101.13(q)(8), must bear nutrition labeling that complies with requirements for the simplified format in paragraph (f) of this section.

(6) "Carbohydrate, total" or "Total carbohydrate": A statement of the number of grams of total carbohydrate in a serving expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, or if the serving contains less than 0.5 gram, the content may be expressed as zero. Total carbohydrate content shall be calculated by subtraction of the sum of the crude protein, total fat, moisture, and ash from the total weight of the food. This calculation method is described in A. L. Merrill and B. K. Watt, "Energy Value of Foods—Basis and Derivation," USDA Handbook 74 (slightly revised 1973) pp. 2 and 3, which is incorporated by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51 (the availability of this incorporation by reference is given in paragraph (c)(1)(i)(A) of this section).

(i) "Dietary fiber": A statement of the number of grams of total dietary fiber in a serving, indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, declaration of dietary fiber is not required or, alternatively, the statement "Contains less than 1 gram" or "less than 1 gram" may be used, and if the serving contains less than 0.5 gram, the content may be expressed as zero. Dietary fiber is defined as non-digestible soluble and insoluble carbohydrates (with 3 or more monomeric units), and lignin that are intrinsic and intact in plants; isolated or synthetic non-digestible carbohydrates (with 3 or more monomeric units) determined by FDA to have physiological effects that are beneficial to human health. Except as provided for in paragraph (f) of this section, if dietary fiber content is not required, and as a result not declared, the statement "Not a significant source of dietary fiber" shall be placed at the bottom of the table of nutrient values in the same type size. The following isolated or synthetic nondigestible carbohydrate(s) have been determined by FDA to have physiological effects that are beneficial to human health and, therefore, shall be included in the calculation of the amount of dietary fiber: [beta]-glucan soluble fiber (as described in §101.81(c)(2)(ii)(A)), psyllium husk (as described in §101.81(c)(2)(ii)(B)(1)), cellulose, guar gum, pectin, locust bean gum, and hydroxypropylmethylcellulose. The manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of dietary fiber in the label and labeling of food when a mixture of dietary fiber, and added nondigestible carbohydrate(s) that does not meet the definition of dietary fiber, is present in the food.

(A) "Soluble fiber" (VOLUNTARY): A statement of the number of grams of soluble dietary fiber in a serving may be declared voluntarily except that when a claim is made on the label or in labeling about soluble fiber, label declaration shall be required. Soluble fiber must meet the definition of dietary fiber in this paragraph (c)(6)(i). The manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of soluble fiber in the label and labeling of food when a mixture of soluble fiber and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food. Soluble fiber content shall be indented under dietary fiber and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero."

(B) "Insoluble fiber" (VOLUNTARY): A statement of the number of grams of insoluble dietary fiber in a serving may be declared voluntarily except that when a claim is made on the label or in labeling about insoluble fiber, label declaration shall be required. Insoluble fiber must meet the definition of dietary fiber in this paragraph (c)(6)(i). The manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of insoluble fiber in the label and labeling of food when a mixture of insoluble and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food. Insoluble fiber content shall be indented under dietary fiber and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

(ii) "Total Sugars": A statement of the number of grams of sugars in a serving, except that the label declaration of sugars content is not required for products that contain less than 1 gram of sugars in a serving if no claims are made about sweeteners, sugars, or sugar alcohol content. Except as provided for in paragraph (f) of this section, if a statement of the total sugars content is not required and, as a result, not declared, the statement "Not a significant source of total sugars" shall be placed at the bottom of the table of nutrient values in the same type size. Total sugars shall be defined as the sum of all free mono- and disaccharides (such as glucose, fructose, lactose, and sucrose). Total sugars content shall be indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

(iii) "Added Sugars": A statement of the number of grams of added sugars in a serving, except that label declaration of added sugars content is not required for products that contain less than 1 gram of added sugars in a serving if no claims are made about sweeteners, sugars, added sugars, or sugar alcohol content. Except as provided for in paragraph (f) of this section, if a statement of the added sugars content is not required and, as a result, not declared, the statement "Not a significant source of added sugars" shall be placed at the bottom of the table of nutrient values in the same type size. Added sugars are either added during the processing of foods, or are packaged as such, and include sugars (free, mono and disaccharides), sugars from syrups and honey, and sugars from concentrated fruit or vegetable juices that are in excess of what would be expected from the same volume of 100 percent fruit or vegetable juice of the same type, except that fruit or vegetable juice concentrated from 100 percent juices sold to consumers, fruit or vegetable juice concentrates used towards the total juice percentage label declaration under §101.30 or for Brix standardization under §102.33(g)(2) of this chapter, fruit juice concentrates which are used to formulate the fruit component of jellies, jams, or preserves in accordance with the standard of identities set forth in §§150.140 and 150.160 of this chapter, or the fruit component of fruit spreads shall not be labeled as added sugars. Added sugars content shall be indented under Total Sugars and shall be prefaced with the word "Includes" followed by the amount (in grams) "Added Sugars" ("Includes `X' g Added Sugars"). It shall be expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. When a mixture of naturally occurring and added sugars is present in the food, and for specific foods containing added sugars, alone or in combination with naturally occurring sugars, where the added sugars are subject to fermentation and/or non-enzymatic browning, the manufacturer must make and keep records in accordance with paragraphs (g)(10) and (11) of this section to verify the declared amount of added sugars in the label and labeling of food.

(iv) "Sugar alcohol" (VOLUNTARY): A statement of the number of grams of sugar alcohols in a serving may be declared voluntarily on the label, except that when a claim is made on the label or in labeling about sugar alcohol or total sugars, or added sugars when sugar alcohols are present in the food, sugar alcohol content shall be declared. For nutrition labeling purposes, sugar alcohols are defined as the sum of saccharide derivatives in which a hydroxyl group replaces a ketone or aldehyde group and whose use in the food is listed by FDA (*e.g.,* mannitol or xylitol) or is generally recognized as safe (*e.g.,* sorbitol). In lieu of the term "sugar alcohol," the name of the specific sugar alcohol (*e.g.,* "xylitol") present in the food may be used in the nutrition label provided that only one sugar alcohol is present in the food. Sugar alcohol content shall be indented and expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero.

(7) "Protein": A statement of the number of grams of protein in a serving, expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. When the protein in foods represented or purported to be for adults and children 4 or more years of age has a protein quality value that is a protein digestibility-corrected amino acid score of less than 20 expressed as a percent, or when the protein in a food represented or purported to be for children greater than 1 but less than 4 years of age has a protein quality value that is a protein digestibility-corrected amino acid score of less than 40 expressed as a percent, either of the following shall be placed adjacent to the declaration of protein content by weight: The statement "not a significant source of protein," or a listing aligned under the column headed "Percent Daily Value" of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the Daily Reference Value (DRV) or Reference Daily Intake (RDI), as appropriate, for protein and expressed as a Percent of Daily Value. When the protein quality in a food as measured by the Protein Efficiency Ratio (PER) is less than 40 percent of the reference standard (casein) for a food represented or purported to be specifically for infants through 12 months, the statement "not a significant source of protein" shall be placed adjacent to the declaration of protein content. Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used.

(i) A statement of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the RDI or DRV for protein, as appropriate, and expressed as Percent of Daily Value, may be placed on the label, except that such a statement shall be given if a protein claim is made for the product, or if the product is represented or purported to be specifically for infants through 12 months or children 1 through 3 years of age. When such a declaration is provided, it should be placed on the label adjacent to the statement of grams of protein and aligned under the column headed "Percent Daily Value," and expressed to the nearest whole percent. However, the percentage of the RDI for protein shall not be declared if the food is represented or purported to be specifically for infants through 12 months and the protein quality value is less than 40 percent of the reference standard.

(ii) The "corrected amount of protein (gram) per serving" for foods represented or purported for adults and children 1 or more years of age is equal to the actual amount of protein (gram) per serving multiplied by the amino acid score corrected for

protein digestibility. If the corrected score is above 1.00, then it shall be set at 1.00. The protein digestibility-corrected amino acid score shall be determined by methods given in sections 5.4.1, 7.2.1, and 8.00 in "Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," except that when official AOAC procedures described in paragraph (c)(7) of this section require a specific factor other than 6.25, that specific factor shall be used. For foods represented or purported to be specifically for infants through 12 months, the corrected amount of protein (grams) per serving is equal to the actual amount of protein (grams) per serving multiplied by the relative protein quality value. The relative protein quality value shall be determined by dividing the subject food protein PER value by the PER value for casein. If the relative protein value is above 1.00, it shall be set at 1.00.

(iii) For the purpose of labeling with a percent of the DRV or RDI, a value of 50 grams of protein shall be the DRV for adults and children 4 or more years of age, a value of 11 grams of protein shall be the RDI for infants through 12 months, a value of 13 grams shall be the DRV for children 1 through 3 years of age, and a value of 71 grams of protein shall be the RDI for pregnant women and lactating women.

(8) "Vitamins and minerals": The requirements related to including a statement of the amount per serving of vitamins and minerals are described in this paragraph (c)(8).

(i) For purposes of declaration of percent of Daily Value as provided for in paragraphs (d), (e), and (f) of this section, foods represented or purported to be specifically for infants through 12 months, children 1 through 3 years, pregnant women, and lactating women shall use the RDIs that are specified for the intended group. For foods represented or purported to be specifically for both infants through 12 months of age and children 1 through 3 years of age, the percent of Daily Value shall be presented by separate declarations according to paragraph (e) of this section based on the RDI values for infants through 12 months of age and children 1 through 3 years of age. When such dual declaration is used on any label, it shall be included in all labeling, and equal prominence shall be given to both values in all such labeling. The percent Daily Value based on the RDI values for pregnant women and lactating women shall be declared on food represented or purported to be specifically for pregnant women and lactating women. All other foods shall use the RDI for adults and children 4 or more years of age.

(ii) The declaration of vitamins and minerals as a quantitative amount by weight and percent of the RDI shall include vitamin D, calcium, iron, and potassium in that order, for infants through 12 months, children 1 through 3 years of age, pregnant women, lactating women, and adults and children 4 or more years of age, except quantitative weights for these vitamins and minerals are not required for labels described in paragraph (j)(13) of this section. The declaration of folic acid shall be included as a quantitative amount by weight when added as a nutrient supplement or a claim is made about the nutrient. The declaration of vitamins and minerals in a food, as a quantitative amount by weight and percent of the RDI, may include any of the other vitamins and minerals listed in paragraph (c)(8)(iv) of this section. The declaration of vitamins and minerals shall include any of the other vitamins and minerals listed in paragraph (c)(8)(iv) of this section as a statement of the amount per serving of the vitamins and minerals as described in this paragraph (c)(8)(ii), calculated as a percent of the RDI and expressed as a percent of the Daily Value, when they are added as a nutrient supplement, or when a claim is made about them, unless otherwise stated as quantitative amount by weight and percent of the Daily Value. Other vitamins and minerals need not be declared if neither the nutrient nor the component is otherwise referred to on the label or the labeling or advertising and the vitamins and minerals are:

(A) Required or permitted in a standardized food (e.g., thiamin, riboflavin, and niacin in enriched flour) and that standardized food is included as an ingredient (i.e., component) in another food; or

(B) Included in a food solely for technological purposes and declared only in the ingredient statement. The declaration may also include any of the other vitamins and minerals listed in paragraph (c)(8)(iv) of this section when they are naturally occurring in the food. The additional vitamins and minerals shall be listed in the order established in paragraph (c)(8)(iv) of this section.

(iii) The percentages for vitamins and minerals shall be expressed to the nearest 2-percent increment up to and including the 10-percent level, the nearest 5-percent increment above 10 percent and up to and including the 50-percent level, and the nearest 10-percent increment above the 50-percent level. Quantitative amounts and percentages of vitamins and minerals present at less than 2 percent of the RDI are not required to be declared in nutrition labeling but may be declared by a zero or by the use of an asterisk (or other symbol) that refers to another asterisk (or symbol) that is placed at the bottom of the table and that is followed by the statement "Contains less than 2 percent of the Daily Value of this (these) nutrient (nutrients)" or "Contains <2 percent of the Daily Value of this (these) nutrient (nutrients)." Alternatively, except as provided for in paragraph (f) of this section, if vitamin D, calcium, iron, or potassium is present in amounts less than 2 percent of the RDI, label declaration of the nutrient(s) is not required if the statement "Not a significant source of—(listing the vitamins or minerals omitted)" is placed at the bottom of the table of nutrient values. Either statement shall be in the same type size as nutrients that are indented. The quantitative amounts of vitamins and minerals, excluding sodium, shall be the amount of the vitamin or mineral included in one serving of the product, using the units of measurement and the levels of significance given in paragraph (c)(8)(iv) of this section, except that zeros following decimal points may be dropped, and additional levels of significance may be used when the number

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

of decimal places indicated is not sufficient to express lower amounts (*e.g.,* the RDI for zinc is given in whole milligrams, but the quantitative amount may be declared in tenths of a milligram).

(iv) The following RDIs, nomenclature, and units of measure are established for the following vitamins and minerals which are essential in human nutrition:

| Nutrient | Unit of measure | RDI | | | |
|---|---|---|---|---|---|
| | | Adults and children ≥ 4 years | Infants[1] through 12 months | Children 1 through 3 years | Pregnant women and lactating women |
| Vitamin D | Micrograms (mcg)[2] | 20 | 10 | 15 | 15 |
| Calcium | Milligrams (mg) | 1,300 | 260 | 700 | 1,300 |
| Iron | Milligrams (mg) | 18 | 11 | 7 | 27 |
| Potassium | Milligrams (mg) | 4,700 | 700 | 3,000 | 5,100 |
| Vitamin A | Micrograms RAE[3] (mcg) | 900 | 500 | 300 | 1,300 |
| Vitamin C | Milligrams (mg) | 90 | 50 | 15 | 120 |
| Vitamin E | Milligrams (mg)[4] | 15 | 5 | 6 | 19 |
| Vitamin K | Micrograms (mcg) | 120 | 2.5 | 30 | 90 |
| Thiamin | Milligrams (mg) | 1.2 | 0.3 | 0.5 | 1.4 |
| Riboflavin | Milligrams (mg) | 1.3 | 0.4 | 0.5 | 1.6 |
| Niacin | Milligrams NE[5] (mg) | 16 | 4 | 6 | 18 |
| Vitamin $B_6$ | Milligrams (mg) | 1.7 | 0.3 | 0.5 | 2.0 |
| Folate[6] | Micrograms DFE[7] (mcg) | 400 | 80 | 150 | 600 |
| Vitamin $B_{12}$ | Micrograms (mcg) | 2.4 | 0.5 | 0.9 | 2.8 |
| Biotin | Micrograms (mcg) | 30 | 6 | 8 | 35 |
| Pantothenic acid | Milligrams (mg) | 5 | 1.8 | 2 | 7 |
| Phosphorus | Milligrams (mg) | 1,250 | 275 | 460 | 1,250 |
| Iodine | Micrograms (mcg) | 150 | 130 | 90 | 290 |
| Magnesium | Milligrams (mg) | 420 | 75 | 80 | 400 |
| Zinc | Milligrams (mg) | 11 | 3 | 3 | 13 |
| Selenium | Micrograms (mcg) | 55 | 20 | 20 | 70 |
| Copper | Milligrams (mg) | 0.9 | 0.2 | 0.3 | 1.3 |
| Manganese | Milligrams (mg) | 2.3 | 0.6 | 1.2 | 2.6 |
| Chromium | Micrograms (mcg) | 35 | 5.5 | 11 | 45 |
| Molybdenum | Micrograms (mcg) | 45 | 3 | 17 | 50 |
| Chloride | Milligrams (mg) | 2,300 | 570 | 1,500 | 2,300 |
| Choline | Milligrams (mg) | 550 | 150 | 200 | 550 |
| Protein | Grams (g) | N/A | 11 | N/A | [8]71 |

[1]RDIs are based on dietary reference intake recommendations for infants through 12 months of age.

[2]The amount of vitamin D may, but is not required to, be expressed in international units (IU), in addition to the mandatory declaration in mcg. Any declaration of the amount of vitamin D in IU must appear in parentheses after the declaration of the amount of vitamin D in mcg.

[3]RAE = Retinol activity equivalents; 1 microgram RAE = 1 microgram retinol, 2 microgram supplemental β-carotene, 12 micrograms dietary β-carotene, or 24 micrograms dietary α-carotene, or dietary 24 micrograms dietary β-cryptoxanthin.

[4]1 mg α-tocopherol (label claim) = 1 mg α-tocopherol = 1 mg RRR- α-tocopherol = 2 mg *all rac*-α-tocopherol.

[5]NE = Niacin equivalents, 1 mg NE = 1 mg niacin = 60 milligrams tryptophan.

[6]"Folate" and "Folic Acid" must be used for purposes of declaration in the labeling of conventional foods and dietary supplements. The declaration for folate must be in mcg DFE (when expressed as a quantitative amount by weight in a conventional food or a dietary supplement), and percent DV based on folate in mcg DFE. Folate may be expressed as a percent DV in conventional foods. When folic acid is added or when a claim is made about the nutrient, folic acid must be declared in parentheses, as mcg of folic acid.

[7]DFE = Dietary Folate Equivalents; 1 DFE = 1 mcg naturally occurring folate = 0.6 mcg folic acid.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

[8]Based on the reference caloric intake of 2,000 calories for adults and children aged 4 years and older, and for pregnant women and lactating women.

(v) The following synonyms may be added in parentheses immediately following the name of the nutrient or dietary component:

Calories—Energy

Vitamin C—Ascorbic acid

Thiamin—Vitamin $B_1$

Riboflavin—Vitamin $B_2$

(vi) A statement of the percent of vitamin A that is present as *beta*-carotene may be declared voluntarily. When the vitamins and minerals are listed in a single column, the statement shall be indented under the information on vitamin A. When vitamins and minerals are arrayed horizontally, the statement of percent shall be presented in parenthesis following the declaration of vitamin A and the percent DV of vitamin A in the food (e.g., "Percent Daily Value: Vitamin A 50 (90 percent as *beta*-carotene)"). When declared, the percentages shall be expressed in the same increments as are provided for vitamins and minerals in paragraph (c)(8)(iii) of this section.

(vii) When the amount of folate is declared in the labeling of a conventional food or a dietary supplement, the nutrient name "folate" shall be listed for products containing folate (natural folate, and/or synthetic folate as a component of dietary supplement, such as calcium salt of L-5-MTHF), folic acid, or a mixture of folate and folic acid. The name of the synthetic form of the nutrient "folic acid", when added or a claim is made about the nutrient, shall be included in parentheses after this declaration with the amount of folic acid. The declaration must be folate in mcg DFE (when expressed as a quantitative amount by weight in a conventional food or a dietary supplement) and the percent DV based on folate in mcg DFE, or for conventional food, may be expressed as folate and the percent DV based on folate in mcg DFE. When declared, folic acid must be in parentheses, mcg of folic acid as shown in paragraph (d)(12) of this section in the display that illustrates voluntary declaration of nutrition information.

(9) The following DRVs, nomenclature, and units of measure are established for the following food components:

| Food component | Unit of measure | Adults and children ≥4 years | Infants through 12 months | Children 1 through 3 years | Pregnant women and lactating women |
|---|---|---|---|---|---|
| Fat | Grams (g) | [1]78 | 30 | [2]39 | [1]78 |
| Saturated fat | Grams (g) | [1]20 | N/A | [2]10 | [1]20 |
| Cholesterol | Milligrams (mg) | 300 | N/A | 300 | 300 |
| Total carbohydrate | Grams (g) | [1]275 | 95 | [2]150 | [1]275 |
| Sodium | Milligrams (mg) | 2,300 | N/A | 1,500 | 2,300 |
| Dietary Fiber | Grams (g) | [1]28 | N/A | [2]14 | [1]28 |
| Protein | Grams (g) | [1]50 | N/A | [2]13 | N/A |
| Added Sugars | Grams (g) | [1]50 | N/A | [2]25 | [1]50 |

[1]Based on the reference caloric intake of 2,000 calories for adults and children aged 4 years and older, and for pregnant women and lactating women

[2]Based on the reference caloric intake of 1,000 calories for children 1 through 3 years of age.

(d)(1) Nutrient information specified in paragraph (c) of this section shall be presented on foods in the following format, as shown in paragraph (d)(12) of this section, except on foods where the tabular display is permitted as provided for in paragraph (d)(11) of this section, on which dual columns of nutrition information are declared as provided for in paragraph (e) of this section, on those food products on which the simplified format is required to be used as provided for in paragraph (f) of this section, on foods for infants through 12 months of age and children 1 through 3 years of age as provided for in paragraph (j)(5) of this section, and on foods in small or intermediate-sized packages as provided for in paragraph (j)(13) of this section. In the interest of uniformity of presentation, FDA strongly recommends that the nutrition information be presented using the graphic specifications set forth in appendix B to part 101.

(i) The nutrition information shall be set off in a box by use of hairlines and shall be all black or one color type, printed on a white or other neutral contrasting background whenever practical.

(ii) All information within the nutrition label shall utilize:

(A) Except as provided for in paragraph (c)(2)(ii) of this section, a single easy-to-read type style,

(B) Upper and lower case letters,

(C) At least one point leading (i.e., space between two lines of text) except that at least four points leading shall be utilized for the information required by paragraphs (d)(7) and (d)(8) of this section as shown in paragraph (d)(12), and

(D) Letters should never touch.

(iii) Information required in paragraphs (d)(7) and (8) of this section shall be in type size no smaller than 8 point. Information required in paragraph (d)(5) of this section for the "Calories" declaration shall be highlighted in bold or extra bold and shall be in a type size no smaller than 16 point except the type size for this information required in the tabular displays as shown in paragraphs (d)(11), (e)(6)(ii), and (j)(13)(ii)(A)(*1*) of this section and the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(*2*) of this section shall be in a type size no smaller than 10 point. The numeric amount for the information required in paragraph (d)(5) of this section shall also be highlighted in bold or extra bold type and shall be in a type size no smaller than 22 point, except the type size for this information required for the tabular display for small packages as shown in paragraph (j)(13)(ii)(A)(*1*) of this section, and for the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(*2*) of this section no smaller than 14 point. The information required in paragraphs (d)(4), (6), and (9) of this section shall be in a type size no smaller than 6 point. When provided, the information described in paragraph (d)(10) of this section shall be in a type size no smaller than 6 point.

(iv) The headings required by paragraphs (d)(2), (d)(3)(ii), (d)(4), and (d)(6) of this section (*i.e.*, "Nutrition Facts," "Serving size," "Amount per serving," and "% Daily Value*"), the names of all nutrients that are not indented according to requirements of paragraph (c) of this section (*i.e.*, "Calories," "Total Fat," "Cholesterol," "Sodium," "Total Carbohydrate" and "Protein"), and the percentage amounts required by paragraph (d)(7)(ii) of this section shall be highlighted in bold or extra bold type or other highlighting (reverse printing is not permitted as a form of highlighting) that prominently distinguishes it from other information. No other information shall be highlighted.

(v) A hairline rule that is centered between the lines of text shall separate "Nutrition Facts" from the servings per container statement required in paragraph (d)(3)(i) of this section and shall separate each nutrient and its corresponding percent Daily Value required in paragraphs (d)(7)(i) and (ii) of this section from the nutrient and percent Daily Value above and below it, as shown in paragraph (d)(12) of this section and in Appendix B to Part 101.

(2) The information shall be presented under the identifying heading of "Nutrition Facts" which shall be set in a type size no smaller than all other print size in the nutrition label except for the numerical information for "Calories" required in paragraph (d)(5) of this section, and except for labels presented according to the format provided for in paragraphs (d)(11), (d)(13)(ii), (e)(6)(ii), (j)(13)(ii)(A)(*1*), and (j)(13)(ii)(A)(*2*) of this section, unless impractical, shall be set the full width of the information provided under paragraph (d)(7) of this section, as shown in paragraph (d)(12) of this section.

(3) Information on servings per container and serving size shall immediately follow the heading as shown in paragraph (d)(12) of this section. Such information shall include:

(i) "___ servings per container": The number of servings per container, except that this statement is not required on single serving containers as defined in paragraph (b)(6) of this section or on other food containers when this information is stated in the net quantity of contents declaration. The information required in this paragraph shall be located immediately after the "Nutrition Facts" heading and shall be in a type size no smaller than 10 point, except the type size for this information shall be no smaller than 9 point in the tabular display for small packages as shown in paragraph (j)(13)(ii)(A)(*1*) of this section and the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(*2*) of this section. For the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(*2*) of this section, the actual number of servings may be listed after the servings per container declaration.

(ii) "Serving size": A statement of the serving size as specified in paragraph (b)(7) of this section which shall immediately follow the "___servings per container" declaration. The information required in this paragraph shall be highlighted in bold or extra bold and be in a type size no smaller than 10 point, except the type size shall be no smaller than 9 point for this information in the tabular displays as shown in paragraphs (d)(11) and (e)(6)(ii) of this section, the tabular display for small packages as shown in paragraph (j)(13)(ii)(A)(*1*) of this section, and the linear display for small packages as shown in paragraph (j)(13)(ii)(A)(*2*) of this section. The serving size amount must be right justified if adequate space is available. If the "Serving size" declaration does not fit in the allocated space a type size of no smaller than 8 point may be used on packages of any size.

(4) A subheading "Amount per serving" shall be separated from the serving size information by a bar as shown in

paragraph (d)(12) of this section, except this information is not required for the dual column formats shown in paragraphs (e)(5), (e)(6)(i), and (e)(6)(ii) of this section.

(5) Information on calories shall immediately follow the subheading "Amount per serving" and shall be declared in one line. If "Calories from saturated fat" is declared, it shall be indented under "Calories" and shall be in a type size no smaller than 8 point.

(6) The column heading "% Daily Value," followed by an asterisk (e.g., "% Daily Value*"), shall be separated from information on calories by a bar as shown in paragraph (d)(12) of this section. The position of this column heading shall allow for a list of nutrient names and amounts as described in paragraph (d)(7) of this section to be to the left of, and below, this column heading. The column headings "Percent Daily Value," "Percent DV," or "% DV" may be substituted for "% Daily Value."

(7) Except as provided for in paragraph (j)(13)(ii)(A)(*2*) of this section, nutrient information for both mandatory and any voluntary nutrients listed in paragraph (c) of this section that are to be declared in the nutrition label, except for folic acid in conventional food and voluntarily declared vitamins and minerals expressed as a statement of the amount per serving calculated as a percent of the RDI and expressed as a percent Daily Value, shall be declared as follows:

(i) The name of each nutrient, as specified in paragraph (c) of this section, shall be given in a column and followed immediately by the quantitative amount by weight for that nutrient appended with a "g" for grams, "mg" for milligrams, or "mcg" for micrograms as shown in paragraph (d)(12) of this section. The symbol "<" may be used in place of "less than."

(ii) A listing of the percent of the DRV as established in paragraphs (c)(7)(iii) and (c)(9) of this section shall be given in a column aligned under the heading "% Daily Value" established in paragraph (d)(6) of this section with the percent expressed to the nearest whole percent for each nutrient declared in the column described in paragraph (d)(7)(i) of this section for which a DRV has been established, except that the percent for protein may be omitted as provided in paragraph (c)(7) of this section. The percent shall be calculated by dividing either the amount declared on the label for each nutrient or the actual amount of each nutrient (i.e., before rounding) by the DRV for the nutrient, except that the percent for protein shall be calculated as specified in paragraph (c)(7)(ii) of this section. The numerical value shall be followed by the symbol for percent (i.e., %).

(8) Nutrient information for vitamins and minerals (except sodium) shall be separated from information on other nutrients by a bar and may be arrayed vertically as shown in paragraph (d)(12) of this section (*e.g.,* Vitamin D 2 mcg 10%, Calcium 260 mg 20%, Iron 8 mg 45%, Potassium 235 mg 6%) or may be listed horizontally. When listed horizontally in two columns, vitamin D and calcium should be listed on the first line and iron and potassium should be listed on the second line, as shown in paragraph (d)(12) of this section in the side-by-side display. When more than four vitamins and minerals are declared voluntarily as shown in paragraph (d)(12) of this section in the label which illustrates the mandatory plus voluntary provisions of paragraph (d) of this section, they may be declared vertically with percentages listed under the column headed "% Daily Value."

(9) A footnote, preceded by an asterisk, shall be placed beneath the list of vitamins and minerals and shall be separated from the list by a bar, except that the footnote may be omitted from foods that can use the terms "calorie free," "free of calories," "without calories," "trivial source of calories," "negligible source of calories," or "dietary insignificant source of calories" on the label or in the labeling of foods as defined in §101.60(b). The first sentence of the footnote: "The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet" may be used on foods that can use the terms "calorie free," "free of calories," "without calories," "trivial source of calories," "negligible source of calories," or "dietary insignificant source of calories" on the label or in the labeling of foods as defined in §101.60(b). The footnote shall state: "*The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet. 2,000 calories a day is used for general nutrition advice." If the food product is represented or purported to be for children 1 through 3 years of age, the second sentence of the footnote shall substitute "1,000 calories" for "2,000 calories."

(10) Caloric conversion information on a per gram basis for fat, carbohydrate, and protein may be presented beneath the information required in paragraph (d)(9) of this section, separated from that information by a hairline. This information may be presented horizontally as shown in paragraph (d)(12) of this section (i.e., "Calories per gram: fat 9, carbohydrate 4, protein 4") or vertically in columns.

(11)(i) If the space beneath the information on vitamins and minerals is not adequate to accommodate the information required in paragraph (d)(9) of this section, the information required in paragraph (d)(9) may be moved to the right of the column required in paragraph (d)(7)(ii) of this section and set off by a line that distinguishes it and sets it apart from the percent Daily Value column. The caloric conversion information provided for in paragraph (d)(10) of this section may be presented beneath either side or along the full length of the nutrition label.

(ii) If the space beneath the mandatory declaration of potassium is not adequate to accommodate any remaining vitamins and minerals to be declared or the information required in paragraph (d)(9) of this section, the remaining information may be moved to the right and set off by a line that distinguishes it and sets it apart from the nutrients and the percent DV information

12/8/2019, 10:22 AM

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

given to the left. The caloric conversion information provided for in paragraph (d)(10) of this section may be presented beneath either side or along the full length of the nutrition label.

(iii) If there is not sufficient continuous vertical space (i.e., approximately 3 in) to accommodate the required components of the nutrition label up to and including the mandatory declaration of potassium, the nutrition label may be presented in a tabular display as shown in the following sample label.

Tabular Format



(12) The following sample labels illustrate the mandatory provisions and mandatory plus voluntary provisions of paragraph (d) of this section and the side-by-side display.

View or download PDF



Standard Vertical
(w/ Voluntary)

View or download PDF



Standard Vertical

View or download PDF





View or download PDF

(13)(i) Nutrition labels on the outer label of packages of products that contain two or more separately packaged foods that are intended to be eaten individually (e.g., variety packs of cereals or snack foods) or of packages that are used interchangeably for the same type of food (e.g., round ice cream containers) may use an aggregate display.

