IN THE UNITED STATES COURT OF INTERNATIOAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| LA MOLISANA, S.P.A., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| and ) | |
| ) | |
| VALDIGRANO DI FLAVIO PAGANI SRL, ) | Consol. Court No. 21-00291 |
| ) | |
| Consolidated Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO**
**PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, Jr.
Assistant Director

OF COUNSEL:
KIRRIN HOUGH
Office of the Chief Counsel for
Trade Enforcement & Compliance
Department of Commerce

SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice, Civil Division
PO Box 480
Ben Franklin Station
Washington, D.C. 20044
Tell: (202) 305-7568
Fax: (202) 307-0972
Email: sosun.bae@usdoj.gov

March 28, 2022

*Attorneys for Defendant*

# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| LA MOLISANA, S.P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| VALDIGRANO DI FLAVIO PAGANI SRL, | )   Consol. Court No. 21-00291 |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>ORDER</u>

Upon consideration of plaintiffs' motion for judgment upon the agency record, defendant's response thereto, plaintiffs' reply, the administrative record, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is DENIED; and it is further

ORDERED that the Department of Commerce determinations at issue in this action are sustained; and it is further

ORDERED that judgment is entered in favor of the United States.


Dated:_____          _____
        New York, New York                                SENIOR JUDGE

# TABLE OF CONTENTS

**PAGE**

STATEMENT PURSUANT TO RULE 56.2 ................................................................ 2

    I.    Administrative Determination Under Review ................................................ 2

    II.    Issues Presented For Review ........................................................................ 2

STATEMENT OF FACTS ............................................................................................ 2

    I.    Administrative Proceedings At Issue ............................................................ 2

        A.    Protein Coding ................................................................................ 3

        B.    Final Results ................................................................................... 4

SUMMARY OF THE ARGUMENT .............................................................................. 7

ARGUMENT ................................................................................................................. 8

    I.    Standard Of Review ...................................................................................... 8

    II.    Plaintiffs Do Not Establish Compelling Reasons For Commerce To Depart From Its Longstanding Protein Content Reporting Instruction Methodology ................................................................................................ 10

        A.    Relevant Framework For Commerce's Model Match Methodology ........ 10

        C.    Commerce's Model Match Methodology For Pasta From Italy .............. 12

        D.    Commerce Relies On The Packaging Label As An Objective Method To Achieve A Product Comparison On A Consistent and Transparent Basis, And The Differing Nitrogen Content Multiplier Does Not Detract From Commerce's Reliance ...................................................... 14

        D.    Commerce Reasonably Determined That Differences In Protein Content Caused By FDA Rounding Standards Are Not Commercially Significant ...................................................................................... 18

        E.    Plaintiffs Fail To Provide Compelling Evidence That Commerce's Instructions For Reporting Content Do No Reflect Market Reality, And Their Heavy Reliance On The Market Report Is Unavailing ........... 21

    III.    The Rate Applied To Valdigrano Was Lawful ............................................ 26

CONCLUSION ................................................................................................................ 28

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(S)**

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984) ................................................................................... 9

*Consol. Edison Co. v. N.L.R.B.,*
   305 U.S. 197 (1938) ................................................................................... 8

*Consol. Fibers, Inc. v. United States*,
   535 F. Supp. 2d 1345 (Ct. Int'l Trade 2008) .......................................... 9

*Consolo v. Fed. Maritime Comm'n,*
   383 U.S. 607 (1966) ................................................................................... 8

*Corus Staal BV v. Dep't of Commerce,*
   395 F.3d 1343 (Fed. Cir. 2005) ............................................................... 8

*Daewoo Electronics Co., Ltd. v. United States,*
   6 F.3d 1511 (Fed. Cir. 1993) ................................................................... 8

*Dongtai Peak Honey Indus. Co. v. United States*,
   777 F.3d 1343 (Fed. Cir. 2015) ............................................................... 9

*Fagersta Stainless AB v. United States,*
   577 F. Supp. 2d 1270 (Ct. of Int'l Trade 2008) ............................... passim

*Fujitsu Gen. Ltd. v. United States,*
   88 F.3d 1034 (Fed. Cir. 1996) .............................................................8, 9

*Ghigi 1870 S.p.A. et al. v. United States*,
   547 F. Supp. 3d 1332 (Ct. Int'l Trade 2021) ....................................... 23

*JFB Rak LLC v. United States,*
   961 F. Supp. 2d 1274 (Ct. Int'l Trade 2014) ...................................... 11

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,*
   28 F.Supp. 3d 1317 (Ct. Int'l Trade 2014) ........................................... 9

*Koyo Seiko Co., Ltd. v. United States,*
   66 F.3d 1204 (Fed. Cir. 1995) ...........................................................9, 10

*La Molisana S.p.A. v. United States*,
No. 16-00047, 2018 WL 3089242 (Court Int'l Trade June 21, 2018) *aff'd*,
785 F. App'x 780 (Fed. Cir. 2019) ........................................................................6, 17

*Manchester Tank & Equip. Co. v. United States*,
483 F. Supp. 3d 1309 (2020) ...............................................................................23

*Matsushita Elec. Indus. Co., v. United States*,
750 F.2d 927 (Fed. Cir. 1984) ...............................................................................8

*Maverick Tube Corp. v. United States*,
107 F. Supp. 3d 1318 (Ct. Int'l Trade 2015) ......................................................11

*New World Pasta Company v. United States*,
316 F. Supp. 2d 1338 ............................................................................................10

*Pesquera Mares Australes Ltda. v. United* States,
266 F.3d 1372 (Fed. Cir. 2001) ....................................................................passim

*Prodotti Alimentari Meridioli, S.r.L., v. United States*,
27 C.I.T. 547 (2003) .............................................................................................12

*SKF USA Inc. v. United States*,
537 F.3d 1373 (Fed. Cir. 2008) ............................................................................10

*Union Steel v. United States*,
823 F. Supp. 2d 1346 (Ct. Int'l Trade 2012) ......................................................11

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ....................................................................................9

19 U.S.C. § 1673d(c)(1)(B)(i) ...................................................................................26

19 U.S.C. § 1673d(c)(1)(B)(i)(II) ..............................................................................27

19 U.S.C. § 1673d(c)(5)(A) .......................................................................................27

19 U.S.C. § 1673d(c)(5)(B) .......................................................................................28

19 U.S.C. § 1677b(a)(6)(C)(ii) ..................................................................................11

19 U.S.C. § 1677(16) .................................................................................................12

19 U.S.C. § 1677(16)(A) ......................................................................................13, 14

**REGULATIONS**

21 C.F.R. § 101.9(c)(7) ............................................................................................22, 23

**ADMINISTRATIVE DETERMINATIONS**

*Certain Pasta from Italy,*
   61 Fed. Reg. 38,544 (Dep't of Commerce Jul. 24, 1996) ............................................ 2

