# UNITED STATES COURT OF INTERNATIONAL TRADE

Before: Richard K. Eaton, Senior Judge

LA MOLISANA S.P.A.,

      Plaintiff,

      and

VALDIGRANO DI FLAVIO PAGANI SRL,

      Consolidated Plaintiff,

      v.

UNITED STATES,

      Defendant.

Consol. Ct. No. 21-00291

## REPLY OF CONSOLIDATED PLAINTIFFS
## LA MOLISANA S.P.A. AND VALDIGRANO DI FLAVIO PAGANI SRL
## TO RESPONSE OF DEFENDANT UNITED STATES

David J. Craven, Esq.
CRAVEN TRADE LAW LLC
3744 N Ashland Avenue
Chicago, Illinois 60613
Tel. 773-709-8506
David.craven@tradelaw.com
      Counsel for Plaintiffs

Dated: May 9, 2022

# Table of Contents

Table of Contents ................................................................................. i

Table of Authorities ............................................................................ ii

  I.   Introduction and Summary of Argument ...................................... 1

      a.  Introduction ...................................................................... 1

      b.  Summary of Argument...................................................... 1

  II.   Argument ...................................................................................... 2

      a.  There Are Compelling Reasons to Depart from the Department's Protein Content Reporting Requirement ....................... 2

          i.  Plaintiffs Are Not Challenging the Model Match Framework ........................................................................ 3

         ii.  Commerce's Model Methodology Supports an Accurate Protein Calculation ........................................................... 3

        iii.  Commerce Cannot Ignore the Difference in Scales ................. 4

        iv.  The Differences in Protein Reporting Resulting from Mandatory FDA Rounding is Commercially Significant and Must be Considered .......................................................... 10

         v.  The Market Report Provides Strong Support for a Protein Content Of 13.5% .................................................... 13

      b.  The Department Must Adjust the Rate for Valdigrano and Cannot Include on Amount Calculated Based on Adverse Facts in the Calculation.................................................................. 14

  III.   Conclusion .................................................................................... 16

      Certificate of Compliance .................................................................. iii

# Table of Authorities

Court Cases:

*ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82 (Fed. Cir. 2012)..................................................................................12

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ..................11

*Changzhou Wujin Fine Chemical Factory Co., Ltd v. United States*, 701 F.3d 1367  (Fed. Cir. 2012) ..........................................................16

*China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771 F. Supp. 407 (Ct. Int'l Trade 1991)...............13

*Fagersta Stainless AB v. United States*, 577 F. Supp. 2d 1270 (Ct. Int'l Trade 2008)......................................................................................7

*Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183 (Ct. Int'l Trade 2009) ..................................................................................11

 *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333 (Fed. Cir. 2016) .............12

*Parkdale Int'l v. United States*, 475 F.3d 1375 (Fed. Cir. 2007) ...........................15

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)............12, 15

*Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57 (Ct. Intl Trade 1993) ...........................................................................12

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376 (Fed. Cir. 2001).........................................................12

*Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077 (Fed. Cir. 2001)...............................................................................8

 *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013).............................................................................12

Statutes and Rules:

19 U.S.C. §1677(16)(B)............................................................................7

21 CFR 101.9(7) .....................................................................................9

Rule 56.2 of the Rules of the United States Court of International Trade ...................................................................................................1

**REPLY OF CONSOLIDATED PLAINTIFFS
LA MOLISANA S.P.A. AND VALDIGRANO DI FLAVIO PAGANI SRL
TO RESPONSE OF DEFENDANT UNITED STATES**

This reply of plaintiffs La Molisana S.p.A. ("La Molisana") and Valdigrano di Flavio Pagani Srl ("Valdigrano") is submitted to the March 28, 2022 response of the Defendant United States to Plaintiffs' Motion for Judgment pursuant to Rule 56.2 of the Rules of the United States Court of International Trade.

## I.   *INTRODUCTION AND SUMMARY OF ARGUMENT*

### a.  *Introduction*

The defendant's response agrees with the plaintiff's motion for judgment on many key points and does not dispute other key points presented by plaintiffs. Ultimately this challenge turns on a limited number of points – and an evaluation of these key points supports plaintiffs' challenge.   Plaintiff submits that its memorandum in support of its 56.2 motion ("56.2 Memo") was detailed and complete, and plaintiff submits that the arguments presented therein were not rebutted in the response.   This reply is in further support, and adopts in full, the arguments presented in its 56.2 motion and supporting memorandum.

