Slip Op. 23-59

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| LA MOLISANA S.P.A., | : |
| Plaintiff, | : |
| and | : |
| VALDIGRANO DI FLAVIO PAGANI S.R.L., | : Before: Richard K. Eaton, Judge |
| Consolidated Plaintiff, | : Consol. Court No. 21-00291 |
| v. | : |
| UNITED STATES, | : |
| Defendant. | : |

**OPINION**

[The final results of the U.S. Department of Commerce's twenty-third administrative review of the antidumping duty order on pasta from Italy are sustained.]

Dated: April 24, 2023

*David L. Simon*, Law Offices of David L. Simon, PLLC, of Washington, D.C., argued for Plaintiff La Molisana S.p.A. and Consolidated Plaintiff Valdigrano di Flavio Pagani S.r.L. On the brief was *David J. Craven*, Craven Trade Law LLC, of Chicago, IL.

*Sosun Bae*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant United States. With her on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Kirrin A. Hough*, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, D.C.

Eaton, Judge: This consolidated action involves the final results of the U.S. Department of Commerce's ("Commerce" or the "Department") twenty-third administrative review of the antidumping duty order on certain pasta from Italy ("Order"). *See Certain Pasta From Italy*, 86

Fed. Reg. 28,336 (Dep't Commerce May 26, 2021) ("Final Results") and accompanying Issues and Decision Mem. (May 20, 2021) ("Final IDM"), PR 277; *see also Certain Pasta From Italy*, 61 Fed. Reg. 38,547 (Dep't Commerce July 24, 1996) (Order).

Plaintiff La Molisana S.p.A. ("La Molisana"), a mandatory respondent,[1] and Consolidated Plaintiff Valdigrano di Flavio Pagani S.r.L. ("Valdigrano"), a non-examined respondent, (collectively, "Plaintiffs") are Italian producers and exporters of the subject pasta. By their motion for judgment on the agency record, Plaintiffs challenge Commerce's determination not to adjust its model-match method with respect to coding for the pasta's protein content. *See* Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 27-1 ("Pls.' Br."); *see also* Pls.' Reply Br., ECF No. 34. For Plaintiffs, the existing model-match method must be adjusted because it results in the comparison of Italian pasta products with those produced in the United States that are physically dissimilar in terms of their protein content.

Defendant the United States ("Defendant"), on behalf of Commerce, urges the court to sustain the Final Results. *See* Def.'s Resp. Opp'n at 8, ECF No. 30 ("The evidence and arguments

---

[1] The only other mandatory respondent was a collapsed entity comprised of Ghigi 1870 S.p.A. and Pasta Zara S.p.A. Neither company is a party to this action. "Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be 'representative' of unexamined respondents for the purpose of calculating the [separate] rate in a review, a [practice] that this Court has regarded with some skepticism." *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1236 (2021) (footnote omitted) (first citing *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); and then citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009)). "There can be little question that, if Commerce were to change its method and name more than two mandatory respondents, separate rate companies would receive more accurate rates, and a great deal of litigation would be avoided." *Xiping Opeck Food Co. v. United States*, 45 CIT __, __, 551 F. Supp. 3d 1339, 1356-57 (2021). The Federal Circuit has expressed similar concerns. *See, e.g.*, *YC Rubber Co. (N. Am.) LLC v. United States*, No. 21-1489, 2022 WL 3711377, at *3-4 (Fed. Cir. Aug. 29, 2022) (not reported in the Federal Reporter) (holding that "Commerce unlawfully restricted its examination to a single mandatory respondent" under 19 U.S.C. § 1677f-1(c)(2)).

placed on the record by plaintiffs do not sufficiently demonstrate that Commerce's instructions for reporting the protein content of finished pasta, in place for more than a decade, result in price-to-price comparisons between physically dissimilar pasta or fail to reflect market reality such that Commerce must alter them.").

The court has jurisdiction under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018). For the following reasons, Plaintiffs' motion is denied, and the Final Results are sustained.