(ii) Aggregate displays shall comply with the format requirements of paragraph (d) of this section to the maximum extent possible, except that the identity of each food shall be specified immediately to the right of the "Nutrition Facts" heading, and both the quantitative amount by weight (*i.e.,* g/mg/mcg amounts) and the percent Daily Value for each nutrient shall be listed in separate columns under the name of each food. The following sample label illustrates an aggregate display.

View or download PDF

(14) In accordance with §101.15(c)(2), when nutrition labeling must appear in a second language, the nutrition information may be presented in a separate nutrition label for each language or in one nutrition label with the information in the second language following that in English. Numeric characters that are identical in both languages need not be repeated (e.g., "Protein/Proteinas 2 g"). All required information must be included in both languages.

(e) Nutrition information may be presented for two or more forms of the same food (*e.g.,* both "as purchased" and "as prepared") or for common combinations of food as provided for in paragraph (h)(4) of this section, for different units (*e.g.,* slices of bread or per 100 grams) as provided for in paragraph (b) of this section, or for two or more groups for which RDIs are established (*e.g.,* both infants through 12 months of age and children 1 through 3 years of age) as shown in paragraph (e)(5) of this section. When such dual labeling is provided, equal prominence shall be given to both sets of values. Information shall be presented in a format consistent with paragraph (d) of this section, except that:

(1) Following the serving size information there shall be two or more column headings accurately describing the amount per serving size of the form of the same food (*e.g.,* "Per ¼ cup mix" and "Per prepared portion"), the combinations of food, the units, or the RDI groups that are being declared as shown in paragraph (e)(5) of this section.

(2) The quantitative information by weight as required in paragraph (d)(7)(i) and the information required in paragraph (d)(7)(ii) of this section shall be presented for the form of the product as packaged and for any other form of the product (*e.g.,* "as prepared" or combined with another ingredient as shown in paragraph (e)(5) of this section).

(3) When the dual labeling is presented for two or more forms of the same food, for combinations of food, for different units, or for two or more groups for which RDIs are established, the quantitative information by weight and the percent Daily Value shall be presented in two columns and the columns shall be separated by vertical lines as shown in paragraph (e)(5) of this section.

(4) Nutrient information for vitamins and minerals (except sodium) shall be separated from information on other nutrients by a bar and shall be arrayed vertically in the following order: Vitamin D, calcium, iron, potassium as shown in paragraph (e)(5) of this section.

(5) The following sample label illustrates the provisions of paragraph (e) of this section:

**Dual Columns, Two Forms of the Same Food**



View or download PDF

(6) When dual labeling is presented for a food on a per serving basis and per container basis as required in paragraph (b)(12)(i) of this section or on a per serving basis and per unit basis as required in paragraph (b)(2)(i)(D) of this section, the quantitative information by weight as required in paragraph (d)(7)(i) and the percent Daily Value as required in paragraph (d)(7)(ii) shall be presented in two columns, and the columns shall be separated by vertical lines as shown in the displays in paragraph (e)(6)(i) of this section.

(i) Nutrient information for vitamins and minerals shall be separated from information on other nutrients by a bar and shall be arrayed vertically in the following order: Vitamin D, calcium, iron, and potassium as shown in the following sample labels.

**Dual Column Display, Per Serving and Per Container**



View or download PDF

Dual Columns, Per Serving and Per Unit



View or download PDF

(ii) The following sample label illustrates the provisions of paragraphs (b)(2)(i)(D) and (b)(12)(i) of this section for labels that use the tabular display.



View or download PDF

(f) The declaration of nutrition information may be presented in the simplified format set forth herein when a food product contains insignificant amounts of eight or more of the following: Calories, total fat, saturated fat, *trans* fat, cholesterol, sodium, total carbohydrate, dietary fiber, total sugars, added sugars, protein, vitamin D, calcium, iron, and potassium; except that for foods intended for infants through 12 months of age and children 1 through 3 years of age to which paragraph (j)(5)(i) of this section applies, nutrition information may be presented in the simplified format when a food product contains insignificant amounts of six or more of the following: Calories, total fat, sodium, total carbohydrate, dietary fiber, total sugars, added sugars, protein, vitamin D, calcium, iron, and potassium.

(1) An "insignificant amount" shall be defined as that amount that allows a declaration of zero in nutrition labeling, except that for total carbohydrate, dietary fiber, and protein, it shall be an amount that allows a declaration of "less than 1 gram."

(2) The simplified format shall include information on the following nutrients:

(i) Total calories, total fat, total carbohydrate, protein, and sodium;

(ii) Any other nutrients identified in paragraph (f) of this section that are present in the food in more than insignificant amounts; and

(iii) Any vitamins and minerals listed in paragraph (c)(8)(iv) of this section when they are required to be added as a nutrient supplement to foods for which a standard of identity exists.

(iv) Any vitamins or minerals listed in paragraph (c)(8)(iv) of this section voluntarily added to the food as nutrient supplements.

(3) Other nutrients that are naturally present in the food in more than insignificant amounts may be voluntarily declared as part of the simplified format.

(4) If any nutrients are declared as provided in paragraphs (f)(2)(iii), (f)(2)(iv), or (f)(3) of this section as part of the simplified format or if any nutrition claims are made on the label or in labeling, the statement "Not a significant source of _____" (with the blank filled in with the name(s) of any nutrient(s) identified in paragraph (f) of this section that are present in insignificant

amounts) shall be included at the bottom of the nutrition label.

Simplified Display

Nutrition Facts
64 servings per container
Serving size 1 tbsp (14g)
Calories 130

View or download PDF

(5) Except as provided for in paragraphs (j)(5) and (j)(13) of this section, nutrient information declared in the simplified format shall be presented in the same manner as specified in paragraphs (d) or (e) of this section, except that the footnote required in paragraph (d)(9) of this section is not required, and an asterisk shall be placed at the bottom of the label followed by the statement "% DV = % Daily Value" when "Daily Value" is not spelled out in the heading, as shown in paragraph (f)(4).

(g) Compliance with this section shall be determined as follows:

(1) A collection of primary containers or units of the same size, type, and style produced under conditions as nearly uniform as possible, designated by a common container code or marking, or in the absence of any common container code or marking, a day's production, constitutes a "lot."

(2) The sample for nutrient analysis shall consist of a composite of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot. Unless a particular method of analysis is specified in paragraph (c) of this section, composites shall be analyzed by appropriate methods as given in the "Official Methods of Analysis of the AOAC International," or, if no AOAC method is available or appropriate, by other reliable and appropriate analytical procedures.

(3) Two classes of nutrients are defined for purposes of compliance:

(i) *Class I.* Added nutrients in fortified or fabricated foods; and

(ii) Class II. Naturally occurring (indigenous) nutrients. When a nutrient is naturally occurring (indigenous) in a food or an ingredient that is added to a food, the total amount of such nutrient in the final food product is subject to class II requirements, except that when an exogenous source of the nutrient is also added to the final food product, the total amount of the nutrient in the final food product (indigenous and exogenous) is subject to class I requirements.

(4) A food with a label declaration of a vitamin, mineral, protein, total carbohydrate, dietary fiber, soluble fiber, insoluble fiber, polyunsaturated or monounsaturated fat shall be deemed to be misbranded under section 403(a) of the Federal Food, Drug, and Cosmetic Act (the act) unless it meets the following requirements:

(i) When a vitamin, mineral, protein, or dietary fiber meets the definition of a Class I nutrient, the nutrient content of the composite must be formulated to be at least equal to the value for that nutrient declared on the label.

(ii) When a vitamin, mineral, protein, total carbohydrate, polyunsaturated or monounsaturated fat, or dietary fiber meets the definition of a Class II nutrient, the nutrient content of the composite must be at least equal to 80 percent of the value for that nutrient declared on the label. *Provided,* That no regulatory action will be based on a determination of a nutrient value that falls below this level by a factor less than the variability generally recognized for the analytical method used in that food at the level involved.

(5) A food with a label declaration of calories, total sugars, added sugars (when the only source of sugars in the food is added sugars), total fat, saturated fat, *trans* fat, cholesterol, or sodium shall be deemed to be misbranded under section 403(a) of the act if the nutrient content of the composite is greater than 20 percent in excess of the value for that nutrient declared on the label. *Provided,* That no regulatory action will be based on a determination of a nutrient value that falls above this level by a factor less than the variability generally recognized for the analytical method used in that food at the level involved.

(6) Reasonable excesses of vitamins, minerals, protein, total carbohydrate, dietary fiber, soluble fiber, insoluble fiber, sugar alcohols, polyunsaturated or monounsaturated fat over labeled amounts are acceptable within current good manufacturing practice. Reasonable deficiencies of calories, total sugars, added sugars, total fat, saturated fat, *trans* fat, cholesterol, or

sodium under labeled amounts are acceptable within current good manufacturing practice.

(7) Compliance will be based on the metric measure specified in the label statement of serving size.

(8) Alternatively, compliance with the provisions set forth in paragraphs (g)(1) through (6) of this section may be provided by use of an FDA approved database that has been computed following FDA guideline procedures and where food samples have been handled in accordance with current good manufacturing practice to prevent nutrition loss. FDA approval of a database shall not be considered granted until the Center for Food Safety and Applied Nutrition has agreed to all aspects of the database in writing. The approval will be granted where a clear need is presented (*e.g.,* raw produce and seafood). Approvals will be in effect for a limited time, *e.g.,* 10 years, and will be eligible for renewal in the absence of significant changes in agricultural or industry practices. Approval requests shall be submitted in accordance with the provisions of §10.30 of this chapter. Guidance on the use of databases may be found in the "FDA Nutrition Labeling Manual—A Guide for Developing and Using Data Bases," available from the Office of Nutrition and Food Labeling (HFS-800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740 or by going to *http://www.fda.gov.*

(9) When it is not technologically feasible, or some other circumstance makes it impracticable, for firms to comply with the requirements of this section (e.g., to develop adequate nutrient profiles to comply with the requirements of paragraph (c) of this section), FDA may permit alternative means of compliance or additional exemptions to deal with the situation. Firms in need of such special allowances shall make their request in writing to the Center for Food Safety and Applied Nutrition (HFS-800), Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740.

(10) The manufacturer must make and keep written records (*e.g.,* analyses of databases, recipes, formulations, information from recipes or formulations, or batch records) to verify the declared amount of that nutrient on the Nutrition Facts label as follows:

(i) When a mixture of dietary fiber, and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber, is present in the food, a manufacturer must make and keep written records of the amount of non-digestible carbohydrate(s) added to the food that does not meet the definition of dietary fiber.

(ii) When a mixture of soluble fiber and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food, a manufacturer must make and keep written records necessary to verify the amount of the non-digestible carbohydrate(s) added to the food that does not meet the definition of dietary fiber.

(iii) When a mixture of insoluble fiber and added non-digestible carbohydrate(s) that does not meet the definition of dietary fiber is present in the food, a manufacturer must make and keep written records necessary to verify the amount of the non-digestible carbohydrate(s) added to the food that does not meet the definition of dietary fiber.

(iv) When a mixture of naturally occurring and added sugars is present in the food, a manufacturer must make and keep written records of the amount of added sugars added to the food during the processing of the food, and if packaged as a separate ingredient, as packaged (whether as part of a package containing one or more ingredients or packaged as a single ingredient).

(v) When the amount of sugars added to food products is reduced through non-enzymatic browning and/or fermentation, manufacturers must:

(A) Make and keep records of all relevant scientific data and information relied upon by the manufacturer that demonstrates the amount of added sugars in the food after non-enzymatic browning and/or fermentation and a narrative explaining why the data and information are sufficient to demonstrate the amount of added sugars declared in the finished food, provided the data and information used is specific to the type of food that is subject to non-enzymatic browning and/or fermentation; or

(B) Make and keep records of the amount of added sugars added to the food before and during the processing of the food, and if packaged as a separate ingredient, as packaged (whether as part of a package containing one or more ingredients or packaged as a single ingredient) and in no event shall the amount of added sugars declared exceed the amount of total sugars on the label; or

(C) Submit a petition, under 21 CFR 10.30, to request an alternative means of compliance. The petition must provide scientific data or other information for why the amount of added sugars in a serving of the product is likely to have a significant reduction in added sugars compared to the amount added prior to non-enzymatic browning and/or fermentation. A significant reduction would be where reduction in added sugars after non-enzymatic browning and/or fermentation may be significant enough to impact the label declaration for added sugars by an amount that exceeds the reasonable deficiency acceptable within good manufacturing practice under paragraph (g)(6) of this section. In addition, the scientific data or other information must include the reason that the manufacturer is unable to determine a reasonable approximation of the amount of added

sugars in a serving of their finished product and a description of the process that they used to come to that conclusion.

(vi) When a mixture of *all rac*-α-tocopherol and RRR-α-tocopherol is present in a food, manufacturers must make and keep written records of the amount of *all rac*-α-tocopherol added to the food and RRR-α-tocopherol in the finished food.

(vii) When a mixture of folate and folic acid is present in a food, manufacturers must make and keep written records of the amount of synthetic folate and/or folic acid added to the food and the amount of naturally-occurring folate in the finished food.

(11) Records necessary to verify certain nutrient declarations that are specified in paragraph (g)(10) of this section must be kept for a period of at least 2 years after introduction or delivery for introduction of the food into interstate commerce. Such records must be provided to FDA upon request, during an inspection, for official review and photocopying or other means of reproduction. Records required to verify information on the label may be kept either as original records, true copies (such as photocopies, pictures, scanned copies, microfilm, microfiche, or other accurate reproductions of the original records), or electronic records which must be kept in accordance with part 11 of this chapter. These records must be accurate, indelible, and legible.

Failure to make and keep the records or provide the records to appropriate regulatory authorities, as required by this paragraph (g)(11), would result in the food being misbranded under section 403(a)(1) of the act.

(h) *Products with separately packaged ingredients or foods, with assortments of food, or to which other ingredients are added by the user* may be labeled as follows:

(1) If a product consists of two or more separately packaged ingredients enclosed in an outer container or of assortments of the same type of food (e.g., assorted nuts or candy mixtures) in the same retail package, nutrition labeling shall be located on the outer container or retail package (as the case may be) to provide information for the consumer at the point of purchase. However, when two or more food products are simply combined together in such a manner that no outer container is used, or no outer label is available, each product shall have its own nutrition information, e.g., two boxes taped together or two cans combined in a clear plastic overwrap. When separately packaged ingredients or assortments of the same type of food are intended to be eaten at the same time, the nutrition information may be specified per serving for each component or as a composite value.

(2) If a product consists of two or more separately packaged foods that are intended to be eaten individually and that are enclosed in an outer container (e.g., variety packs of cereals or snack foods), the nutrition information shall:

(i) Be specified per serving for each food in a location that is clearly visible to the consumer at the point of purchase; and

(ii) Be presented in separate nutrition labels or in one aggregate nutrition label with separate columns for the quantitative amount by weight and the percent Daily Value for each food.

(3) If a package contains a variety of foods, or an assortment of foods, and is in a form intended to be used as a gift, the nutrition labeling shall be in the form required by paragraphs (a) through (f) of this section, but it may be modified as follows:

(i) Nutrition information may be presented on the label of the outer package or in labeling within or attached to the outer package.

(ii) In the absence of a reference amount customarily consumed in §101.12(b) that is appropriate for the variety or assortment of foods in a gift package, the following may be used as the standard serving size for purposes of nutrition labeling of foods subject to this paragraph: 1 ounce for solid foods; 2 fluid ounces for nonbeverage liquids (*e.g.,* syrups); 8 ounces for beverages that consist of milk and fruit juices, nectars and fruit drinks; and 12 fluid ounces for other beverages. However, the reference amounts customarily consumed in §101.12(b) shall be used for purposes of evaluating whether individual foods in a gift package qualify for nutrient content claims or health claims.

(iii) The number of servings per container may be stated as "varied."

(iv) Nutrition information may be provided per serving for individual foods in the package, or, alternatively, as a composite per serving for reasonable categories of foods in the package having similar dietary uses and similar significant nutritional characteristics. Reasonable categories of foods may be used only if accepted by FDA. In determining whether a proposed category is reasonable, FDA will consider whether the values of the characterizing nutrients in the foods proposed to be in the category meet the compliance criteria set forth in paragraphs (g)(3) through (6) of this section. Proposals for such categories may be submitted in writing to the Office of Nutrition and Food Labeling (HFS-800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740.

(v) If a food subject to paragraph (j)(13) of this section because of its small size is contained in a gift package, the food

need not be included in the determination of nutrition information under paragraph (h) of this section if it is not specifically listed in a promotional catalogue as being present in the gift package, and:

(A) It is used in small quantities primarily to enhance the appearance of the gift package; or

(B) It is included in the gift package as a free gift or promotional item.

(4) If a food is commonly combined with other ingredients or is cooked or otherwise prepared before eating, and directions for such combination or preparations are provided, another column of figures may be used to declare nutrition information on the basis of the food as consumed in the format required in paragraph (e) of this section; *e.g.,* a dry ready-to-eat cereal may be described with the percent Daily Value and the quantitative amounts for the cereal as sold (*e.g.,* per ounce), and the percent Daily Value and the quantitative amounts for the cereal and milk as suggested in the label (*e.g.,* per ounce of cereal and ½ cup of vitamin D fortified skim milk); and a cake mix may be labeled with the percent Daily Value and the quantitative amounts for the dry mix (per serving) and the percent Daily Value and the quantitative amounts for the serving of the final cake when prepared, as shown in paragraph (e)(5) of this section: Provided, that, the type and quantity of the other ingredients to be added to the product by the user and the specific method of cooking and other preparation shall be specified prominently on the label.

(i) Except as provided in paragraphs (j)(13) and (j)(17) of this section, the location of nutrition information on a label shall be in compliance with §101.2.

(j) The following foods are exempt from this section or are subject to special labeling requirements:

(1)(i) Food offered for sale by a person who makes direct sales to consumers (*e.g.,* a retailer) who has annual gross sales made or business done in sales to consumers that is not more than $500,000 or has annual gross sales made or business done in sales of food to consumers of not more than $50,000, *Provided,* That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section, §101.10, or §101.11, as applicable.

(ii) For purposes of this paragraph, calculation of the amount of sales shall be based on the most recent 2-year average of business activity. Where firms have been in business less than 2 years, reasonable estimates must indicate that annual sales will not exceed the amounts specified. For foreign firms that ship foods into the United States, the business activities to be included shall be the total amount of food sales, as well as other sales to consumers, by the firm in the United States.

(2) Except as provided in §101.11, food products that are:

(i) Served in restaurants, *Provided,* That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section;

(ii) Served in other establishments in which food is served for immediate human consumption (*e.g.,* institutional food service establishments, such as schools, hospitals, and cafeterias; transportation carriers, such as trains and airplanes; bakeries, delicatessens, and retail confectionery stores where there are facilities for immediate consumption on the premises; food service vendors, such as lunch wagons, ice cream shops, mall cookie counters, vending machines, and sidewalk carts where foods are generally consumed immediately where purchased or while the consumer is walking away, including similar foods sold from convenience stores; and food delivery systems or establishments where ready-to-eat foods are delivered to homes or offices), *Provided,* That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising, except as provided in §101.8(c). Claims or other nutrition information, except as provided in §101.8(c), subject the food to the provisions of this section;

(iii) Sold only in such facilities, *Provided,* That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section;

(iv) Used only in such facilities and not served to the consumer in the package in which they are received (e.g., foods that are not packaged in individual serving containers); or

(v) Sold by a distributor who principally sells food to such facilities: *Provided,* That:

(A) This exemption shall not be available for those foods that are manufactured, processed, or repackaged by that distributor for sale to any persons other than restaurants or other establishments that serve food for immediate human consumption, and

(B) The manufacturer of such products is responsible for providing the nutrition information on the products if there is a reasonable possibility that the product will be purchased directly by consumers.

(3) Except as provided in §101.11, food products that are:

(i) Of the type of food described in paragraphs (j)(2)(i) and (j)(2)(ii) of this section,

(ii) Ready for human consumption,

(iii) Offered for sale to consumers but not for immediate human consumption,

(iv) Processed and prepared primarily in a retail establishment, and

(v) Not offered for sale outside of that establishment (e.g., ready-to-eat foods that are processed and prepared on-site and sold by independent delicatessens, bakeries, or retail confectionery stores where there are no facilities for immediate human consumption; by in-store delicatessen, bakery, or candy departments; or at self-service food bars such as salad bars), *Provided,* That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section.

(4) Except as provided in §101.11, foods that contain insignificant amounts of all of the nutrients and food components required to be included in the declaration of nutrition information under paragraph (c) of this section, *Provided,* That the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information, except as provided in §101.8(c), subject the food to the provisions of this section. An insignificant amount of a nutrient or food component shall be that amount that allows a declaration of zero in nutrition labeling, except that for total carbohydrate, dietary fiber, and protein, it shall be an amount that allows a declaration of "less than 1 gram." Examples of foods that are exempt under this paragraph include coffee beans (whole or ground), tea leaves, plain unsweetened instant coffee and tea, condiment-type dehydrated vegetables, flavor extracts, and food colors.

(5)(i) Foods, other than infant formula, represented or purported to be specifically for infants through 12 months of age and children 1 through 3 years of age shall bear nutrition labeling. The nutrients declared for infants through 12 months of age and children 1 through 3 years of age shall include calories, total fat, saturated fat, *trans* fat, cholesterol, sodium, total carbohydrates, dietary fiber, total sugars, added sugars, protein, and the following vitamins and minerals: Vitamin D, calcium, iron, and potassium.

(ii) Foods, other than infant formula, represented or purported to be specifically for infants through 12 months of age shall bear nutrition labeling, except that:

(A) Such labeling shall not declare a percent Daily Value for saturated fat, *trans* fat, cholesterol, sodium, dietary fiber, total sugars, or added sugars and shall not include a footnote.

(B) The following sample label illustrates the provisions of paragraph (j)(5)(ii) of this section.



View or download PDF

(C)-(E) [Reserved]

(iii) Foods, other than infant formula, represented or purported to be specifically for children 1 through 3 years of age shall include a footnote that states: "*The % Daily Value tells you how much a nutrient in a serving of food contributes to a daily diet. 1,000 calories a day is used for general nutrition advice."

(A) The following sample label illustrates the provisions of paragraph (j)(5)(iii) of this section.

Children 1-3 Years



View or download PDF

(B) [Reserved]

(6) Dietary supplements, except that such foods shall be labeled in compliance with §101.36.

(7) Infant formula subject to section 412 of the act, as amended, except that such foods shall be labeled in compliance with part 107 of this chapter.

(8) Medical foods as defined in section 5(b) of the Orphan Drug Act (21 U.S.C. 360ee(b)(3)). A medical food is a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation. A food is subject to this exemption only if:

(i) It is a specially formulated and processed product (as opposed to a naturally occurring foodstuff used in its natural state) for the partial or exclusive feeding of a patient by means of oral intake or enteral feeding by tube;

(ii) It is intended for the dietary management of a patient who, because of therapeutic or chronic medical needs, has limited or impaired capacity to ingest, digest, absorb, or metabolize ordinary foodstuffs or certain nutrients, or who has other special medically determined nutrient requirements, the dietary management of which cannot be achieved by the modification of the normal diet alone;

(iii) It provides nutritional support specifically modified for the management of the unique nutrient needs that result from the specific disease or condition, as determined by medical evaluation;

(iv) It is intended to be used under medical supervision; and

(v) It is intended only for a patient receiving active and ongoing medical supervision wherein the patient requires medical care on a recurring basis for, among other things, instructions on the use of the medical food.

(9) Food products shipped in bulk form that are not for distribution to consumers in such form and that are for use solely in the manufacture of other foods or that are to be processed, labeled, or repacked at a site other than where originally processed or packed.

(10) Raw fruits, vegetables, and fish subject to section 403(q)(4) of the act, except that the labeling of such foods should adhere to guidelines in §101.45. This exemption is contingent on the food bearing no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to nutrition labeling in accordance with §101.45. The term *fish* includes freshwater or marine fin fish, crustaceans, and mollusks, including shellfish, amphibians, and other forms of aquatic animal life.

(11) Packaged single-ingredient products that consist of fish or game meat (i.e., animal products not covered under the Federal Meat Inspection Act or the Poultry Products Inspection Act, such as flesh products from deer, bison, rabbit, quail, wild turkey, or ostrich) subject to this section may provide required nutrition information for a 3-ounce cooked edible portion (i.e., on an "as prepared" basis), except that:

(i) Such products that make claims that are based on values as packaged must provide nutrition information on an as packaged basis, and

(ii) Nutrition information is not required for custom processed fish or game meats.

(12) Game meats (i.e., animal products not covered under the Federal Meat Inspection Act or the Poultry Products Inspection Act, such as flesh products from deer, bison, rabbit, quail, wild turkey, or ostrich) may provide required nutrition information on labeling in accordance with the provisions of paragraph (a)(2) of this section.

(13)(i) Foods in small packages that have a total surface area available to bear labeling of less than 12 square inches, *Provided,* That the labels for these foods bear no nutrition claims or other nutrition information in any context on the label or in labeling or advertising, except as provided in §101.8(c). Claims or other nutrition information, except as provided in §101.8(c), subject the food to the provisions of this section.

(A) The manufacturer, packer, or distributor shall provide on the label of packages that qualify for and use this exemption an address or telephone number that a consumer can use to obtain the required nutrition information (*e.g.,* "For nutrition information, call 1-800-123-4567").

(B) When such products bear nutrition labeling, either voluntarily or because nutrition claims or other nutrition information is provided, all required information shall be in type size no smaller than 6 point or all upper-case type of 1-16 inches minimum height, except that individual serving-size packages of food served with meals in restaurants, institutions, and on board passenger carriers, and not intended for sale at retail, may comply with §101.2(c)(2).

(ii) Foods in packages that have a total surface area available to bear labeling of 40 or less square inches may modify the requirements of paragraphs (c) through (f) and (i) of this section by one or more of the following means:

(A) Presenting the required nutrition information in a tabular or, as provided below, linear (i.e., string) fashion rather than in vertical columns if the product has a total surface area available to bear labeling of less than 12 square inches, or if the product has a total surface area available to bear labeling of 40 or less square inches and the package shape or size cannot accommodate a standard vertical column or tabular display on any label panel. Nutrition information may be given in a linear fashion only if the label will not accommodate a tabular display.

(*1*) The following sample label illustrates the tabular display for small packages.



View or download PDF

(*2*) The following sample label illustrates the linear display.

View or download PDF

(B) Using any of the following abbreviations:

Serving size—Serv size

Servings per container—Servings

Calories from saturated fat—Sat fat cal

Saturated fat—Sat fat

Monounsaturated fat—Monounsat fat

Polyunsaturated fat—Polyunsat fat

Cholesterol—Cholest

Total carbohydrate—Total carb. This abbreviation can also be used on dual-column displays as shown in paragraphs (e)(5), (e)(6)(i), and (e)(6)(ii).

Dietary fiber—Fiber

Soluble fiber—Sol fiber

Insoluble fiber—Insol fiber

Sugar alcohol—Sugar alc

Vitamin—Vit

Potassium—Potas

Includes—Incl. This abbreviation can also be used on dual-column displays as shown in paragraphs (e)(5), (e)(6)(i), and (e)(6)(ii) of this section.

(C) Presenting the required nutrition information on any label panel.

(14) Shell eggs packaged in a carton that has a top lid designed to conform to the shape of the eggs are exempt from outer carton label requirements where the required nutrition information is clearly presented immediately beneath the carton lid or in an insert that can be clearly seen when the carton is opened.

(15) The unit containers in a multiunit retail food package where:

(i) The multiunit retail food package labeling contains all nutrition information in accordance with the requirements of this section;

(ii) The unit containers are securely enclosed within and not intended to be separated from the retail package under conditions of retail sale; and

(iii) Each unit container is labeled with the statement "This Unit Not Labeled For Retail Sale" in type size not less than 1/16-inch in height, except that this statement shall not be required when the inner unit containers bear no labeling at all. The word "individual" may be used in lieu of or immediately preceding the word "Retail" in the statement.

(16) Food products sold from bulk containers: *Provided,* That nutrition information required by this section be displayed to consumers either on the labeling of the bulk container plainly in view or in accordance with the provisions of paragraph (a)(2) of this section.

(17) Foods in packages that have a total surface area available to bear labeling greater than 40 square inches but whose principal display panel and information panel do not provide sufficient space to accommodate all required information may use any alternate panel that can be readily seen by consumers for the nutrition label. The space needed for vignettes, designs, and other nonmandatory label information on the principal display panel may be considered in determining the sufficiency of available space on the principal display panel for the placement of the nutrition label. Nonmandatory label information on the information panel shall not be considered in determining the sufficiency of available space for the placement of the nutrition label.

(18) Food products that are low-volume (that is, they meet the requirements for units sold in paragraphs (j)(18)(i) or (j)(18)(ii) of this section); that, except as provided in paragraph (j)(18)(iv) of this section, are the subject of a claim for an exemption that provides the information required under paragraph (j)(18)(iv) of this section, that is filed before the beginning of the time period for which the exemption is claimed, and that is filed by a person, whether it is the manufacturer, packer, or distributor, that qualifies to claim the exemption under the requirements for average full-time equivalent employees in paragraphs (j)(18)(i) or (j)(18)(ii) of this section; and whose labels, labeling, and advertising do not provide nutrition information or make a nutrient content or health claim.

(i) For food products first introduced into interstate commerce before May 8, 1994, the product shall be exempt for the period:

(A) Between May 8, 1995, and May 7, 1996, if, for the period between May 8, 1994, and May 7, 1995, the person claiming the exemption employed fewer than an average of 300 full-time equivalent employees and fewer than 400,000 units of that product were sold in the United States; and

(B) Between May 8, 1996, and May 7, 1997, if for the period between May 8, 1995, and May 7, 1996, the person claiming the exemption employed fewer than an average of 200 full-time equivalent employees and fewer than 200,000 units of that product were sold in the United States.

(ii) For all other food products, the product shall be eligible for an exemption for any 12-month period if, for the preceding 12 months, the person claiming the exemption employed fewer than an average of 100 full-time equivalent employees and fewer than 100,000 units of that product were sold in the United States, or in the case of a food product that was not sold in the 12-month period preceding the period for which exemption is claimed, fewer than 100,000 units of such product are reasonably anticipated to be sold in the United States during the period for which exemption is claimed.

(iii) If a person claims an exemption under paragraphs (j)(18)(i) or (j)(18)(ii) of this section for a food product and then, during the period of such exemption, the number of full-time equivalent employees of such person exceeds the appropriate number, or the number of food products sold in the United States exceeds the appropriate number, or, if at the end of the period of such exemption, the food product no longer qualifies for an exemption under the provisions of paragraphs (j)(18)(i) or (j)(18)(ii) of this section, such person shall have 18 months from the date that the product was no longer qualified as a low-volume product of a small business to comply with this section.