*Certain Pasta From Italy*,
   61 Fed. Reg. 30,326 (Dep't of Commerce June 14, 1996)...........................................12

*Certain Pasta From Italy*,
   64 Fed. Reg. 6,615 (Dep't of Commerce Feb. 10, 1999)............................................12

*Top-of-the-Stove Stainless Steel Cooking Ware from Korea*,
   66 Fed. Reg. 45,664 (Dept' of Commerce Aug. 29, 2001) ..........................................11

*Certain Pasta from Italy*,
   75 Fed. Reg. 6,352 (Dep't of Commerce Feb. 9, 2010)...............................................13

*Certain Pasta from Italy*,
   78 Fed. Reg. 9,364 (Dep't of Commerce Feb. 8, 2013)................................................. 5

*Certain Pasta from Italy*,
   82 Fed. Reg. 57,428 (Dep't of Commerce Dec. 5, 2017) .............................................. 2

*Certain Pasta from Italy*,
   83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018)............................................ 2

*Initiation of Antidumping and Countervailing Administrative Reviews,*
   84 Fed. Reg. 47,248 (Dep't of Commerce Sept. 9, 2019) ............................................ 2

*Certain Pasta from Italy*,
   85 Fed. Reg. 2,714 (Dep't of Commerce Jan. 16, 2020) .............................................. 5

*Certain Pasta From Italy,*
   86 Fed. Reg. 28,336 (Dep't of Commerce May 26, 2021).............................................. 2

**OTHER AUTHORITIES**

H.R. Rep. No. 103-316, vol. 1, at 873 (1994),
   *reprinted in U.S.C.C.A.N.* 4040 ..............................................................................27

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| LA MOLISANA, S.P.A., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| and | ) |
| | ) |
| VALDIGRANO DI FLAVIO PAGANI SRL, | )    Consol. Court No. 21-00291 |
| | ) |
| Consolidated Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT'S RESPONSE IN OPPOSITION TO
### PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States, respectfully submits this response in opposition to the motion for judgment on the agency record filed by plaintiff, La Molisana, S.P.A. (La Molisana), and consolidated plaintiff Valdigrano Di Flavio Pagani SRL, (Valdigrano) (together, plaintiffs). Plaintiffs challenge certain aspects of the Department of Commerce's (Commerce) final results in the 23rd administrative review of the antidumping duty order covering certain pasta from Italy. As demonstrated below, Commerce's final results are supported by substantial evidence and are otherwise in accordance with law; therefore, we respectfully request that the Court sustain the final results and enter judgment for the United States.

**STATEMENT PURSUANT TO RULE 56.2**

**I.    Administrative Determination Under Review**

Plaintiffs challenge certain aspects of Commerce's 23rd administrative review of the antidumping duty order covering certain pasta from Italy. *See Certain Pasta From Italy,* 86 Fed. Reg. 28,336 (Dep't of Commerce May 26, 2021) (final results) (P.R. 282), and accompanying Issues and Decision Memorandum (IDM) (P.R. 277).[1]  The period of review covered by the final results is July 1, 2018, through June 30, 2019.

**II.    Issues Presented For Review**

1.    Whether Commerce's protein content reporting instructions are reasonable, supported by substantial evidence, and in accordance with law.

2.    Whether Commerce's calculation of the rate assigned to Valdigrano is lawful.

**STATEMENT OF FACTS**

**I.    Administrative Proceedings At Issue**

In 1996, Commerce published an antidumping duty order covering certain pasta from Italy. *See Certain Pasta from Italy,* 61 Fed. Reg. 38,544 (Dep't of Commerce Jul. 24, 1996) (order).  On September 9, 2019, Commerce initiated an administrative review of the order, covering the period from July 1, 2018, through June 30, 2019.  *See Initiation of Antidumping and Countervailing Administrative Reviews,* 84 Fed. Reg. 47,248 (Dep't of Commerce Sept. 9, 2019) (P.R. 18).  Commerce selected the following mandatory respondents for examination:  Ghigi 1870 S.p.A. (Ghigi) and Pasta Zara S.p.A. (Zara) (collectively, Ghigi/Zara)[2], and La Molisana.

---

[1]  Citations to the documents on the public record (P.R.) and the confidential record (C.R.) refer to the record of the underlying administrative review.

[2]  Commerce has collapsed Ghigi and Zara since the 2015–2016 administrative review. *See Certain Pasta from Italy*, 82 Fed. Reg. 57,428 (Dep't of Commerce Dec. 5, 2017); *see also Certain Pasta from Italy*, 83 Fed. Reg. 63,627 (Dep't of Commerce Dec. 11, 2018).

*See* Respondent Selection Memo (P.R. 43, C.R. 5).  Commerce assigned Ghighi/Zara a weighted-average dumping margin of 91.76 percent (based on adverse facts available), and La Molisana a weighted-average dumping margin of 15.72 percent.  86 Fed. Reg. at 28,337.  Valdigrano participated in the administrative review as a non-examined respondent.  Commerce calculated the rate for non-examined respondents, including Valdigrano, as 15.72 percent.

### A.     Protein Coding

As part of its administrative review, Commerce issued an initial questionnaire to the mandatory respondents, including La Molisana.  *See* November 1, 2019 Initial Questionnaire (P.R. 66).  In the initial questionnaire, Commerce requested that the mandatory respondents "{i}dentify the percentage of protein in the pasta sold, as stated on the label of the respective product."  *Id.* at Sections B and C.  La Molisana reported that it had used the protein content declared on the product label, but contended that, "due to the nature of the nutrition facts panel and other incontrovertible facts, this is not necessarily an accurate representation of the Protein Content."  *See* January 3, 2020 La Molisana Section B Response at B-11 and Exhibit B-2. (P.R. 120).