### b.  *Summary of Argument*

- Defendant's arguments with respect to the protein field are unavailing. The arguments presented by defendant ignore the primary arguments presented by plaintiffs and seek to interpose form over substance.

- Plaintiffs are not challenging the model match framework.  Plaintiffs do not seek to change the methodology, but rather simply ensure that the words are given meaning.

- Commerce's model methodology at least partially supports an accurate protein calculation as long as the scale is adjusted to ensure that the comparison is on a metaphorical "Apples-to-Apples" basis.

- The differences in protein reporting caused by mandatory FDA rounding is commercially significant.  As detailed in the 56.2 motion for judgment and the memorandum in support, the FDA mandatory rounding rules result in dissimilar treatment for identical product in different markets.

- The market report provides strong support for a protein content of 13.5%. The market report, while conducted in a single location, applies across the board and represents the only substantial evidence on the issue.

- If the Department adjusts the rate for La Molisana, it should also adjust the rate for Valdigrano.   The Department should not pre-judge the rate for Valdigrano, and to the extent that La Molisana were to obtain a de minimis rate, such rate should not include an AFA component.


## II.   ARGUMENT

### a.   There are Compelling Reasons to Depart from the Department's Protein Content Reporting Requirement

At pages 10 to 26 of its response ("Defendant's Response in Opposition to Plaintiffs' Motion for Judgment on the Agency Record" of March 28, 2022, hereafter "Response") defendant argues that there are no compelling reasons for Commerce to depart from its longstanding protein content reporting instructions. The defendant's response is based on five points.  Each of these points, as set forth herein, can be readily dismissed.

*i.   Plaintiffs are not Challenging the Model Match Framework*

The first point in opposition presented by defendant is contained at pages 10-12 of its response is merely a discussion of the concept of model match.  Plaintiffs do not disagree with the general points presented by defendant and agrees that model matches must focus on "meaningful" or "significant" differences and once established, the model match methodology should not be modified absent compelling reasons.  Plaintiffs also agree with defendant that:

> Commerce will find that "compelling reasons" exist if a party proves by "compelling and convincing evidence" that the existing model-matching criteria are 'not reflective of the merchandise in question,' that there have been changes in the relevant industry, or that "there is some other compelling reason present which requires a change".
> *Response* at 12

As will be further demonstrated in our reply, plaintiffs are not seeking to change the criteria, and to the extent that plaintiffs request is considered to be a change in the criteria, there are compelling reasons to make such change.

*ii.   Commerce's Model Methodology Supports an Accurate Protein Calculation*

The second point in opposition presented by defendant is set forth on pages 12-14 of the response.   As with the first point, this is primarily an informational discussion.  Plaintiffs do not disagree with many of the basic points presented.  Plaintiffs agree with the general proposition cited by defendant that:

> Commerce established a model match methodology to ensure that comparisons are made for contemporaneous sales of product that are either identical or most similar with respect to several model match characteristics such as . . .

*Response* at 12.

Plaintiff also agrees with defendant that the 12.5 percent standard was determined by the Department based on the Italian Commodity Exchanges. *Response at 13.* Plaintiff also agrees with the defendant that the dividing line between premium and standard pasta has been based on protein category. The definition of this has changed several times during the course of the investigation. *Response* at 12-13. The issue is ultimately how the "12.5% Italian Commodity standard" should be implemented.

### iii.   Commerce Cannot Ignore the Difference in Scales

The third point in opposition presented by defendant is set forth on pages 14-18 of the response.  This is the first primary point of disagreement.  The defendant argues that the scalar differences should be ignored and that the Department's reliance on the product label produces a "consistent and transparent approach". Plaintiffs submit that this position is misplaced on multiple points.