## BACKGROUND

In September 2019, Commerce initiated the twenty-third review of the Order, covering the period of review from July 1, 2018, to June 30, 2019. *See Initiation of Antidumping and Countervailing Duty Admin. Revs.*, 84 Fed. Reg. 47,242 (Dep't Commerce Sept. 9, 2019). Commerce selected La Molisana as a mandatory respondent. Valdigrano was not selected for examination but participated in the review by filing an administrative case brief.

The primary controversy in this case involves the method that Commerce requires respondents to use when reporting the protein content of pasta sold in the home market (PROTEINH) and in the United States (PROTEINU). Protein content is one of several physical characteristics of pasta that are used to compose a control number, or CONNUM, for each unique pasta product.[2] CONNUMs are comprised of digits, and each digit is a "code" for a physical

---

[2] The protein content of pasta "is an important determinant of the quality of the product." Pls.' Br. at 3 (citing Pls.' Br. attach. B (Market Report) Ex. H). "The protein content in pasta comes from semolina flour—the main input of pasta—which is made from durum wheat." *Ghigi 1870 S.p.A. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1332, 1337 n.7 (2021).

characteristic of the product. Commerce uses CONNUMs in its model-match method to identify "like" products to compare.

In November 2019, Commerce issued its initial antidumping questionnaire to La Molisana. *See* Antidumping Questionnaire (Nov. 1, 2019), PR 66. The questionnaire instructions asked the respondent to "[i]dentify the percentage of protein in the pasta sold, as stated on the label of the respective product." *Id.* at B-9 (home market sales), C-7 (U.S. sales). Pasta with a protein content of 12.5% or more was to be coded as "1" (premium), and pasta with a protein content of 10.00-12.49% was to be coded as "2" (standard), based on the protein content listed on the nutrition label of the packaging.[3] The "1" or "2," in turn, would become a digit in the CONNUM for a particular product.

Here, La Molisana complied with Commerce's instructions and coded the protein content of its pasta as "1" or "2," using the percentage of protein stated on the nutrition label. But in its questionnaire response La Molisana also stated that "due to the nature of the nutrition facts panel and other incontrovertible facts, [the reported code] is not necessarily an accurate representation of the Protein Content." La Molisana Sec. B Resp. Ex. B-2 (Jan. 3, 2020), PR 120. In other words, La Molisana complied with Commerce's instructions but also in its narrative response questioned whether Commerce's method of coding protein content (i.e., as premium "1" or standard "2") would lead to comparisons of products that were dissimilar in terms of protein.

---

[3]   Commerce has used the same coding method, i.e., "1" for premium pasta with a minimum protein content of 12.5% and "2" for standard, based on the percentage listed on the nutrition label, since protein content was introduced as a physical characteristic of pasta in the twelfth administrative review. *See* Final IDM at 7; *see also Certain Pasta from Italy*, 75 Fed. Reg. 6,352, 6,353 (Dep't Commerce Feb. 9, 2010) (final results of twelfth administrative review). To determine the 12.5% breakpoint, Commerce "relied on the breakpoints of *three* separate Italian commodity exchanges." Final IDM at 12 (emphasis in original).

After the preliminary results were published, in which Commerce applied its usual model-match method, Valdigrano and La Molisana filed administrative case briefs. In their respective briefs, each pressed its arguments for why the model-match method, with respect to coding for protein content, must be adjusted to ensure that Commerce compared physically similar pasta products: premium with premium and standard with standard.

Specifically, Valdigrano argued that the 12.5% breakpoint between standard and premium pasta does not reflect current market reality. The company relied on a report that presented price and protein content information for a sample of pasta products sold in the Italian and U.S. markets ("Market Report"). *See* Valdigrano Case Br. (Jan. 26, 2021), PR 257; *see also* Pls.' Br. attach. B (Market Report). The Market Report was prepared by Plaintiffs' counsel based on pasta purchased in one food retail chain in Italy and four food retailers in a suburb of Washington, D.C. Also, part of the information in the report was a screenshot of a website that, for Plaintiffs, demonstrated that a grain exchange in Bologna, Italy "has updated the breakpoint between standard and premium semolina, which now occurs at 13.5% protein content." Market Report at 7 (citing Ex. K). The report concluded that pasta with 12.5% protein content is standard, not premium pasta. *Id.* at 4.