(iv) A notice shall be filed with the Office of Nutrition and Food Labeling (HFS-800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740 and contain the following information, except that if the person is not an importer and has fewer than 10 full-time equivalent employees, that person does not have to file a notice for any food product with annual sales of fewer than 10,000 total units:

(A) Name and address of person requesting exemption. This should include a telephone number or FAX number that can be used to contact the person along with the name of a specific contact;

(B) Names of the food products (including the various brand names) for which exemption is claimed;

(C) Name and address of the manufacturer, distributor, or importer of the food product for which an exemption is claimed, if different than the person that is claiming the exemption;

(D) The number of full-time equivalent employees. Provide the average number of full-time equivalent individuals employed by the person and its affiliates for the 12 months preceding the period for which a small business exemption is claimed for a product. The average number of full-time equivalent employees is to be determined by dividing the total number of hours of salary or wages paid to employees of the person and its affiliates by the number of hours of work in a year, 2,080 hours (i.e., 40 hours × 52 weeks);

(E) Approximate total number of units of the food product sold by the person in the United States in the 12-month period preceding that for which a small business exemption is claimed. Provide the approximate total number of units sold, or expected to be sold, in a 12-month period for each product for which an exemption is claimed. For products that have been in production for 1 year or more prior to the period for which exemption is claimed, the 12-month period is the period immediately preceding the period for which an exemption is claimed. For other products, the 12-month period is the period for which an exemption is claimed; and

(F) The notice shall be signed by a responsible individual for the person who can certify the accuracy of the information presented in the notice. The individual shall certify that the information contained in the notice is a complete and accurate statement of the average number of full-time equivalent employees of this person and its affiliates and of the number of units of the product for which an exemption is claimed sold by the person. The individual shall also state that should the average number of full-time equivalent employees or the number of units of food products sold in the United States by the person exceed the applicable numbers for the time period for which exemption is claimed, the person will notify FDA of that fact and the date on which the number of employees or the number of products sold exceeded the standard.

(v) FDA may by regulation lower the employee or units of food products requirements of paragraph (j)(18)(ii) of this section for any food product first introduced into interstate commerce after May 8, 2002, if the agency determines that the cost of compliance with such lower requirement will not place an undue burden on persons subject to it.

(vi) For the purposes of this paragraph, the following definitions apply:

(A) *Unit* means the packaging or, if there is no packaging, the form in which a food product is offered for sale to consumers.

(B) *Food product* means food in any sized package which is manufactured by a single manufacturer or which bears the same brand name, which bears the same statement of identity, and which has similar preparation methods.

(C) *Person* means all domestic and foreign affiliates, as defined in 13 CFR 121.401, of the corporation, in the case of a corporation, and all affiliates, as defined in 13 CFR 121.401, of a firm or other entity, when referring to a firm or other entity that is not a corporation.

(D) *Full-time equivalent employee* means all individuals employed by the person claiming the exemption. This number shall be determined by dividing the total number of hours of salary or wages paid directly to employees of the person and of all of its affiliates by the number of hours of work in a year, 2,080 hours (i.e., 40 hours × 52 weeks).

(k) A food labeled under the provisions of this section shall be deemed to be misbranded under sections 201(n) and 403(a) of the act if its label or labeling represents, suggests, or implies:

(1) That the food, because of the presence or absence of certain dietary properties, is adequate or effective in the prevention, cure, mitigation, or treatment of any disease or symptom. Information about the relationship of a dietary property to a disease or health-related condition may only be provided in conformance with the requirements of §101.14 and part 101, subpart E.

(2) That the lack of optimum nutritive quality of a food, by reason of the soil on which that food was grown, is or may be responsible for an inadequacy or deficiency in the quality of the daily diet.

(3) That the storage, transportation, processing, or cooking of a food is or may be responsible for an inadequacy or deficiency in the quality of the daily diet.

(4) That a natural vitamin in a food is superior to an added or synthetic vitamin.

(l) The standards required in this section are incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. All approved material is available for inspection at the Office of Nutrition and Food Labeling (HFS-800), Center for Food Safety and Applied Nutrition, Food and Drug Administration, 5001 Campus Dr., College Park, MD 20740, 240-402-2404 and is available from the sources indicated below. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: *http://www.archives.gov/federal__register/code__of__federal__regulations /ibr__locations.html.*

(1) AOAC Reseller. Techstreet, 6300 Interfirst Dr., Ann Arbor, MI 48108, Toll free in United States: 1-800-699-9277, Outside United States: 1-734-780-8000, Fax: 1-734-780-2046, *www.techstreet.com,techstreet.service@thomsonreuters.com.* FDA does not endorse any particular reseller and notes that other resellers also may have the reference for sale. Consult FDA at 240-402-2404 for more information on additional resellers.

(i) "Official Methods of Analysis of the AOAC INTERNATIONAL," 19th Edition, Volumes 1 and 2, 2012.

(ii) [Reserved]

(2) Food and Agriculture Organization of the United Nations/World Health Organization (FAO/WHO), Publications Division, Viale delle Terme di Caracalla, 00100 Rome, Italy

(i) FAO Food and Nutrition Paper 51,"Report of the Joint FAO/WHO Expert Consultation on Protein Quality Evaluation," Rome, 1991. *http://apps.who.int/iris/bitstream/10665/38133/1/9251030979__eng.pdf.*

(ii) [Reserved]

(3) United States Department of Agriculture (USDA), Agricultural Research Service, Washington, DC, Nutrient Data Laboratory, Bldg. 005 Room 105 BARC-West, Beltsville, MD 20705, 301-504-0630. *http://www.ars.usda.gov /News/docs.htm?docid=9447.*

(i) USDA Handbook No. 74, Energy Value of Foods—basis and derivation, by A. L. Merrill and B. K. Watt, (slightly revised, 1973) *http://www.ars.usda.gov/SP2UserFiles/Place/80400525/Data/Classics/ah74.pdf.*

(ii) [Reserved]

[58 FR 2175, Jan. 6, 1993]

E.. TORIAL NOTE: For FEDERAL REGISTER citations affecting §101.9, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at *www.govinfo.gov.*

Need assistance?

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH C    21 CFR 137, SEMOLINA AND FLOUR

**§137.320   Semolina.**

(a) Semolina is the food prepared by grinding and bolting cleaned durum wheat to such fineness that, when tested by the method prescribed in §137.300(b)(2), it passes through a No. 20 sieve, but not more than 3 percent passes through a No. 100 sieve. It is freed from bran coat, or bran coat and germ, to such extent that the percent of ash therein, calculated to a moisture-free basis, is not more than 0.92 percent. Its moisture content is not more than 15 percent.

(b) For the purpose of this section, ash and moisture are determined by the methods therefor referred to in §137.105(c).

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# ELECTRONIC CODE OF FEDERAL REGULATIONS

## e-CFR data is current as of December 5, 2019

Title 21 → Chapter I → Subchapter B → Part 137 → Subpart B

Title 21: Food and Drugs
PART 137—CEREAL FLOURS AND RELATED PRODUCTS

## Subpart B—Requirements for Specific Standardized Cereal Flours and Related Products

**Contents**

§137.105   Flour.
§137.155   Bromated flour.
§137.160   Enriched bromated flour.
§137.165   Enriched flour.
§137.170   Instantized flours.
§137.175   Phosphated flour.
§137.180   Self-rising flour.
§137.185   Enriched self-rising flour.
§137.190   Cracked wheat.
§137.195   Crushed wheat.
§137.200   Whole wheat flour.
§137.205   Bromated whole wheat flour.
§137.211   White corn flour.
§137.215   Yellow corn flour.
§137.220   Durum flour.
§137.225   Whole durum flour.
§137.250   White corn meal.
§137.255   Bolted white corn meal.
§137.260   Enriched corn meals.
§137.265   Degerminated white corn meal.
§137.270   Self-rising white corn meal.
§137.275   Yellow corn meal.
§137.280   Bolted yellow corn meal.
§137.285   Degerminated yellow corn meal.
§137.290   Self-rising yellow corn meal.
§137.300   Farina.
§137.305   Enriched farina.
§137.320   Semolina.
§137.350   Enriched rice.

⬆ Back to Top

### §137.105   Flour.

(a) Flour, white flour, wheat flour, plain flour, is the food prepared by grinding and bolting cleaned wheat, other than durum wheat and red durum wheat. To compensate for any natural deficiency of enzymes, malted wheat, malted wheat flour, malted barley flour, or any combination of two or more of these, may be used; but the quantity of malted barley flour so used is not more than 0.75 percent. Harmless preparations of α-amylase obtained from *Aspergillus oryzae,* alone or in a safe and suitable carrier, may be used. When tested for granulation as prescribed in paragraph (c)(4) of this section, not less than 98 percent of the flour passes through a cloth having openings not larger than those of woven wire cloth designated "212 µm (No. 70)" complying with the specifications for such cloth set forth in "Official Methods of Analysis of the Association of Official Analytical Chemists" (AOAC), 13th Ed. (1980), Table 1, "Nominal Dimensions of Standard Test Sieves (U.S.A. Standard Series)," under the heading "Definitions of Terms and Explanatory Notes," which is incorporated by reference. Copies may be obtained from the AOAC INTERNATIONAL, 481 North Frederick Ave., suite 500, Gaithersburg, MD 20877, or may be examined at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or

go to: *http://www.archives.gov/federal__register/code__of__federal__regulations/ibr__locations.html*. The flour is freed from bran coat, or bran coat and germ, to such extent that the percent of ash therein, calculated to a moisture-free basis, is not more than the sum of $\frac{1}{20}$ of the percent of protein therein, calculated to a moisture-free basis, plus 0.35. Its moisture content is not more than 15 percent. It may contain ascorbic acid in a quantity not to exceed 200 parts per million as a dough conditioner. Unless such addition conceals damage or inferiority or makes the flour appear to be better or of greater value than it is, one or any combination of two or more of the following optional bleaching ingredients may be added in a quantity not more than sufficient for bleaching or, in case such ingredient has an artificial aging effect, in a quantity not more than sufficient for bleaching and such artificial aging effect:

(1) Oxides of nitrogen.

(2) Chlorine.

(3) Nitrosyl chloride.

(4) Chlorine dioxide.

(5) One part by weight of benzoyl peroxide mixed with not more than six parts by weight of one or any mixture of two or more of the following: potassium alum, calcium sulfate, magnesium carbonate, sodium aluminum sulfate, dicalcium phosphate, tricalcium phosphate, starch, calcium carbonate.

(6) Acetone peroxides complying with the provisions of §172.802 of this chapter.

(7) Azodicarbonamide (complying with the requirements of §172.806 of this chapter, including the quantitative limit of not more than 45 parts per million).

(b)(1) *Label declaration.* Each of the ingredients used in the food shall be declared on the label as required by the applicable sections of parts 101 and 130 of this chapter.

(2) When ascorbic acid is added, the label shall bear the statement "Ascorbic acid added as a dough conditioner". When the optional ingredient α-amylase obtained from *Aspergillus oryzae*" is used, it may alternatively be declared in the list of ingredients as "Fungal *alpha*-amylase," "Fungal α-amylase", "Enzyme", or "Enzyme added for improved baking". When any optional bleaching ingredient is used, the label shall bear the word "Bleached". Wherever the name of the food appears on the label so conspicuously as to be easily seen under customary conditions of purchase, the word "Bleached" shall immediately and conspicuously precede or follow such name, without intervening written, printed, or graphic matter; except that where such name is a part of a trademark or brand, other written, printed, or graphic matter, which is also a part of such trademark or brand, may so intervene if the word "Bleached" is in such juxtaposition with such trademark or brand as to be conspicuoulsy related to such name.

(c) For the purposes of this section:

(1) Ash is determined by the method prescribed in the AOAC, 13th Ed. (1980), section 14.006, "Direct Method—Official Final Action," under the heading "Ash (5)," which is incorporated by reference. The availability of this incorporation by reference is given in paragraph (a) of this section. Ash is calculated to a moisture-free basis by subtracting the percent of moisture in the flour from 100, dividing the remainder into the percent of ash, and multiplying the quotient by 100.

(2) Protein is 5.7 times the nitrogen as determined by the method prescribed in section 2.057, "Improved Kjeldahl Methods for Nitrate-Free Samples (20)—Official Final Action," AOAC, 13th Ed. (1980), which is incorporated by reference. The availability of this incorporation by reference is given in paragraph (a) of this section. Protein is calculated to a moisture-free basis by subtracting the percent of moisture in the flour from 100, dividing the remainder into the percent of protein, and multiplying the quotient by 100.

(3) Moisture is determined by the method prescribed in the AOAC, 13th Ed. (1980), sections 14.002 and 14.003, "Vacuum Oven Method (2)—Official Final Action," under the heading "Total Solids Moisture, Indirect Method," which is incorporated by reference. The availability of this incorporation by reference is given in paragraph (a) of this section.

(4) Granulation is determined as follows: Use No. 70 sieve complying with the specifications for "Nominal Dimensions of Standard Test Sieves (U.S.A. Standard Series)" prescribed in paragraph (a) of this section. Attach bottom pan to sieve in Ro-Tap sifter (or an equivalent sifter). Place half of a rubber ball or other sieving aid in the sieve. Pour 100 grams of the sample in the sieve and turn on the sifter with knocker. Sift exactly 5 minutes. Weigh the residue on the No. 70 sieve and convert to percentage.

[42 FR 14402, Mar. 15, 1977, as amended at 47 FR 11827, Mar. 19, 1982; 47 FR 24693, June 8, 1982; 47 FR 43363, Oct. 1, 1982; 49 FR

10097, Mar. 19, 1984; 54 FR 24894, June 12, 1989; 58 FR 2877, Jan. 6, 1993]

By Authority Of

THE UNITED STATES OF AMERICA

Legally Binding Document

By the Authority Vested By Part 5 of the United States Code § 552(a) and
Part 1 of the Code of Regulations § 51 the attached document has been duly
INCORPORATED BY REFERENCE and shall be considered legally
binding upon all citizens and residents of the United States of America.
HEED THIS NOTICE : Criminal penalties may apply for noncompliance.

Document Name: AOAC: Official Methods of Analysis, 1980
CFR Section(s) : 2 1 CFR 131.1 50(c)
Standards Body: AOAC International
OFFICIAL
METHODS OF ANALYSIS OF THE ASSOCIATION OF OFFICIAL ANALYTICAL CHEMISTS
William Horwitz, Editor
THIRTEENTH EDITION, 1980


….

2.057 Improved Kjeldahl Method for Nitrate-Free
Samples {20}— Official Final Action

{Caution: See 51.030 and 51.065.)

Place weighed sample (0.7-2.2 g) in digestion flask. Add 0.7
g HgOor0.65g metallic Hg, 15 g powd K 2 S0 4 or anhyd. Na 2 S0 4 ,
and 25 mL H 2 S0 4 . If sample >2.2 g is used, increase H 2 S0 4 by 10
mL for each g sample. Place flask in inclined position and heat
gently until frothing ceases (if necessary, add small amt of
paraffin to reduce frothing); boil briskly until soln clears and
then ^30 min longer (2 hr for samples contg org. material).

Cool, add ca 200 mL H 2 0, cool <25°, add 25 mL of the sulfide
or thiosulfate soln, and mix to ppt Hg. Add few Zn granules to
prevent bumping, tilt flask, and add layer of NaOH without
agitation. (For each 10 mL H 2 S0 4 used, or its equiv. in dild H 2 S0 4 ,
add 15 g solid NaOH or enough soln to make contents strongly
alk.) (Thiosulfate or sulfide soln may be mixed with the NaOH
soln before addn to flask.) Immediately connect flask to distg
bulb on condenser, and, with tip of condenser immersed in std
acid and 5-7 drops indicator in receiver, rotate flask to mix
contents thoroly; then heat until all NH 3 has distd (^150 mL
distillate). Remove receiver, wash tip of condenser, and titr.
excess std acid in distillate with std NaOH soln. Correct for blank
detn on reagents.

% N - [(mL std acid x normality acid) - (mL std NaOH

x normality NaOH)] x1.4007/g sample

# EXH D    AR 14 TOMASELLO AC SQR#2 PUBLIC

## LAW OFFICES OF DAVID L. SIMON

**Attorney-at-Law**
**1025 Connecticut Avenue, NW, Suite 1000**
**Washington, DC 20036 USA**
**Tel. 202-481-9000          Fax 202-481-9010**
**e-mail: DLSimon@DLSimon.com**

David L. Simon                                                    Ayla  Simon
Admitted, MD, DC                                         Foreign Legal Consultant

                                                              Roberto Turolla
                                            International Trade Consultant
                                                                  Milan, Italy

April 20, 2011

Secretary of Commerce                                             A-475-818
Attn: Import Administration                                      Pages: 28
Central Records Unit, Room 1870                    §751(a) AD review, 7/09-6/10
US Department of Commerce                             AD/CVD Op 3:JZ
14th Street and Constitution Avenue, NW       Proprietary information redacted at
Washington, DC 20230                                 pp 1,3,4,6 -10 & Exhs.2,3,4
                                                            **PUBLIC VERSION**

Attn:    Official-in-Charge: James Terpstra

Re:      *Pasta From Italy*;
         Tomasello  §AC SQR#2

Dear Mr. Secretary:

Molino e Pastificio Tomasello S.p.A. ("Tomasello"), by its counsel, hereby responds to the  second section AC supplemental questionnaire in the referenced administrative review in an original and five copies, pursuant to 19 CFR 351.303(c).  A public version will be submitted by the following business day in an original and two copies.

This submission contains proprietary information for which we request proprietary treatment pursuant to 19 CFR 351.304.  We agree that all proprietary information may be released under administrative protective order.  The proprietary information is enclosed in brackets in the exhibits; some pages of the exhibits are entirely proprietary.  Where possible, we have provided ranged figures for proprietary figures.  This request for proprietary treatment uses the following codes:

| Code | 19 CFR §351.105(c) - | Reason |
|------|------|--------|
| 1 | (1) | Business or trade secret |
| 2 | (2) | Production cost and elements thereof |
| 3 | (3) | Distribution cost and elements thereof |
| 4 | (4) | Terms of sale |
| 5 | (5) | Prices of individual sales |
| 6 | (6) | Names of particular customers, distributors or suppliers |

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/09 - 6/30/10 ...

*L*AW *O*FFICES OF *D*AVID *L*. *S*IMON

Import Administration
April 20, 2011
Page 2

| Code | 19 CFR §351.105(c) - | Reason |
|------|----------------------|--------|
| 7 | (7) | Margin on individual sale |
| 11 | (11) | Any other business proprietary information the release of which would cause substantial harm to the competitive position of the submitter |
| 13 | | In question |

The material for which proprietary treatment is requested is as follows:

| Page | |
|------|---|
| 9 | In question, code 13 |
| 1,8 | Details of individual accounts, code 1,2,3,11 |
| 3,4 | Laboratory test results, code 1,2,11 |
| 6-7 | Aggregate sales data, code 1,11 |
| 8-10 | Details of particular transactions, including customer names, code 1,2,3,4,5,6,11 |
| **Exhibit** | |
| 2 | Documentation of particular sales and lab test results, code 1,2,3,4,5,6,11 |
| 3 | Lab test results, code 1,2,6,11 |
| 4 | Sales transaction documents, code 1,2,3,4,5,6,11 |

Kindly contact the undersigned if further information is required.

Respectfully submitted,

David L. Simon / Ayla Simon
Counsel to Tomasello





**MOLINO E PASTIFICIO TOMASELLO s.p.a.**
Via Nazionale, 4 - 90014 CASTELDACCIA (PA)
Tel. 091.941954 - 091.941955 - Fax 091.954074
www.pastatomasello.it - e-mail: info@pastatomasello.it

I, Antonio Coglitore, currently employed as Chairman of the Board and Director of Finance and Administration of Molino e Pastificio Tomasello SpA, certify that (1) I have read the attached submission, and (2) the information contained in this submission is, to the best of my knowledge, complete and accurate.

Antonio Coglitore

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

**ATTORNEY CERTIFICATION**

I, David L. Simon, Attorney-at-law, hereby certify that I have read the attached submission and, based on the information made available to me by my clients, I have no reason to believe that this submission contains any material misrepresentation or omission of fact.

David L. Simon

**CERTIFICATE OF SERVICE**

I, David L. Simon, hereby certify that the attached submission was served by first-class mail, postage prepaid, on the following parties on April 20, 2011:

David C. Smith, Jr., Esq.
Kelley Drye & Warren LLP
3050 K Street, NW
Suite 400
Washington, DC 20007-5108

Mark David Davis, Esq.
Davis & Leiman P.C.
1025 Connecticut Ave. NW
Suite 1012
Washington, DC 20036
(waived service)

Richard Ferrin, Esq.
Drinker Biddle & Reath LLP
1500 K Street, NW
Washington, DC 20005

David L. Simon

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
IMPORT ADMINISTRATION
Washington, DC, U.S.A.

PUBLIC  VERSION
A-475-818

| |
|---|
| *In the Matter of –*<br>*ANTIDUMPING ADMINISTRATIVE*<br>*REVIEW (2009/2010):*<br>*CERTAIN PASTA FROM ITALY* |

# SECOND SECTION AC

## SUPPLEMENTAL QUESTIONNAIRE RESPONSE

### OF

## MOLINO E PASTIFICIO TOMASELLO S.P.A.

LAW OFFICES OF DAVID L. SIMON

David L. Simon, Esq.
Ayla Simon
1025 Connecticut Avenue, NW
Suite 1000
Washington, DC  20036
tel.    202-481-9000
fax    202-481-9010
e-mail dlsimon@dlsimon.com

Counsel to Tomasello

Date: April 20, 2011

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

## EXHIBIT LIST

| EXHIBIT 1 | PROTEIN TEST METHOD |
|-----------|---------------------|
| EXHIBIT 2 | DOCUMENTATION RE: PROTEIN |
| EXHIBIT 3 | SEMOLINA TEST RESULTS |
| EXHIBIT 4 | DOCUMENTATION CONCERNING APPARENT PRICING ANOMALIES |

*Public Version*
*Proprietary information redacted in brackets, [ … ]*

***This is the response of Molino e Pastificio Tomasello S.P.A. to the second supplemental questionnaire of the Department of Commerce in the fourteenth administrative review of the antidumping order on pasta from Italy, covering the period July 2009 through June 2010.***

1. Please state where Tomasello has reported its CONAI contribution fees.  Demonstrate with a worksheet that this expense has been captured in the reported cost.

   ***The CONAI fee is included in the following account:***

   [

   |  |  |  |
   |---|---|---|

   ]

   ***The cost in included in packing cost; see AD QR Exh. 25 PDF-594 cell I130.***

2. On page 9 of your SQR, you state that "in the antidumping files, we capture the amount of slotting fees and the like actually paid out in the POR," and on page 13, you further state that "to introduce its products to large supermarket chains, Tomasello had to pay one-time slotting fees to new customers."  Did Tomasello make any sales to the new customers during the POR?  If yes, has Tomasello reported the slotting fees?

   ***Yes, Tomasello included slotting fees paid out in the POR in the reported rebates.***

3. Tomasello reported both its home market and U.S. sales of subject merchandise as having a protein content of ≥ 12.5 percent.

   a) Explain how the protein content is determined and calculated by Tomasello.

   ***Tomasello's laboratory equipment uses the Kjeldahl method to test for the protein content of wheat, semolina and pasta; see Exhibit 1.  Tomasello's laboratory uses a factor of 5.7 to convert the Nitrogen (N) number to a protein percentage, as is common and accepted usage for wheat and wheat products; see Exhibit 1 at 7.***

   ***Note that the U.S. Food and Drug Administration uses a Kjeldahl N factor of 6.25; see 21 CFR §101.9(c)(7), a copy of which is provided in Exhibit 1 at 8.***

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

*The nutrition panel on Tomasello's U.S. packaging follows the U.S. FDA requirements, and converts Tomasello's N-5.7 protein percentage to an N-6.25 protein factor. As will be shown below, Tomasello's lab results for all its pasta are around 11.0 – 11.3% protein (based on N 5.7). If we consider the 11.3% protein and divide this by 5.7 then multiply by 6.25, to convert Tomasello's lab results into U.S. parlance, we obtain a protein percentage of 12.4%, which is within the tolerance for a value on the package nutrition panel of 12.5%. This is why, as will be shown below, Tomasello's U.S. packaging shows 12.5% protein, while its lab testing shows protein content in the 11.2-11.4% range: it is simply a difference in the Kjeldahl Nitrogen conversion factor. We also would reiterate and underscore that Tomasello's lab Nitrogen factor of 5.7 is the factor generally accepted for wheat and wheat products; see <mark>Exhibit</mark> 1 at 7.*

*Furthermore, the foregoing is the source of some questions concerning the reporting of protein content in the original questionnaire response and of Tomasello's reporting of a PROTEINH/U code 1 for all U.S. and HM sales and costs in its §AC SQR of 3/3/2011. Tomasello's U.S. pasta all correctly and properly bears a label showing protein content of 12.5%, which is based on the FDA N factor of 6.25. However, Tomasello's internal testing, and its Italian-market labels, all show a protein content of less than 12.5%, because Tomasello's internal testing and its European labeling uses the accepted N factor of 5.7.*

*It bears noting at this juncture, also, that the Department's questionnaire does not specify which by which Kjeldahl N factor respondents are intended to report protein content.*

*Given all of the foregoing, Tomasello amends its prior responses with respect to protein content: all of Tomasello's reported sales, whether U.S. market or home market, and all of its reported cost of production, should have a protein code of 2 (protein <12.5%), utilizing a Kjeldahl N of 5.7. Insofar as all of Tomasello's pasta has the same protein content, the foregoing makes no practical difference in Tomasello's databases, and we are not amending the sales or cost databases.*

> b)  Demonstrate with specific examples of how the reported protein content corresponds to the protein content identified on Tomasello's packaging for its pasta.

*Please see <mark>Exhibit</mark> 2.*

*On pages 1-8 we provide the documentation for a U.S. sale of spaghetti.*

- *Page 1 is a cover page.*

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

- *Page 2 is the customer's purchase order.  Note that the PO does not specify the protein content of the pasta; rather, it specifies the assortment of shapes that the customer wants to buy, together with shipment and similar information.*

- *Page 3 is Tomasello's invoice relating to this sale. Again, there is no reference to the protein content of the pasta.*

- *Page 4 is the "bioterrorism packing slip," required for U.S. sales.  This links the batch number, shown on the laboratory test results and the finished goods packing report, to the commercial documents.*

- *Page 5 is the report of Tomasello's internal laboratory for its finished-goods testing between December 11, 2009 and December 25, 2009. The batch code of interest is 39417-4, on the third row; it shows a humidity of [ ], ash content of [ ] and protein of [ ].  (The finished-goods test form does not show explicitly that Tomasello uses the N 5.7 factor; this is shown on the semolina test report, which we provide in* Exhibit *3, below.) The finished-goods tests also show color, dimensional control, and cooking quality.*

    *Tomasello does not test every single batch of finished goods; rather, it tests selected batches from every day's production.  Therefore, it is not always possible to begin from a batch number and work back into a test result.  However, it is always possible to select a given batch number in the finished goods test report and work forward to the packing department report and the invoice.*

- *Page 6 is Tomasello's packing department report for December 11, 2009, to show that the batch in question was indeed packed on that date.*

- *Page 7 is a scan of the packaging for this shape of pasta.  The protein is given as 12.5% (7 grams out of a 56-gram portion; 7/56 = 0.125).  This is a U.S. sale (see invoice, page 3 above), so the protein percentage is based on a N factor of 6.25.*

*Pages 8-17 are the documentation for a domestic sale of spaghetti.*

- *Page 8 is the cover page.*

- *Pages 9-12 are the purchase order.  The customer orders pasta by brand and shape; it does not specify the protein content.*

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ … ]*

- *Pages 13-14 are the invoice.  The copy is not a very good quality, but it is the best available.  For present purposes, the important element is the line item of spaghetti, which we have written out based on our inspection of a magnified PDF.*

- *Page 15 is the finished-goods quality testing report for batch 39342, which Tomasello has identified from the packing report as the spaghetti shipped on the invoice in question.  The test results are humidity [   ], ash [   ], and protein [   ], with additional tests for color, dimensional control and cooking quality.*

- *Page 16 is the packing department report.*

- *Page 17 is a scan of the packaging, showing a protein content of 11.5, consistently (within tolerances) with the laboratory analysis.*

*Pages 18-25 are another domestic sale.*

- *Page 18 is the cover page.*

- *Pages 19-21 are the purchase order.  Again, there is no mention of protein content, or, indeed, or any physical characteristics on the PO.  The customer orders by brand and shape.  The particular line item of interest is on page 20.*

- *Page 22 is the invoice.*

- *Page 23 is the finished goods quality testing report for the period including the testing of this batch.  We indicate the product in question with an arrow. The protein content is [   ].*

- *Page 24 is the packing department report showing the packing of this batch.*

- *Page 25 is a scan of the package for this product.  The protein content is indicated as 11.5%.*

*Pages 26-31 are a U.S. sale of Tomasello brand spaghettini.*

- *Page 26 is the cover page.*

- *Page 27 is Tomasello's order confirmation email (for this customer, Tomasello sends an email confirmation), giving the details of the order.*

- *Page 28 is the invoice.*

- *Page 29 is the finished goods testing report.*

- *Page 30 is the related packing department report.*

- *Page 31 is a scan of the packing material.  The stated protein content is 12.5%.*

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

c)  Explain whether Tomasello's customers specify protein content when they put an order or whether the actual protein content was displayed on the package.

***Customers do not specify protein content.  The protein content is shown on the package.***

d)  For both the U.S. sales and home market sales, provide customer specification sheets and purchase orders that shows customer orders, based on specific protein content.  Also, provide the corresponding customer or brand-specific packaging and nutrition labels which allow a comparison of the customer specification to the respective product labels.

***There are no customer specification sheets.  Protein content is brand-specific. HM packing shows protein content as N 5.7.  U.S. packaging is converted from N 5.7 to N 6.25 to satisfy U.S. FDA requirements.***

e)  Prove examples of test of how protein content of semolina is tested.  Provide copies of Tomasello's international testing documentation.

***We provide a sample of Tomasello's semolina test reports in Exhibit 3.  Tomasello tests for humidity, ash content, protein, color, gluten and granulometry (particle size). Here, the protein test explicitly states N X 5.7 as the computational basis.  The methodology for testing protein is the same for semolina as for pasta.***

***Pages 1-3 are the test results for the period November 3 – December 18, 2009.***

***Page 4 is the test results for August-September 2009.  Tomasello is closed for most of the month of August, so there are few test results in that month.***

4.  Your calculation of U.S. indirect selling expenses (INDIRSU), provided in Exhibit 14 of the original A-C response is not clear.  Please explain and provide the basis for your allocation methodology for different markets.