La Molisana continued its arguments against Commerce's protein content reporting instructions in its administrative case brief.  *See* La Molisana Case Brief at 3-12 (P.R. 259).  Specifically, La Molisana claimed that relying on the protein content posted on the product label was flawed because the U.S. Food and Drug Administration (FDA) reporting standards requiring rounding on nutrition facts panels rendered the protein content reporting inaccurate.  *See id.*  La Molisana further complained that differing protein measurement calculation methodologies between the United States and Italy resulted in conflicting protein content percentages.  *See id.*

3

In its own administrative case brief, Valdigrano argued that, when Commerce issued its coding instructions for protein content, it had not analyzed whether the distinction between premium and standard semolina on Italian commodity exchanges was the same as in the United States. *See* Valdigrano Case Brief at 2-19 (P.R. 257). To support its argument, Valdigrano relied on the "Market Report" affixed to Ghigi/Zara's initial questionnaire response. This report, prepared by Valdigrano's own counsel and lacking indicia of reliability, cites certain evidence, based on purchases made by a shopper, claiming that premium pasta in the United States has a minimum 13 to 13.5 percent protein content, similar to the current 13.5 percent breakpoint on the Bologna commodity exchange. *See* Law Offices of David L. Simon, PLLC's Letter, *Pasta Physical Characteristics; Protein*, December 8, 2019 (Market Report) included as Exhibit B-13 of *Section B Questionnaire Response of Ghigi 1870 S.P.A and Pasta Zara S.P.A*, dated December 13, 2019 (C.R. 41- 48). Relying primarily on the Market Report's conclusion that the 12.5 percent breakpoint for "premium pasta" used by Commerce should not apply to the United States market, Valdigrano argued that Commerce must amend the instructions given to respondents for reporting the physical characteristic of protein content for this administrative review and all subsequent reviews with at least one of the three following adjustments: (1) treating pasta sold to the United States with a label protein content of 12.5 percent as standard pasta rather than premium pasta; (2) defining the code for protein content reported for United States sales as the label protein content divided by 1.096; or (3) changing the breakpoint between standard and premium pasta to 13.5 percent. *See* Valdigrano Case Brief at 2-19 (P.R. 257).

**B.   <u>Final Results</u>**

Commerce addressed the parties' concerns in its final results, disagreeing with Valdigrano's and La Molisana's assertions that the instructions for reporting the protein content

are so flawed that they require revision. *See* IDM at 6-12. Commerce divided its analysis into two segments, first addressing the overarching argument that the instructions lead to price-to-price comparisons between physically dissimilar pasta, and then the claim that the instructions do not sufficiently reflect market reality. *Id.* at 7.

Commerce began by addressing the argument regarding the different standards for calculating protein content between the United States and Italy, as well as La Molisana's concerns with the FDA rounding requirement, observing that both arguments had been raised in prior reviews and rejected, and that the protein content reporting instructions had been in place for more than a decade. *Id.* (citing *Certain Pasta from Italy*, 78 Fed. Reg. 9,364 (Dep't of Commerce Feb. 8, 2013) (final results), and accompanying IDM at cmt. 4 (15th administrative review); *Certain Pasta from Italy*, 85 Fed. Reg. 2,714 (Dep't of Commerce Jan. 16, 2020) (final results), and accompanying IDM at cmt. 1 (22nd administrative review)).

In the 15th administrative review, a respondent argued that the FDA rounding standards for nutrition labels led to distorted price comparisons, *i.e.*, that pasta with a "real" protein content below 12.5 percent was compared with pasta of 12.5 percent or greater. *See* 15th administrative review IDM at 7-8. Commerce responded, describing its disagreement with the respondent and emphasizing the reasoning for reporting using label content, stating that relying on packaging label information provided transparency and consistency. *Id.* at 9. Commerce also explained that the differences resulting from the FDA rounding standards were not commercially significant, and that no clearly defined superior method of identifying premium pasta had been set forth. *Id.*

Commerce then turned to the 22nd administrative review, during which a respondent complained that the differing nitrogen multipliers between the United States and Italy led to

comparisons between different products. *See* 22nd administrative review IDM at 9-10. But, as Commerce explained in that review, and similar to its reasoning in the 15th administrative review, there exists no better, objective method of identifying premium pasta other than the label protein content. *Id*.

Commerce found no compelling reason to depart from its longstanding methodology for reporting protein content, or from its reasoning rejecting nearly identical arguments in prior reviews. *Id*. at 10. It explained that "relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product, (*i.e.*, CONNUM), which in turn implicates the accuracy of the product comparisons." *Id*. Commerce also remarked that this Court has upheld Commerce's decisions rejecting proposed challenges to physical characteristics, even when some evidence seems to support the contention that certain products might be misclassified. *Id*. at 10-11 (citing *La Molisana S.p.A. v. United States*, No. 16-00047, 2018 WL 3089242 (Court Int'l Trade June 21, 2018), *aff'd*, 785 F. App'x 780 (Fed. Cir. 2019)). In addition, Commerce cited the decision of the United States Court of Appeals for the Federal Circuit in *Pesquera Mares Australes Ltda. v. United* States, 266 F.3d 1372 (Fed. Cir. 2001), in which the court held that Commerce could treat merchandise as identical for purposes of price-to-price comparisons "despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." *Id*. at 11 (citing *Pesquera Mares* at 1384). Commerce concluded that there was no basis for finding the discrepancy in protein measurement standards commercially significant, particularly as the market perception of premium or standard pasta relies on information readily available to consumers, such as the packaging label. *Id*.

Commerce then moved to an analysis of respondents' second broad argument disputing the reflectiveness of the 12.5 percent breakpoint between standard and premium pasta, particularly focusing on Valdigrano's reliance on the Market Report prepared by respondent's counsel. *Id.* Commerce considered Valdigrano's assertion that certain data for pasta purchased in the Washington, DC metropolitan area showed that the 13.5 percent should be the breakpoint for premium pasta rather than 12.5 percent, but determined that the information in the Market Report did not constitute sufficient evidence to change its existing coding instructions. *Id.* As Commerce explained, the Market Report data relied on pasta purchases from only four supermarkets in one concentrated geographic area, and the Market Report participants could have manipulated the data through their choice of pasta purchases.

Commerce also addressed the argument that the Bologna Grain Exchange used a 13.5 percent breakpoint to discern "superior" semolina, explaining that it had relied on the breakpoints of *three* separate Italian exchanges when establishing the 12.5 percent breakpoint, and therefore a single exchange's breakpoint did not constitute sufficient evidence of an industry-wide change compelling Commerce to change its instructions. *Id.* at 12. Accordingly, Commerce continued to rely on the nutrition facts panel on the respective product as the basis for coding the protein content of finished pasta. *Id.*

## SUMMARY OF THE ARGUMENT

Plaintiffs have failed to present compelling reasons for Commerce to depart from its longstanding, transparent, consistent, and reasonable instructions for reporting protein content. The relevant statute, Commerce's past practice, and caselaw direct Commerce to base its product-matching criteria on physical characteristics; in the case of certain pasta from Italy, the pertinent physical characteristics of finished pasta, including the protein content, are found on

the packaging label of the respective products.  The evidence and arguments placed on the record by plaintiffs do not sufficiently demonstrate that Commerce's instructions for reporting the protein content of finished pasta, in place for more than a decade, result in price-to-price comparisons between physically dissimilar pasta or fail to reflect market reality such that Commerce must alter them.  Commerce's final results are supported by the record and relevant precedent in this Court and the Federal Circuit and, accordingly, should be sustained.

Because Commerce correctly calculated La Molisana's rate, the all-others rate assigned to Validgrano should remain as-is.  If the Court were to remand, and if, upon remand, Commerce were to recalculate La Molisana's rate, Commerce intends to follow statutory requirements and its own past practice in recalculating the all-others rate.