Initially, adjusting the product labels for scalar differences has no impact on a consistent and transparent approach relying upon the product labels, rather, it simply ensures that the labels are read accurately and consistently with the same basis for comparison.   Essentially, the dispute resolves in part on the definition of the term "protein" and the fact that a common name does not mean a common definition any more than the term "gallon" refers to only one unit of measure.  That this difference

is significant is readily apparent when the "impact" of the scalar difference is codified.   The Italian Market standard, as acknowledged by the Department, is 12.5% protein. *Response* at 13.   To obtain a protein content of 12.5%, using the Italian standard of 5.711 units of nitrogen per gram of protein, would require 2.189 units of nitrogen per 100 grams of material.  This is calculated by taking 12.5 grams of protein, the amount that would be present in a 100-gram sample and dividing it by the Italian standard.   This results in the 2.189 units of nitrogen.  Taking the same 2.189 units of nitrogen and multiplying this by the U.S. standard of 6.251 units of nitrogen per gram produces a protein content of 13.68 grams per 100 grams or 13.68%. In a similar fashion, product reported with 12.5% protein using the U.S. standard would have a nitrogen factor  of 1.99 per 100 grams.   This 1.99 nitrogen factor, when applied to the Italian standard would produce 11.36 grams of protein per 100 grams or 11.36%.   See 56.2 Memo at 35, 37 and Exhibit B-2/C-2 to La Molisana's Section B and Section C questionnaire response (CR 74-80, PR 120-124).

In other words, the Department should have made a simple scalar adjustment by directing parties to multiple the "U.S. Protein" on the label by .9136 (91.36%) (Italian standard/ US Standard)(5.711/6.251) to put the U.S. and the Italian product on the same scale as used by the Italian commodity markets that formed the basis of the Department's 12.5% protein standard.  This would result in the Italian product

matching the Italian wheat standard using the Italian protein content, and then translating the NFP protein value, calculated using the U.S. standard, to the same scale.   Applying this to a U.S. product with an NFP showing 7 grams of protein per 56 grams per serving, would result in a reported protein value of 6.39 grams (7 grams multiplied by the scalar adjustment of 91.36%).    This 6.39 grams of protein per 56 grams per serving would be a protein percentage of 11.4%, or standard pasta.

Plaintiffs submit that the failure to adjust for scalar differences is arbitrary and capricious and has no impact on the Department's desire for consistency and transparency.   The protein content would still be that set forth on the product label and should simply be adjusted to a uniform scale.  In other words, the Department should compare Apples to Apples.     As discussed in the 56.2 motion and memorandum, a scalar adjustment is not unusual.    It would, for example, be irrational to fail to convert between the Kelvin, Fahrenheit, Celsius or Rankine scales when measuring temperature.  All are described as "degrees", but without adjusting, it would create the absurd result where a temperature of 31 on the Fahrenheit scale would produce a temperature below the freezing point, while 31 on the Celsius scale would be a hot day. (56.2 Motion at 43-45).

Furthermore, the Department regularly adjusts data to consistent units of measure.   In this review, for example, in Field Number 16.0 the Department directs

respondents to "Report all sales in this file in the same unit of measure.  Us an

abbreviation or code to indicate the unit of measure".   The Department also stated:

> Please use a single unit of measure for expressing all prices, expenses,
> and adjustments you report. If you make sales or incur expenses or
> adjustments using more than one unit of measure, select the
> predominantly used unit of measure for sales of merchandise to
> express all reported data. Additionally, in separate fields report the
> price, expense or adjustment as it appears in your records (i.e., before
> the conversion to a single unit of measure), and the conversion factor
> applied to convert the data to a single unit of measure.
> Questionnaire at page B-15 to B-16 and C-14 to C-15, PR 50.

 In other words, the data must be converted to a common unit of measure.

Failing to do so, ignores a key proposition as set forth in *Fagersta Stainless AB v.*

*United States*, 577 F. Supp. 2d 1270, 1275 (Ct. Int'l Trade 2008) that a compelling

reason is "greater accuracy in comparing foreign like product to the single most

similar U.S. model, in accordance with {19 U.S.C. §1677(16)(B)}…"  577 F. Supp.

2d at 1277.