For its part, La Molisana argued that using the nutrition label as the basis to report protein content leads to comparisons of physically dissimilar products because of differences in protein measurement standards in Italy and the United States. Specifically, La Molisana pointed out the countries' different "nitrogen-to-protein" conversion numbers[4] and the rounding requirement

---

[4] Under U.S. Food and Drug Administration regulations, protein content is calculated by multiplying the nitrogen content of the finished product by 6.25. *See* Market Report at 5 (citing Ex. B). Under the Italian standard, protein content is calculated by multiplying the nitrogen content by 5.7. *Id.* at 6 (citing Ex. F). For Plaintiffs, the difference in these multipliers obscures the "real" protein content of products in the U.S. and Italian markets. *See* Pls.' Br. at 35-36 (setting out mathematical calculations of protein content under different nitrogen conversion factors).

under U.S. Food and Drug Administration ("FDA") rules,[5] for which there is no equivalent in Italy. *See* La Molisana Case Br. (Jan. 26, 2021), PR 259.

In the Final Results, Commerce declined to adjust its model-match method with respect to coding for protein and continued to apply its usual method to identify like products, including classifying pasta with a protein content of 12.5% or more as premium pasta, and 10.00-12.49% as standard pasta. Final IDM at 6-12. Ultimately, Commerce determined a weighted average dumping margin for La Molisana of 15.72% and applied the same margin to Valdigrano, as the all-others rate. *See* Final Results, 86 Fed. Reg. at 28,337. Plaintiffs timely commenced this action to bring their objections before the court. Plaintiffs ask the court to remand this matter to Commerce with instructions to adjust its model-match method for coding protein content and revise La Molisana's and Valdigrano's rates accordingly.

## STANDARD OF REVIEW

Commerce's Final Results will be sustained unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## LEGAL FRAMEWORK

In an antidumping case, Commerce compares the price at which subject merchandise is sold in the United States with normal value. *See* 19 U.S.C. § 1677b(a). Normal value is "the price

---

[5] Under FDA food labeling regulations, protein content must be rounded to the nearest gram. *See* 21 C.F.R. § 101.9(c)(7) (2019). Under these rules, Plaintiffs argue, the percentage of protein reported on the nutrition label of a product sold in the United States could be artificially inflated or reduced. For instance, without rounding, pasta with 6.51 grams of protein (or 11.63%) would be considered standard, but with rounding, that same pasta has 7 grams of protein (or 12.5%) and must be coded as premium. *See* Pls.' Br. at 5.

at which the *foreign like product* is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country." *Id.* § 1677b(a)(1)(B)(i) (emphasis added). The antidumping statute defines "foreign like product" as merchandise that is either identical with, or similar to, subject merchandise, according to a hierarchy of characteristics.[6] *Id.* § 1677(16)(A)-(C).

Commerce uses its model-match method to make "[d]eterminations of both identical and like/similar (i.e., non-identical but capable of comparison) merchandise." *Manchester Tank & Equip. Co. v. United States*, 44 CIT __, __, 483 F. Supp. 3d 1309, 1314 (2020). Products may be considered identical "despite the existence of minor differences in physical characteristics, if those minor differences are not commercially significant." *Pesquera Mares Australes Ltda. v. United States*, 266 F.3d 1372, 1384 (Fed. Cir. 2001). Determining whether a physical difference between products is commercially significant, i.e., one "that merits distinguishing between identical and similar products," is a fact-intensive inquiry. *See Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d

---

[6] The statute lists these characteristics, in order of preference:

(A) The subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—
(i) produced in the same country and by the same person as the subject merchandise,
(ii) like that merchandise in component material or materials and in the purposes for which used, and
(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—
(i) produced in the same country and by the same person and of the same general class or kind as the subject merchandise,
(ii) like that merchandise in the purposes for which used, and
(iii) which the administering authority determines may reasonably be compared with that merchandise.