***See §AD QR Exh. 14 PDF-420-21.***

***INDIRSGEN represents indirect selling expenses incurred on all sales, regardless of destination.  This class of expenses includes, for example, the wages of sales department personnel.  The denominator of the calculation must be homogeneous with the numerator; that is, this figure is divided by total sales.***

Barcode:3920624-06 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

*INDIRSDOM is that subset of indirect selling expenses that are incurred solely with respect to sales in the domestic market, such as the charges for Tomasello's participation in local trade shows, or the amortization expense for capitalized advertising expenses (since Tomasello only advertises in the domestic market). The denominator for these expenses is domestic sales.*

*INDIRSEXPTC are those indirect selling expenses incurred only with respect to third-country sales. The expense in this category consists of participation in trade shows in third countries. The denominator for these expenses is third-country sales.*

*INDIRS EXP USA are those indirect selling expenses incurred only with respect to U.S. sales. In fact, there are no such expenses.*

*The basis for these expenses is the trial balance (bildump) excerpt at id. at PDF-421.*

5.  With regard to Tomasello's home market warranty expense:

    a.  Report all actual warranty expenses incurred on subject merchandise (rather than merchandise sold) during the POR and, where possible, divide the expenses on a model-specific basis, thus creating a warranty ratio for each product control number (CONNUM) for the POR.

*Tomasello does not have the information required to segregate returns into subject/nonsubject, and, a fortiori, into CONNUMs. Tomasello has provided abundant documentation relating to returns in §AC SQR 3/3/11 Exh. 19. The product code for returns is 999; see, e.g., id. PDF-339, -350. This category includes subject merchandise as well as organic pasta and other nonsubject products. There is no database from which Tomasello is able to separate out the subject versus nonsubject products returned, and a fortiori it is not possible for Tomasello to differentiate returns by CONNUM.*

*Tomasello's home market sales, which is where returns occur, is over 92% subject merchandise by value, as shown in the following extract from Tomasello's sales source file:*

*[*

| | | € | NO. OBS. | SHARE BY- | |
|---|---|---|---|---|---|
| | | | | VALUE | OBS |
| SUBJECT | | | | | |
| NONSUBJECT | | | | | |
| RIMACINATO | | | | | |

6

Filed By: tetriversedhlav.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved



Barcode:3920624-07 A-475-818 REV - Admin Review 7/1/18 - 6/30/19



Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

Filed By: tstrivers@hlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

Barcode:3920624-07 A-475-818 REV - Admin Review 7/1/18 - 6/30/19















Barcode:3920624-07 A-475-818 REV - Admin Review 7/1/18 - 6/30/19





# INGREDIENTI

**Semola di grano
duro, acqua.**
Può contenere soia e uova.
Paese di coltivazione del grano:
UE e non UE
Paese di molitura: Italia

## CONSERVAZIONE

Conservare in luogo
fresco e asciutto

*Dichiarazione
nutrizionale*

**Valori medi per
100g di prodotto**

| Energia | 1501kJ |
|---|---|
| | 354kcal |
| Grassi | 1,3g |
| - di cui acidi grassi saturi | 0,3g |
| Carboidrati | 73g |
| - di cui zuccheri | 3,2g |
| Fibre | 2,7g |
| Proteine | 11,5g |
| Sale | <0,01g |



**Pam**

*Qualità per te*

**BUONI E CONTROLLATI**
solo i migliori prodotti per te

**Spaghetti**
— n.5 —

**PASTA DI SEMOLA
DI GRANO DURO**

**500g**

## MODALITÀ DI COTTURA

Porta ad ebollizione
un'abbondante quantità
di acqua salata (1 litro
d'acqua ogni 100 g di
pasta). Versa la pasta e
mescola mantenendo
ebollizione fino a
di cottura desiderata
(vedere le indicazioni sul
fronte della confezione).
Scola rapidamente e
condisci secondo la
ricetta che desideri.

**SERVIZIO CLIENTI**
Per eventuali ... Filed By: tstrivers@dhlaw.com,



prodotto Pam Pano...
servizioclienti@pam...

Barcode:3920624-07 A-475-818 REV. - Admin Review 7/1/18 - 6/30/19



Ø2

Pam PANORAMA

SPAGHETTI

GRANO ITALIANO 100%

PASTA DI SEMOLA DI GRANO DURO

Pasta di semola di grano duro

**INGREDIENTI**

Semola di **grano** duro, acqua.
Può contenere **soia** e **uova**.

**CONSERVAZIONE**

Conserva in luogo fresco ed asciutto.

| DICHIARAZIONE NUTRIZIONALE | |
|---|---|
| Valori medi | per 100 g di prodotto |
| Energia | 1515 kJ / 357 kcal |
| Grassi | 1,3 g |
| - di cui acidi grassi saturi | 0,3 g |
| Carboidrati | 72 g |
| - di cui zuccheri | 3,2 g |
| Fibre | 2,7 g |
| Proteine | 13 g |
| Sale | <0,01 g |

MOD.
Porta
dante
litro d
Versa la pa
in ebollizio
desiderato
fronte della
Scola rapid
la ricetta ch

esaltandone il sapore ed il profumo

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

COMPOSIZIONE MATERIALI

FILM
ACCOPPIATO: **C/PAP 81**

Da consumarsi preferibilmente entro il:

| Dichiarazione nutrizionale | |
|---|---|
| Valori medi | per 100 g di prodotto |
| Energia | 1503 kJ 354 kcal |
| Grassi di cui acidi grassi saturi | 1,3 g 0,3 g |
| Carboidrati di cui zuccheri | 70,8 g 3,2 g |
| Fibre | 2,7 g |
| Proteine | 13,5 g |
| Sale | 0,005 g |

8 004263 676134

Ø3

Barcode-928624-07 A-475-848 REV - Admin Revise 7 1/18 - 8/30/19

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

Filed By: terriversachiaw.com; Filed Date: 12/13/19 9:18 PM; Submission Status: Approved



| VALORI NUTRIZIONALI MEDI | | 100g | 85g[1] | %AR[2]/85g | | | 100g | 85g[1] | %AR[2]/85g |
|---|---|---|---|---|---|---|---|---|---|
| ENERGIA | kJ | 1521 | 1293 | 15% | CARBOIDRATI | g | 70,2 | 59,7 | 23% |
| | kcal | 359 | 305 | 15% | di cui ZUCCHERI | g | 3,5 | 3,0 | 3% |
| GRASSI | g | 2,0 | 1,7 | 2% | FIBRE | g | 3,0 | 2,6 | |
| di cui ACIDI GRASSI SATURI | g | 0,5 | 0,4 | 2% | PROTEINE | g | 13,5 | 11,5 | 23% |
| | | | | | SALE | g | 0,013 | 0,011 | 0% |

[1]85g = esempio di una porzione. La confezione contiene 6 porzioni circa.
[2]AR = assunzioni di riferimento di un adulto medio (8400 kJ/2000 kcal).

PASTA DI SEMOLA DI (
coltivazione del grano
contenere tracce di s
indicato con la lette
Parma - Italia. Prod
parentesi vicino alla
(F) Foggia (Italia) - S
S.S. 87 km 20+500 / (
DA CONSUMARS

Filed By: tstrivers@chlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved



| VALORI NUTRIZIONALI MEDI | | 100g | 85g[1] | %AR[2]/85g | | | 100g | 85g[1] | %AR[2]/85g |
|---|---|---|---|---|---|---|---|---|---|
| ENERGIA | kJ | 1521 | 1293 | 15% | CARBOIDRATI g | 70,9 | 60,3 | 23% |
| | kcal | 359 | 305 | 15% | di cui ZUCCHERI g | 3,5 | 3,0 | 3% |
| GRASSI | g | 2,0 | 1,7 | 2% | FIBRE g | 3,0 | 2,6 | |
| di cui ACIDI GRASSI SATURI | g | 0,5 | 0,4 | 2% | PROTEINE g | 12,8 | 10,9 | 22% |
| | | | | | SALE g | 0,013 | 0,011 | 0% |

[1]85g = esempio di una porzione. La confezione contiene 6 porzioni circa.
[2]AR = assunzioni di riferimento di un adulto medio (8400 kJ/2000 kcal).

PASTA DI SEM
Paese di coltu
Può conten
stabilimento
Via Mantov
stabilimento
vicino alla
166 / (F) Fo
DA CONSI
(VEDI RETR

Barcode 339206211716-375-818 REV - Admin Review 7/1/18 - 6/30/19

>> SCOPRI DI PIÙ VOIELLO.IT «

| NUTRITIONAL MEDIO - AVERAGE NUTRITIONAL VALUES - NUTRITIONNELLES MOYENNES | 100 g | 85 g | %RI / 85 g |
|---|---|---|---|
| ENERGY - VALOR ENERGÉTICO - ENERGIE - ÉNERGIE | 1521 kJ - 359 kcal | 1293 kJ - 305 kcal | 15% |
| GRASAS - FETT - MATIÈRES GRASSES | 2,0 g | 1,7 g | 2% |
| RASSI SATURI - OF WHICH SATURATES - DE LAS CUALES | | | |
| CARBON GESATTIGTE FETTSÄUREN - DONT : ACIDES GRAS SATURÉS | 0,4 g | 0,3 g | 2% |
| CARBOHYDRATE - HIDRATOS DE CARBONO - KOHLENHYDRATE - GLUCIDES | 69,7 g | 59,2 g | 23% |
| ZUCCHERI - OF WHICH: SUGARS - DE LOS CUALES: AZÚCARES - ZUCKER - DONT : SUCRES | 3,5 g | 3,0 g | 3% |
| FIBRE - FIBRE - FIBRA ALIMENTARIA - BALLASTSTOFFE - FIBRES ALIMENTAIRES | 3,0 g | 2,6 g | - |
| PROTEINE - PROTEIN - PROTEÍNAS - EIWEISS - PROTÉINES | 14,0 g | 11,9 g | 24% |
| SALE - SALT - SAL - SALZ - SEL | 0,013 g | 0,011 g | 0% |

SERVING - EJEMPLO DE UNA RACIÓN - BEISPIEL FÜR EINE PORTION - EXEMPLE D'UNE PORTION

⁽*⁾RI = ASSUNZIONI DI RIFERIMENTO DI UN ADULTO MEDIO / REFERENCE INTAKE OF AN AVERAGE ADULT / INGESTA DE REFERENCIA DE UN ADULTO MEDIO / REFERENZMENGE FÜR EINEN DURCHSCHNITTLICHEN ERWACHSENEN / APPORT DE RÉFÉRENCE POUR UN ADULTE-TYPE (8400 kJ / 2000 kcal)

LA CONFEZIONE CONTIENE 6 PORZIONI CIRCA - THE PACKAGE CONTAINS 6 SERVINGS APPROXIMATELY EL ENVASE CONTIENE APROXIMADAMENTE PORCIONES - EINE PACKUNG ENTHÄLT CA. PORTIONEN - LE PAQUET CONTIENT ENVIRON 6 PORTIONS







Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved



TEMPS DE CUISSON
TIEMPO DE COCCIÓN
KOOKTIJD • KOKTID
KEITTOAIKA • KOGETID

9 min

| VALORI NUTRIZIONALI MEDI PER 100g AVERAGE NUTRITIONAL VALUES PER 100g DURCHSCHNITTLICHE NÄHRWERTE JE 100g VALEURS NUTRITIONNELLES MOYENNES POUR 100g VALORES NUTRICIONALES MEDIOS POR 100g GEMIDDELDE VOEDINGSWAARDE PER 100g GENOMSNITTLIGT NÄRINGSVÄRDE PER 100g KESKIMÄÄRÄINEN RAVINTOSISÄLTÖ 100g GENNEMSNITLIG NÆRINGSVÆRDI PER 100g | |
|---|---|
| ENERGIA ENERGY • ENERGIE • ÉNERGIE VALOR ENERGÉTICO • ENERGIE ENERGI • ENERGIA • ENERGI | 1512 kJ 357 kcal |
| GRASSI FAT • FETT • MATIÈRES GRASSES GRASAS • VETTEN • FETT • RASVA • FEDT | 1,5 g |
| DI CUI: ACIDI GRASSI SATURI OF WHICH: SATURATES DAVON: GESÄTTIGTE FETTSÄUREN DONT: ACIDES GRAS SATURÉS DE LAS CUALES: SATURADAS WAARVAN: VERZADIGDE VETZUREN VARAV: MÄTTAT FETT JOSTA: TYYDYTTYNYTTÄ HERAF: MÆTTEDE FEDTSYRER | 0,3 g |
| CARBOIDRATI CARBOHYDRATE • KOHLENHYDRATE GLUCIDES • HIDRATOS DE CARBONO KOOLHYDRATEN • KOLHYDRAT HIILIHYDRAATIT • KULHYDRAT | 69 g |
| DI CUI: ZUCCHERI OF WHICH: SUGARS • DAVON: ZUCKER DONT: SUCRES • DE LOS CUALES: AZÚCARES WAARVAN: SUIKERS • VARAV: SOCKERARTER JOSTA: SOKEREITA • HERAF: SUKKERARTER | 1,4 g |
| FIBRE FIBRE • BALLASTSTOFFE • FIBRES ALIMENTAIRES • FIBRA ALIMENTARIA • VEZELS FIBER • RAVINTOKUITU • KOSTFIBRE | 3,5 g |
| PROTEINE PROTEIN • EIWEIß • PROTÉINES PROTEÍNAS • EIWITTEN • PROTEIN PROTEIINI • PROTEIN | 15 g |
| SALE SALT • SALZ • SEL • SAL • ZOUT • SALT SUOLA • SALT | < 0,01 g |

**500g** ℮ NET WT 17.6 OZ | ☆ Ⓚ

PASTA DI SEMOLA DI GRANO DURO
INGREDIENTI: SEMOLA DI GRANO DURO 100% ITALIANO
DURUM WHEAT SEMOLINA PASTA
INGREDIENTS: SEMOLINA FROM 100% ITALIAN
DURUM WHEAT
TEIGWAREN AUS HARTWEIZENGRIESS
ZUTATEN: GRIESS AUS 100% ITALIENISCHEN HARTWEIZEN
PÂTES ALIMENTAIRES DE SEMOULE DE BLÉ DUR
INGRÉDIENTS: SEMOULE DE BLÉ DUR 100% ITALIENNE
PASTA DE SÉMOLA DE TRIGO DURO
INGREDIENTES: SÉMOLA DE TRIGO DURO 100% ITALIANO



GA

MOLI

CHICC
MARC
AURELI

MOLI
INITO
STIFIC

ENERG
VER

IPRO
IENTI
EGGI

1

T. CS

asta
è l
ce
ari
D

Barcode: 3897042507 A-475-818 REV - Admin Review 7/1/18 - 6/30/19



| | per 100g |
|---|---|
| Average nutritional values - Valeurs nutritionnelles moyennes - Durchschnittliche Nährwerte - Gemiddelde voedingswaarde - Genomsnittligt näringsvärde - Keskimääräinen ravintosisältö - por - Besin değerleri | 100g |
| Energy - Energie - Energie - Valor energético - Energia - Ενέργεια - Enerji | 1510 kJ 356 kcal |
| Fats - Matières grasses - Fett - Grasas - Vetten - Fedt - Fett - Rasva - Λιπαρά - Yağ | 1,6 g |
| of which saturates - dont : acides gras saturés - gesättigte Fettsäuren - de las cuales: saturadas - vetzuren - Heraf: mættede fedtsyrer - das quais saturados - josta: tyydyttynyttä - εκ των οποίων: κορεσμένα - Doymuş yağ | 0,3 g |
| Carbohydrate - Glucides - Kohlenhydrate - Hidratos - Koolhydraten - Kulhydrat - Hidratos de - Υδατάνθρακες - Karbonhidrat | 69,5 g |
| of which sugars - dont: sucres - davon: Zucker - de los cuales - suikers - Heraf: sukkerarter - Varav: sockerarter - dos quais - εκ των οποίων: σάκχαρα - Şekerler | 3,1 g |
| Fibre - Fibres alimentaires - Ballaststoffe - Fibra alimentaria - Fibre - Fibra - Ravintokuitu - Εδώδιμες ίνες - Lif | 2,9 g |
| Protein - Protéines - Proteínas - Eiweiß - Proteine - Proteínas - Proteiini - Πρωτεΐνες - Protein | 14,5 g |
| Salt - Sel - Salz - Sal - Zout - Salt - Suola - Αλάτι - Tuz | 0,005 g |

Store in a cool dry place / Conserver dans un endroit frais / Conservar en lugar fresco y seco / Op een droge en koele plaats / Opbevares tørt og køligt / Förvaras torrt och svalt / Conservar em lugar fresco e seco / Kuivassa ja viileässä paikassa. / Φυλάσσεται σε δροσερό και ξηρό μέρος / Serin ve kuru yerde saklayınız.

Best before (dd/mm/yyyy): / À consommer de préférence avant le: / Mindestens haltbar bis: / Consumir preferentemente antes del: / Ten minste houdbaar tot: / Bedst før: / Bäst före: / Parasta ennen: / Ανάλωση κατά προτίμηση πριν από / Tavsiye edilen tüketim tarihi (TETT):

(A) 18 09 2022

L9261 R1

Filed By: wade.legg@dhlaw.com, Filed Date: 12/13/19 5:10 PM, Submission Status: Approved

318 REV – Admin Review 7/1/18 – 6/30/19



Vieni a scoprire
le nostre ricette

## VALORI NUTRIZIONALI
## MEDI PER 100g

| | |
|---|---|
| ENERGIA | 1490 kJ |
| | 351 kcal |
| GRASSI | 1,5 g |
| DI CUI ACIDI GRASSI SATURI | 0,3 g |
| CARBOIDRATI | 69 g |
| DI CUI ZUCCHERI | 3,4 g |
| FIBRE | 2,9 g |
| PROTEINE | 14 g |
| SALE | 0 g |

PRODOTTO CERTIFICATO

DNV·GL

STP-CE-PC-AGRO 38



Filed By: lawyer@law.com, Filed Date: 12/23/19 5:10 PM, Submission Status: Approved

PASTA DI GRAGNANO IGP

Ingredienti: semola di **GRANO** duro
Può contenere tracce di **SOIA**

Dichiarazione nutrizionale per 100g

| Energia | 1489 kJ/351 kcal | Fibre | |
|---|---|---|---|
| Grassi | 1,0g | Proteine | 3,0g |
| di cui acidi grassi saturi | 0,2g | Sale | 14g |
| Carboidrati | 70g | | <0,01g |
| di cui zuccheri | 3,0g | | |

Paese di coltivazione del grano: UE e non UE
Paese di molitura: ITALIA

Pastificio Lucio Garofalo S.p.A.
Via dei Pastai, 42
80054 GRAGNANO (NA)
(tel. 0818011002 - fax 0818012937
www.pastagarofalo.it

F.220 H.330
PER ALIMENTI
IGRF0014250

11

Dal 1910 nel nostro il
Molino maciniamo dal
migliore grano duro dal colore
profumo intenso, dal colore
giallo tenue e dall'alto
contenuto proteico.
La decorticazione
a pietra, moderna
tecnologia che utilizza un
metodo antico, purifica
ogni chicco e ne mantiene
intatte le qualità originali
per una pasta ruvida e
tenace, trafilata al bronzo
e dall'eccellente tenuta
in cottura.

Paese di coltivazione del grano: **Italia**
Paese di molitura: **Italia**

• Pasta di semola di GRANO duro,
conservare in luogo asciutto e fresco.
Può contenere tracce di SOIA

| Valori nutrizionali | 100g |
|---|---|
| Energia | kJ 1489 kcal 351 |
| Grassi di cui Saturi | 1,0g 0,3g |
| Carboidrati di cui Zuccheri | 70g 4,0g |
| Fibre alimentari | 3,0g |
| Proteine | 14g |
| Sale | 0,02g |

*la* Molisana

**La Molisana Spa**
C.da Colle delle Api 100/A
86100 Campobasso, Italy

**www.lamolisana.it**

⏎WhatsApp     Servizio Clienti
+39 380.1292455    ☎ 800.81.80.81

Peso netto



Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ … ]*

|  |  |  | SHARE BY- | |
|---|---|---|---|---|
|  | € | NO. OBS. | VALUE | OBS |
| TOMATO PROD |  |  |  |  |
| SOFT WHEAT FLOUR |  |  |  |  |
| GLUTEN FREE PASTA |  |  |  |  |
| ORGANIC |  |  |  |  |
| BULK |  |  |  |  |
| COUSCOUS |  |  |  |  |
| CORRISP (sales from Tomasello's retail shop) |  |  |  |  |
| **Grand Total** |  |  |  |  |

]

*There is no reason to believe that there is any material quantity of nonsubject merchandise in the returns such that it would distort the WARRH ratios, which are, in any event, extremely small.*

*The total incidence of WARRH expense in the HM sales submitted database is [ ]%, i.e., €[ ] warranty expense on sales of €[ ]. This is reasonably consistent with Tomasello's 3-year history, infra, given the fact that the reported sales are only subject merchandise, while total sales contains a very large amount of sales such as byproducts, on which there are no returns. One would therefore expect that WARRH in the reported database would be slightly higher than WARRH over total company sales.*

    b.    As stated in the original questionnaire, include a schedule of warranty expenses incurred for the foreign like product for the three most recently completed fiscal years. In addition, calculate a cost per unit for each year. The yearly averages should be reported on the same model-specific basis.

*Tomasello's 3-year history of warranty expense, calculated on the same basis as the reporting of WARRH in the HM sales database, is as follows:*

[

| YEAR | DOMESTIC SALES | RETURNS | |
|---|---|---|---|
|  | € | € | % |
| 2010 |  |  |  |
| 2009 |  |  |  |
| 2008 |  |  |  |

]

6.   Did Tomasello incur any bad debt expenses during the POR? If yes, where did Tomasello report these expenses?

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

*Bad debt is included in indirect selling expenses; see §AD QR Exh. 14 PDF-421 row 266.  The account is:*

*[*

| | | | |
|---|---|---|---|
| | | | |

*]*

7. You reported the following fields of Tomasello's home market sales database in negative values: OMAGGIOH, REBATE1H, REBATE2H, REBATE3H, COMM1H ADVERTH, WARRH, INDIRSH and INVCARH.  Please check and explain why these expense fields are negative.

*The question addresses nine database fields.  For seven of these fields – namely, OMAGGIOH,  REBATE2H, REBATE3H, COMM1H, ADVERTH,  INDIRSH and INVCARH – there is one and only one row of the database for which the reported value is negative.  This single row is the erroneous row of invoice 100275 of 2/26/2010, namely, SEQH 111498, for which we provided complete documentation in §AC SQR (3/3/2011) at Exh. 12 and explained in the text, id. at 23 and 33 (the cross-reference in the second paragraph following the table should read "Re negative values, see supra at 23…" rather than "…see supra at 37…").*

*For WARRH, there are two rows of the HM sales submitted database for which there are negative values.*

- *The first of these is the same SEQH 111498 discussed in the first paragraph of the response to this question.*
- *The second of these is SEQH 43969, invoice 500330 of February 26, 2010 to customer [  ].  There is, in fact, only one sale to this customer in the entire reported HM sales database, and that sale consists of this one line item, which is [  ] kg of pasta, or about [  ]% of the HM sales database.  That customer had a negative WARRH ratio, as shown at §AD QR Exh. 14 PDF-417, row 37 (credit note of   ] on sales of €[  ]).  This is the only customer with a negative warranty ratio; see id. PDF-417-19.*

*Thus, this instance of negative WARRH is properly reported and is a thoroughly trivial transaction.*

*The last of the database fields with negative adjustments is REBATE1H.*

- *One row of negative values for this field consists of SEQH 111498, which is discussed above.*

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

- **We have isolated all of the rows of the database with negative REBATE1H and have summed them by customer, by quantity and value, as follows:**

[

| HM SALES WITH NEGATIVE REBATE1H | | |
|---|---|---|
| CUSCODH | KG TOTAL | € TOTAL |
| | | |
| | | |
| | | |
| | | |

]

*The second line item in the table – customer [   ] – is the sale discussed in the first bullet point (i.e., SEQH 111498). The remaining three customers all have negative REBATE1H ratios; see §AD QR Exh. 14 PDF-405. Since these customers have negative REBATE1H ratios, the reported unit values for REBATE1H for these customers will be negative. Note that these negative rebate ratios are extremely small, id., and the abundant REBATE1H documentation provided in the §AC SQR (3//2011 at 24-28 and Exh. 14) establishes the accuracy of Tomasello's reporting for REBATE1H.*

*We have therefore explained every instance where a negative unit value is reported in the fields OMAGGIOH, REBATE1H, REBATE2H, REBATE3H, COMM1H ADVERTH, WARRH, INDIRSH and INVCARH referenced in the question. In every instance, Tomasello's reporting is correct.*

8. A data analysis of Tomasello's home market data shows great price variations for the following products:

CONNUMH [ ]           [ ]      SEQH [ ]
                       [ ]              [ ]
CONNUMH [ ]           [ ]      SEQH [ ]
                       [ ]              [ ]

Please explain the price variation and provide sales-related documentations.

*The question relates to the following observations from the HM sales database:*

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*Public Version*
*Proprietary information redacted in brackets, [ ... ]*

*[*

| SEQH | | | | |
|---|---|---|---|---|
| PRODCODH | | | | |
| CONNUMH | | | | |
| PASTYPEH | | | | |
| CUSCODH | | | | |
| SALINDTH | | | | |
| INVOICEH | | | | |
| QTYH | | | | |
| GRSUPRH | | | | |
| OTHDIS1H | | | | |
| OTHDIS2H | | | | |
| OTHDIS3H | | | | |
| OTHDIS4H | | | | |

*]*

*We provide the relevant documentation in* ==*Exhibit*== *4.*

- *Invoice 101603 (page 1) was a mistake and it was reverse entered with credit note AV 800 (page 2-3) for the same amount.  The transaction pricing was wrong, and so the sale was reversed by means of a credit note.*

- *Invoice 3939 (page 4) had an input error: instead of entering the price,  the shape code of the following item was input into the price field (76). No credit note to amend this mistake has been issued so far, as no one appears to have caught the error.*

- *Regarding invoice 100662, on March 11, 2010 Tomasello issued a credit note (AV207) (page 5) to [    ], where there was a mistake in the quantity field; it was indicated as Unit of Measure CF (cartons) but the quantity number and the price were in kilograms; then on April 26, 2010 Tomasello issued an invoice (page 6) to reverse the credit note, because there is no other mechanism to reverse a credit note.*

- *Finally, invoice 101287 (page 7) is correct.  Napoletani are a sort of "candele" shape (long hollow cuts), and from a marketing point of view they are considered special shapes, even though they have a production throughput rate that places them among normal long cuts (note that they are not on the Department's list of shapes in the appendix to the questionnaire).*

*Tomasello has therefore explained each of the anomalies presented in the Department's question.  The anomalies are negligible and they in no way impugn the reliability of the reported sales database.*

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

**EXHIBIT 1        PROTEIN TEST METHOD**

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19



Click here to



—e-learning for
Quantiative analysis

# Kjeldahl Method



polypeptide

ammonia

trapping
flask

### Introduction

Nitrogen is one of the five major elements found in organic materials such as protein. This fact was recognized by a Danish chemist, Johan Kjeldahl, who used it as a method of determining the amount of protein in samples taken from a wide variety of organisms. In 1883 Kjeldahl presented to the Danish Chemical Society a method (much revised since his day) for determining the amount of nitrogen in mixtures of substances containing ammonium salts, nitrate, or organic nitrogen compounds.

The central basis used in this procedure is the oxidation of the organic compound using strong sulfuric acid. As the organic material is oxidized the carbon it contains is converted to carbon dioxide and the hydrogen is converted into water.

The **nitrogen**, from the amine groups found in the peptide bonds of the polypeptide chains, is converted to ammonium ion, which dissolves in the oxidizing solution, and can later be converted to ammonia gas.

The Kjeldahl method of nitrogen analysis is the worldwide standard for calculating the protein content in a wide variety of materials ranging from human and animal food, fertilizer, waste water and fossil fules.

### A three step procedure

The Kjeldahl method consists of three steps, which have to be carefully carried out in sequence:

1. the sample is first digested in strong sulfuric acid in the presence of a catalyst, which helps in the conversion of the amine nitrogen to ammonium ions,
2. the ammonium ions are then converted into ammonia gas, heated and distilled. The ammonia gas is led into a trapping solution where it

dissolves and becomes an ammonium ion once
again,
3. finally the amount of the ammonia that has been
trapped is determined by titration with a standard
solution, and a calculation made.



### Step One: Digestion of the Sample



This is the most time-consuming step in the analysis. The
purpose of this step is to break down the bonds that hold
the polypeptides together, and convert them to simpler
chemicals such as water, carbon dioxide and, of course,
ammonia.

Such reactions can be considerably speeded up by the
presence of a catalyst and by a neutral substance, such as
potassium sulfate ($K_2SO_4$), which raises the boiling point
of the digesting acid and thus the temperature of the
reaction.

Catalysts are also used to help in the digestion process;
many different one have been tried including selenium,
mercury, copper, or ions of mercury or copper.

### Digestion is accomplished by:

1. Weighing out approximately 1 gm of the sample
containing protein, making a note of the weight,
and placing the sample into a digestion flask, along
with 12-15 ml of concentrated sulfuric acid
($H_2SO_4$).
2. Adding seven grams of potassium sulfate and a
catalyst, usually copper.
3. Bringing the digestion tube/flask and mixture to a

"rolling boil" (about 370°C to 400°C) using a
heating a block.
4. Heating the mixture in the tube/flask until white
   fumes can be seen, and then continuing the heating
   for about 60-90 mins.
5. Cooling the tube/flask and cautiously adding 250
   mls of water.

### Step Two: Distillation



The purpose of the next step, distillation, is to separate the
ammonia (that is, the nitrogen) from the digestion mixture.
This is done by,

1. raising the pH of the mixture using sodium
   hydroxide (45% NaOH solution). This has the
   effect of changing the ammonium ($NH_4^+$) ions
   (which are dissolved in the liquid) to ammonia
   ($NH_3$), which is a gas.
2. separating the nitrogen away from the digestion
   mixture by distilling the ammonia (converting it to
   a volatile gas, by raising the temperature to boiling
   point) and then trapping the distilled vapors in a
   special trapping solution of about 15 ml HCl
   (hydrochloric acid) in 70 ml of water.
3. removing the trapping flask and rinsing the
   condenser with water so as to make sure that all the
   ammonia has been dissolved.

### Step Three: Titration



sodium
hydroxide

trapping acid
+
ammonia

As the ammonia dissolves in the acid trapping solution, it
neutralizes some of the HCl it finds there. What acid is left
can then be "back titrated", that is titrated with a standard,
known solution of base (usually NaOH). In this way the
amount of ammonia distilled off from the digestive
solution can be calculated, and hence the amount of
nitrogen in the protein determined.

**The quantities of acid, and hence ammonia are
determined by,**

1. adding an indicator dye to the acid/ammonia
   trapping solution. This dye should turn a strong
   color, indicating that a significant amount of the
   original trapping acid is still present.
2. putting a standard solution of NaOH (sodium
   hydroxide) into the buret (a long tube with a tap at
   the end), and slowly, slowly adding small amounts
   of the sodium hydroxide solution to the acid
   solution with the dye.
3. watching for the point at which the dye turns
   orange, indicating that the "endpoint" has been

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

Filed By: tsrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

reached and that now all the acid has been
neutralized by the base.

4. recording the volume of the neutralizing base
(sodium hydroxide solution) that was necessary to
reach the endpoint.