## ARGUMENT

## I.    Standard Of Review

This Court upholds any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *Corus Staal BV v. Dep't of Commerce,* 395 F.3d 1343, 1346 (Fed. Cir. 2005) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)); *Fujitsu Gen. Ltd. v. United States,* 88 F.3d 1034, 1038 (Fed. Cir. 1996).  "Substantial evidence" is considered "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938); *Matsushita Elec. Indus. Co., v. United States,* 750 F.2d 927, 933 (Fed. Cir. 1984).  Even if two inconsistent conclusions may be drawn from record evidence, it does not mean that Commerce's findings are not supported by substantial evidence.  *Consolo v. Fed. Maritime Comm'n,* 383 U.S. 607, 620 (1966).  The Federal Circuit has acknowledged that Commerce is "the 'master' of antidumping law . . . {and that its determinations are} worthy of considerable deference."  *Daewoo Electronics Co., Ltd. v. United States,* 6 F.3d 1511, 1516

(Fed. Cir. 1993) (citations omitted); *see also Fujitsu,* 88 F.3d at 1039 ("Antidumping and countervailing duty determinations involve complex economic and accounting decisions of a technical nature, for which agencies possess far greater expertise than courts.").

In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 (1984), the Supreme Court held that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." The Court further explained that the judiciary "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." *Id.* at 844. Acknowledging the "principle of deference to administrative interpretations," the Court also stated that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Id.* The Federal Circuit has held that Commerce's model match methodology is entitled to *Chevron* deference. *See Koyo Seiko Co., Ltd. v. United States,* 66 F.3d 1204, 1209 (Fed. Cir. 1995); *see also Pesquera Mares,* 266 F.3d at 1383-84.

Further, this Court reviews Commerce's conduct of its administrative proceedings under the abuse of discretion standard. *See, e.g., Dongtai Peak Honey Indus. Co. v. United States,* 777 F.3d 1343, 1350 (Fed. Cir. 2015); *Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States,* 28 F. Supp. 3d 1317, 1323 (Ct. Int'l Trade 2014). This Court "(1) must consider whether {Commerce's} decision was based on a consideration of relevant factors and whether there has been a clear error of judgment, and (2) analyze whether a rational connection exists between {Commerce's} fact-findings and its ultimate action." *Consol. Fibers, Inc. v. United States,* 535 F. Supp. 2d 1345, 1352-54 (Ct. Int'l Trade 2008) (citation omitted).

II.     **Plaintiffs Do Not Establish Compelling Reasons For Commerce To Depart From Its Longstanding Protein Content Reporting Instruction Methodology**

A.     **Relevant Framework For Commerce's Model Match Methodology**

To establish a dumping margin, whether in an initial investigation or a subsequent administrative review, Commerce must first identify the "foreign like product" that will form the basis for comparison to merchandise exported to the United States. 19 U.S.C. § 1677(16); *see also Pesquera Mares*, 266 F.3d at 1375. Because Congress has not mandated the precise methodology by which Commerce must identify the "foreign like product," it has implicitly delegated that authority to Commerce. *Id.* at 1384; *Koyo Seiko*, 66 F.3d at 1209. Commerce has "considerable discretion" to define the "foreign like product" in an antidumping proceeding. *SKF USA Inc. v. United States*, 537 F.3d 1373, 1379 (Fed. Cir. 2008). Thus, Commerce's choice of matching methodology should be upheld if it constitutes a permissible construction of that statute. *Koyo*, 66 F.3d at 1209-10.

In *New World Pasta Company v. United States*, 316 F. Supp. 2d 1338, 1352 (Ct. Int'l Trade 2004), the Court explained that, in defining a "foreign like product" for purposes of 19 U.S.C. § 1677(16)(A), "Commerce is constrained both by statute and by its own past practice." As a result, the Court found that Commerce must base product-matching criteria on "physical characteristics," and recognized that Commerce's practice is to consider only "meaningful" or "significant" physical differences. *Id.* (quoting 19 U.S.C. § 1677(16)(A)). In determining what is "meaningful" or "significant," the Court acknowledged that Commerce looks at both "price differences in the marketplace and cost differences which may reflect different production processes." *Id.* at 1353-54 (citation omitted). Moreover, "{i}dentical" products do not have to be exactly the same. Rather, "merchandise should be considered to be identical despite the existence of minor differences in physical characteristics, if those minor differences are not

10

commercially significant." *Pesquera Mares,* 266 F.3d at 1384.  Commerce determines what constitutes "commercially significant" physical differences on a case-by-case basis. *See Fagersta Stainless AB v. United States,* 577 F. Supp. 2d 1270, 1279 (Ct. of Int'l Trade 2008).

Model match methodologies are based on a hierarchy of commercially significant product characteristics for the relevant product that Commerce uses to create control numbers (CONNUMS), which identify unique products for comparison. *JFB Rak LLC v. United States,* 961 F. Supp. 2d 1274, 1283-84 (Ct. Int'l Trade 2014); *Union Steel v. United States,* 823 F. Supp. 2d 1346, 1349 (Ct. Int'l Trade 2012).  Commerce's model matching methodologies are based on the physical characteristics of products. *See* 19 U.S.C. § 1677(16)(A).  This Court has stated that "differences in costs do not constitute differences in products in and of themselves." *Maverick Tube Corp. v. United States,* 107 F. Supp. 3d 1318, 1330 (Ct. Int'l Trade 2015).  When the products being sold in the United States and home market are not identical, Commerce makes a difference in merchandise (DIFMER) adjustment to account for cost variations arising from physical differences between the products. *See Fagersta,* 577 F. Supp. 2d at 1281 (citing 19 USC § 1677b(a)(6)(C)(ii)).  A DIFMER calculation of greater than twenty percent creates a "presumption of noncomparability," but does not absolutely preclude Commerce from comparing those products. *Id.* (citation omitted).

Once Commerce has established a model match methodology, it uses consistent and uniform model-matching criteria for respondents in antidumping proceedings. *See Top-of-the-Stove Stainless Steel Cooking Ware from Korea,* 66 Fed. Reg. 45,664 (Dept' of Commerce Aug. 29, 2001) (final results and rescission in part), and accompanying IDM.  Additionally, Commerce has a longstanding practice not to modify that methodology in subsequent proceedings unless there are "compelling reasons" to do so. *Fagersta,* 577 F. Supp. 2d at 1275.

"Commerce will find that "compelling reasons" exist if a party proves by 'compelling and convincing evidence' that the existing model-matching criteria 'are not reflective of the merchandise in question,' that there have been changes in the relevant industry, or that 'there is some other compelling reason present which requires a change.'" *Id.* at 1277 (citation omitted).