The key point is that the purpose of model match is not to have a "clear and

consistent methodology" which is not accurate, rather it is a methodology which

ensures that identical product in the two markets are treated in the same way.   A

non-adjustment of scale means that identical merchandise will not be treated the

same way.  Where, as here, a clear and consistent methodology can be maintained

with a simple scalar adjustment, the failure to make such adjustment is arbitrary and

capricious.

As the Federal Circuit has explained, "while various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available…." *Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077, 1085 (Fed. Cir. 2001).   This is precisely the case here.   Here, it is plainly unreasonable for Commerce to rely on "transparency and consistency" as justifying a methodology that results in the treatment of physically identical goods as dissimilar and dissimilar goods as if they were identical.  Commerce's methodology is arbitrary and capricious and cannot stand.

To the extent that the defendant is arguing that the use  of different scales is not commercially significant, plaintiffs respectfully disagrees. "Commercial significance" is a principal criterion by which to decide whether differences between products are "minor."   In this case, where the Department established a 12.5% protein standard, the Department by its very actions, determined that the protein content of pasta is commercially significant, for if it were not, it would not be one of the limited number of model match criteria.

In sum, the Department's argument that using the protein reported on the label provides a clear and consistent standard, does not overcome the fact that accuracy requires that the values on the label be converted to a standard unit of measure. Adjusting for a uniformity of scale does not change the clear and consistent use of

the nutrition facts label, as desired by the Department, it simply ensures that the scalar differences are taken into account.

Plaintiff also appears to argue that as the protein conversion factor is not enumerated on the product label, such adjustment to the values on the package, this would not be transparent.   This argument is, at best, disingenuous.   The product label also does not contain, for example, the formula for converting grams to ounces, nor do weather reports contain the formula for converting Celsius to Fahrenheit. They need not do so as these are objective external standards.   In the same way, the "nitrogen" standard for calculating protein is also an objective external standard. The US FDA regulations for calculating protein states:

> Protein content may be calculated on the basis of the factor 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the "Official Methods of Analysis of the AOAC International," except when official AOAC procedures described in this paragraph (c)(7) require a specific factor other than 6.25, that specific factor shall be used.
>  21 CFR 101.9(7)

Finally, defendants argue that since the Court upheld the model match methodology with respect to shape, finding that the Court must defer to concerns with respect to manipulation, it should have similar concerns with respect to protein. However, there is a significant difference.  The classification of a shape, and whether a special or standard cut, is a subjective test.   In contrast, the Department determined that a 12.5% protein content line was an objective test for determining whether a

product was standard or premium.  The Department further determined that the label would reflect this objective test.  In this case, the adjustment for scalar differences is also objective.  In other words, as there is no subjective component, there is no prospect for manipulation.

> iv.  *The Differences in Protein Reporting Resulting from Mandatory FDA Rounding is Commercially Significant and Must be Considered*

The fourth point in opposition presented by defendant is set forth on pages 18-21 of the response is that the differences in protein reporting caused by mandatory FDA rounding is not commercial significant.  Plaintiffs submit that the Department's position is unsupported, and that, in fact, these roundings produce commercially significant differences.

As an initial matter, plaintiffs note that this is a question of first impression for the Court.   The issue as to the impact of rounding, while it was considered by the Department in an earlier administrative review, this review was not challenged in the Court and the Court has never considered this issue.

The Department has established two protein bands – 10.00 to 12.49% protein and 12.5% and higher.  (Questionnaire at pages B-8 and C-7) (PR at 50).  In other words, the Department has determined that the differences between standard and premium product falls within a relatively narrow range of protein content, with the first band covering approximately 2.5%.   As discussed in detail in 56.2

memorandum, a product with a protein content of more than 11.63% protein (as calculated using the US nitrogen standard) would be classified as premium pasta. (56.2 Memo at 47 – 49).   The defendant has not challenged this calculation, but rather has simply suggested that there is no showing that any product exists with the 11.63% protein percentage. The difference between the Department dividing line of 12.5% and the actual dividing line of 11.63% is .87%.    This difference of .87% constitutes more than 1/3rd of the first "band" (.87/2.5 = 34.8%) and eliminates the top 1/3rd of this band (11.63% to 12.49%) from being treated as "standard" pasta.