19 U.S.C. § 1677(16)(A)-(C).

at 1316, 1317 ("Considering the record as a whole, Commerce has supported with substantial evidence its decision to accept as commercially significant the distinction between zinc and non-zinc coatings because zinc coating requires unique production processes, is specifically requested by customers, and leads to price variations."). This inquiry may involve a consideration of whether and to what extent the industry at large treats the difference as significant. *See Pesquera Mares*, 266 F.3d at 1384-85 (cleaned up) (affirming Commerce's finding that "the differences between super-premium and premium salmon do not warrant separate classification in an antidumping analysis," where Commerce relied on record evidence of the "commercial practice of the world's largest salmon farming countries whose salmon industries also exported to" the third-country market, Japan). Relying on industry-wide data, instead of a smaller, company-specific dataset, avoids the risk of manipulation of sales information by the respondent. *See id.* at 1385 ("Indeed, if Commerce were to limit itself to consideration of the small volume of 'premium' sales of the particular exporter, it would risk market manipulation for antidumping purposes.").

      This Court and the Federal Circuit "have looked for 'compelling reasons' when Commerce [itself] modifies a model-match methodology in a review after having used that methodology in previous segments of the proceeding." *Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (first citing *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1380 (Fed. Cir. 2008); then citing *Koyo Seiko Co. v. United States*, 31 CIT 1512, 1517-18, 516 F. Supp. 2d 1323, 1331-32 (2007), *aff'd* 551 F.3d 1286 (Fed. Cir. 2008); and then citing *Fagersta Stainless AB v. United States*, 32 CIT 889, 894-95, 577 F. Supp. 2d 1270, 1276-77 (2008)). "'Compelling reasons' require the agency to provide 'compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason' requiring the change." *Id.* (quoting *Fagersta*, 32 CIT

at 894, 577 F. Supp. 2d at 1277). So too, must respondents provide a compelling reason to change the model-match criteria by presenting their proposed modifications and supporting evidence to Commerce during the administrative process. *See Ghigi 1870 S.p.A. v. United States*, 45 CIT \_\_, \_\_, 547 F. Supp. 3d 1332, 1349 (2021).

## DISCUSSION

Plaintiffs' main argument is that Commerce's refusal to adjust its model-match method with respect to protein coding lacks the support of substantial evidence, because the information presented in their Market Report is compelling and unrebutted. Pls.' Br. at 3 ("[U]nrebutted substantial evidence showed that pasta with protein content 12.5% was standard pasta, not premium pasta, in both the U.S. market and the Italian market."). Plaintiffs also challenge Commerce's refusal to adjust its method for scalar differences and rounding rules, instead of coding protein content based solely on the nutrition label.[7] *Id.*

In the Final Results, Commerce found the Market Report data provided unreliable and insufficient evidence of an industry-wide change to a 13.5% breakpoint between standard and premium pasta to justify adjusting its model-match method for reporting protein content:

> The U.S. section of the Market Report consists of labels and receipts for pasta purchased from Washington DC metro area supermarkets along with charts illustrating the relationship between protein content and price. Valdigrano asserts that these data show 12.5 percent protein content is a floor for pasta sold in the U.S. market, and that the true breakpoint between standard and premium pasta is 13.5 percent protein content. We do not find this evidence sufficient to change our existing coding for protein content. The Market Report data cited to in the case brief consist of pasta purchases from four supermarkets in a small geographic region of

---

[7] *See supra* notes 4 and 5. As noted, Plaintiffs assert that the scalar differences stem from the differences in the nitrogen multiplier required by U.S. and Italian regulations: "U.S. FDA rules calculate protein content by multiplying the nitrogen content by 6.25 while the Italian standard calculates protein content by multiplying the same nitrogen content by 5.7." Pls.' Br. at 43. Under FDA rounding rules, Plaintiffs argue, the percentage of protein reported on the nutrition label of a product sold in the United States could be artificially inflated or reduced. *See id.* at 5.

> the United States. *No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products.* As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.
>
> For Italy, Valdigrano cites to a screenshot in the Market Report of the Bologna Grain Exchange's website defining "superior" semolina as having 13.5 percent or greater protein content to assert that the industry standard for defining premium and standard semolina has changed and, thus, that there is a "compelling reason," . . . for Commerce to change the breakpoint for reporting protein content. However, in the [memorandum that supported the 12.5 percent breakpoint, i.e., the Wheat Code Memo], Commerce relied on the breakpoints of *three* separate Italian commodity exchanges. The plain meaning of "industrywide" connotes an *entire* industry or, at the very least, predominance or prevalence within an industry. *We find that the Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina and thus that it is not a compelling reason to change the instructions for reporting protein content.*

Final IDM at 11-12 (emphasis added) (citations omitted).