5. performing a calculation to find the amount of
ammonia, and thus nitrogen, that came from the
original sample.

## Calculations



One mole of ammonia coming from the digestion mixture
(and hence from the original protein) will neutralize
exactly one mole of the acid in the trapping flask.

The first calculation, therefore, is to find the number of
moles of ammonia that have been produced and then
trapped from your sample(s).

This is done by,

* calculating the number of moles of acid in the
trapping flask originally (before any ammonia was
trapped) by multiplying the molarity of the acid
solution by the volume of the trapping solution

**moles of acid =
molarity of acid x volume used in flask
(molesA = M x V)**

* calculating the number of moles of base (NaOH)
that were added from the buret to neutralize the
remaining acid (that NOT neutralized by the
ammonia).

**moles of base =
molarity of base x volume added from buret
(molesB = M x V)**

* subtracting the "moles of base" added from the
"moles of acid" present at the beginning, to get,
the number of "moles of ammonia" coming from
the protein.

**moles ammonia =
moles acid — moles base**

* the number of "moles of ammonia" is the same as
the "moles of nitrogen",

* so ... to calculate the number of grams of nitrogen
in the original sample of protein, multiply the
"moles of nitrogen" by the atomic mass of nitrogen
(mass of atoms of nitrogen),

**gms nitrogen =**

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

**moles nitrogen x atomic mass**
(gN = molesN x 14.0067)

It is also possible to calculate the amount of crude protein in the sample. Although there are differences between different samples, the amount of "crude protein" (**CP**) can be found by multiplying the percent Nitrogen by a factor (usually 6.25).

**percent Nitrogen**

The percentage of nitrogen found in the original sample can now be calculated by:

**CP = %N x 6.25**

**%nitrogen =
(gms nitrogen / gms sample) x 100**
%N = (gN / gS) x 100

Source: http://www.brooklyn.cuny.edu/bc/ahp/SDKC/Chem/SD_KjeldahlMethod.html

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# Kjeldahl method

From Wikipedia, the free encyclopedia

The **Kjeldahl method** or **Kjeldahl digestion** in analytical chemistry is a method for the quantitative determination of nitrogen in chemical substances developed by Johan Kjeldahl in 1883.[1]

## Contents

- 1 Method
- 2 Applications
    - 2.1 Conversion factors
- 3 See also
- 4 References

## Method

The method consists of heating a substance with sulfuric acid, which decomposes the organic substance by oxidation to liberate the reduced nitrogen as ammonium sulfate. In this step potassium sulfate is added to increase the boiling point of the medium (from 337°F to 373°F / 169℃ to 189℃). Chemical decomposition of the sample is complete when the medium has become clear and colorless (initially very dark).

The solution is then distilled with sodium hydroxide (added in small quantities) which converts the ammonium salt to ammonia. The amount of ammonia present (hence the amount of nitrogen present in the sample) is determined by back titration. The end of the condenser is dipped into a solution of boric acid. The ammonia reacts with the acid and the remainder of the acid is then titrated with a sodium carbonate solution with a methyl orange pH indicator:

Degradation: $Protein + H_2SO_4 \rightarrow (NH_4)_2SO_4(aq) + CO_2(g) + SO_2(g) + H_2O(g)$

Liberation of ammonia: $(NH_4)_2SO_4(aq) + 2NaOH \rightarrow Na_2SO_4(aq) + 2H_2O(l) + 2NH_3(g)$

Capture of ammonia: $B(OH)_3 + H_2O + NH_3 \rightarrow NH_4^+ + B(OH)_4^-$

Back-titration: $B(OH)_3 + H_2O + Na_2CO_3 \rightarrow NaHCO_3(aq) + NaB(OH)_4(aq) + CO_2(g) + H_2O$

Nowadays, the Kjeldahl method is largely automated and makes use of specific catalysts (mercury oxide or copper sulfate) to speed up the decomposition.

## Applications

The Kjeldahl method's universality, precision and reproducibility have made it the internationally-recognized method for estimating the protein content in foods and it is the standard method against which all other methods are judged. It does not, however, give a measure of true protein content, as it measures nonprotein nitrogen in addition to the nitrogen in proteins. This is evidenced by the 2007 pet food incident and the 2008 Chinese milk powder scandal, when melamine, a nitrogen-rich chemical, was added to raw materials to fake high protein

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

contents. Also, different correction factors are needed for different proteins to account for different amino acid sequences. Additional disadvantages, such as the need to use concentrated sulfuric acid at high temperature and the relatively long testing time (an hour or more), compare unfavorably with the Dumas method for measuring crude protein content.[2]

## Conversion factors

Conversion factors for common foods range from 6.38 for dairy and 6.25 for meat, eggs, corn (maize) and sorghum to 5.83 for most grains, 5.70 for wheat flour and 5.46 for peanuts.[3]

# See also

- Total Kjeldahl nitrogen
- Devarda's alloy, a powerful reducing agent for nitrate analysis

# References

1. ^ Julius B. Cohen *Practical Organic Chemistry* 1910 Link to online text (http://www.archive.org/details/PracticalOrganicChemistry)
2. ^ Dr. D. Julian McClements. "Analysis of Proteins" (http://www.unix.oit.umass.edu/~mcclemen/581Proteins.html) . University of Massachusetts. http://www.unix.oit.umass.edu/~mcclemen/581Proteins.html. Retrieved 2007-04-27.
3. ^ http://www.fao.org/docrep/006/y5022e/y5022e03.htm

Retrieved from "http://en.wikipedia.org/wiki/Kjeldahl_method"
Categories: Titration

- This page was last modified on 4 March 2011 at 20:52.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

19 CFR § 101.9   Nutrition labeling of food.

(a) Nutrition information relating to food shall be provided for all products intended for human consumption and offered for sale unless an exemption is provided for the product in paragraph (j) of this section.

…

(c) The declaration of nutrition information on the label and in labeling of a food shall contain information about the level of the following nutrients, except for those nutrients whose inclusion, and the declaration of amounts, is voluntary as set forth in this paragraph.

…

(7) Protein: A statement of the number of grams of protein in a serving, expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero. When the protein in foods represented or purported to be for adults and children 4 or more years of age has a protein quality value that is a protein digestibility-corrected amino acid score of less than 20 expressed as a percent, or when the protein in a food represented or purported to be for children greater than 1 but less than 4 years of age has a protein quality value that is a protein digestibility-corrected amino acid score of less than 40 expressed as a percent, either of the following shall be placed adjacent to the declaration of protein content by weight: The statement "not a significant source of protein," or a listing aligned under the column headed ?Percent Daily Value? of the corrected amount of protein per serving, as determined in paragraph (c)(7)(ii) of this section, calculated as a percentage of the Daily Reference Value (DRV) or Reference Daily Intake (RDI), as appropriate, for protein and expressed as Percent of Daily Value. When the protein quality in a food as measured by the Protein Efficiency Ratio (PER) is less than 40 percent of the reference standard (casein) for a food represented or purported to be for infants, the statement "not a significant source of protein" shall be placed adjacent to the declaration of protein content. **Protein content may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis** as given in the ?Official Methods of Analysis of the AOAC International? (formerly the Association of Official Analytical Chemists), 15th Ed. (1990), which is incorporated by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51, except when the official procedure for a specific food requires another factor. Copies may be obtained from ….

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

**PUBLIC VERSION**

**EXHIBIT 2        DOCUMENTATION RE: PROTEIN**

**Proprietary Information**
**Not Amenable to Summarization**

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

**EXHIBIT 3          SEMOLINA TEST RESULTS**

**Proprietary Information**
**Not Amenable to Summarization**

**EXHIBIT 4**      **DOCUMENTATION CONCERNING**
**APPARENT PRICING ANOMALIES**

**Proprietary Information**
**Not Amenable to Summarization**

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH E    AR 15 GRANORO PROTEIN COMMENTS

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

## LAW OFFICES OF DAVID L. SIMON

**Attorney-at-Law**
**1025 Connecticut Avenue, NW, Suite 1000**
**Washington, DC 20036 USA**
**Tel. 202-481-9000        Fax 202-481-9010**
**e-mail: DLSimon@DLSimon.com**

David L. Simon
Admitted, MD, DC

Ayla  Simon
Foreign Legal Consultant

Roberto Turolla
International Trade Consultant
Milan, Italy

July 28, 2012

Secretary of Commerce                                                          A-475-818
Attn: Import Administration                                                    Pages: 14
Central Records Unit, Room 1870                              §751(a) AD review, 7/10-6/11
US Department of Commerce                                      AD/CVD Operations 3: DM
14th Street and Constitution Avenue, NW
Washington, DC 20230                                               **PUBLIC  DOCUMENT**

      Attn:   Official-in-Charge: James Terpstra

      Re:   *Pasta From Italy*;
           Granoro comments on PROTEINH/U coding

Dear Mr. Secretary:

      Pastificio Attilio Mastromauro–Pasta Granoro S.r.L. hereby provides comments concerning PROTEINH/U coding, as requested by the Department.  These comments reflect material previously submitted in Granoro's pre-preliminary comments, filed on July 9, 2012.

      The protein content of a food is ascertained by measuring the nitrogen (N) content, and then multiplying the N content by a factor.  In Italy, and in the EU generally, food regulations follow the convention of applying a factor of 5.7 to the N content.  In the United States, the FDA requires application of a factor of 6.25.  See Attachment A, which consists of public documents excerpted from Granoro's sales verification exhibit 17, originally submitted to the Department in the POR-14 review of Tomasello, as discussed in Granoro's pre-preliminary comments.  We are submitting them herewith in order to place them on the public record.

      Because the United States and the EU use two different N factors, it is not possible to compare directly the protein contents of the labels used for the U.S. and Italian (or EU) markets.

      Granoro suggests that the Department add a sentence to the instructions for the PROTEINH/U field requiring respondents to report the protein content based on an N factor of 5.7.  Since respondents are Italian companies, they are running their protein tests in this way. See pages 75, 80 of the PDF file released to the parties by the Department on July 20, 2012 (lab test result, N = 5.7); *id.* at 157 (technical article).  If respondents are (erroneously) reporting

LAW OFFICES OF DAVID L. SIMON

Import Administration
July 28, 2012
Page 2

their U.S. protein content based on the literal verbiage on the label, they will have to recalculate it to reflect an N factor of 5.7.  Note that Granoro reported protein content in both markets using the same factor, N = 5.7.

In sum, it is mathematically necessary to use a common N factor in both markets.

Respectfully submitted,

David L. Simon / Ayla Simon
Counsel to Granoro

CERTIFICATION

I, Michele dell'Aquila , currently employed as Export Manager of Pastificio Attilio Mastromauro–Pasta Granoro S.r.L., certify that I prepared or otherwise supervised the preparation of the attached comments dated July 30, 2012, in the July 1, 2010-June 30, 2011 antidumping administrative review of pasta  from  Italy, case no. A-475-818.  I certify that the information contained in this submission is accurate and complete to the best of my knowledge.  I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce.  I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document.  The original will be available for inspection by U.S. Department of Commerce officials.

Signature:          July 29, 2012

Date:

## CERTIFICATION OF COUNSEL

I,   David L. Simon, of the Law Offices of David L. Simon, counsel to Pastificio Attilio Mastromauro–Pasta Granoro S.r.L., certify that I have read the attached comments, dated July 28, 2012, in the July 1, 2010 – June 30, 2011 administrative review of the antidumping order on pasta from Italy, Case No. A-475-818. In my capacity as an adviser, counsel, preparer or reviewer of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge.  I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.  In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification.  I certify that I am filing a copy of this signed certification with this submission to the U.S. Department of Commerce and that I will retain the original for a five-year period commencing with the filing of this document.  The original will be available for inspection by U.S. Department of Commerce officials.

July 28, 2012

## CERTIFICATE OF SERVICE

I, David L. Simon, hereby certify that the attached submission was served by first-class mail, postage prepaid, on the following parties on July 30, 2012:

David C. Smith, Jr., Esq.
Kelley Drye & Warren LLP
3050 K Street, NW, Suite 400
Washington, DC 20007-5108

Richard P. Ferrin, Esq.
Drinker Biddle & Reath
1500 K Street, NW
Suite 1100
Washington, DC 20005

David L. Simon

**UNITED STATES DEPARTMENT OF COMMERCE**
International Trade Administration
Washington, D.C. 20230

# ATTACHMENT A

A-475-818
Administrative Review
POR: 7/1/09 - 6/30/10
~~Proprietary Document~~ *Public Version*
Office 3: JZ, GM

| | |
|---|---|
| DATE: | July 18, 2011 |
| MEMORANDUM TO: | The File |
| THROUGH: | Melissa Skinner<br>Director, Office 3 |
| THROUGH: | James Terpstra<br>Program Manager, Office 3 |
| FROM: | Joy Zhang<br>George McMahon<br>International Trade Compliance Analysts, Office 3 |
| SUBJECT: | <u>Verification of the Sales Response of Tomasello in the<br>Antidumping Review of Certain Pasta from Italy</u> |

The verification of Molino e Pastificio Tomasello S.p.A. (Tomasello) took place from June 6, 2011 through June 10, 2011. The attached report outlines the procedures followed at the verification and describes our findings. We have appended a separate list of Exhibits compiled at the verification. We have also attached a list of participants at the verification.

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

4.      For pre-selected home market and U.S. sales identified in the attachments to this outline, where applicable, please provide the following documents: (1) support documentation for the input wheat used; (2) packaging showing the protein content and/or other identifying traits; and (3) agreements between Tomasello and its customer(s) identifying the specified wheat input; (4) the protein content of finished pasta; (5) how the protein content is tested; (6) how the protein content is labeled in the packaging of the merchandise in the home market and U.S. market; (7) what the home market and U.S. market requirements are for proteins contents for pasta; and (8) provide samples of packaging for sale in the home and U.S. market showing protein contents.

*We reviewed the production process with company officials and took a tour of Tomasello's laboratory. A laboratory employee told us that Tomasello performs semolina tests for all truck loads of wheat coming into the factory. They conduct lab tests for all finished products too. Protein contents range from 11 to 12.5 percent for pasta sold in all markets. However, Tomasello uses a Nitrogen factor of 5.7 for all its Italian and European labeling for protein contents. Company officials further explained that Nitrogen factor of 5.7 is the factor generally accepted for wheat and wheat products. However, Tomasello uses a N-6.25 protein factor for product sold in the United States in accordance with the U.S. Food and Drug Administration (FDA) requirement.*

7

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19
ESCERPT FROM GRANORO POR-15 SALES VERIFICATION EXHIBIT 17





—e-learning for
——Quantiative analysis
———Kjeldahl Method



**Introduction**

Nitrogen is one of the five major elements found in organic materials such as protein. This fact was recognized by a Danish chemist, Johan Kjeldahl, who used it as a method of determining the amount of protein in samples taken from a wide variety of organisms. In 1883 Kjeldahl presented to the Danish Chemical Society a method (much revised since his day) for determining the amount of nitrogen in mixtures of substances containing ammonium salts, nitrate, or organic nitrogen compounds.

The central basis used in this procedure is the oxidation of the organic compound using strong sulfuric acid. As the organic material is oxidized the carbon it contains is converted to carbon dioxide and the hydrogen is converted into water.

The nitrogen, from the amine groups found in the peptide bonds of the polypeptide chains, is converted to ammonium ion, which dissolves in the oxidizing solution, and can later be converted to ammonia gas.

The Kjeldahl method of nitrogen analysis is the worldwide standard for calculating the protein content in a wide variety of materials ranging from human and animal food, fertilizer, waste water and fossil fules.

**A three step procedure**

The Kjeldahl method consists of three steps, which have to be carefully carried out in sequence:

1. the sample is first digested in strong sulfuric acid in the presence of a catalyst, which helps in the conversion of the amine nitrogen to ammonium ions,

2. the ammonium ions are then converted into ammonia gas, heated and distilled. The ammonia gas is led into a trapping solution where it

dissolves and becomes an ammonium ion once again,

3. finally the amount of the ammonia that has been trapped is determined by titration with a standard solution, and a calculation made.



### Step One: Digestion of the Sample

This is the most time-consuming step in the analysis. The purpose of this step is to break down the bonds that hold the polypeptides together, and convert them to simpler chemicals such as water, carbon dioxide and, of course, ammonia.



Such reactions can be considerably speeded up by the presence of a catalyst and by a neutral substance, such as potassium sulfate ($K_2SO_4$), which raises the boiling point of the digesting acid and thus the temperature of the reaction.

Catalysts are also used to help in the digestion process; many different one have been tried including selenium, mercury, copper, or ions of mercury or copper.

**Digestion is accomplished by:**

1. Weighing out approximately 1 gm of the sample containing protein, making a note of the weight, and placing the sample into a digestion flask, along with 12-15 ml of concentrated sulfuric acid ($H_2SO_4$).
2. Adding seven grams of potassium sulfate and a catalyst, usually copper.
3. Bringing the digestion tube/flask and mixture to a

"rolling boil" (about 370°C to 400°C) using a
heating a block.
4. Heating the mixture in the tube/flask until white
fumes can be seen, and then continuing the heating
for about 60-90 mins.
5. Cooling the tube/flask and cautiously adding 250
mls of water.

**Step Two: Distillation**    The purpose of the next step, distillation, is to separate the
ammonia (that is, the nitrogen) from the digestion mixture.
This is done by,



1. raising the pH of the mixture using sodium
hydroxide (45% NaOH solution). This has the
effect of changing the ammonium ($NH_4^+$) ions
(which are dissolved in the liquid) to ammonia
($NH_3$), which is a gas.
2. separating the nitrogen away from the digestion
mixture by distilling the ammonia (converting it to
a volatile gas, by raising the temperature to boiling
point) and then trapping the distilled vapors in a
special trapping solution of about 15 ml HCl
(hydrochloric acid) in 70 ml of water.
3. removing the trapping flask and rinsing the
condenser with water so as to make sure that all the
ammonia has been dissolved.

**Step Three: Titration**    As the ammonia dissolves in the acid trapping solution, it
neutralizes some of the HCl it finds there. What acid is left
can then be "back titrated", that is titrated with a standard,
known solution of base (usually NaOH). In this way the
amount of ammonia distilled off from the digestive
solution can be calculated, and hence the amount of
nitrogen in the protein determined.



sodium
hydroxide

The quantities of acid, and hence ammonia are
determined by,

1. adding an indicator dye to the acid/ammonia
trapping solution. This dye should turn a strong
color, indicating that a significant amount of the
original trapping acid is still present.
2. putting a standard solution of NaOH (sodium
hydroxide) into the buret (a long tube with a tap at
the end), and slowly, slowly adding small amounts
of the sodium hydroxide solution to the acid
solution with the dye.
3. watching for the point at which the dye turns
orange, indicating that the "endpoint" has been

trapping acid
+
ammonia

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

reached and that now all the acid has been neutralized by the base.

4. recording the volume of the neutralizing base (sodium hydroxide solution) that was necessary to reach the endoint.

5. performing a calculation to find the amount of ammonia, and thus nitrogen, that came from the original sample.

## Calculations



moles ammonia =

moles acid — moles base

One mole of ammonia coming from the digestion mixture (and hence from the original protein) will neutralize exactly one mole of the acid in the trapping flask.

The first calculation, therefore, is to find the number of moles of ammonia that have been produced and then trapped from your sample(s).

This is done by,

- calculating the number of moles of acid in the trapping flask originally (before any ammonia was trapped) by multiplying the molarity of the acid solution by the volume of the trapping solution

$$moles \ of \ acid = \\ molarity \ of \ acid \ x \ volume \ used \ in \ flask \\ (molesA = M \ x \ V)$$

- calculating the number of moles of base (NaOH) that were added from the buret to neutralize the remaining acid (that NOT neutralized by the ammonia).

$$moles \ of \ base = \\ molarity \ of \ base \ x \ volume \ added \ from \ buret \\ (molesB = M \ x \ V)$$

- subtracting the "moles of base" added from the "moles of acid" present at the beginning, to get,
- the number of "moles of ammonia" coming from the protein,
- the number of "moles of ammonia" is the same as the "moles of nitrogen",
- so ... to calculate the number of grams of nitrogen in the original sample of protein, multiply the "moles of nitrogen" by the atomic mass of nitrogen (mass of atoms of nitrogen),

$$gms \ nitrogen =$$

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

$$\text{moles nitrogen x atomic mass}$$
$$(gN = molesN \times 14.0067)$$

It is also possible to calculate the amount of crude protein in the sample. Although there are differences between different samples, the amount of "crude protein" (**CP**) can be found by multiplying the percent Nitrogen by a factor (usually 6.25).

**percent Nitrogen**

The percentage of nitrogen found in the original sample can now be calculated by:

$$\text{CP} = \%N \times 6.25$$

$$\textbf{\%nitrogen} =$$
$$\textbf{(gms nitrogen / gms sample) x 100}$$
$$\%N = (gN / gS) \times 100$$

Source: http://www.brooklyn.cuny.edu/bc/ahp/SDKC/Chem/SD_KjeldahlMethod.html

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# Kjeldahl method

From Wikipedia, the free encyclopedia

The **Kjeldahl method** or **Kjeldahl digestion** in analytical chemistry is a method for the quantitative determination of nitrogen in chemical substances developed by Johan Kjeldahl in 1883.[1]

## Contents

- 1 Method
- 2 Applications
    - 2.1 Conversion factors
- 3 See also
- 4 References

## Method

The method consists of heating a substance with sulfuric acid, which decomposes the organic substance by oxidation to liberate the reduced nitrogen as ammonium sulfate. In this step potassium sulfate is added to increase the boiling point of the medium (from 337°F to 373°F / 169°C to 189°C). Chemical decomposition of the sample is complete when the medium has become clear and colorless (initially very dark).

The solution is then distilled with sodium hydroxide (added in small quantities) which converts the ammonium salt to ammonia. The amount of ammonia present (hence the amount of nitrogen present in the sample) is determined by back titration. The end of the condenser is dipped into a solution of boric acid. The ammonia reacts with the acid and the remainder of the acid is then titrated with a sodium carbonate solution with a methyl orange pH indicator.

Degradation: $Protein + H_2SO_4 \rightarrow (NH_4)_2SO_4(aq) + CO_2(g) + SO_2(g) + H_2O(g)$

Liberation of ammonia: $(NH_4)_2SO_4(aq) + 2NaOH \rightarrow Na_2SO_4(aq) + 2H_2O(l) + 2NH_3(g)$

Capture of ammonia: $B(OH)_3 + H_2O + NH_3 \rightarrow NH_4^+ + B(OH)_4^-$

Back-titration: $B(OH)_3 + H_2O + Na_2CO_3 \rightarrow NaHCO_3(aq) + NaB(OH)_4(aq) + CO_2(g) + H_2O$

Nowadays, the Kjeldahl method is largely automated and makes use of specific catalysts (mercury oxide or copper sulfate) to speed up the decomposition.

## Applications

The Kjeldahl method's universality, precision and reproducibility have made it the internationally-recognized method for estimating the protein content in foods and it is the standard method against which all other methods are judged. It does not, however, give a measure of true protein content, as it measures nonprotein nitrogen in addition to the nitrogen in proteins. This is evidenced by the 2007 pet food incident and the 2008 Chinese milk powder scandal, when melamine, a nitrogen-rich chemical, was added to raw materials to fake high protein

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

contents. Also, different correction factors are needed for different proteins to account for different amino acid sequences. Additional disadvantages, such as the need to use concentrated sulfuric acid at high temperature and the relatively long testing time (an hour or more), compare unfavorably with the Dumas method for measuring crude protein content.[2]

## Conversion factors

Conversion factors for common foods range from 6.38 for dairy and 6.25 for meat, eggs, corn (maize) and sorghum to 5.83 for most grains, 5.70 for wheat flour and 5.46 for peanuts.[3]

# See also

- Total Kjeldahl nitrogen
- Devarda's alloy, a powerful reducing agent for nitrate analysis

# References

1. ^ Julius B. Cohen *Practical Organic Chemistry* 1910 Link to online text (http://www.archive.org/details/PracticalOrganicChemistry)
2. ^ Dr. D. Julian McClements. "Analysis of Proteins" (http://www-unix.oit.umass.edu/~mcclemen/581Proteins.html) University of Massachusetts. http://www-unix.oit.umass.edu/~mcclemen/581Proteins.html. Retrieved 2007-04-27.
3. ^ http://www.fao.org/docrep/006/y5022e/y5022e03.htm

Retrieved from "http://en.wikipedia.org/wiki/Kjeldahl_method"
Categories: Titration

- This page was last modified on 4 March 2011 at 20:52.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.
  Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

FDA REGULATIONS

19 CFR § 101.9   Nutrition labeling of food.

(a) Nutrition information relating to food shall be provided for all
products intended for human consumption and offered for sale unless an
exemption is provided for the product in paragraph (j) of this section.

...

(c) The declaration of nutrition information on the label and in
labeling of a food shall contain information about the level of the
following nutrients, except for those nutrients whose inclusion, and the
declaration of amounts, is voluntary as set forth in this paragraph.

...

(7) Protein: A statement of the number of grams of protein in a
serving, expressed to the nearest gram, except that if a serving
contains less than 1 gram, the statement "Contains less than 1 gram" or
"less than 1 gram" may be used as an alternative, and if the serving
contains less than 0.5 gram, the content may be expressed as zero. When
the protein in foods represented or purported to be for adults and
children 4 or more years of age has a protein quality value that is a
protein digestibility-corrected amino acid score of less than 20
expressed as a percent, or when the protein in a food represented or
purported to be for children greater than 1 but less than 4 years of age
has a protein quality value that is a protein digestibility-corrected
amino acid score of less than 40 expressed as a percent, either of the
following shall be placed adjacent to the declaration of protein content
by weight: The statement "not a significant source of protein," or a
listing aligned under the column headed ?Percent Daily Value? of the
corrected amount of protein per serving, as determined in paragraph
(c)(7)(ii) of this section, calculated as a percentage of the Daily
Reference Value (DRV) or Reference Daily Intake (RDI), as appropriate,
for protein and expressed as Percent of Daily Value. When the protein
quality in a food as measured by the Protein Efficiency Ratio (PER) is
less than 40 percent of the reference standard (casein) for a food
represented or purported to be for infants, the statement "not a
significant source of protein" shall be placed adjacent to the
declaration of protein content. **Protein content may be calculated on the
basis of the factor of 6.25 times the nitrogen content of the food as
determined by the appropriate method of analysis** as given in the
?Official Methods of Analysis of the AOAC International? (formerly the
Association of Official Analytical Chemists), 15th Ed. (1990), which is
incorporated by reference in accordance with 5 U.S.C. 552(a) and 1 CFR
part 51, except when the official procedure for a specific food requires
another factor. Copies may be obtained from ….

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH F   ITALIAN SEMOLINA AND PASTA STANDARDS (2001)

# ITALY

## 1. LEGISLATION IN FORCE

## *(unofficial translation)*

### PRESIDENTIAL DECREE N° 187, dated 9 February 2001

*(Official Journal n. 117, of May 22, 2001)*

**Regulation for the revision of laws concerning the production and sale of milling products and pasta, pursuant to Article 50 of Law N° 146, dated 22 February 1994.**

<u>THE PRESIDENT</u>

Having read Article 87, Paragraph five, of the Italian Constitution;

Having read Article 17, Paragraph two, of Law N° 400, dated 23 August 1988;

Having read Law N° 146 dated 22 February 1994, and especially Article fifty thereof, which states that following the procedure set out in Article four, Paragraph five, of Law N° 86 dated 9 March 1989 regulations may be made concerning the production and sale of foodstuffs, whether preserved or not, even if there is a specific law dealing with them;

Having read Law N° 580, dated 4 July 1967;

Having read Legislative Decree N° 109, dated 27 January 1992;

Having read Health Ministry Decree N° 209, dated 27 February 1996;

Having read Legislative Decree N° 155, dated 26 May 1997;

Having read Law N° 128, dated 24 April 1998, and in particular Article 48, which, among other things, states that the regulations concerning the production and sales of milling products and pasta set out in Law N° 580 of 1967 are not applicable to products legally manufactured and sold in other Member States of the European Union or other countries which have signed the European Economic Area Agreement, according to their laws, when the products are imported into Italy;

**UNAFPA**

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

Having read Law N° 59, dated 15 March 1997, and in particular Article 20-bis, which states that the obligations for the hand-over of powers to Non-Government bodies may also cover those administrative procedures, the violation of which constitutes a legal tort. In this case the regulations, when they apply the aforementioned obligations, may contain delaying measures for the application of penalties for the violation of the deregulated standards spoken of in the various laws;

Having read the notification made to the European Commission pursuant to Council Directive
N° 98/34/EC;

Having listened to the opinion of the Council of State for Administrative Affairs, given at the consultative session for regulatory laws during the hearings on 22 February 1999, 10 May 1999, and 4 December 2000;

Having read the deliberation of the Cabinet, adopted at its meeting of 19 January 2001;

After proposals made by the Minister for Community Policies and the Minister for Industry, Commerce, Crafts, and Foreign Trade, in agreement with the Justice Minister, the Finance Minister, the Agriculture and Forestry Minister, and the Health Minister;

E M A N A T E S

the following Decree:

*Chapter I*

TYPES OF MILLING

**Article 1.**

*Soft Wheat Flours*

1. "Soft wheat flour" is the name to be used for the product obtained by grinding and then sifting soft wheat, which has had any impurities and extraneous bodies removed.
2. "Soft whole-meal flour" is the name to be used for the product directly obtained by grinding soft wheat which has had any impurities and extraneous bodies removed.
3. The flours mentioned in paragraphs 1 and 2 destined for sale must have the following characteristics:

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

| Type and denomination | Maximum humidity (%) | Per hundred parts of dry substance | | |
|---|---|---|---|---|
| | | Ash | | Minimum protein (nitrogen x 5.7) |
| | | minimum | maximum | |
| Soft wheat flour, type 00 | 14.50 | - | 0.55 | 9,00 |
| Soft wheat flour, type 0 | 14.50 | - | 0.65 | 11,00 |
| Soft wheat flour, type 1 | 14.50 | - | 0.80 | 12,00 |
| Soft wheat flour, type 2 | 14.50 | - | 0.95 | 12,00 |
| Soft whole-meal flour | 14.50 | 1.3 | 1.70 | 12,00 |

4. The regulations set out in Paragraph 3 are not applicable to flours destined for uses other than the making of bread.

5. Type 00 flour may also be produced in granular form (soft wheat semolina).

6. Type 1 flour may not contain more than 0.1 percent of the insoluble fraction of ash in hydrochloric acid.

7. Soft wheat flours may contain a relative humidity up to 15.50%, provided that the packaging states *maximum humidity 15.50%*.

### Article 2.

#### *Durum wheat milling products*

1. "Durum wheat semolina" or simply "semolina" is the name to be used for the rough, granular product obtained by grinding and sifting durum wheat, which has had any impurities and extraneous bodies removed.

2. "Durum wheat low grade semolina " or simply "low grade semolina" is the name to be used for the product obtained by grinding and sifting durum wheat, which has had any impurities and extraneous bodies removed, after the bran has been extracted.