**B.    Commerce's Model Match Methodology For Pasta From Italy**

Commerce established the model match methodology for pasta from Italy during the investigation and has refined it in its subsequent reviews. Commerce developed the methodology in consultation with both domestic petitioners and Italian pasta respondents. *See Prodotti Alimentari Meridioli, S.r.L., v. United States,* 27 C.I.T. 547, 548 (2003) (addressing the longstanding history of the methodology).

On June 14, 1996, Commerce issued its final investigation determination. *See Certain Pasta From Italy,* 61 Fed. Reg. 30,326 (Dep't of Commerce June 14, 1996) (final determination). As part of the investigation, Commerce established a model match methodology to ensure that comparisons are made for contemporaneous sales of products that are either identical or most similar with respect to several model match characteristics such as pasta shape, wheat type, additives and enrichment. *See id.* This methodology has served as a consistent and uniform basis for model matching in all subsequent administrative reviews of the order, stretching decades.[3] *See, e.g., Certain Pasta From Italy,* 64 Fed. Reg. 6,615 (Dep't of Commerce Feb. 10, 1999) (final results), and accompanying IDM. The current standards for the relevant characteristics (*i.e.,* shape of product, wheat species, milling form, protein content, additives and

---

[3] Commerce has, as described below, revised certain aspects of the methodology when there has been compelling reason to do so.

enrichment) are set forth in Appendix III of Commerce's initial questionnaire, which, again, Commerce has consistently used in prior administrative reviews. *See* Initial Questionnaire at Appendix III (P.R. 66).

In the 12th administrative review of the same product, Commerce modified the pasta CONNUM, stemming from its determination that its treatment of separate wheat codes in model match decisions in previous determinations had lacked consistency. *See Certain Pasta from Italy*, 75 Fed. Reg. 6,352 (Dep't of Commerce Feb. 9, 2010) (final results), and accompanying 2007-2008 IDM at cmt. 1 (12th administrative review). In making this modification, Commerce outlined previous challenges in defining "superior" semolina and incorporating that criterion as a physical characteristic. A particular concern was that in prior reviews, model match decisions were based on company-specific information, leading to inconsistencies in the definition of the physical characteristics of the in-scope merchandise for different respondents. Commerce sought to reduce the subjectivity and potential for variation from respondent to respondent and review to review. *See id.* In seeking to develop objective criteria that would apply in each subsequent review of the order, Commerce replaced the wheat code field with three fields: wheat species, form, and, of particular relevance in this case, protein content.

With respect to the protein content field PROTEINH, the threshold corresponds to the minimum protein content of 12.5 percent established by the Italian Commodity Exchanges, which includes the Milan Grain Exchange, the Bologna Grain Exchange, and the Bologna Commodities Exchange. *See* Domestic Producers' Letter, December 20, 2019 at Exh. 2 (affixing *Preliminary Model Match Clarification on Pasta Wheat Code Classifications* (Dep't of Commerce July 31, 2009) (Wheat Code Memo) (P.R. 108). This 12.5 percent threshold serves as a dividing line for pasta containing premium semolina and pasta containing standard semolina.

13

*Id.* Accordingly, when reporting protein content for United States and home market pasta sales, respondents are required to code a "1" for finished pasta that has a protein content of 12.5 percent or higher (premium pasta), and a "2" for finished pasta that has a protein content of 10.00-12.49 percent (standard pasta). See, *e.g.*, Initial Questionnaire at B-8 (P.R. 66).

### C.   Commerce Relies On The Packaging Label As An Objective Method To Achieve A Product Comparison On A Consistent and Transparent Basis, And The Differing Nitrogen Content Multiplier Does Not Detract From Commerce's Reliance

Plaintiffs argue that Commerce must adjust the instructions for reporting the protein content because the United States and Italy use different standards for calculating protein content in pasta[4] and, thus, pasta labeled as 12.5 percent protein content in the United States would have a lower actual protein content than pasta labeled as 12.5 percent in Italy.[5] *See* Pls. Br. at 33. But, as Commerce explained in its final results, its protein measurement methodology provides a consistent and transparent approach for measuring protein content, and Commerce has used it for years. Plaintiffs' reheated complaints do not serve as sufficient cause for this Court to overturn Commerce's longstanding, reasonable, and objective methodology.

As Commerce already explained in the 12th administrative review of the same product, basing protein content reporting off the packaging label of the pasta product, and using 12.5 percent protein content as a dividing line for premium pasta and standard pasta, provides an objective method to achieve a product comparison on a "consistent and transparent" basis. *See* 12th administrative review IDM at cmt. 1. As Commerce elaborated:

---

[4] In the United States, the nitrogen content of the pasta is multiplied by 6.2510, while in Italy, the nitrogen content is multiplied by 5.711. IDM at 7.

[5] Plaintiffs also lodge the related assertion that different scales are used in Italy and the United States to calculate the number of grams of protein in pasta. *See* Pls. Br. at 42.

> Our decision to use a minimum protein content of 12.5 percent for premium finished pasta is based on four factors. The first one is that, as stated above, we believe some brands of pasta are produced, marketed, and sold as premium products, distinct from standard products. These premium pasta brands have distinct physical characteristics that are commercially significant. The second factor is that there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages. The third factor is that there is a clear relationship between the physical characteristics of the semolina used to produce the finished pasta and the finished pasta itself. The forth {sic} factor is that 12.5 percent minimum content is an industry standard developed in the Italian market place of pasta manufacturers and semolina sellers. Given these factors, we believe our approach is reasonable and will contribute to the accuracy of the dumping analysis.

*Id.*

In the 15th administrative review, Commerce, in the face of a respondent's complaints, further described its reasoning for relying upon the information listed on the packaging label for finished pasta:

> {T}he protein content of the finished pasta listed on the package is central to our analysis. As petitioner noted above, all of the physical characteristics that are basis for our model match criteria are printed on the labels of the finished pasta packages. Buyers and sellers examine this information, as listed on the packaging, in determining which products to purchase and/or sell and the appropriate price. In addition, because pasta is sold through retail chain to individual customers, there are often many different intermediaries involved in the distribution and sale of finished pasta; each of which need to know the relevant information.
>
> Furthermore, our reliance upon the information listed on the packaging of the finished product (*i.e.*, the same information that is available to a consumer in the United States) conforms to our statutory obligation to base our price-to-price comparison on a transparent and consistent basis. Thus, relying on the information reported on the packages of finished pasta is appropriate.

IDM at 9 (citing 15th administrative review IDM at cmt. 4).