Plaintiffs submit that the use of the FDA nutrition facts standards, because of rounding, is neither transparent nor consistent and produces results which mask the true protein content of the goods.  Without such adjustment, the protein content is inaccurate and unreliable and does not necessarily reflect the actual protein content.

Commerce must make its decision based on a fair and balanced comparison of the data.  A comparison which is not fair or balanced is inherently arbitrary and capricious.  Commerce also must make its decisions based on a fair and balanced comparison of the data.  To do otherwise is arbitrary and capricious. *See Atlantic Sugar, Ltd. v. United States*, 744 F.2d at 1562 ("substantial evidence" must be measured by the record as a whole, "including whatever fairly detracts from the substantiality of the evidence.")  *See also, Jinan Yipin Corp. v. United States*, 637 F. Supp. 2d 1183, 1192 (Ct. Int'l Trade 2009).

It is clear that Congress intended that Commerce calculate dumping margins as accurately as possible and use the best available information.  *See Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268  F.3d 1376, 1382 (Fed. Cir. 2001); *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990); *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir. 2013).  This protein calculation is inherently not the most accurate as it would result in the disparate treatment of the identical product in different markets.  In *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1344 (Fed. Cir. 2016), the Court explained that a Commerce determination is "'accurate' if it is correct as a <u>mathematical and factual matter</u>…"  (Emphasis added).  To achieve this required accuracy, "antidumping orders should not be interpreted in a vacuum devoid of any consideration of the way the language of the order is used in the relevant industry." *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 88 (Fed. Cir. 2012). *See also, Saha Thai Steel Pipe Co., Ltd. v United States*, 828 F. Supp. 57, 64 (Ct. Intl Trade 1993) ("...the Department has honored one of the fundamental principles underlying the trade statute –accuracy. It is this endeavor for accuracy … that lends respectability to U.S. trade statutes. .").  The Department's protein calculation methodology is not correct as a mathematical matter.

In sum, the Court should find that the NFP rounding significantly distorts the protein calculation and cannot be used.

*v. The Market Report Provides Strong Support for a Protein Content of 13.5%*

The fourth point in opposition presented by defendant is set forth on pages 21-26 of the response is that plaintiffs failed to provide compelling evidence that the Department's protein standard is not based on marketing reality and that plaintiffs have relied too heavily on the market report.   Neither of these points are availing.

Plaintiffs submit that the market report stands on its own and is the only direct and compelling evidence of record with respect to the market treatment of premium and standard pasta.   The Department's position, in contrast, is based on mere speculation and thus is not grounded in substantial evidence.   It is clear that the Department may not rely on speculation when making factual determinations.  *See, China National Arts and Crafts Import and Export Corp., Tianjin Branch v. United States,* 771 F. Supp. 407 (Ct. Int'l Trade 1991)   The market report is the only substantial evidence on this point and it is directly contrary to the Department's speculation based position.   Further, while the survey which underlies the market report was only conducted in one metropolitan area, this does not impact the validity of the data.   As demonstrated by La Molisana's U.S. sales database, which reports destinations for its pasta in multiple states in numerous regions ranging from the Northeast to the South, and from the Atlantic Coast to the Pacific Coast. (See Printout of La Molisana U.S. Sales database provided with La Molisana's response to the Department's Section B and C supplemental Questionnaire of January 27,

2020) (CR 201-202),  pasta is a national product and thus a survey conducted in a major U.S. market would still be highly informational about the U.S. national treatment of pasta.   Critically, this market research report was not rebutted by petitioner and was not the subject of questions by the Department.    These two actions are a tacit acknowledgment of the correctness of this market research report.

Accordingly, as the market research report is the primary data point on the differentiation between premium and standard pasta, it was understandably a point of major reliance.   Plaintiffs note that this does not stand alone.  As admitted in its response, the Italian commodity markets reported a protein content which is reflected in the 12.5% protein standard using the Italian protein calculation, (Response at 13).   This 12.5%  when adjusted for scalar differences, would be 13.68%, which rounds to the very 13.5% discussed in the market research report.

In sum, the market research report contains substantial evidence, in fact the only substantial evidence, of the treatment of premium and standard pasta. This was properly relied upon by plaintiffs in its presentations to the Department of Commerce.   The Department should have given the market survey full weight, and based on this report, should have clarified the protein reporting requirement.