Regarding Plaintiffs' contention that Commerce must adjust its method for scalar differences and rounding rules, instead of coding protein content based solely on the nutrition label, Commerce stated:

> Commerce has considered and rejected the claims regarding rounding and nitrogen conversion factors in prior reviews and in doing so has repeatedly emphasized the importance of transparency and consistency. We do the same here. Given that the protein content physical characteristic was created, in part, based on the finding that "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we find that relying on values not shown on the packaging label for this physical characteristic would detract from the consistency and transparency of defining each product (*i.e.*, CONNUM), which in turn implicates the accuracy of the product comparisons (*i.e.*, the identification of identical or similar merchandise sold in the Italian market based on whether the pasta sold in each market is premium or not).

*Id.* at 10 (citing comment 1 in final decisional memorandum accompanying final results of twelfth administrative review). Put another way, Commerce declined, when it was constructing

CONNUMs, to rely on information other than that displayed on the packaging label because doing so would result in less transparency and consistency than by using the label.

Additionally, Commerce found there was no evidence that the differences in Italian and U.S. protein measurement standards were commercially significant:

> Given that we have found "there is not a clearly defined method of identifying premium pasta other than the protein content marked on the packages," we do not see a basis to find the discrepancy in protein measurement standards between the U.S. and Italian markets as commercially significant when the market perception of premium pasta or non-premium pasta relies on information readily available to consumers, namely the packaging label associated with the pasta in the marketplace.

*Id.* at 11. That is, the information on packaging labels allows consumers to readily distinguish premium and standard pasta and make purchasing decisions. For Commerce, there was no evidentiary basis to conclude that differences in nitrogen multipliers and rounding rules, which is not information readily available to consumers, mattered in the marketplace. Thus, Commerce found that the differences were not commercially significant.

The court finds, based on this record, that Commerce did not err when it declined to adjust its existing model-match method. Plaintiffs have failed to demonstrate by "'compelling and convincing evidence that the existing model-match criteria are not reflective of the merchandise in question, that there have been changes in the relevant industry, or that there is some other compelling reason' requiring the change." *Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (quoting *Fagersta*, 32 CIT at 894, 577 F. Supp. 2d at 1277).

First, the court cannot fault Commerce for finding that the Market Report was insufficient to support Plaintiffs' claim that the 12.5% breakpoint is out of step with current industry-wide standards because no serious argument can be made that the report is representative of the entire industry either in the United States or in Italy. When Commerce has reconsidered its model-match

criteria in the past, it has stated that for data to be "industry-wide" it must be public, published information. *See* Letter from Kelley Drye & Warren to Sec'y of Commerce (Dec. 20, 2019) Ex. 2, at 6, PR 108 ("Wheat Code Mem.") ("Because we strive to identify a universal set of criteria which apply to all respondents in this proceeding, we looked to publicly available information and published industry standards for guidance."). In contrast, the report here was prepared for presentation to Commerce, and bears no indicia of having been publicized or published to or by the industry at large. Rather, the report presents the retail prices of pasta products of different shapes that were sold by several different brands, which Plaintiffs' counsel purchased from four supermarkets in the suburbs of Washington, D.C. (Safeway, Giant, Harris Teeter, and Balducci's) and at one Italian supermarket (Pam Panorama S.p.A.). *See* Market Report Exs. M & L.

The report also contains a screenshot of a website page of a single grain exchange in Bologna, which is cited as evidence of market-wide acceptance of 13.5% as the new minimum for premium pasta. *See* Market Report Ex. K. But there is nothing in the report that indicates that this single Bologna exchange represents the entire market or even a large portion of it. Indeed, while in the past this particular grain exchange was one of three Italian exchanges considered by Commerce, alongside one commodity exchange in Bologna and another in Milan, no evidence from the other two exchanges is included in the report. For this reason, Commerce reasonably found the Market Report insufficient to support a change in the standard-to-premium breakpoint from 12.5% to 13.5%.