3. "Durum wheat whole-meal semolina" or simply "whole-meal semolina" is the name to be used for the granular product directly obtained by grinding durum wheat which has had any impurities and extraneous bodies removed.

4. "Durum wheat flour" is the name to be used for the finely ground product obtained by grinding and sifting durum wheat which has had any impurities and extraneous bodies removed.

5. Durum wheat milling products destined for sale must have the following characteristics:-

| Type and denomination | Maximum humidity (%) | Per hundred parts of dry substance | | |
|---|---|---|---|---|
| | | Ash | | Minimum protein (nitrogen x 5.7) |
| | | minimum | maximum | |
| Semolina * | 14.50 | - | 0.90 | 10.50 |
| Low grade semolina | 14.50 | 0.90 | 1.35 | 11,50 |
| Durum wheat whole-meal semolina | 14.50 | 1.40 | 1.80 | 11,50 |
| Durum wheat flour | 14.50 | 1.36 | 1.70 | 11,50 |

**\*Particle size, to be tested using calibrated vibrating sieves: with a mesh of 0.180 mm, no more than 25% may pass through the sieve.**

6. The production of remilled durum wheat semolina, remilled coarse semolina and durum wheat flour is permitted solely for the making of bread or the sale consumers.

7. The milling products mentioned in Paragraphs 5 and 6 may contain up to three per cent of soft wheat flour.

8. Durum wheat milling products destined for sale may have a relative humidity up to 15.50% provided that the packaging states *maximum humidity 15.50 per cent.*

## Article 3

### Mixtures

1. The packaging of flours of cereals other than wheat, if mixed with any type of wheat milling products, must clearly indicate the type of cereal from which the flour mixed with the wheat flour comes.

## Article 4.

### Prohibitions

1. The addition of any type whatsoever of organic or inorganic substances is most strictly prohibited, as is the treatment of milling products with physical or chemical agents. Exception is made for those set out in the relative Health Ministry regulations, published pursuant to Law N° 283, dated 30 April 1962.

2. The sale, storage for sale, or use for making bread, pasta, or any other types of foodstuffs, of any types of milling products different from the types set out in this Decree is prohibited.

3. The sale, storage for sale, use for making bread, pasta, or any other types of foodstuffs of any types of milling products which have been altered, contaminated, modified, or infected with animal or vegetable parasites is also prohibited.

## Article 5.

### Packaging

1. Milling products must be sold in ready-made, sealed packages.

2. This regulation shall not apply to flours and semolina delivered bulk in tanker lorries, nor to the warehousing and storage by users of the same, as specified in the Agriculture and Forestry Ministry Decree dated 1 April 1968, published in the Italian Official Gazette N° 103, dated 22 April 1968, as amended by the Decree of the same Ministry dated 17 February 1972, published in the Italian Official Gazette N° 125, dated 15 May 1972.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

## Chapter II

## PASTA

## Article 6.

## Pasta

1. "Durum wheat semolina pasta" and "low grade durum wheat semolina pasta" are the names to be used for the products obtained by drawing, rolling, and drying a dough prepared respectively and only:
   a)      with durum wheat semolina and water;
   b)      with low grade durum wheat semolina and water.
2. "Durum wheat whole-meal semolina pasta" is the name to be used for the products obtained by drawing, rolling, and drying a dough prepared exclusively with durum whole-meal semolina and water.
3. Pasta destined for sale must have the following characteristics:

| Type and denomination | Maximum humidity (%) | Per hundred parts of dry substance | | | Maximum acidity (degrees)* |
| | | Ash | | Minimum protein (nitrogen x 5.7) | |
| | | minimum | maximum | | |
| Durum wheat semolina pasta | 12.50 | - | 0.90 | 10.50 | 4 |
| Low grade durum wheat semolina pasta | 12.50 | 0.90 | 1.35 | 11,50 | 5 |
| Durum wheat whole-meal semolina pasta | 12.50 | 1.40 | 1.80 | 11,50 | 6 |

* The level of acidity is the number of cubic centimetres of normal alkaline solution required to neutralise 100 grams of dry substance.

4. Except in the case of the specifications set out in Article 12, Paragraphs 1 and 4, the manufacture of dry pastas prepared using soft wheat flour is forbidden.
5. In the types of pasta mentioned in Paragraph 3 and Articles 7 and 8, the presence of soft wheat flour is permitted, provided it does not exceed 3% of the total.
6. In the manufacture of pasta, special pasta and egg pasta, the re-use within the same factory of product or parts of the same from the manufacturing or packaging processes is permitted. Notwithstanding the provisions of Decree N° 155, dated 26 May 1997, of the Health Ministry in agreement with the Ministers for Industry, Commerce, and Crafts, and for Agriculture and Forestry, certain application standards may be decided upon.
7. The regulations set out in Paragraphs 3, 4, 5, and 6 are also to be applied to other products manufactured using durum wheat milling products and water, that can be assimilated to pasta.
8. The labelling of pasta manufactured in other countries using only soft wheat flour or this and other types as well and sold in Italy must show one of the following sales denominations:
   a)      "soft wheat flour pasta", if manufactured using only soft wheat flour;
   b)      "durum wheat semolina and soft wheat flour pasta", if manufactured using a mixture of these two types of milling products and most of it comes from durum wheat;

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

c)      "soft wheat and durum wheat semolina pasta", if manufactured using a mixture of these two types of milling products and most of it comes from soft wheat;

## Article 7.

## Special pastas

1.  The manufacture of special pasta is permitted. The term special pasta refers to the types set out in Article 6 which contain ingredients, other than soft wheat flour, and which meet health requirements.

2.  Special pastas must be sold with the sales name *durum wheat semolina pasta* on the packaging completed by mentioning the ingredient used, and, in the case of pasta made using several ingredients, by mentioning the characterising ones.

3.  If eggs are used in the dough of pasta, the final product must comply with the requirements of Article 8.

## Article 8.

## Egg pasta

1.  Egg pasta may only be manufactured using durum wheat semolina and at least 4 hens' eggs weighing at least two hundred grams, without the shells, per kilogram of semolina. Instead of eggs a corresponding amount of liquid egg product may be used. It must have been produced using only hens' eggs and comply with the requirements set out in Legislative Decree N° 65, dated 4 February 1993.

2.  The pasta mentioned in Paragraph 1 must be sold only under the name egg pasta, and must have the following characteristics: maximum humidity 12.50%, ash content no greater than 1.10 per hundred parts of dry substance, protein (nitrogen x 5.70) no less than 12.50 per hundred parts of dry substance, maximum acidity five degrees.

3.  The ether extract and sterol content must not be lower than 2.80 grams and 0.145 grams respectively, per hundred parts of dry substance.

4.  The upper limit for ash in egg pasta made with more than 4 eggs may be raised by 0.05 per hundred parts of dry substance per each egg or corresponding addition of liquid egg product above the prescribed minimum.

## Article 9.

## Fresh and stabilised pastas

1.  Fresh and stabilised pastas may be manufactured as per the regulations set out in Articles 6, 7, and 8, except for the humidity and acidity.

2.  Soft wheat flour may be used.

3.  Acidity must not exceed the limit of seven degrees.

4.  Fresh pasta, offered for sale not pre-packaged, must be stored at a temperature not higher than four degrees Celsius between manufacture and sale, with a tolerance of three degrees during transportation, and two in other cases;

during transportation from the place of manufacture to the point of sale, it must be kept in wrappings, not intended for the consumer. This wrappings must guarantee an adequate protection against external agents, and bear the text: *fresh pasta for loose sale*. The sell-by date must be no later then five days from the date of manufacture.

    5. Pre-packaged fresh pasta must have the following characteristics:

a)    its moisture content must be no less than 24 percent;

b)    it must have a water activity (aw) of between 0.92 and 0.97;

c)    it must have undergone a heat treatment at least equivalent to pasteurisation;

d)    it must be stored, between manufacture and sale, at a temperature of no more than four degrees Celsius, with a tolerance of two degrees.

    6. Stabilised pasta is the denomination to be applied to pasta with a moisture content of no less than 20 percent and a water activity (aw) not higher than 0.92. It must have undergone a heat treatment and manufactured using technology which allow it to be transported and stored at ambient temperature.

## Article 10.

## Exceptions

    1. Soft wheat flour and durum wheat milling products, when used for the preparation of foodstuffs other than bread and pasta, may only be described as "wheat flour" in the list of ingredients on the packaging.

## Article 11.

## Prohibitions

    1. With the exception of the conditions specified in Article 12, Paragraphs 1 and 4, and Article 48 of Law N° 128, dated 24 April 1998, the sale or storage for later sale – even in manufacturing premises, of pasta not conforming to those set out in this Decree is prohibited.

    2. The sale, storage for later sale, of pasta, which has been altered, contaminated, modified, or infected with animal or vegetable parasites is also prohibited.

## Chapter III

### TRANSITIONAL AND FINAL PROVISIONS

## Article 12.

### Transitional and Final Provisions

1. The manufacture of milling products and pasta with requisites different from those set out in this Decree and the relevant Regulatory Body is permitted when the products are destined for exportation to other Member Countries of the European Union or other states which have signed the European Economic Area Agreement, provided that they are not harmful and the manufacturer sends in advance a registered letter to the Agriculture and Forestry Ministry. This letter shall state the type and quantities of goods manufactured, the differences between its characteristics and those set out in this Decree, the type, quantity, and characteristics of the raw materials which are to be used to manufacture it, when work is due to begin and how long the manufacturing process is due to last, and the country to which the goods are to be exported.

2. The manufacture of milling products and pasta as described in Paragraph 1 is to be performed in such a way as to permit direct, immediate checks to be carried out by the Regulatory Body. This is especially the case if work is to go on at the same time as that on products destined for domestic market. Raw materials and substances which have not been authorised for use in milling products and pasta destined for domestic market, as well as finished products with characteristics different from those required destined for the European Union markets or to other countries which have signed the European Economic Area Agreement, or for exportation, are to be stored in special areas, and on the doors of these areas a notice must be affixed with visible characters stating "Store for raw materials and finished products not destined for the Italian market".

3. Individual, basic raw materials having characteristics different from those prescribed by this Decree, and substances which have not been authorised for use in production of milling products and pasta pursuant to this Decree, but which are intended for use in accordance with Paragraph 1, must be noted in a special incoming and outgoing register. This register must give the same information as that spoken of in Paragraph 4 when milling products and pasta are to be manufactured for successive exportation.

4. The manufacture of milling products and pasta is also permitted when they have different characteristics from those set out in this Decree and in the provisions laid down by the various Regulatory Bodies mentioned in this Decree, provided that these products are destined for exportation and are not harmful. Authorisation must be applied for via the means to be laid out in an Agriculture and Forestry Ministry Decree, in agreement with the Ministry of Industry, Commerce and Crafts, and the Health Ministry. Until the aforementioned Decree comes into force, reference must continue to be made to the Decree made by the Ministry of Agriculture and Forests dated 9 August 1969, published in the Italian Official Gazette N° 8, dated 10 January 1972. Despite this, references made in that Decree to Law N° 580, dated 4 July 1967, concerning milling products and pasta have been superseded by this Decree.

5. Notwithstanding the provisions of Article 48 of Law N° 128, dated 24 April 1998, and Article 9 of Presidential Decree N° 502 dated 30 November 1998, it is

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19    **ITALY**

forbidden to import milling products and pasta having characteristics different from those set out in this Decree and the provisions laid down by the Regulatory Bodies mentioned in this Decree.

6. For a further hundred and eighty days after this Decree comes into force, the use of non-conforming labels and packaging is allowed, provided they at least comply with the requirements of Law N° 580 dated 4 July 1967 and Legislative Decree N° 109, dated 27 January 1992.

## Article 13.

### Indictment provisions

1. Notwithstanding an offence is committed when:

a) the regulations set out in Article 4, Paragraphs 1 and 3, and Article 11, Paragraph 2 are broken, the administrative sanction laid down in Article 44, Paragraph 1, letter a) of Law N° 580 dated 4 July 1967 shall be applied;

b) the regulations set out in Article 1, Paragraph 7, Article 2, Paragraph 8, and Article 9, Paragraph 6, letter a) are broken, the administrative sanction laid down in Article 44, Paragraph 1, letter b) of Law N° 580 dated 4 July 1967 shall be applied;

c) regulations other than those mentioned at points a) and b) (above), or the administrative provisions mentioned in this Decree are broken, the administrative sanction laid down in Article 44, Paragraph 1, letter c) of Law N° 580 dated 4 July 1967 shall be applied.

2. The other provisions Part VIII of the aforementioned Law N° 580/1967 connected with the application of sanctions as mentioned in Paragraph 1 shall also be applied.

## Article 14.

### Statute repeals

1. When this Decree enters into force, the following provisions shall be repealed:

a) Articles 6, 7, 8, 9, 10, 11, 12, 13, 28, 29, 30, 31, 32, 33, 34, 35, 36, and 50, Paragraph 1, of Law N° 580, dated 4 July 1967;

b) Health ministry Decree N° 264, dated 27 April 1998.

2. The text of Article 50, Paragraph 2, of Law N° 580, dated 4 July 1967, shall be replaced by the following:

"Except where otherwise stated in Article 48 of Law N° 128, dated 24 April 1998, and in Article 9 of Presidential Decree N° 502, dated 30 November 1998, the importation of bread having characteristics different from those specified by this Law, its Enforcement Regulation, and the regulations of the Regulatory Bodies mentioned by the same Law shall be forbidden".

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19 **ITALY**

This Decree, which bears the official state seal, is to be inserted into the Official Deposit of Italian Laws. Everyone must obey it and have others obey it also.

Given this ninth day of February 2001 at Rome

CIAMPI

Amato, *Prime Minister*

Mattioli, *Minister for Community Policies*

Letta, *Minister for Industry, Commerce, Crafts, and Foreign Trade*

Fassino, *Justice Minister*

Del Turco, *Finance Minister*

Pecoraro Scanio, *Agriculture and Forestry Minister*

Veronesi, *Health Minister*

*Seen, the Attorney-general:* Fassino

Registered at the Auditors' Court this second day of May 2001

Institutional Ministries: Prime Minister's Office, Register N° 4, sheet N° 343

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

NOTES

NOTICE:

The text of the notes given here below has been prepared by the competent administration, pursuant to Article 10, Paragraphs 2 and 3, of the Law concerning the promulgation of new legislation, the emanation of Presidential Decrees, and Official Italian Publications, N° 1092, dated 28 December 1985, solely to help with reading amended laws or those which have been repealed. The value and efficacy of the laws copied below remains unaltered.

For EEC Directives, the date of their publication in the European Communities Official Journal (ECOJ) is given.

*Note on introduction:*

— Article 87, Paragraph five, of the Constitution grants the President the power to promulgate Laws, and to emanate Decrees which have the same value as Laws.

— Law N° dated 23 August 1988, deals with: "Discipline concerning Government activities and regulations for the Prime Minister's Office".

— Article 17, Paragraph 2, of the aforementioned Law states as follows: "With a Presidential Decree, after deliberation of the Cabinet, and the Council of State for Administrative Affairs, Decrees are emanated for those matters where the Constitution does not forbid them. Italian Laws, which grant the Executive a legislative function, determine the standards to be applied and repeal the relative laws currently in force, as soon as the new legislation comes into effect".

— Law N° 146 dated 22 February 1994 deals with: "Provisions for the fulfilling of obligations deriving from Italy's membership of the European Communities – Community Law 1993". Article 50 of this Law states:

"Article 50 (*Regulation of products*). 1. The Government may emanate one or more Laws to provide standards for the review and reordering of the production and sales of foodstuffs, whether preserved or otherwise, even if these are already covered by some other Law.

2. The Regulations spoken of in Paragraph 1 are to be applied pursuant to the procedure set out in Article 4, Paragraph 5 of Law N° 86 dated 9 March 1989.

3. Rules governing the manufacture and sale of preserved or processed foodstuffs:
a)    These conform to the principles and standards of Community Law, with particular reference to free circulation of goods, bearing in mind what has been said in Article 36 of the European Economic Community Treaty;
b)    They safeguard interests relative to health, the environment, consumer protection, product quality, the health of animals and plants, with all due respect for the principles which inspire this Law.

4. In application of what has been stated at Paragraph 1, any regulations in contrast with general laws as mentioned at letter a) of Paragraph 3 shall be repealed or amended or changed when applying the general standard mentioned at letter b) of the same Paragraph 3.

5. The Laws mentioned in Paragraph 1 may be Ministerial Decrees, to be adopted pursuant to Article 17, Paragraphs 3 and 4 of Law N° 400 dated 23 August 1988, n. 400, the Technical Regulations Emanation Act.".

— Law N° 86 dated 9 March 1989 deals with: "General standards for the participation of Italy in the Community law-making process and for the procedures required in meeting Community obligations". Article 4, Paragraph 5 of this Law states as follows:

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

"5. Implementation Laws are adopted in accordance with the procedures set out in Article 17 of Law N° 400 dated 23 August 1988, after a proposal has been made by the Prime Minister, or his/her delegated Minister for the Coordination of Community Policies, within four months from the entry in force of the relative Community Law. In this case, the opinion of the Council of State for Administrative Affairs must be expressed within forty days of the request. After this time, even if the opinion has not been expressed, the Decree is emanated".

— Law N° 580, dated 4 July 1967, deals with: "Discipline concerning work on and sale of cereals, milling products, bread, and pasta".

— Legislative Decree N° 109, dated 27 January 1992, deals with: "Implementation of Directives 89/395/EEC and 89/396/EEC concerning the labelling and presentation of, and advertising for foodstuffs".

— Health Ministry Decree N° 209, dated 27 February 1996, deals with: "Regulations concerning the discipline of food additives allowed during the manufacture and preservation of foodstuffs, in implementation of Directives 94/34/EC, 94/35/EC, 94/36/EC, 95/2/EC, and 95/31/EC.

— Legislative Decree N° 155, dated 26 May 1997, deals with the: "Implementation of Directives 93/43/EEC and 96/3/EC concerning hygiene in food manufacture".

— Law N° 128, dated 24 April 1998, deals with: "Regulations for meeting the obligations imposed by Italy's membership of the European Communities, (community law 1995-1997)".

— Article 48 of the aforementioned Law states as follows:

"Article 48 (Food products). 1. The regulations concerning the ingredients, the composition and the labelling of foodstuffs, as laid out in Law N° 580 dated 4 July 1967 concerning work on and the sale of cereals, flour, bread, and pasta, are not applied to foodstuffs legally manufactured and marketed in other European Union countries, or in countries which have signed the European Economic Area Agreement, which have imported and sold them in their own countries.

2. Labelling of the products mentioned in Paragraph 1 must conform to the regulations mentioned in Council Directive 79/112/EC, as amended.

3. Foodstuffs which contain any sort of organism which has been genetically modified, or parts or derivatives thereof, must be notified to the consumer via a clear label. This label must clearly state that the foodstuff contains genetically modified organisms, or parts or derivatives thereof".

— Law N° 59, dated 15 March 1997, deals with the: "Mandate of the Government's duties to the Regions and Local Bodies in terms of reforms to the Civil Service and the simplification of administrative procedures". Article 20-bis of the aforementioned Law states as follows:

"Article 20-bis. — 1. Regulations for the handover of powers to Non-Government bodies may also cover those administrative procedures, the violation of which constitutes a legal tort and may therefore:

a)   eliminate those procedures which are believed to be superfluous or inadequate for the requirements of procedural simplification; this elimination requires the repeal of the corresponding administrative sanction;
b)   re-propose the same procedures; in this case, the administrative sanctions mentioned in the various laws are to be applied to violations of the corresponding handover laws, in accordance with special postponement regulations agreed upon during the simplification procedure".

— Directive 98/34/EC may be found published in the ECOJ N° 204 dated 21 July 1998.

*Note on Article **4**:*

**UNAFPA**                                                                                                    12

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

— Law N° 283, dated 30 April 1962, deals with the: "Amendment to Articles 242, 243, 247, 250, and 262 of the Health Laws passed by Royal Decree N° 1265, dated 27 July 1934: hygiene regulations for the manufacture and sales of foodstuffs and drinks".

*Notes on Article 5:*

— The Agriculture and Forestry Ministry Decree of 1 April 1968, deals with the: "Regulations concerning the delivery of loose flours and semolina products in tanker lorries, and the depositing and storage of the same at the purchasers' premises."

— The Agriculture and Forestry Ministry Decree of 17 February 1972 deals with the: "Integration of the Ministerial Decree dated 1 April 1968, concerning regulations for the delivery of loose flours and semolina products in tanker lorries, and the depositing and storage of the same at the purchasers' premises".

*Note on Article 6:*

— for references to Legislative Decree N° 155, dated 26 May 1997, please see the notes on the introduction.

*Note on Article 8:*

— Legislative Decree N° 65, dated 4 February 1993, deals with the: "Implementation of Directive 89/437/EEC concerning health and hygiene problems with the manufacture and sale of egg products."

*Note on Article 11:*

— For the text of Article 48 of Law N° 128, dated 24 April 1998, please see the notes on the introduction.

*Notes on Article 12:*

— The Agriculture and Forestry Ministry Decree of 9 August 1969 deals with: "Means for granting authorisation for the manufacture of flour, bread, and pasta destined for exportation when these have requisites different from those set out in Law N° 580 dated 4 July 1967".

— For references to Law N° 580 dated 4 July 1967, please see the notes on the introduction.

— For the text of Article 48 of Law N° 128, dated 24 April 1998, please see the notes on the introduction.

— Presidential Decree N° 502, dated 30 November 1998, deals with: "Regulations for standards to be applied when revising laws concerning the manufacture and sales of bread, pursuant to Article 50 of Law N° 146, dated 22 February 1994". Article 9 of the aforementioned Presidential Decree states:

"Article 9 (*Mutual recognition*). — 1. The provisions of these regulations, in addition to those set out in Law N° 580, dated 4 July 1967, shall not be applied to bread manufactured or sold in other member countries of the European Union or in countries which have signed the European Economic Area Agreement when they are sold in those countries".

— For references to Legislative Decree N° 109, dated 27 January 1992, please see the notes on the introduction.

*Notes on Article 13:*

— Article 44 of the aforementioned Law N° 580, dated 4 July 1967, states: "Article 44. — Given that an offence is committed when:

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

a)  the regulations set out in Articles 1, 2, 3, 5, 10, 12 (Paragraph two), 18, 27, 34, and 36 (Paragraph two) are broken,
the administrative sanction for them is hereby set at £6,000,000 (six million lire);

b)  the regulations set out in Articles 7 and 9 (final Paragraphs), 16, 17, 20 (Paragraphs two, three, and four), 21, 22 (final Paragraph), 24 (Paragraphs two and three), 26, 33 (final Paragraph)are broken,
the administrative sanction for them is hereby set at £6,000,000 (six million lire);

c)  the regulations set out in this Decree and not mentioned above at letters a) and b) or in the implementation regulation for this Decree as set out in the Decree itself are broken,

the administrative sanction for them is hereby set at £3,000,000 (three million lire).

Whether or not an offence has been committed, the accused shall pay the costs of any analyses carried out. Those performing the analyses shall be paid as per Law N° 322, dated 5 April 1961.

Pursuant to Article 15 of the Penal Code, the regulations of this Decree are special in regard to Laws 283, dated 30 April 1962, and 41, dated 26 February 1963."

— Part VIII of the aforementioned Law N° 580, passed in 1967, deals with: "Supervision and sanctions".

*Notes on Article 14:*

— For references to Law N° 580, dated 4 July 1967, please see the notes on the introduction.

— Health Ministry Decree N° 264, dated 27 April 1998, and repealed by this Decree, dealt with: "Regulations for standards concerning the use of permitted ingredients in the manufacture of special dry and fresh pasta".

— The following is the text of Article 50 of the aforementioned Law N° 580, passed in 1967, as now amended by this Decree:

"Article 50. The manufacture of milling products, bread, and pasta having characteristics different from those specified by the standards of this Decree, its implementation Regulation, and the provisions of the Regulatory Body to be set up under the same Decree is permitted, provided that the manufactured goods are destined for exportation, and are not harmful, and after authorisation has been granted under the procedures which will be specified by the same Regulations.

Notwithstanding the provisions of Article 48 of Law N° 128, dated 24 April 1998, and Article 9 of Presidential Decree N° 502, dated 30 November 1998, the importation of bread with characteristics different from those set out in the standards of this Decree, its Implementation Regulation, and the provisions of the Regulatory Authority to be set up under the same Decree is prohibited".

— For the text of Article 48 of Law N° 128, dated 24 April 1998, please see the notes on the introduction.

— For the text of Article 9 of Presidential Decree N° 502, dated 30 November 1998, please see the notes on Article 12.

# LEGISLATION IN FORCE

## *(texts in the original language)*

**Decreto del Presidente della Repubblica**

**9 febbraio 2001, n. 187**

**Regolamento per la revisione della normativa sulla produzione e commercializzazione di sfarinati e paste alimentari, a norma dell'articolo 50 della legge 22 febbraio 1994, n. 146**

**(Gazzetta Ufficiale della Repubblica Italiana n. 117, del 22 maggio 2001)**

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

nomici, dell'importo annuo lordo pari alla differenza tra il valore delle classi e scatti stipendiali calcolati sul livello di inquadramento ed il corrispondente valore computato nel settimo livello retributivo. Analogamente si provvede nei confronti dei funzionari delle Forze di polizia provenienti da carriere militari e dai ruoli sottostanti

2. All'onere derivante dall'attuazione del comma 1, secondo periodo, valutato in lire 290 milioni a decorrere dall'anno 2000, si provvede mediante corrispondente riduzione dello stanziamento iscritto, ai fini del bilancio triennale 2000-2002, nell'ambito dell'unità previsionale di base di parte corrente «Fondo speciale» dello stato di previsione del Ministero del tesoro, del bilancio e della programmazione economica per l'anno 2000, allo scopo parzialmente utilizzando l'accantonamento relativo al Ministero medesimo. Il Ministro del tesoro, del bilancio e della programmazione economica è autorizzato ad apportare, con propri decreti, le occorrenti variazioni di bilancio.»

— La legge 8 agosto 1990, n. 231, recante «Disposizioni in materia di trattamento economico del personale militare», è pubblicata nella *Gazzetta Ufficiale* della Repubblica italiana n. 187 dell'11 agosto 1990; si riporta il testo dell'art. 2, comma 1:

«1. A decorrere dal 1° gennaio 1989, a tutto il personale di cui all'art. 1, che abbia prestato servizio nel periodo 1° gennaio 1987-31 dicembre 1988, la retribuzione individuale di anzianità è incrementata dei seguenti importi annui lordi:

| | | |
|---|---|---|
| a) livello quinto | L. | 288.000; |
| b) Livello sesto | » | 330.000; |
| c) livello sesto-*bis* | » | 357.000; |
| d) livello settimo | » | 384.000; |
| e) livello ottavo | » | 462.000; |
| f) livello ottavo-*bis* | » | 508.200.». |

— Il decreto del Presidente della Repubblica 5 giugno 1990, n. 147, recante «Regolamento per il recepimento delle norme risultanti dalla disciplina prevista dall'accordo del 22 dicembre 1989 concernente il personale della Polizia di Stato», è pubblicato nella *Gazzetta Ufficiale* della Repubblica Italiana n. 137 del 14 giugno 1990; si riporta il testo dell'art. 3, comma 1:

«1. A decorrere dal 1° gennaio 1989, per tutto il personale che abbia prestato servizio nel periodo 1° gennaio 1987-31 gennaio 1988 la retribuzione individuale di anzianità è incrementata dei seguenti importi annui lordi:

| | | | |
|---|---|---|---|
| Livello | IV | L. | 264.000 |
| » | V | » | 288.000 |
| » | VI | » | 330.000 |
| » | VI-*bis* | » | 357.000 |
| » | VII | » | 334.000 |
| » | VIII | » | 462.000 |
| » | VIII-*bis* | » | 508.200». |

— La legge 1° aprile 1981, n. 121, recante «Nuovo ordinamento dell'amministrazione della pubblica sicurezza», è pubblicata nella *Gazzetta Ufficiale* della Repubblica italiana n. 100 del 10 aprile 1981, supplemento ordinario.

*Note all'art. 3:*

— Per il testo vigente dell'art. 32 del citato decreto legislativo n. 298 del 2000 si veda nelle note all'art. 1.

— Per il testo dell'art. 50, comma 9, della legge 23 dicembre 2000, n. 388, si veda nelle note alle premesse.

01G0241

**DECRETO DEL PRESIDENTE DELLA REPUBBLICA** 9 febbraio 2001, n. **187.**

**Regolamento per la revisione della normativa sulla produzione e commercializzazione di sfarinati e paste alimentari, a norma dell'articolo 50 della legge 22 febbraio 1994, n. 146.**

## IL PRESIDENTE DELLA REPUBBLICA

Visto l'articolo 87, comma quinto, della Costituzione;

Visto l'articolo 17, comma 2, della legge 23 agosto 1988, n. 400;

Vista la legge 22 febbraio 1994, n. 146, ed in particolare l'articolo 50, il quale prevede che, con la procedura di cui all'articolo 4, comma 5, della legge 9 marzo 1989, n. 86, possono essere emanate norme regolamentari per rivedere la produzione e la commercializzazione dei prodotti alimentari conservati e non, anche se disciplinati con legge;

Vista la legge 4 luglio 1967, n. 580;

Visto il decreto legislativo 27 gennaio 1992, n. 109;

Visto il decreto del Ministro della sanità 27 febbraio 1996, n. 209;

Visto il decreto legislativo 26 maggio 1997, n. 155;

Vista la legge 24 aprile 1998, n. 128, ed in particolare l'articolo 48, il quale stabilisce, tra l'altro, che le disposizioni concernenti la produzione e la commercializzazione degli sfarinati e delle paste alimentari di cui alla legge n. 580 del 1967 non si applicano ai prodotti legalmente fabbricati e commercializzati negli altri Stati membri dell'Unione europea o negli altri Paesi contraenti l'Accordo sullo spazio economico europeo, introdotti e posti in vendita nel territorio nazionale;

Vista la legge 15 marzo 1997, n. 59, ed in particolare l'articolo 20-*bis*, il quale stabilisce, tra l'altro, che i regolamenti di delegificazione possono disciplinare anche i procedimenti amministrativi che prevedono obblighi la cui violazione costituisce illecito amministrativo e possono, in tale caso, se riproducono i predetti obblighi, contenere apposite disposizioni di rinvio per applicare le sanzioni amministrative previste dalle norme legislative alle violazioni delle corrispondenti norme delegificate;

Vista la notifica alla Commissione europea effettuata ai sensi della direttiva del Consiglio n. 98/34/CE;

Udito il parere del Consiglio di Stato, espresso dalla sezione consultiva per gli atti normativi nelle adunanze del 22 febbraio 1999, del 10 maggio 1999 e del 4 dicembre 2000;

Vista la deliberazione del Consiglio dei Ministri, adottata nella riunione del 19 gennaio 2001;

Sulla proposta del Ministro per le politiche comunitarie e del Ministro dell'industria, del commercio e dell'artigianato e del commercio con l'estero, di concerto con i Ministri della giustizia, delle finanze, delle politiche agricole e forestali e della sanità;

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

E M A N A
il seguente regolamento:

*Capo I*

SFARINATI

Art. 1.