Commerce then faced a nearly identical complaint from respondents Ghigi/Zara during the 22nd administrative review, with Ghigi/Zara also complaining about the difference in the nitrogen content multiplier. IDM at 9-10 (citing 22nd administrative review IDM at cmt. 1). Although Commerce primarily rejected Ghigi/Zara's arguments on other grounds, it nonetheless addressed the issue, stating:

> As we noted in the Pasta 2007-2008 Review, the market reality is that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages." Thus, Commerce's reliance on the packaging label is an objective method to achieve a product comparison on a "consistent and transparent" basis because all of the physical characteristics are listed on the product label. Indeed, Ghigi/Zara market and price their sales to U.S. customers based on the specification of the product denoted on the label. Thus, we find unconvincing Ghigi/Zara's argument that we should base the PROTEINU coding upon the internal information in its {bills of materials} or on a different measurement protocol for protein content.

*Id.*

Commerce has more than sufficiently explained, in this review and the course of previous reviews, its continuing reliance on the 12.5 percent dividing line and the requirement to report based on the packaging label of the finished pasta product. Commerce's reliance upon the information listed on the packaging label of the finished pasta product conforms to its statutory obligation to base its price-to-price comparison on a transparent and consistent basis. *Id.* Given the market reality that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," the protein content as listed on the packaging label for finished pasta provides an objective method to achieve a product comparison because all of the physical characteristics are listed on the product label. *See* 22nd administrative review IDM at cmt. 1.

Despite Commerce's years-long reliance on the packaging label to achieve a product comparison on a consistent and transparent basis, plaintiffs argue that its current classification results in inaccurate comparisons between the goods, and that the goals of "transparency and consistency" cannot override the goal of accuracy when determining protein content of finished pasta. *See* Pls. Br. at 38. However, this Court has emphasized the importance of transparency and consistency in Commerce's model match methodology, while affirming aspects of that methodology. *See La Molisana*, 2018 WL 3089242. In *La Molisana*, this Court upheld Commerce's refusal to reclassify certain shape codes, even though record evidence appeared to demonstrate that some shapes were being "misclassified" pursuant to the current methodology. The Court stated that:

> insistence that certain shapes remain within the respective categories associated with slower "specialty" line speeds when record evidence supports actual production of those shapes at higher "standard" cut line speeds might seem to imply that the determination is unsupported by substantial evidence of record. ***Nonetheless, as indicated, La Molisana's argument is contrary to Commerce's stated policy, and the court must defer to Commerce's concerns regarding the potential for manipulation***.

*La Molisana*, 2018 WL 3089242, at *4-5 (emphasis added).

Although the plaintiff in *La Molisana* challenged the shape classification rather than protein content, the reasoning is similar, and the outcome should be the same: the Court should reject plaintiffs' attempt to overturn an established reporting requirement on the grounds that the requirement is inconsistent with the actual physical characteristics of subject merchandise, particularly when plaintiffs cannot provide another realistic method achieving the important goals of objectivity, transparency, and consistency, and when plaintiffs cannot establish that Commerce should not be allowed to treat the merchandise as identical. *See Pesquera Mares*, 266 F.3d at 1372, 1379, 1383-84.

17

In this case, Commerce examined the record and its past proceedings, finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," IDM at 10-11, and therefore no basis to find the discrepancy in protein measurement standards between the United States and Italian markets commercially significant. Indeed, as Commerce observed, "market perception of premium pasta or non-premium pasta relies on information readily available to consumers, namely the packaging label associated with the pasta in the marketplace." *See* IDM at 11. As such, Commerce properly found that relying on values other than those shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product, which in turn implicates the accuracy of the product comparisons (*i.e.,* the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium). *Id.* at 10-11. Accordingly, the Court should not heed plaintiffs' arguments that the nitrogen content multiplier discrepancy between the United States and Italian markets renders Commerce's model match methodology with regard to protein content unlawful or inadequate.

### D. Commerce Reasonably Determined That Differences In Protein Content Caused By FDA Rounding Standards Are Not Commercially Significant

Plaintiffs allege that the FDA's requirement to report grams of protein per pasta serving rounded to the nearest gram leads to situations when pasta, as measured by United States standards, can have less than 12.5 percent protein content despite being reported on the label as having 12.5 percent protein content. Pls. Br. at 46. But, as Commerce explained in the final results, such arguments were already made and rejected a decade ago, and the differences resulting from the rounding are not commercially significant. Plaintiffs have established no

compelling reason for this Court to require Commerce to depart from its longstanding practice of relying on labels for protein content due to the FDA rounding requirements.

By way of background, in accordance with 21 C.F.R. § 101.9(c)(7), all food manufacturers are required by the FDA to label packages for protein content by rounding to the nearest gram. Specifically, the regulation requires that food manufacturers include on the packaging label "{a} statement of the number of grams of protein in a serving, expressed to the nearest gram, except that if a serving contains less than 1 gram, the statement "Contains less than 1 gram" or "less than 1 gram" may be used as an alternative, and if the serving contains less than 0.5 gram, the content may be expressed as zero." 21 C.F.R. § 101.9(c)(7).

Plaintiffs contend that this requirement renders Commerce's reliance on protein content indicated on packaging labels as the basis for coding the physical characteristic of protein so flawed that Commerce much alter its methodology. They contend that the FDA requirement means that pasta with an actual protein content between 11.6 and 12.48 percent is described on the package label as having a 12.5 percent protein content and would thus be coded as premium pasta. *See* Pls. Br. at 48. They further argue that, under Commerce's current reporting instructions, it is impossible for pasta with a protein percentage of greater than 11.6 percent to be classified as standard pasta. *Id.* at 49. These arguments are misplaced and do not compel a change in Commerce's instructions because plaintiffs have not demonstrated that the differences caused by the FDA rounding standards are commercially significant such that they constitute a sufficient basis to alter Commerce's longstanding protein content coding methodology.[6]

---

[6] In addition to plaintiffs failing to establish that the rounding standards cause commercially significant differences, they have not even demonstrated that the scenario they posit, that pasta with an actual protein content as low as 11.6 percent is labeled and coded as 12.5

As stated above, Commerce has already addressed a nearly identical argument raised by a respondent in the 15th administrative review of pasta. In that review, Commerce did not dispute that rounding standards differed between the United States and Italy insofar as companies in Italy print the actual percentage of protein in the finished pasta on the package, and in the United States, companies are required by the FDA to print the grams of protein per standard serving size. IDM at 9 (citing 15th administrative review IDM at cmt. 4). However, Commerce determined that such rounding "does not undermine {the} core priority of relying on the data specifically printed on the package, upon which the ultimate customers rely." 15th administrative review IDM at cmt. 4. Commerce further explained that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages, and, thus, the customer of premium pasta is likely to rely on the protein content reported on the packages of the finished pasta" *Id*. (cleaned up). Finally, Commerce explained in the 15th administrative review that the information provided by the respondent indicated that "in certain instances the protein content of the semolina (input) determined by Rummo is slightly higher than that on the label of Rummo's finished pasta (*i.e.*, rounded down), while in the other instances it is slightly lower (*i.e.*, rounded up). These slight differences are not readily apparent to customers of the finished product and, therefore, are not commercially significant." *Id*.