### b. The Department Must Adjust the Rate for Valdigrano and Cannot Include an Amount Calculated Based on Adverse Facts in the Calculation

The defendant argues, as set forth on pages 26-28 of the response that the rate

applied to Valdigrano was proper.    The primary basis for this is the defendant's
position that the rate for La Molisana is accurate and thus Valdigrano's rate is proper.
Plaintiffs agree with the defendant that IF the La Molisana rate is correct, the
Valdigrano rate is also proper.    As discussed above, the rate for La Molisana is not
correct and thus the rate of Valdigrano is not proper.    The second part of the
response, however, is troubling.    The Department suggests that it has already pre-
judged the issue of a rate calculation in the event that La Molisana receives a *de
minimis* rate and informed Valdigrano that it would apply a significantly increased
rate to Valdigrano in the event that it prevails at the Court.    Specifically, the
defendant stated "Commerce **would** average…" notwithstanding that defendant also
acknowledges that this is only a general rule. (Response at 27 – 28)   The Department
should not pre-judge this case, and in fact, the Courts have held that the use of an
AFA based rate in calculating a rate for a cooperating entity is not appropriate.    The
Court of Appeals for the Federal Circuit stated:

> Deterrence is not relevant here, where the "AFA rate" only impacts
> cooperating respondents. We find no support in our caselaw or the
> statute's plain text for the proposition that deterrence, rather than
> fairness or accuracy, is the "overriding purpose" of the antidumping
> statue **when calculating a rate for a cooperating party**. See, e.g.,
> *Parkdale Int'l v. United States*, 475 F.3d 1375,1380 (Fed. Cir. 2007)
> ("[A]n overriding purpose of Commerce's administration of
> antidumping laws is to calculate dumping margins as accurately as
> possible. . .")(citing *Rhone Poulenc, Inc. v. United States*, 899 F.2d
> 1185, 1191 (Fed. Cir. 1990)). **Quite the contrary: applying an
> adverse rate to cooperating respondents undercuts the
> cooperation-promoting goal of the AFA statute**.

*Changzhou Wujin Fine Chemical Factory Co., Ltd v. United States*, 701 F.3d 1367  (Fed. Cir. 2012) (Emphasis Added).

In sum, if plaintiffs prevail in this matter, Valdigrano should receive the rate assigned to La Molisana. If La Molisana were to receive a rate of de minimis, the Department should calculate a "reasonable" rate for Valdigrano which does not include an AFA component.   The inclusion of an AFA component would be inappropriate.   As noted by the Court, "applying an adverse rate to cooperating respondents undercuts the cooperation-promoting goal of the AFA statute."

## III.   <u>CONCLUSION</u>

La Molisana and Valdigrano respectfully submits that the response submitted by the defendant is unavailing.   The Court should promptly remand this matter to the Department.  Specifically, the Court should find:

- That the Department's calculation of the protein content for purposes of the CONNUM is inaccurate as it does not properly reflect the protein content of standard and premium pasta;

- That the Department's refusal to adjust the protein content for scalar differences is unsupported by substantial evidence as absent such adjustment, the calculation is not "correct as a mathematical and factual matter";

- That the Department's refusal to take into account impact of the FDA nutrition rounding rules results in comparisons that are not correct to a "mathematical and factual matter" and effectively changes the standard from 12.5% to 11.6% solely because of such rounding;

- That the rate assigned to Valdigrano should be the rate assigned to La Molisana and should not include an AFA component.

Respectfully submitted,

/s/ David Craven
David Craven

Counsel to *La Molisana S.p.A.* and *Valdigrano di Flavio Pagani S.r.L.*

Dated: May 9, 2022

<u>CERTIFICATE OF COMPLIANCE</u>

1. This reply complies with the guidelines set forth in the Standard Chambers Procedures. The reply contains 4,053 words on numbered pages (that is, excluding only the Cover Page, the Table of Contents, the Table of Authorities, the signature block, and the present certificate) according to the word-count function of Microsoft Word for Office 365, the word processing program used to prepare this memorandum.

2. This reply has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Respectfully Submitted,
/s/ David J. Craven
David J. Craven

May 9, 2022