The report itself is neither public, nor published outside of this litigation, nor is there a basis to conclude that it is objectively reliable. As Commerce stated:

> No attempt is made in the Market Report to address the potential for manipulation in choice of purchases or to support a claim that these purchases are reflective of the entire U.S. market for pasta products. As such, we do not find these data to be a "compelling reason" to change the instructions for reporting protein content.

Final IDM at 12. Further, Commerce found:

> [T]he Market Report's citation to a single exchange's breakpoint is not sufficient evidence of an industry-wide change in standards from semolina and thus that it is not a compelling reason to change the instructions for reporting protein content.

*Id.* Indeed, Plaintiffs do not deny the report's limitations. Instead, they appear to argue that, limited as it might be, the Market Report is the only evidence on the record: "The Market Report was unrebutted. It was submitted near the outset of the proceeding, and the petitioners had ample opportunity to submit rebuttal factual evidence. Instead, petitioners were silent." Pls.' Br. at 13; *id.* at 33 ("Petitioners' failure to provide any evidence of such different treatment in different commodity exchanges compels Commerce to accept the finding of the Market Report. There is simply no reason to disbelieve the exhibit in the Market Report, and indeed, Commerce does not dispute its correctness.").

Just because evidence is unrebutted, however, does not make it substantial. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). It cannot be said that the Market Report reasonably supports the conclusion that *industry-wide* the minimum protein content of premium pasta is 12.5% in the United States or that the industry in Italy has recognized a protein minimum of 13.5% because (1) the report does not represent the entire U.S. industry but, at best, only the experience of a handful of stores in the Washington, D.C. suburbs, and (2) a single screenshot from one grain exchange in Italy that states (as translated from the Italian in Exhibit L of the Market Report), "semolina with characteristics superior to the regulation – minimum protein 13.5%," cannot reasonably be understood to mean that the entire Italian industry as a whole has increased the minimum protein content of premium pasta from 12.5% to 13.5%. This is not to say that information from exchanges in Italy cannot be the source of industry-wide data, but, as

Commerce indicated in the Final IDM, it must be representative, i.e., the data of more than one exchange. Again, the 12.5% breakpoint was established by three exchanges. *See* Final IDM at 12 (emphasis in original) ("[I]n the [original report that supported the 12.5 percent breakpoint, i.e., the Wheat Code Memo], Commerce relied on the breakpoints of *three* separate Italian commodity exchanges. The plain meaning of 'industry-wide' connotes an *entire* industry or, at the very least, predominance or prevalence within an industry." (citing Wheat Code Mem.)); *see also Manchester Tank*, 44 CIT at __, 483 F. Supp. 3d at 1315 (quoting *Fagersta*, 32 CIT at 894, 577 F. Supp. 2d at 1277) ("'Compelling reasons' require the agency to provide 'compelling and convincing evidence . . . that there have been changes in the relevant industry['] . . . requiring the change.").

Moreover, the court finds no error with respect to Commerce's conclusion that differences in Italian and U.S. protein measurement standards and rounding rules were not commercially significant. It is unrebutted that consumers rely on packaging information when making pasta purchasing decisions, and that coding for protein content based on the nutrition label fosters transparency and consistency in CONNUM-building.[8] Where the parties disagree is whether the Market Report constitutes substantial record evidence that differences in Italian and U.S. protein measurement standards were commercially significant. For the reasons discussed above, it does not.

Even if the court were to take into account the pricing data in the Market Report, remand would not be required here, because at best, Plaintiffs have offered an alternative conclusion to the one reached by Commerce. Plaintiffs have failed to demonstrate that Commerce's conclusion—

---

[8]    Though unrebutted, the court notes that Commerce's reliance on the finding that customers make purchasing decisions based on information found on a pasta product's packaging departs from the relevant inquiry, which focuses on the physical characteristics of the product, not its packaging.

that values other than those readily available to consumers on the packaging label were not commercially significant—was unreasonable. *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (describing substantial evidence as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence"). Therefore, the court sustains Commerce's Final Results.

## CONCLUSION

Based on the foregoing, the court denies Plaintiffs' motion and sustains the Final Results. Judgment will be entered accordingly.

/s/ Richard K. Eaton
Judge

Dated: April 24, 2023
       New York, New York