*Farine di grano tenero*

1. È denominato «farina di grano tenero» il prodotto ottenuto dalla macinazione e conseguente abburattamento del grano tenero liberato dalle sostanze estranee e dalle impurità.

2. È denominato «farina integrale di grano tenero» il prodotto ottenuto direttamente dalla macinazione del grano tenero liberato dalle sostanze estranee e dalle impurità.

3. Le farine di cui ai commi 1 e 2 destinate al commercio sono prodotte nei tipi e con le caratteristiche seguenti:

| Tipo e denominazione | Umidità massima % | Su cento parti di sostanza secca | | Proteine min. (azoto x 5,70) |
|---|---|---|---|---|
| | | Ceneri | | |
| | | minimo | massimo | |
| Farina di grano tenero tipo 00 | 14,50 | — | 0,55 | 9,00 |
| Farina di grano tenero tipo 0 | 14,50 | — | 0,65 | 11,00 |
| Farina di grano tenero tipo 1 | 14,50 | — | 0,80 | 12,00 |
| Farina di grano tenero tipo 2 | 14,50 | — | 0,95 | 12,00 |
| Farina integrale di grano tenero | 14,50 | 1,30 | 1,70 | 12,00 |

4. Le disposizioni del comma 3 non si applicano alle farine destinate ad utilizzazioni diverse dalla panificazione.

5. La farina tipo 00 può essere prodotta anche sotto forma di sfarinato granulare (granito).

6. Nella farina tipo 1 le ceneri non possono contenere più dello 0,3 per cento di parte insolubile in acido cloridrico.

7. È tollerata l'immissione al consumo di farine di grano tenero con tenore di umidità fino al 15,50 per cento, a condizione che sulla relativa etichetta figuri la dicitura *umidità massima 15,50 per cento.*

Art. 2.

*Sfarinati di grano duro*

1. È denominato «semola di grano duro», o semplicemente «semola», il prodotto granulare a spigolo vivo ottenuto dalla macinazione e conseguente abburattamento del grano duro, liberato dalle sostanze estranee e dalle impurità.

2. È denominato «semolato di grano duro», o semplicemente «semolato», il prodotto ottenuto dalla macinazione e conseguente abburattamento del grano duro liberato dalle sostanze estranee e dalle impurità, dopo l'estrazione della semola.

3. È denominato «semola integrale di grano duro», o semplicemente «semola integrale», il prodotto granulare a spigolo vivo ottenuto direttamente dalla macinazione del grano duro liberato dalle sostanze estranee e dalle impurità.

4. È denominato «farina di grano duro» il prodotto non granulare ottenuto dalla macinazione e conseguente abburattamento del grano duro liberato dalle sostanze estranee e dalle impurità.

5. Gli sfarinati di grano duro destinati al commercio sono prodotti nei tipi e con le caratteristiche seguenti:

| Tipo e denominazione | Umidità massima % | Su cento parti di sostanza secca | | Proteine min. (azoto x 5,70) |
|---|---|---|---|---|
| | | Ceneri | | |
| | | minimo | massimo | |
| Semola * | 14,50 | — | 0,90 | 10,50 |
| Semolato | 14,50 | 0,90 | 1,35 | 11,50 |
| Semola integrale di grano duro | 14,50 | 1,40 | 1,80 | 11,50 |
| Farina di grano duro | 14,50 | 1,36 | 1,70 | 11,50 |

    * Valore granulometrico alla prova di setacciatura: passaggio staccio con maglie di millimetri 0,180 di luce, massimo 25 per cento.

6. È consentita la produzione, da destinare esclusivamente alla panificazione ed al consumatore, di semola e di semolato rimacinati nonché di farina di grano duro.

7. Negli sfarinati di cui ai commi 5 e 6 è tollerata la presenza di farina di grano tenero in misura non superiore al 3 per cento.

8. È tollerata l'immissione al consumo di sfarinati di grano duro con tenore di umidità fino al 15,50 per cento, a condizione che sulla relativa etichetta figuri la dicitura umidità massima 15,50 per cento.

Art. 3.

*M i s c e l e*

1. Le farine di cereali diversi dal grano, se miscelate con sfarinati di grano in qualsiasi proporzione, devono essere poste in vendita con la chiara indicazione della denominazione di cereale da cui proviene la farina miscelata con quella di grano.

Art. 4.

*D i v i e t i*

1. È vietata l'aggiunta di sostanze organiche ed inorganiche di qualsiasi natura, nonché qualsiasi trattamento degli sfarinati con agenti fisici o chimici, salvi i competenti provvedimenti del Ministero della sanità, emanati a norma della legge 30 aprile 1962, n. 283.

2. È vietato vendere, detenere per vendere, nonché impiegare per la panificazione, pastificazione o altri usi alimentari, sfarinati aventi caratteristiche diverse da quelle stabilite dal presente regolamento.

3. È altresì vietato vendere, detenere per vendere, nonché impiegare per la panificazione, pastificazione o altri usi alimentari, sfarinati comunque alterati, adulterati, sofisticati o invasi da parassiti animali o vegetali.

Art. 5.

*Confezionamento*

1. Gli sfarinati devono essere posti in vendita in imballaggi preconfezionati chiusi all'origine.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

2. Restano salve le disposizioni, relative alla consegna delle farine o delle semole alla rinfusa in carri cisterna ed il loro deposito e conservazione presso gli utilizzatori, previste dal decreto del Ministro per l'agricoltura e le foreste in data 1° aprile 1968, pubblicato nella *Gazzetta Ufficiale* della Repubblica italiana n. 103 del 22 aprile 1968, come integrato dal decreto del medesimo Ministro in data 17 febbraio 1972, pubblicato nella *Gazzetta Ufficiale* della Repubblica italiana n. 125 del 15 maggio 1972.

### Capo II

### PASTA

### Art. 6.

### *Pasta*

1. Sono denominati «pasta di semola di grano duro» e «pasta di semolato di grano duro» i prodotti ottenuti dalla trafilazione, laminazione e conseguente essiccamento di impasti preparati rispettivamente ed esclusivamente:

*a)* con semola di grano duro ed acqua;

*b)* con semolato di grano duro ed acqua.

2. È denominato «pasta di semola integrale di grano duro» il prodotto ottenuto dalla trafilazione, laminazione e conseguente essiccamento di impasto preparato esclusivamente con semola integrale di grano duro ed acqua.

3. La pasta destinata al commercio è prodotta soltanto nei tipi e con le caratteristiche seguenti:

| Tipo e denominazione | Umidità massima % | Su cento parti di sostanza secca | | | Acidità massima in gradi* |
| | | Ceneri | | Proteine min. (azoto x 5,70) | |
| | | minimo | massimo | | |
|---|---|---|---|---|---|
| Pasta di semola di grano duro | 12,50 | — | 0,90 | 10,50 | 4 |
| Pasta di semolato di grano duro | 12,50 | 0,90 | 1,35 | 11,50 | 5 |
| Pasta di semola integrale di grano duro | 12,50 | 1,40 | 1,80 | 11,50 | 6 |

    * Il grado di acidità è espresso dal numero di centimetri cubici di soluzione alcalina normale occorrente per neutralizzare 100 grammi di sostanza secca.

4. Salvo quanto previsto dall'articolo 12, commi 1 e 4, è vietata la fabbricazione di pasta secca preparata con sfarinati di grano tenero.

5. Nei tipi di pasta di cui ai comma 3 e agli articoli 7 e 8 è tollerata la presenza di farine di grano tenero in misura non superiore al 3 per cento.

6. Nella produzione delle paste, delle paste speciali e della pasta all'uovo è ammesso il reimpiego, nell'ambito dello stesso stabilimento di produzione, di prodotto o parti di esso provenienti dal processo produttivo o di confezionamento. Fermo restando quanto previsto dal decreto legislativo 26 maggio 1997, n. 155, con decreto del Ministro della sanità, di concerto con i Ministri dell'industria del commercio e dell'artigianato e delle politiche agricole e forestali, possono essere fissate particolari modalità di applicazione.

7. Le disposizioni di cui ai commi 3, 4, 5 e 6 si applicano anche ai prodotti preparati a base di sfarinati di grano duro ed acqua, comunque riconducibili merceologicamente alla pasta.

8. La pasta prodotta in altri Paesi in tutto o in parte con sfarinati di grano tenero e posta in vendita in Italia deve riportare una delle denominazioni di vendita seguenti:

*a)* pasta di farina di grano tenero, se ottenuta totalmente da sfarinati di grano tenero;

*b)* pasta di semola di grano duro e di farina di grano tenero, se ottenuta dalla miscelazione dei due prodotti con prevalenza della semola;

*c)* pasta di farina di grano tenero e di semola di grano duro, se ottenuta dalla miscelazione dei due prodotti con prevalenza della farina di grano tenero.

### Art. 7.

### *Paste speciali*

1. È consentita la produzione di paste speciali. Per paste speciali si intendono le paste di cui all'articolo 6 contenenti ingredienti alimentari, diversi dagli sfarinati di grano tenero, rispondenti alle norme igienico-sanitarie.

2. Le paste speciali devono essere poste in vendita con la denominazione pasta di semola di grano duro completata dalla menzione dell'ingrediente utilizzato e, nel caso di più ingredienti, di quello o di quelli caratterizzanti.

3. Qualora nella preparazione dell'impasto sono utilizzate uova, la pasta speciale deve rispondere ai requisiti previsti dall'articolo 8.

### Art. 8.

### *Pasta all'uovo*

1. La pasta all'uovo deve essere prodotta esclusivamente con semola e almeno quattro uova intere di gallina, prive di guscio, per un peso complessivo non inferiore a duecento grammi di uovo per ogni chilogrammo di semola. Le uova possono essere sostituite da una corrispondente quantità di ovoprodotto liquido fabbricato esclusivamente con uova intere di gallina, rispondente ai requisiti prescritti dal decreto legislativo 4 febbraio 1993, n. 65.

2. La pasta di cui al comma 1 deve essere posta in vendita con la sola denominazione pasta all'uovo e deve avere le seguenti caratteristiche: umidità massima 12,50 per cento, contenuto in ceneri non superiore a 1,10 su cento parti di sostanza secca, proteine (azoto x 5,70) in quantità non inferiore a 12,50 su cento parti di sostanza secca, acidità massima pari a 5 gradi.

3. L'estratto etereo ed il contenuto degli steroli non devono risultare inferiori, rispettivamente, a 2,80 grammi e 0,145 grammi, riferiti a cento parti di sostanza secca.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

4. Il limite massimo delle ceneri per la pasta all'uovo con più di 4 uova è elevato mediamente, su cento parti di sostanza secca, di 0,05 per ogni uovo o quantità corrispondente di ovoprodotto in più rispetto al minimo prescritto.

### Art. 9.

*Paste alimentari fresche e stabilizzate*

1. È consentita la produzione di paste alimentari fresche e stabilizzate secondo le prescrizioni stabilite dagli articoli 6, 7 e 8, eccetto che per l'umidità e l'acidità.

2. È consentito l'impiego delle farine di grano tenero.

3. L'acidità non deve superare il limite di 7 gradi.

4. Le paste alimentari fresche, poste in vendita allo stato sfuso, devono essere conservate, dalla produzione alla vendita, a temperatura non superiore a + 4ºC, con tolleranza di 3ºC durante il trasporto e di 2ºC negli altri casi; durante il trasporto dal luogo di produzione al punto di vendita devono essere contenute in imballaggi, non destinati al consumatore finale, che assicurino un'adeguata protezione dagli agenti esterni e che rechino la dicitura «paste fresche da vendersi sfuse». La durabilità non può essere superiore a giorni cinque dalla data di produzione.

5. Le paste alimentari fresche, poste in vendita in imballaggi preconfezionati, devono possedere i seguenti requisiti:

*a)* avere un tenore di umidità non inferiore al 24 per cento;

*b)* avere un'attività dell'acqua libera (Aw) non inferiore a 0,92 né superiore a 0,97;

*c)* essere state sottoposte al trattamento termico equivalente almeno alla pastorizzazione;

*d)* essere conservate, dalla produzione alla vendita, a temperatura non superiore a +4ºC, con una tolleranza di 2ºC.

6. Sono denominate paste stabilizzate le paste alimentari che hanno un tenore di umidità non inferiore al 20 per cento e un'attività dell'acqua libera (Aw) non superiore a 0,92 e che sono state sottoposte a trattamenti termici e a tecnologie di produzione che consentono il trasporto e la conservazione a temperatura ambiente.

### Art. 10.

*D e r o g h e*

1. Le farine di grano tenero e gli sfarinati di grano duro, utilizzati nella preparazione di prodotti alimentari diversi dal pane e dalle paste alimentari, possono essere designati, nell'elenco degli ingredienti del prodotto finito, con la sola dicitura farina di frumento.

### Art. 11.

*D i v i e t i*

1. Salvo quanto previsto dall'articolo 12, commi 1 e 4, e dall'articolo 48 della legge 24 aprile 1998, n. 128, è vietato vendere o detenere per vendere, anche negli stabilimenti di produzione, pasta avente caratteristiche diverse da quelle stabilite dal presente regolamento.

2. È altresì vietato vendere o detenere per vendere pasta alterata, adulterata, sofisticata o infestata da parassiti animali o vegetali.

### Capo III

DISPOSIZIONI TRANSITORIE E FINALI

### Art. 12.

*Disposizioni transitorie e finali*

1. È consentita la produzione di sfarinati e paste alimentari aventi requisiti diversi da quelli prescritti dalle norme del presente regolamento e dei provvedimenti dell'autorità amministrativa previsti dal presente regolamento, quando è diretta alla successiva spedizione verso altri Paesi dell'Unione europea o verso gli altri Paesi contraenti l'accordo sullo spazio economico europeo, a condizione che non siano nocivi alla salute umana ed il produttore, di volta in volta, invii preventivamente, a mezzo raccomandata fornita di ricevuta di ritorno indirizzata al Ministero delle politiche agricole e forestali, una comunicazione scritta nella quale siano indicate le merci ed il quantitativo da produrre, i requisiti di difformità dalle norme del presente regolamento, la quantità, il tipo e le caratteristiche delle materie prime e delle sostanze che si intendono utilizzare, la data di inizio della lavorazione e la durata della medesima, nonché il Paese di destinazione finale.

2. La lavorazione degli sfarinati e delle paste alimentari di cui al comma 1 va effettuata in modo da rendere possibile il diretto, immediato controllo da parte degli organi di vigilanza, specie se tale lavorazione si effettua contemporaneamente a quella dei prodotti destinati al consumo nazionale. Le materie prime e le sostanze diverse da quelle impiegabili nella produzione di sfarinati e paste alimentari destinate al consumo nazionale, nonché i prodotti destinati alla spedizione verso altri Paesi dell'Unione europea o verso gli altri Paesi contraenti l'accordo sullo spazio economico europeo o alla esportazione ed aventi requisiti diversi da quelli prescritti, vanno immagazzinati in appositi locali sulla porta dei quali deve essere affisso un cartello recante la scritta a caratteri ben visibili: «Deposito di materie prime e di prodotti finiti non destinati al mercato nazionale».

3. Le singole materie prime di base con requisiti diversi da quelli prescritti dalle norme del presente regolamento, nonché le sostanze delle quali non è autorizzato l'impiego per la produzione degli sfarinati e delle paste alimentari ai sensi del presente regolamento, che, invece, si intendono utilizzare per la fabbricazione di sfarinati e paste alimentari di cui al comma 1, vanno annotate in apposito registro di carico e scarico il quale

— 9 —

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

deve riportare le stesse indicazioni prescritte quando si intendono utilizzare le stesse materie e sostanze per la fabbricazione degli sfarinati e delle paste alimentari destinate all'esportazione, di cui al comma 4.

4. È, altresì, consentita la produzione di sfarinati e paste alimentari aventi requisiti diversi da quelli prescritti dalle norme del presente regolamento e dei provvedimenti dell'autorità amministrativa previsti dal presente regolamento, purché si tratti di prodotti destinati all'esportazione e non nocivi alla salute umana, previa autorizzazione da concedersi con le modalità fissate con apposito decreto del Ministro delle politiche agricole e forestali, di concerto con i Ministri dell'industria, del commercio e dell'artigianato e della sanità. Fino all'emanazione del predetto decreto continua ad applicarsi il decreto del Ministro per l'agricoltura e le foreste in data 9 agosto 1969, pubblicato nella *Gazzetta Ufficiale* della Repubblica italiana n. 8 del 10 gennaio 1970, fermo restando che i richiami alla legge 4 luglio 1967, n. 580, in esso contenuti, con riferimento agli sfarinati ed alle paste alimentari, sono sostituiti con i richiami al presente regolamento.

5. Salvo quanto previsto dall'articolo 48 della legge 24 aprile 1998, n. 128, e dall'articolo 9 del decreto del Presidente della Repubblica 30 novembre 1998, n. 502, è vietata l'importazione di sfarinati e paste alimentari aventi requisiti diversi da quelli prescritti dalle norme del presente regolamento e dei provvedimenti dell'autorità amministrativa previsti dal presente regolamento.

6. Per centottanta giorni dalla data di entrata in vigore del presente regolamento è consentita l'utilizzazione di etichette ed imballaggi non conformi, purché conformi alle disposizioni della legge 4 luglio 1967, n. 580 e del decreto legislativo 27 gennaio 1992, n. 109.

### Art. 13.

#### *Disposizioni di rinvio*

1. Salvo che il fatto costituisca reato:

*a)* nel caso di violazione delle disposizioni di cui agli articoli 4, commi 1 e 3, 11, comma 2, si applica la sanzione amministrativa prevista dall'articolo 44, comma primo, lettera *a)*, della legge 4 luglio 1967, n. 580;

*b)* nel caso di violazione delle disposizioni di cui agli articoli 1, comma 7, 2 comma 8, e 9 comma 6, lettera *a)*, si applica la sanzione amministrativa prevista dall'articolo 44, comma primo, lettera *b)*, della legge 4 luglio 1967, n. 580;

*c)* nel caso di violazione delle norme del presente regolamento diverse da quelle indicate nelle lettere *a)* e *b)*, nonché dei provvedimenti amministrativi previsti dal presente regolamento, si applica la sanzione amministrativa prevista dall'articolo 44, comma primo, lettera *c)*, della legge 4 luglio 1967, n. 580.

2. Si applicano, altresì, le altre disposizioni contenute nel titolo VIII della citata legge n. 580 del 1967, connesse all'applicazione delle sanzioni di cui al comma 1.

### Art. 14.

#### *Abrogazioni*

1. Dalla data di entrata in vigore del presente regolamento cessano di avere efficacia le seguenti disposizioni:

*a)* gli articoli 6, 7, 8, 9, 10, 11, 12, 13, 28, 29, 30, 31, 32, 33, 34, 35, 36 e 50, primo comma, della legge 4 luglio 1967, n. 580;

*b)* il decreto del Ministro della sanità 27 aprile 1998, n. 264.

2. L'articolo 50, secondo comma, della legge 4 luglio 1967, n. 580, è sostituito dal seguente:

«Salvo quanto previsto dall'articolo 48 della legge 24 aprile 1998, n. 128, e dall'articolo 9 del decreto del Presidente della Repubblica 30 novembre 1998, n. 502, è vietata l'importazione di pane avente requisiti diversi da quelli prescritti dalle norme della presente legge, del regolamento di esecuzione e dei provvedimenti dell'autorità amministrativa previsti dalla legge medesima.».

Il presente decreto, munito del sigillo dello Stato, sarà inserito nella Raccolta ufficiale degli atti normativi della Repubblica italiana. È fatto obbligo a chiunque spetti di osservarlo e di farlo osservare.

Dato a Roma, addì 9 febbraio 2001

CIAMPI

Amato, *Presidente del Consiglio dei Ministri*

Mattioli, *Ministro per le politiche comunitarie*

Letta, *Ministro dell'industria, del commercio e dell'artigianato e del commercio con l'estero*

Fassino, *Ministro della giustizia*

Del Turco, *Ministro delle finanze*

Pecoraro Scanio, *Ministro delle politiche agricole e forestali*

Veronesi, *Ministro della sanità*

Visto, *il Guardasigilli:* Fassino
*Registrato alla Corte dei conti il 2 maggio 2001*
*Ministeri istituzionali - Presidenza del Consiglio dei Ministri, registro n. 4, foglio n. 343*

— 10 —

22-5-2001      GAZZETTA UFFICIALE DELLA REPUBBLICA ITALIANA      *Serie generale* - n. **117**

N O T E

AVVERTENZA:

Il testo delle note qui pubblicato è stato redatto dall'amministrazione competente per materia, ai sensi dell'art. 10, commi 2 e 3, del testo unico delle disposizioni sulla promulgazione delle leggi, sull'emanazione dei decreti del Presidente della Repubblica e sulle pubblicazioni ufficiali della Repubblica italiana, approvato con decreto del Presidente della Repubblica 28 dicembre 1985, n. 1092, al solo fine di facilitare la lettura delle disposizioni di legge modificate o alle quali è operato il rinvio. Restano invariati il valore e l'efficacia degli atti legislativi qui trascritti.

Per le direttive CEE vengono forniti gli estremi di pubblicazione nella Gazzetta Ufficiale delle Comunità europee (GUCE).

*Note alle premesse:*

— L'art. 87, comma quinto, della Costituzione conferisce al Presidente della Repubblica il potere di promulgare le leggi ed di emanare i decreti aventi valore di legge ed i regolamenti.

— La legge 23 agosto 1988, n. 400, reca: «Disciplina dell'attività di Governo e ordinamento della Presidenza del Consiglio dei Ministri».

— L'art. 17, comma 2, della citata legge, così recita:

«2. Con decreto del Presidente della Repubblica, previa deliberazione del Consiglio dei Ministri, sentito il Consiglio di Stato, sono emanati i regolamenti per la disciplina delle materie, non coperte da riserva assoluta di legge prevista dalla Costituzione, per le quali le leggi della Repubblica, autorizzando l'esercizio della potestà regolamentare del Governo, determinano le norme generali regolatrici della materia e dispongono l'abrogazione delle norme vigenti, con effetto dall'entrata in vigore delle norme regolamentari.».

— La legge 22 febbraio 1994, n. 146, reca: «Disposizioni per l'adempimento di obblighi derivanti dall'appartenenza dell'Italia alle Comunità europee - legge comunitaria 1993.». L'art. 50 della citata legge, così recita:

«Art. 50 *(Regolamentazione dei prodotti)*. — 1. Il Governo emana, con uno o più regolamenti, norme intese a rivedere e riordinare la materia della produzione e commercializzazione dei prodotti alimentari conservati e non, anche se disciplinata con legge.

2. I regolamenti di cui al comma 1 sono adottati con la procedura prevista dall'art. 4, comma 5, della legge 9 marzo 1989, n. 86.

3. La disciplina della produzione e commercializzazione dei prodotti alimentari conservati o trasformati:

    *a)* si conforma ai principi e alle norme di diritto comunitario con particolare riferimento alla libera circolazione delle merci, tenuto conto dell'art. 36 del Trattato istitutivo della Comunità economica europea;

    *b)* tutela gli interessi relativi alla salute, all'ambiente, alla protezione del consumatore e alla qualità dei prodotti, alla sanità degli animali e dei vegetali, nel rispetto dei principi ispiratori della legislazione vigente.

4. In applicazione di quanto stabilito al comma 1, le disposizioni vigenti in contrasto con la norma generale di cui alla lettera *a)* del comma 3 saranno abrogate oppure modificate o sostituite in attuazione della norma generale di cui alla lettera *b)* del medesimo comma 3.

5. I regolamenti di cui al comma 1 possono demandare a decreti ministeriali, da adottare ai sensi dell'art. 17, commi 3 e 4, della legge 23 agosto 1988, n. 400, la emanazione di regole tecniche.».

— La legge 9 marzo 1989, n. 86, reca: «Norme generali sulla partecipazione dell'Italia al processo normativo comunitario e sulle procedure di esecuzione degli obblighi comunitari». L'art. 4, comma 5, della citata legge, così recita:

«5. Il regolamento di attuazione è adottato secondo le procedure di cui all'art. 17 della legge 23 agosto 1988, n. 400, su proposta del Presidente del Consiglio dei Ministri, o del Ministro per il coordinamento delle politiche comunitarie da lui delegato, entro quattro mesi dalla data di entrata in vigore della legge comunitaria. In questa ipotesi il parere del Consiglio di Stato deve essere espresso entro quaranta giorni dalla richiesta. Decorso tale termine il regolamento è emanato anche in mancanza di detto parere.».

— La legge 4 luglio 1967, n. 580, reca: «Disciplina per la lavorazione e commercio dei cereali, degli sfarinati, del pane e delle paste alimentari».

— Il decreto legislativo 27 gennaio 1992, n. 109, reca: «Attuazione delle direttive 89/395/CEE e 89/396/CEE concernenti l'etichettatura, la presentazione e la pubblicità dei prodotti alimentari».

— Il decreto del Ministro della Sanità 27 febbraio 1996, n. 209, reca: «Regolamento concernente la disciplina degli additivi alimentari consentiti nella preparazione e per la conservazione delle sostanze alimentari in attuazione delle direttive numeri 94/34/CE, 94/35/CE, 94/36/CE, 95/2/CE e 95/31/CE.

— Il decreto legislativo 26 maggio 1997, n. 155, reca: «Attuazione delle direttive numeri 93/43/CEE e 96/3/CE concernenti l'igiene dei prodotti alimenari».

— La legge 24 aprile 1998, n. 128, reca: «Disposizioni per l'adempimento di obblighi derivanti dall'appartenenza dell'Italia alle Comunità europee, (legge comunitaria 1995-1997)».

— L'art. 48 della citata legge, così recita:

«Art. 48 *(Prodotti alimentari)*. — 1. Le disposizioni concernenti gli ingredienti, la composizione e l'etichettatura dei prodotti alimentari, di cui alla legge 4 luglio 1967, n. 580 sulla lavorazione e il commercio dei cereali, degli sfarinati, del pane e delle paste alimentari, non si applicano ai prodotti alimentari legalmente fabbricati e commercializzati negli altri Stati membri dell'Unione europea o negli altri Paesi contraenti l'Accordo sullo spazio economico europeo, introdotti e posti in vendita nel territorio nazionale.

2. L'etichettatura dei prodotti di cui al comma 1 deve essere conforme alle disposizioni previste dalla direttiva 79/112/CE del Consiglio, e successive modificazioni.

3. I prodotti alimentari che contengano in qualunque forma organismi manipolati geneticamente o loro parti o derivati devono essere chiaramente individuati dal consumatore attraverso l'etichettatura che deve riportare in maniera ben leggibile l'indicazione che il prodotto alimentare contiene organismi geneticamente modificati o loro parti o derivati.».

— La legge 15 marzo 1997, n. 59, reca: «Delega al Governo per il conferimento di funzioni e compiti alle regioni ed enti locali, per la riforma della pubblica amministrazione e per la semplificazione amministrativa». L'art. 20-*bis* della citata legge, così recita:

«Art. 20-*bis*. — 1. I regolamenti di delegificazione possono disciplinare i procedimenti amministrativi che prevedono obblighi la cui violazione costituisce illecito amministrativo e possono, in tale caso, alternativamente:

    *a)* eliminare detti obblighi, ritenuti superflui o inadeguati alle esigenze di semplificazione del procedimento; detta eliminazione comporta l'abrogazione della corrispondente sanzione amministrativa;

— 11 —

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

*b)* riprodurre i predetti obblighi; in tale ipotesi, le sanzioni amministrative previste dalle norme legislative si applicano alle violazioni delle corrispondenti norme delegificate, secondo apposite disposizioni di rinvio contenute nei regolamenti di semplificazione.».

— La direttiva 98/34/CE è pubblicata in GUCE L 204 del 21 luglio 1998.

*Nota all'art. 4:*

— La legge 30 aprile 1962, n. 283, reca: «Modifica degli articoli 242, 243, 247, 250 e 262 del testo unico delle leggi sanitarie approvato con regio decreto 27 luglio 1934, n. 1265: Disciplina igienica della produzione e della vendita delle sostanze alimentari e delle bevande.».

*Note all'art. 5:*

— Il decreto del Ministro per l'agricoltura e le foreste, 1º aprile 1968, reca: «Disposizioni per la consegna delle farine o delle semole alla rinfusa in carri cisterna ed il loro deposito e conservazione presso gli utilizzatori.»

— Il decreto del Ministro per l'agricoltura e le foreste, 17 febbraio 1972, reca: «Integrazione del decreto ministeriale 1º aprile 1968, recante disposizioni per la consegna delle farine o delle semole alla rinfusa in carri cisterna ed il loro deposito e conservazione presso gli utilizzatori».

*Nota all'art. 6:*

— Per i riferimenti del decreto legislativo 26 maggio 1997, n. 155, vedi le note alle premesse.

*Nota all'art. 8:*

— Il decreto legislativo 4 febbraio 1993, n. 65, reca: «Attuazione della direttiva 89/437/CEE concernente i problemi igienici e sanitari relativi alla produzione ed immissione sul mercato degli ovoprodotti.»

*Nota all'art. 11:*

— Per il testo dell'art. 48 della legge 24 aprile 1998, n. 128, vedi le note alle premesse.

*Note all'art. 12:*

— Il decreto del Ministro per l'agricoltura e le foreste 9 agosto 1969, reca: «Modalità per il rilascio dell'autorizzazione a produrre sfarinati, pane e paste alimentari destinati all'esportazione con requisiti diversi da quelli prescritti dalla legge 4 luglio 1967, n. 580».

— Per i riferimenti della legge 4 luglio 1967, n. 580, vedi le note alle premesse.

— Per il testo dell'art. 48 della legge 24 aprile 1998, n. 128, vedi le note alle premesse.

— Il decreto del Presidente della Repubblica 30 novembre 1998, n. 502, reca: «Regolamento recante norme per la revisione della normativa in materia di lavorazione e di commercio del pane, a norma dell'art. 50 della legge 22 febbraio 1994, n. 146».— L'art. 9 del citato decreto del Presidente della Repubblica, così recita:

«Art. 9 *(Mutuo riconoscimento)*. — 1. Le disposizioni del presente regolamento, nonché quelle previste dalla legge 4 luglio 1967, n. 580, non si applicano al pane legalmente prodotto o commercializ-

zato negli Stati membri dell'Unione europea ed a quello originario dei Paesi contraenti dell'Accordo sullo spazio economico europeo, introdotto e posto in vendita sul territorio nazionale.».

— Per i riferimenti del decreto legislativo 27 gennaio 1992, n. 109, vedasi le note alle premesse.