Furthermore, *Pesquera Mares* supports Commerce's determination that the differences caused by the FDA rounding standards are not commercially significant such that they would be the basis to alter the coding for the physical characteristic of protein content. CONNUMs

---

percent, actually *exists* (*i.e.*, that an affected pasta maker produces a pasta with 11.6 percent protein content yet is forced to label its pasta as having 12.5 percent).

are used for characteristics relevant to market value and, as the Federal Circuit held in *Pesquera Mares*, Commerce may treat merchandise as identical when making price-to-price comparisons based on products sold in the United States and comparison markets that are not physically identical if the differences between the products are not commercially significant. *See Pesquera Mares*, 266 F.3d at 1384.

Pasta is a consumer product and its value is conveyed by the label, not the molecular composition. As such, Commerce reasonably concluded that there was insufficient basis for finding the discrepancy in protein measurement standards between the United States and Italian markets commercially significant when the market perception of premium pasta or non-premium pasta relies on information readily available to consumers, namely the packaging label associated with the pasta in the marketplace. IDM at 11-12*; see also* Wheat Code Memo (P.R. 108) at 7 ("...the differences in physical qualities, labeling, pricing and merchandising practices between superior and standard pasta appear to be perceived by consumers.").

**E.    Plaintiffs Fail To Provide Compelling Evidence That Commerce's Instructions For Reporting Content Do No Reflect Market Reality, And Their Heavy Reliance On The Market Report Is Unavailing**

Plaintiffs contest the 12.5 percent breakpoint between standard and premium pasta that Commerce employs, for model match purposes, in its protein content coding instructions. Pls. Br. at 20. In doing so, they rely almost entirely on the Market Report, a document prepared by Valdigrano's counsel, to support the contention that the minimum protein content for premium pasta should be 13.5 percent. Plaintiffs argue that the Market Report establishes that 12.5 percent protein content constitutes standard pasta in both the United States and Italy, while the minimum protein required for premium pasta is 13.5 percent. Pls. Br. at 32. However, as Commerce properly determined, the self-serving Market Report does not constitute sufficient

evidence supporting plaintiffs' arguments, and does not offer a compelling reason to modify Commerce's protein coding methodology.

As explained in its Wheat Code Memorandum, Commerce relies on 12.5 percent protein content as a dividing line for premium pasta and standard pasta because it reflects the breakpoint established by three separate Italian commodity exchanges and provides an objective method to achieve a product comparison on a "consistent and transparent basis." IDM at 10; *see also* Wheat Code Memorandum (P.R. 108) at 6. Plaintiffs, however, contend that 12.5 percent protein content is, in fact, a floor for pasta sold in the United States market, and that the true breakpoint between standard and premium pasta is 13.5 percent protein content. Pls. Br. 20-32. In doing so, they cite data from the United States section of the Market Report, which consists of labels and receipts for certain pasta purchased from four supermarkets in the Washington, DC metro area, along with charts illustrating the relationship between protein content and price. *See* Market Report at 4-5 and Exhibits M through Q. Based on this data, plaintiffs assert that "the Market Report shows that, in the four DC-area supermarkets, pasta with a protein content of 12.5% is standard pasta and indeed, 12.5% is the minimum protein content for retail pasta." Pls. Br. at 26.

Plaintiffs also cite a screenshot contained in the Market Report that purports to show that the Bologna Grain Exchange's website defines "superior" semolina as having 13.5 percent or greater protein content, and accordingly, the industry standard for defining premium and standard semolina has changed to a 13.5 percent breakpoint for premium pasta. Pls. Br. at 14, 33. This, plaintiffs posit, constitutes "compelling reason" for Commerce to change the breakpoint for reporting protein content. *Id*.

Contrary to plaintiffs' assertions, neither the Washington, DC supermarket data nor the Bologna Grain Exchange data provides a compelling reason for Commerce to alter its protein content coding methodology. As explained above, and as sanctioned by the Court, once Commerce has established its model match methodology, it need change that methodology only if there are "compelling reasons" to do so. *See Fagersta*, 577 F. Supp. 2d at 1276-77. "Commerce will find that 'compelling reasons' exist if a party proves by 'compelling and convincing evidence' that the existing model-match criteria 'are not reflective of the merchandise in question,' that there have been changes in the relevant industry, or that 'there is some other compelling reason present which requires a change.'" *Id.*; *see also Ghigi 1870 S.p.A. et al. v. United States*, 547 F. Supp. 3d 1332, 1334 (Ct. Int'l Trade 2021). As this Court in *Ghigi 1870* stated:

> {c}hanges to Commerce's model-match method are not undertaken lightly. This Court and the Federal Circuit "have looked for 'compelling reasons' when Commerce modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." *Manchester Tank & Equip. Co. v. United States*, 44 CIT __, __, 483 F. Supp. 3d 1309, 1315 (2020).… "'Compelling reasons' require the agency to provide 'compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason' requiring the change." *Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (quoting *Fagersta*, 32 CIT at 894, 577 F. Supp. 2d at 1277). So too must respondents provide a compelling reason to change the model-match criteria by presenting their proposed modifications first to Commerce during the administrative process, and only if they fail to convince Commerce, by bringing their arguments to this Court.

*Id.*

For numerous reasons, plaintiffs fail to present the requisite compelling evidence necessary to displace Commerce's current protein content methodology. First, the Market Report does not provide any affirmative indication that such data is representative of the entire United States market for pasta products. Indeed, the data reflected in the table accounts for only four supermarkets located in the Washington, DC area. *See* Market Report at 4-5 and Exhibits M through Q. Plaintiffs contend that "Commerce's supposition that the Market Report may not be representative of the U.S. market as a whole is unsupported by any evidence whatsoever." Pls. Br. at 29. This argument is misplaced. As previously explained, this Court has recognized that a compelling reason to modify the existing model-match methodology includes "the existence of a 'specific standard . . . that is not captured in the model-matching criteria but which is industry-wide, commercially accepted and recognizes material physical characteristics of various types for the particular product at issue.'" *Fagersta*, 577 F. Supp. 2d at 1277. Accordingly, a market report purporting to show protein differences in four retail outlets in one limited geographic area is not sufficient to demonstrate that there is an "industry-wide" standard or characteristic that is not reflected by the current matching criteria.