*Note all'art. 13:*

— L'art. 44 della citata legge 4 luglio 1967, n. 580, così recita:

«Art. 44. — Salvo che il fatto costituisca più grave reato:

*a)* la violazione delle disposizioni di cui agli articoli 1, 2, 3, 5, 10, 12 (secondo comma), 18, 27, 34, 36 (secondo comma) è punita con la sanzione amministrativa sino a L. 6.000.000;

*b)* la violazione delle disposizioni di cui agli articoli 7 e 9 (ultimi commi), 16, 17, 20 (secondo, terzo e quarto comma), 21, 22 (ultimo comma), 24 (secondo e terzo comma), 26, 33 (ultimo comma) è punita con la sanzione amministrativa sino a L. 600.000;

*c)* la violazione delle norme della presente legge diverse da quelle indicate nelle precedenti lettere *a)* e *b)* e del regolamento per l'esecuzione della presente legge nonché dei provvedimenti amministrativi previsti dalla legge medesima è punita con la sanzione amministrativa sino a L. 3.000.000.

In ogni caso il contravventore è tenuto al pagamento della tassa di analisi. Al personale preposto al servizio di vigilanza competono i diritti previsti dalla legge 5 aprile 1961, n. 322.

Ai sensi dell'art. 15 del codice penale, le disposizioni della presente legge sono speciali rispetto a quelle contenute nelle leggi 30 aprile 1962, n. 283 e 26 febbraio 1963, n. 41.».

— Il titolo VIII della citata legge n. 580 del 1967, reca: «Vigilanza e sanzioni».

*Note all'art. 14:*

— Per i riferimenti della legge 4 luglio 1967, n. 580, vedi le note alle premesse.

— Il decreto del Ministro della sanità 27 aprile 1998, n. 264, abrogato dal presente regolamento recava: «Regolamento recante norme per l'impiego di ingredienti consentiti nella produzione delle paste alimentari speciali, secche e fresche».

— Si riporta il testo dell'art. 50 della citata legge n. 580 del 1967, come modificato dal presente regolamento:

«Art. 50. È consentita la produzione di sfarinati, pane e paste alimentari aventi requisiti diversi da quelli prescritti dalle norme della presente legge, del regolamento di esecuzione e dei provvedimenti dell'autorità amministrativa previsti dalla legge medesima, purché si tratti di prodotti destinati all'esportazione e non nocivi alla salute umana, previa autorizzazione da concedersi con le modalità che verranno fissate dal regolamento.

*Salvo quanto previsto dall'art. 48 della legge 24 aprile 1998, n. 128, e dall'art. 9 del decreto del Presidente della Repubblica 30 novembre 1998, n. 502, è vietata l'importazione di pane avente requisiti diversi da quelli prescritti dalle norme della presente legge, del regolamento di esecuzione e dei provvedimenti dell'autorità amministrativa previsti dalla legge medesima.».*

— Per il testo dell'art. 48 della legge 24 aprile 1998, n. 128, vedasi le note alle premesse.

— Per il testo dell'art. 9 del decreto del Presidente della Repubblica 30 novembre 1998, n. 502, vedasi le note all'art. 12.

**01G0242**

— 12 —

**JULY 2001** Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19        **ITALY**

## 2.  USEFUL CONTACTS

***Associazione delle Industrie del Dolce e della Pasta Italiane – A.I.D.EP.I.***

61, Viale del Poggio Fiorito

I - 00144 Roma

Tel.: 0039/068091071

Fax: 0039/0688073186

e-mail: aidepi@aidepi.it

Web: http://www.aidepi.it

**Mr. Paolo Barilla (President)**

**Mr. Mario Piccialuti (Director General)**

*r*

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH G   FOOD GROUPS



https://www.google.com/search?q=usda+food+pyramid+2019&sa=X&biw=1253&bih=734&sxsrf=ACYB
GNSS8ZWI_xVXBhYtVxre2ji2pLijyQ:1575823778656&tbm=isch&source=iu&ictx=1&fir=S2aLw_xjLwESxM
%253A%252C9LEjRhDyueB_5M%252C_&vet=1&usg=AI4_-kScK86i4GHwCdjtaU99YG-
O4J3DVw&ved=2ahUKEwjxkLiEwabmAhVOMt8KHYhQBwQQ9QEwAHoECAgQHA#imgrc=S2aLw_xjLwESx
M: *accessed* December 8, 2019

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# EXH H   PASTA NOODLE TECH -  WHEAT, SEMO & PASTA QUALITY

# Pasta
## *and*
# Noodle
## Technology

Edited by

**James E. Kruger**
**Robert B. Matsuo** (retired)
Canadian Grain Commission
Winnipeg, Manitoba

**Joel W. Dick**
The Roman Meal Milling Company
Fargo, North Dakota

Published by the
**American Association of Cereal Chemists, Inc.**
St. Paul, Minnesota, U.S.A.

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

# QUALITY REQUIREMENTS OF DURUM WHEAT FOR SEMOLINA MILLING AND PASTA PRODUCTION

P. Feillet[1] and J. E. Dexter[2]

[1]Institut National de la Recherche Agronomique, Laboratoire de Technologie des Céréales, 2 Place Viala, 34060 Montpellier Cedex 01, France

[2]Canadian Grain Commission, Grain Research Laboratory, 1404-303 Main St., Winnipeg, Manitoba, Canada R3C 3G8

## INTRODUCTION

Pasta products have been known to Mediterranean civilizations for many centuries, and are eaten and enjoyed everywhere. Pasta is popular because it is a versatile, natural and wholesome food, and the manufacturing process is relatively simple. Pasta products are available in a variety of shapes, can be stored conveniently for long periods, are easily transported, and have excellent nutritional and hygienic quality.

The raw materials used to manufacture pasta must perform the following functions:

- allow the pasta to be shaped by extrusion through a die;
- yield a strong, flexible, dry finished product free from checking with good packaging tolerance and good storage stability;
- yield a translucent dry finished product with the essential aesthetic qualities of a smooth clear surface free of specks and a bright amber yellow color;
- yield a firm, resilient, nonsticky cooked product with a pleasing taste and aroma;

95

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

- make a significant contribution to the balanced diet of the consumer;
- be beyond reproach with respect to hygiene.

Durum wheats are the preferred raw material for pasta processing, although common wheats can also be used to make a less satisfactory product. However, not all durum wheats possess the full set of properties required for the best processing value. The characteristics that determine the industrial or technological value of durum wheat can be placed in two groups according to how they affect:

- the milling performance of the wheat, i.e., the proportion of semolina of the desired degree of refinement that can be extracted from the wheat (semolina milling quality);
- the ability of the extracted semolina to give pasta with the required appearance, resistance to breakage and cooking tolerance (pasta quality).

Test procedures used in Europe, the United States and Canada to evaluate durum wheat quality were documented by Cubadda (1988), Dick and Youngs (1988), Matsuo (1988) and Cole (1991) and, hence, will not be reviewed here. This chapter will discuss the technological and physicochemical basis for the quality criteria that are demanded of durum wheat and semolina by discriminating durum wheat millers and pasta manufacturers.

## DURUM WHEAT MILLING QUALITY CRITERIA

### The Durum Wheat Semolina Milling Process

The durum wheat milling process has evolved in response to the inherent properties of durum wheat, and to the requirements of pasta manufacturers. The durum wheat milling process is briefly reviewed here to provide the knowledge necessary to understand fundamental durum wheat milling quality criteria. Durum wheat milling has been reviewed in detail by Bizzarri and Morelli (1988).

Durum wheat is very hard, and therefore lends itself to the production of semolina, a granular product comprised of evenly sized endosperm particles. Semolina is the durum wheat

96

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

milling product which commands the highest price in most markets. Therefore it is the aim of durum wheat millers to achieve a maximum yield of highly refined semolina. To most durum wheat millers, flour is a lower valued by-product of semolina milling.

## Cleaning and Conditioning

Dark specks originating from foreign material in wheat will adversely affect the appearance of the semolina and the finished pasta. Therefore, durum wheat semolina mills feature very extensive cleaning houses. Cleaning by specific gravity is used extensively to remove light contaminants that are of similar size to sound durum wheat kernels. Disc separators or indent cylinders are also essential for thorough cleaning of durum wheat. They remove seeds that are comparable in density to durum wheat kernels, but are slightly different in shape and size.

Durum wheat is tempered prior to milling to toughen the bran, thereby reducing the number of bran specks in the semolina. Tempering time is generally 4 hr or less. The temper time is short in order to retain the hard vitreous nature of durum wheat, thereby maximizing the release of large endosperm particles and minimizing the yield of flour.

A recent development in durum wheat milling is preprocessing prior to milling (Dexter *et al.*, 1994*a,b*; McGee, 1992). In the process, bran layers are removed during sequential friction and abrasion operations by a series of modified rice-polishing machines. About 65% of the bran is removed during the process. The remaining bran is confined to the crease area, and is removed during conventional roller milling. Proponents of preprocessing cite increased return on millfeed due to the composition and functionality of some fractions derived from by-products of preprocessing, increased semolina yield, improved semolina refinement, and simplification of the mill flow.

## The Milling Process

A simplified diagram of a typical durum wheat semolina mill flow is shown in Fig. 1. Durum wheat semolina mills have a long break system, allowing the gradual release of coarse endosperm particles with a minimum yield of flour (Nuret *et al.*,

97

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved



Fig. 1. A simplified durum wheat semolina mill flow. B = break roll;
P = purifier; SZ = sizing roll; F = flour; S = sizing purifier; SC = coarse
sizing purifier; SF = fine sizing purifier; M = middling roll; SEMO =
semolina; SH = shorts.

98

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

1966).  Flour production is further minimized by using flutes with sharp profiles on all corrugated rolls in the break and sizing systems, and by setting the rolls sharp-to-sharp (Abercrombie, 1980; Sebestyen, 1973).  When rolls are set sharp-to-sharp the cutting action is by the short cutting edge of the flute, which maximizes shearing and reduces the proportion of fines produced during grinding.

Durum wheat semolina mill flows are instantly recognizable by the large number of purification passages.  Purifiers separate endosperm particles by size and density.  The oscillation of the purifier sieve frame and an upward air current cause the stock to stratify, with lighter bran-rich particles rising to the surface.  The heavier endosperm particles fall through the sieve if the aperture is large enough, whereas bran-rich particles float over the end of the sieve frame.

After sifting, coarse endosperm stock released by the break system is purified and then sent to sizing rolls.  The sizing rolls grind the coarse particles lightly to release adhering bran and to reduce particle size.  The sized semolina is then purified again.  Clean stock of the appropriate size is recovered as finished semolina from the sizing purifiers.

Most durum wheat semolina mills will have a short reduction system to recover flour from stock that is either too fine or too bran-rich to be included in semolina.  These rolls have a smooth surface, and are set closely together to release flour as efficiently as possible.

Depending on semolina granulation, and government regulations or customer specifications controlling semolina refinement (e.g., ash content or brightness), the semolina extraction rate of a modern, well-equipped mill solely dedicated to durum wheat milling will range from 65 to 75%.

### Durum Wheat Quality

There are many factors that the miller must consider when evaluating the processing potential of durum wheat.  A discussion of those that are generally considered to be the most important follows.

99

## Physical Condition (Grade)

The most important factor determining the semolina milling potential of durum wheat is physical condition.  In most durum wheat producing countries, grading systems are in place which segregate the wheat on the basis of visual standards (degree of damage) and objective tests such as test weight.  Grade specifications develop in response to the requirements of durum wheat millers.  Therefore, the miller can insure that his minimum quality standards will be met by specifying the appropriate grade.  Where the miller is not familiar with the relative quality of the milling grades being offered by a supplier, or if the supplier does not have a well developed grading system, the miller will demand that the supplier satisfy a list of specifications, thereby insuring that minimum quality requirements will be met.  In some cases, the miller may request specific varieties, because durum wheat varieties of similar physical condition can have very different intrinsic processing properties.

## Test Weight and Kernel Weight

Weight per unit volume, or test weight, is widely used as a primary durum wheat grading specification and milling quality indicator.  Several studies have demonstrated that test weight of American and Canadian durum is strongly related to semolina yield (Dexter *et al.*, 1987; Watson *et al.*, 1977).  As seen in Fig. 2A, for Canadian durum wheats of good visual quality, for each drop in test weight of one kg/hL there is a corresponding 0.7% decrease in semolina yield.  When semolina yield is expressed on a constant ash content basis (milling score), semolina yield drops an additional 1.0% (Fig. 2B).

Durum wheat test weight is a good predictor of semolina milling potential because it exhibits a strong linear relationship to kernel weight (Dexter *et al.*, 1987, 1991).  Generally, durum wheat milling performance is related to kernel plumpness. Thin, shrunken and damaged kernels impart reduced semolina yield and increased semolina speckiness (Dexter and Matsuo, 1981).  In addition to specifying a minimum test weight, millers often will specify a minimum proportion of kernels that must be held on a sieve with a carefully defined aperture in order to avoid excessive amounts of thin kernels.

100

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19



Fig. 2. The relationships of Canadian durum wheat test weight to semolina yield and semolina milling score (semolina yield at constant ash content). Source: Dexter *et al.* (1987).

101

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

## Foreign Material

Foreign material, the impurities that remain behind after removal of dockage, are detrimental to the milling value of durum wheat. Firstly, foreign material removed from durum wheat during cleaning is a low valued by-product which reduces the milling value of the wheat sample. Secondly, the foreign material left behind in the sample after cleaning will reduce semolina yield and impart undesirable speckiness in the semolina.

Ergot bodies are undesirable in all grains because they are toxigenic, but they are particularly serious contaminants to durum wheat millers because their dark color imparts unsightly dark specks to semolina (Dexter and Matsuo, 1982). Ergot bodies are from a fungal parasite, *Claviceps purpurea*, which grows parasitically in place of the grain kernel in cereals and grasses. The specific gravity tables found in most durum wheat cleaning houses remove ergot bodies effectively (Dexter *et al.*, 1991).

## Contrasting Wheat Classes

Common wheat is an undesirable impurity in durum wheat. Common wheat has a softer texture than durum wheat, and therefore will produce less coarse semolina and more flour. In addition, compared to durum wheat pasta, common wheat pasta exhibits inferior color and poorer cooking quality (Dexter *et al.*, 1983). As a result, some countries have legislation which requires that pasta for internal consumption must be made from durum wheat semolina. The most commonly used methods for detecting adulteration of durum wheat products with common wheat are based on protein characterization (Feillet and Kobrehel, 1974; Resmini and De Bernardi, 1976). The reliability of alternative methods based on the proportion of sitosteryl palmitate in semolina is limited because of the genetic variability of this component in both common and durum wheats (Laignelet, 1983).

## Yellow Berry (Starchiness)

Yellow berry (starchiness, mealiness, nonvitreousness) is a physical property of particular importance to durum wheat

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

millers.  It is universally agreed that starchy durum wheat ker-
nels are lower in protein content than vitreous kernels (Matveef,
1963).  Starchy zones in durum wheat endosperm are chalky,
and impart aesthetically undesirable white spots in dried pasta
(Matveef, 1963).

Starchy durum wheat kernels are softer than hard vitreous
kernels, and it is generally believed that starchy durum wheat
samples yield less coarse semolina and more flour.  However,
there is mounting evidence that the importance of vitreousness
to durum wheat semolina milling performance may be over-
estimated.  Menger (1971) questioned the importance of starchi-
ness on durum wheat semolina milling performance, given
modern trends to finer granulations.  Bolling and Zwingelberg
(1972) found that durum wheat semolina yield was related more
to wheat origin than to differences in wheat vitreousness.
Dexter *et al.* (1988, 1989) found that fully starchy durum wheat
kernels were softer than vitreous kernels, but partially vitreous
kernels were comparable in hardness to fully vitreous kernels.
They concurred with Matveef (1963) that fully starchy kernels
should be given greater emphasis than partially starchy kernels
when estimating durum wheat milling potential.

### Sprouted Kernels

Sprout-damaged durum wheat is considered undesirable
because of inferior pasta-making potential, and many millers
will specify a minimum wheat Falling Number.  American and
French pasta producers have reported that sprout damage in
durum wheat causes uneven extrusion, strand stretching, diffi-
culties in drying and poor storage stability (Donnelly, 1980).
However, similar effects have not been confirmed in controlled
laboratory experiments.  American (Dick *et al.*, 1974), French
(Combe *et al.*, 1988) and Canadian (Dexter *et al.*, 1990) studies
have concluded that sprout damage has little effect on spaghetti
cooking quality.  The combined effects of a relatively low water
content in pasta doughs and a rapid decrease in pasta moisture
during drying prevent the alpha-amylase enzyme from degrad-
ing starch during pasta processing (Dexter *et al.*, 1990).  Then,
during cooking, the alpha-amylase is rapidly heat denatured by
penetration of the boiling cooking water (Kruger and Matsuo,

103

1982).  However, when sprout damage is severe, there may be a slight detrimental effect on cooked pasta firmness, and an increase in the proportion of solids lost to the cooking water (Grant *et al.*, 1993; Matsuo *et al.*, 1982*a*).

Sprout damage does not appear to have an effect on semolina milling potential or spaghetti color (Dexter *et al.*, 1990). However, mildew fungus *(Cladosporium)* is commonly associated with weathered and sprouted grain.  Mildew has been shown to cause speckier semolina and duller spaghetti (Dexter and Matsuo, 1982).

### Blackpoint and Smudge

A common infection of the wheat kernel, which might be caused by *Alternaria alternata* and *Helminthosporium sativum* and other fungi gives the kernel a dark brown or black discoloration. When the infection is confined to the germ end, the condition is known as blackpoint.  As the infection progresses along the crease to the brush end, and more of the kernel is discolored, the damage is referred to as smudge.  Durum wheat millers consider smudge and blackpoint to be very serious quality defects because black specks associated with infected kernels are prominent in the semolina, and detract from the appearance of both semolina and pasta (Dexter and Matsuo, 1982).

### Protein Content and Gluten Strength

There is universal agreement that protein content is the primary factor influencing pasta quality and that gluten strength is an important secondary factor (Autran *et al.*, 1986; D'Egidio *et al.*, 1990; Matsuo *et al.*, 1982*b*; Novaro *et al.*, 1993).  Therefore, suppliers are often obligated to meet a minimum protein content specification.  The SDS-sedimentation test (Dexter *et al.*, 1980; Quick and Donnelly, 1980) is an effective rapid indicator of durum wheat gluten strength.  Recently, a minimum SDS-sedimentation volume has become a popular durum wheat quality specification.

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

## Semolina Properties

### Particle Size

There is no universal agreement on the optimum particle size distribution for semolina. Traditionally, semolina particle size ranged from 550 to 150 μm. In recent years, pasta equipment manufacturers have been recommending finer semolina to get the best performance out of modern pasta presses. In some cases, a granulation range as fine as 350 to 130 μm may be ideal (Manser, 1980a). Regardless, pasta manufacturers all prefer the majority of particles to fall within a narrow particle size range to insure that the semolina will flow freely, and that pasta dough water uptake will be homogeneous. Semolina particle size distribution is determined by sieving over sieves of specified aperture for a fixed period.

### Grit Test

In North America, a grit test is commonly performed to quantify small particles of metal and stone. Grit is particularly undesirable for processing of thin-walled hollow goods because they become lodged in the die openings, and cause streaking or tearing of the dough (Irvine, 1971). Grit can be detected readily by floatation of semolina in carbon tetrachloride. Grit sinks to the bottom of the liquid whereas semolina and bran particles float on the surface.

### Specks

Semolina specks are estimated visually by counting the number of specks in a defined area. Usually millers will have separate specifications for bran specks and black specks. The latter are particularly undesirable because they are very obvious in the finished pasta. The most universal procedure is to place a glass, which is etched in squares of defined area, over the semolina (Abercrombie, 1980; Dick and Youngs, 1988; El Bouziri and Posner, 1988).

### Ash Content and Brightness (Degree of Refinement)

Detailed studies of individual durum wheat semolina mill-streams have shown that the least refined streams produce a

105

product that is browner and duller (Abecassis and Alause, 1979; Houliarapoulos *et al.*, 1981; Matsuo and Dexter, 1980). Therefore, as seen in Fig. 3, semolina extraction rate is negatively correlated to spaghetti brightness (Dexter and Matsuo, 1978).



Fig. 3. The relationships of semolina extraction rate to spaghetti brightness for the Canadian durum wheat cultivars Hercules (O) and Wascana (●). Source: Dexter and Matsuo (1978).

Semolina speckiness tends to increase with increased extraction rate, but specks are also caused by improper cleaning, the presence of kernels damaged by smudge, mildew or blackpoint, or improper purifier settings. The most universally accepted index of extraction rate is ash content, because ash content increases from the inner to the outer regions of the wheat kernel (Hinton 1959; Morris *et al.*, 1946).

Ash content has limitations as a semolina extraction rate indicator because it is influenced both by cultivar (Fig. 4) and by environment (Abecassis and Feillet, 1985). Generally, a direct

106

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

measurement of semolina brightness such as the AGTRON color test will relate to spaghetti brightness better than ash content (Dexter *et al.*, 1987).



Fig 4. The relationship of semolina extraction rate to semolina ash content for the Canadian durum wheat cultivars Hercules (O) and Wascana (●). Source: Dexter and Matsuo (1978).

## Yellow Pigment

The desired color of semolina is a clear bright yellow imparted mainly by xanthophyll, a carotenoid pigment (Irvine, 1971). Yellow pigment content can be determined quantitatively by overnight extraction in water soluble n-butanol followed by measurement of absorbance at 435.8 nm (Dexter and Matsuo, 1978). However, the procedure is rarely used commercially because n-butanol is a noxious flammable solvent, and the procedure is tedious.

107

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

Estimation of the color of dry semolina can be misleading because semolina appears increasingly pale as granulation becomes finer (Irvine, 1971). This applies whether semolina color is being judged visually or with reflected-light colorimeters (Allen *et al.*, 1989; Symons and Dexter, 1991).

In Europe, semolina color is often measured on disks of dough as described by Alause and Feillet (1970). Yellowness and brownness is derived from Judd-Hunter tristimulus color coordinates L* (brightness), and b* (yellow-blue chromaticity) (Francis, 1983).

## Protein Content and Gluten Strength

As mentioned earlier, pasta cooking quality is related to protein content and gluten quality. Most pasta manufacturers will demand a minimum semolina protein content. Wet gluten content is another frequently used semolina specification because it is readily standardized.

In addition to using the SDS-sedimentation test (Dexter *et al.*, 1980; Quick and Donnelly, 1980), the gluten strength of semolina can be monitored by physical dough tests. D'Egidio *et al.* (1990) have shown a strong relationship between alveograph properties and pasta cooking quality. The mixograph (Bendelow, 1967) and the viscoelastograph (Damidaux and Feillet, 1980; Kovacs *et al.*, 1994) also can be used to predict semolina gluten strength. Irvine *et al.* (1961) found that farinograph curves obtained at pasta dough absorption by using the small bowl at the large bowl lever setting relate well to pasta-making potential.

## PASTA QUALITY

Food processing transforms agricultural products of varying composition into foods having defined organoleptic, nutritional and hygienic properties. Transformation is achieved by physical or biological processes, with or without optional ingredients. Therefore, food quality depends on both the transformation processes employed, and on the properties of the raw materials supplied by agriculture. The pasta industry is not exempt from this rule, so it is scarcely possible to describe the pasta-making

108

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

quality of a durum wheat semolina without taking into consideration recent changes in the manufacturing process. The pasta manufacturing process has been reviewed in detail by Baroni (1988), Dick and Matsuo (1988) and Milatovic and Mondelli (1991).

### The Pasta Manufacturing Process

As seen in Fig. 5, pasta production is a simple operation. Grain endosperm, in the form of uniformly-sized semolina particles, is hydrated, mixed, kneaded, extruded to give the pasta the desired shape, and dried.





Fig. 5. A simplified diagram of a long goods pasta line.

109

In the preliminary stage of pasta processing, water, eggs (optional) and semolina are mixed in a paddle mixer. The quantity of water added is approximately 280 liters per tonne of semolina. The initial moisture content of semolina is generally about 14%, so the final water content of the dough is approximately 33%. Unlike dough mixing during the baking process, mixing in the pasta-making process does not develop the dough (Matsuo *et al.*, 1978). The paddle mixer effects gradual and homogeneous hydration of the semolina, and the physicochemical properties of the proteins are modified only slightly. Depending on the length and the intensity of the mixing process, and the characteristics of the raw materials used, lumps of varying size are formed, some of which can reach 2 or 3 cm in diameter. Most modern mixing chambers operate under vacuum to minimize the oxidation of pigments that can occur at this stage.

The hydrated semolina now enters an extrusion worm. The extrusion worm has a double function. It moves the loose dough forward and simultaneously compresses it into a homogeneous plastic mass, prior to extrusion through a die which is located at the head of the worm housing. The pressure to which the dough is subjected during this operation can exceed 100 kg per $cm^2$. Water circulates in a cooling system around the extrusion cylinder chamber to prevent excessive heating. The temperature must not exceed 50°C in order to avoid damage to semolina gluten proteins (Abecassis *et al.*, 1994; Menger, 1977). Vacuum is applied during this phase in order to prevent oxidation of yellow pigment, and to eliminate air bubbles that would spoil the appearance and cooking performance of the finished product. The shape of the die and the time interval between extrusion and cutting determine the shape of the finished product (spaghetti, noodles, hollow goods, shells, nests, etc.).

In the next stage, drying, water is removed so that the final moisture content does not exceed 12.5% (the equilibrium water content of pasta in an atmosphere of 20°C and 67% RH). In the case of long goods, drying is a particularly delicate operation. Atmospheric conditions and air flow must be stringently controlled to avoid creating a discontinuity in the moisture gradient between the interior and exterior of the pasta which is estab-

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

lished gradually during drying. In general, the wet bulb depression must not exceed 5°C. In the last fifteen years or so, high-temperature drying (>60°C) has become universally accepted because of better control of bacteria, particularly for egg products, shorter drying times which make the lines more compact, and, as seen in Table I, superior cooking quality (Abecassis *et al.*, 1984; Dexter *et al.*, 1981*a*; Malcolmson *et al.*, 1993; Manser, 1980*b*; Pavan, 1979). Today drying is frequently carried out at temperatures in excess of 80°C.

TABLE I

The Effect of Drying Conditions on Appearance, Yellow Index, Brown Index and Cooking Quality of Pasta Produced from 11 French Durum Wheats[1]

| | Appearance | Yellow Index[2] | Brown Index[2] | GIV[3] |
|---|---|---|---|---|
| Dried at 37°C | | | | |
| Mean | 4.7 | 23.9 | 32.9 | 5.0 |
| Range | 2 to 9 | 18.0–34.1 | 30.2–35.9 | 0.9–8.7 |
| Dried at 70°C | | | | |
| Mean | 5.2 | 24.6 | 33.1 | 7.7 |
| Range | 1 to 9 | 17.0–32.4 | 30.7–35.6 | 1.3–11.5 |
| Dried at 90°C | | | | |
| Mean | 5.4 | 25.6 | 32.6 | 6.9 |
| Range | 2 to 8 | 18.5–32.9 | 30.4–34.8 | 1.2–10.2 |
| Significance of effect of: | | | | |
| Sample | $P<0.01$ | $P<0.01$ | $P<0.01$ | $P<0.01$ |
| Drying Temperature | $P<0.05$ | $P<0.01$ | $P<0.01$ | $P<0.01$ |

[1] Data taken from Abecassis *et al.* (1984).

[2] Yellow and brown indices determined from Judd-Hunter tristimulus color coordinates (Francis, 1983). Yellow index = b* (yellow-blue chromaticity); brown index = 100 - L* (brightness).

[3] GIV = general index of viscoelasticity of cooked pasta.

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

In summary, production of pasta from durum wheat involves transformation of vitreous grain endosperm. The yield of the complete process from milling to pasta is as follows: 140 kg of durum wheat (containing 14% moisture) provides 95 to 105 kg of semolina (containing 14% moisture); 100 kg of semolina (moisture content 14%) produces 98.5 kg of pasta with a 12.5% moisture content.

## Pasta Color and Appearance

The appearance of pasta is determined by four groups of factors:

- color, which largely depends on the characteristics of the wheat used;
- specks, which result from improper cleaning, improper mill settings and the presence of damaged kernels, particularly those with surface discolorations;
- surface texture, related primarily to the condition of the die;
- strand strength and flexibility, related to the conditions under which the pasta is extruded and dried.

### Pasta Color

Pasta color results from a desirable yellow component, and an undesirable brown component (Laignelet *et al.*, 1972). Under certain drying conditions, a red component can develop (Abecassis *et al.*, 1984).

The yellow component is related to the presence of carotenoid pigments (Morzella and Cutler, 1935), certain lipids and lipoxygenase activity in the semolina. Those components, in turn, are dependent on the intrinsic characteristics of the durum wheat, the milling conditions (i.e., the extraction rate and the degree to which the lipoxygenase-rich germ is eliminated from the milled product), and the parameters under which the pasta is processed (i.e., hydration, mixing, extrusion and drying). All of these factors can promote or deter oxidation and affect the destruction of carotenoid pigments, and the resultant bleaching of pasta color mediated by lipoxygenase.

112

Barcode:3920624-08 A-475-818 REV - Admin Review 7/1/18 - 6/30/19

Irvine and Anderson (1953) studied variability in semolina carotenoid pigment content and lipoxygenase activity. They concluded that a major factor associated with differences in these two characteristics was a difference in intrinsic levels among durum wheat varieties (Table II). Many later studies confirmed the genetic variability and high heritability of carotenoid pigment content in durum wheat varieties (Matz and Larsen, 1954). It has also been known for a long time that pigment destruction is due to the presence of lipoxygenase (Irvine and Winkler, 1950). However, Mkhitaryan *et al.* (1974) claimed that carotenoids form complexes with proteins which protect them from oxidation, thereby casting doubt on the conventional interpretation, and minimizing the role played by lipoxygenase. Matsuo *et al.* (1970) found that most pigment was lost during drying, and concluded that although lipoxygenase was definitely involved in pigment destruction, its level of activity was not as important as availability of substrate. Their data supported a previous suggestion by Dahle (1965) that free polyunsaturated fatty acids play a significant role in pigment oxidation.

The cause of browning is more complex. Two phenomena seem to be involved: the presence of a naturally colored protein, and enzymatic oxidation. According to Matsuo and Irvine (1967), a colored soluble protein containing copper is responsible for the varietal differences in pasta browning, and Walsh (1969) confirmed their finding.

Menger *et al.* (1969) suggested that flavonoids could be partially oxidized by polyphenol oxidase (PPO) during pasta production, thereby creating brown components. Irvine (1971) distinguished two types of browning, one intrinsic and the other related to high extraction rate and resulting, at least in part, from enzyme activity. Kobrehel *et al.* (1972, 1974) attributed both these types of browning to the same enzymatic origin. They found that both the intrinsic tendency to browning and browning that is influenced by pasta processing variables are related to PPO activity. They concluded that a selection program to identify durum wheat varieties with a low tendency to browning could be based on screening for low PPO activity. Kobrehel and Gautier (1974) demonstrated that there was a wide range of

113

Filed By: tstrivers@dhlaw.com, Filed Date: 12/13/19 5:13 PM, Submission Status: Approved