Plaintiffs further argue that Commerce could not properly find that the purchases in the Market Report do not reflect the entire United States because the petitioners never submitted comments disputing this allegation during the underlying administrative proceeding. *See* Pls. Br. at 29. But it was not incumbent upon the petitioners to provide any rebuttal factual information proving that the Market Report is *not* representative of the United States market as a whole, and Commerce is not required to take plaintiffs' conclusions as undisputed fact.[7] Rather, it is

---

[7] Moreover, although petitioners did not specifically dispute this during the underlying proceeding, they did question the validity of the Market Report as a whole, observing that it was

incumbent upon plaintiffs to affirmatively provide substantial evidence demonstrating that the Market Report data of the pasta purchases from the four grocery stores in the Washington, DC area are representative of the United States market as a whole, as well as to provide other indicia of reliability, especially given that the relied-upon purchases constituted an entirely self-selected sample by a party to the proceeding. Commerce evaluated the Market Report and reasonably found that it was not sufficiently reliable and representative of the United States market for pasta. *See* IDM at 11-12.

Commerce also found that plaintiffs made no attempt during the administrative proceeding to address the potential for manipulation in the Market Report by the choice of pasta purchases made in collecting the data for the report. *Id*. Although plaintiffs contend that Commerce's concern of manipulation in the selection of pasta purchased for the report is unfounded, *see* Pls. Br. at 13, the record fails to demonstrate that no selective purchasing occurred or that the data are, in fact, reliable. Again, it was incumbent on the parties to the proceeding to proffer indicia of reliability if they desired a change to Commerce's methodology.

With respect to the screenshot in the Market Report of the Bologna Grain Exchange's website defining "superior" semolina as having 13.5 percent or greater protein content, Commerce reasonably found that this evidence of a single exchange's breakpoint was not a "compelling reason" to change the breakpoint for reporting protein content. As previously described, Commerce relied on the breakpoints of three separate Italian commodity exchanges. *See* Wheat Code Memo P.R. 108 at 6. Those three exchanges demonstrated "that the industry standard for superior semolina is that its protein content must exceed 12.5 percent." *Id*. at 6-7.

---

prepared by Valdigrano's own counsel, and that the statements in the document were self-serving. *See* Petitioners' Rebuttal Comments at 11 (P.R. 493).

The screenshot from the Bologna Grain Exchange is but evidence regarding a single exchange. The plain meaning of "industry-wide" connotes an entire industry or, at the very least, predominance or prevalence within an industry. IDM at 12. Nothing in the Market Report indicates that the Bologna Grain Exchange is an industry-wide exchange or that it is the predominant exchange in Italy. And plaintiffs did not provide evidence demonstrating that other exchanges had also altered their breakpoints upward. Accordingly, Commerce properly determined that the Bologna Grain Exchange screenshot did not constitute sufficient evidence of an industry-wide change in protein measurement standards to provide a compelling reason to change the instructions for reporting protein content.

## II.    The Rate Applied To Valdigrano Was Lawful

Plaintiffs assert that, if this matter is remanded to Commerce, and a new rate is calculated for La Molisana, such rate should also be assigned to Valdigrano. *See* Pls. Br. at 50. According to plaintiffs, "{t}he inclusion of the rate for the other mandatory respondent in the calculation of the rate for Valdigrano would not be appropriate as it was calculated solely on the basis of adverse facts." *Id*. As an initial matter, Commerce correctly calculated La Molisana's rate; accordingly, no change to Validrano's rate is justified. In addition, although Commerce sometimes excludes AFA-based rates in calculating an all-others rate, plaintiffs' argument runs contrary to Commerce's practice of assigning rates to non-mandatory respondents in certain scenarios. *See* 19 U.S.C. § 1673d(c)(1)(B)(i).

Section 1673d(c) provides for two types of rates that Commerce assigns in market economy investigations: individual and all-others. 19 U.S.C. § 1673d(c)(1)(B)(i). Companies selected for individual investigation receive an individual rate. *Id*. In market economy investigations, the all-others rate, as distinguished from an individual rate, is applied to "all

exporters and producers not individually investigated." 19 U.S.C. § 1673d(c)(1)(B)(i)(II). Section 1673d(c)(5) provides for both a general rule and an exception for calculating the all-others rate. The general rule is applied when at least one mandatory respondent receives a rate that is not zero, *de minimis*, or based on AFA. *See* 19 U.S.C. § 1673d(c)(5)(A). Pursuant to the general rule, Commerce averages the rates assigned to all individually investigated respondents, omitting any zero, *de minimis*, and AFA rates. *Id*.

Commerce applies the exception to the general rule when all mandatory respondents receive rates that are either zero, *de minimis*, or based on AFA. 19 U.S.C. § 1673d(c)(5)(B). When Commerce calculates the all-others rate pursuant to the exception, Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated, including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B). Unlike the general rule, the exception does not provide that Commerce must disregard any zero, *de minimis*, or AFA rates. *Id*. The Statement of Administrative Action then specifies that "expected method" is to "weight average the zero and *de minimis* margins and margins determined pursuant to the facts available, provided that volume data is available." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, vol. 1, at 873 (1994), *reprinted in U.S.C.C.A.N.* 4040, 4201.

In the underlying review, Commerce assigned Ghigi/Zara a weighted-average dumping margin of 91.76 percent, based on AFA. *See* 86 Fed. Reg. at 28,337. Commerce separately assigned La Molisana a weighted-average dumping margin of 15.72 percent. *Id*. Commerce then followed the general rule and assigned Valdigrano, a non-examined respondent, the same

rate assigned to La Molisana (15.72 percent) because that rate was the only calculated rate that was not zero, *de minimis* or based on the application of total adverse facts available.  *See id.*

However, if this Court were to remand this determination back to Commerce, and Commerce finds that La Molisana's rate is *de minimis*, the exception under 19 U.S.C. § 1673d(c)(5)(B) might apply, and if so, Commerce would average any such *de minimis* rate of La Molisana with the AFA rate of Ghigi/Zara, because these will be the only rates calculated for the mandatory respondents.  Accordingly, Valdigrano might receive the simple average of La Molisana's *de minimis* rate and Ghigi/Zara's AFA rate of 91.76 percent, rather than the equivalent of La Molisana's calculated rate.

## **CONCLUSION**

For these reasons, we respectfully request that the Court deny plaintiffs' motion for judgment upon the agency record and enter judgment in favor of the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, Jr.
Assistant Director

OF COUNSEL:

KIRRIN HOUGH
Office of the Chief Counsel for
Trade Enforcement & Compliance
Department of Commerce

/s/ Sosun Bae
SOSUN BAE
Senior Trial Counsel
U.S. Department of Justice, Civil Division
PO Box 480
Ben Franklin Station
Washington, D.C. 20044
Tell: (202) 305-7568

Fax: (202) 307-0972
Email:  sosun.bae@usdoj.gov

March 28, 2022                                    *Attorneys for Defendant*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court, that this brief contains 8,151 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).

<u>s/Sosun Bae</u>
Sosun Bae

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of March 2022, I electronically filed a copy of the foregoing using the CM/ECF system, which sent a notification of such filing to counsel of record.

<u>/s/ Sosun Bae</u>
Sosun Bae