A-475-818<br>
Remand<br>
Slip Op 23-59<br>
**Public Document**<br>
E&C/OIII:  PB

*La Molisana S.p.A. v. United States*,<br>
Court No. 21-00291, Slip Op. 23-59<br>
(CIT April 24, 2023)<br>
Certain Pasta from Italy

**FINAL RESULTS OF REDETERMINATION<br>
PURSUANT TO COURT REMAND**

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *La Molisana S.p.A. v. United States*, Court No. 21-00291 (CIT April 24, 2023), consistent with the opinion issued by the U.S. Court of Appeals for the Federal Circuit (Federal Circuit).[1] This action arises out of Commerce's final results in the 2018-19 administrative review of the antidumping duty (AD) order on certain pasta (pasta) from Italy, covering the period of review (POR) July 1, 2018, through June 30, 2019.[2]

The Federal Circuit vacated, in part, and affirmed, in part, the Court's decision in *La Molisana I*, in which the Court sustained the *Final Results*.[3] The Federal Circuit vacated the Court's judgement regarding the model-matching methodology relied upon in the *Final Results*. Specifically, the Federal Circuit held that "a compelling reason to modify the model-match

---

[1] *See La Molisana S.p.A. v. United States*, 138 F.4th 1353 (Fed. Cir. 2025) (*Remand Opinion*); *see also La Molisana S.p.A. v. United States*, Court No. 21-00291, ECF No. 53 (August 4, 2025) (*Remand Order*).
[2] *See Certain Pasta from Italy:  Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2018–2019*, 86 FR 28336 (May 26, 2021) (*Final Results*), and accompanying Issues and Decision Memorandum (IDM).
[3] *See La Molisana S.p.A. v. United States*, Slip Op. 23-59 (CIT April 24, 2023) (*La Molisana I*); *see also Remand Opinion*, 138 F.4th at 1355.

methodology exists because Commerce's current methodology fails to adhere to the statutory requirement to compare goods on the basis of identical physical characteristics."[4] Accordingly, the Federal Circuit held that Commerce's findings in the *Final Results* regarding protein content (PROTEIN) rounding and nitrogen content measurement issues are not supported by substantial evidence, vacated the Court's judgement regarding these issues, and remanded for further proceedings.[5] The Court remanded these issues to Commerce.[6]

Pursuant to the Court's *Remand Order*, Commerce has modified its model-matching methodology to incorporate revisions to its PROTEIN coding methodology. These modifications changed the PROTEIN codes, and, thereby, the control number (CONNUM), reported for certain U.S. market sales. Commerce therefore revised its weighted-average dumping margin calculations for respondent La Molisana, S.p.A. (La Molisana). The revised weighted-average dumping margin calculated for La Molisana equals 15.14 percent. Moreover, as a result of La Molisana's revised weighted-average dumping margin, the revised review-specific rate applicable to the respondent not selected for individual examination that is a party to this litigation equals 15.14 percent.

## II.    BACKGROUND

On July 24, 1996, Commerce published the *Order* in the *Federal Register*.[7] On September 9, 2019, Commerce initiated a review of the *Order* covering the POR.[8] Commerce selected La Molisana for individual examination in the review, and issued it the AD

---

[4] *See Remand Opinion*, 138 F.4th at 1362.
[5] *Id.*
[6] *See Remand Order*.
[7] *See Notice of Antidumping Duty Order and Amended Final Determination of Sales at Less Than Fair Value: Certain Pasta from Italy*, 61 FR 38547 (July 24, 1996) (*Order*).
[8] *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 FR 47242 (September 9, 2019).

Questionnaire.[9]  The AD Questionnaire instructed La Molisana to assign CONNUMs to each unique product, using "a concatenation of" certain product characteristic fields, including PROTEIN.[10]  The AD Questionnaire provided the following instructions regarding product characteristic field PROTEIN:

> FIELD NAME:   PROTEIN{}
> 1 = 12.5 percent or higher protein in finished pasta
> 2 = 10.00 - 12.49 percent protein in the finished pasta
> NARRATIVE:    Identify the percentage of protein in the pasta sold, as stated on the label of the respective product.[11]

La Molisana complied with the above-referenced instructions in its response to the AD Questionnaire.[12]  However, La Molisana argued that Commerce's PROTEIN coding methodology "is not necessarily an accurate representation" of a product's protein content.[13]  Specifically, La Molisana asserted that nutritional label rounding requirements, as well as differences between Italian and American nitrogen content measurement standards, undermine the accuracy of the protein amount reported on a product's nutritional label.[14]  Moreover, Valdigrano di Flavio Pagani S.r.L. (Valdigrano), a non-examined respondent, argued that Commerce's 12.5 percent "breakpoint" is "controverted by the record and, therefore, legally untenable."[15]

In the *Final Results*, Commerce declined to deviate from the PROTEIN methodology delineated in the AD Questionnaire, and calculated a weighted-average dumping margin for La

---

[9] *See* Memorandum, "Selection of Additional Respondent for Individual Review," dated November 1, 2019; *see also* Commerce's Letter, "Request for Information," dated November 1, 2019 (AD Questionnaire).
[10] *See* AD Questionnaire at B-7 and C-6.
[11] *Id.* at B-8-9 and C-7, and Appendix III.
[12] *See* La Molisana's Letter, "Response to Section B and C of Initial Questionnaire and Related Filings," dated January 3, 2020, at B-11 and C-10.
[13] *Id.* at Exhibits B-2 and C-2.
[14] *Id.*
[15] *See* Valdigrano's Letter, "Case Brief of Valdigrano," dated January 26, 2021, at 11.

Molisana equal to 15.72 percent.[16]  Commerce assigned La Molisana's weighted-average dumping margin to the respondents not selected for individual examination because it was the only rate calculated in the *Final Results* that was not zero, *de minimis*, or based entirely on facts available.[17]  In *La Molisana I*, the Court affirmed Commerce's reliance upon its established PROTEIN methodology.[18]  Upon appeal, the Federal Circuit affirmed *La Molisana I* with regard to the 12.5 percent breakpoint issue, and vacated and remanded the Court's determination regarding the nutritional label rounding and nitrogen content measurement issues to Commerce.[19]  The Court remanded the nutritional label rounding and nitrogen content measurement issues to Commerce.[20]

In the *Remand Opinion*, the Federal Circuit held that inaccuracies deriving from Commerce's PROTEIN methodology prevent Commerce from matching sales of the foreign like product to sales of subject merchandise that is identical in physical characteristics, as required by section 771(16)(A) of the Tariff Act of 1930, as amended (the Act).[21]  Specifically, the Federal Circuit held that, because the U.S. Food and Drug Administration (FDA) "requires that labels for food sold in the United States shall include '{a} statement of the number of grams of protein in a serving, expressed to the nearest gram…,'" rounding the "actual protein content" may inaccurately affect the PROTEIN code assigned to a particular transaction in the comparison or U.S. market sales databases.[22]  The Federal Circuit further held that, because "{t}he grams of protein in a product are calculated by multiplying the determined nitrogen content (nitrogen

---

[16] *See Final Results*, 86 FR at 28337.
[17] *Id.*
[18] *See La Molisana I*, Slip Op. 23-59 at 11 ("{t}he court finds, based on this record, that Commerce did not err when it declined to adjust its existing model-match method").
[19] *See Remand Opinion*, 138 F.4th at 1362-63.
[20] *See Remand Order*.
[21] *See Remand Opinion*, 138 F.4th at 1359.
[22] *Id.*, 138 F.4th at 1359-60 (quoting 21 CFR 101.9(c)(7)).

4

units) by a nitrogen-to-protein conversion factor," the difference in the conversion factors prescribed in Italy (*i.e.*, 5.7110) and the United States (*i.e.*, 6.2510) may cause "physically identical products {to} be classified differently in the United States versus Italy based on the protein displayed on the packaging."[23] Therefore, the Federal Circuit determined that "a compelling reason to modify the model-match methodology exists because Commerce's current methodology fails to adhere to the statutory requirement to compare goods on the basis of identical physical characteristics."[24]

### III.  ANALYSIS

Pursuant to the *Remand Opinion*, Commerce finds that its PROTEIN coding needs modification, and, thereby, its model-matching methodology, to match La Molisana's sales of the foreign like product to its sales of subject merchandise with identical physical characteristics. In order to follow the *Remand Opinion* and *Remand Order*, Commerce determined that the record of the 2018-19 review of the *Order* lacked information necessary to effectuate the required modification to the model-matching methodology. Accordingly, Commerce issued a supplemental questionnaire to La Molisana to obtain the information necessary to match La Molisana's sales of the foreign like product to its sales of subject merchandise with identical physical characteristics.[25]  La Molisana timely submitted its response on September 10, 2025.[26]

In the First La Molisana Remand Supplemental Questionnaire, Commerce requested information regarding, *inter alia*, how La Molisana determines and records the "actual protein content" and "nitrogen content" of its pasta products.[27]  In response, La Molisana stated that:

---

[23] *Id.*, 138 F.4th at 1361-62.
[24] *Id.*, 138 F.4th at 1362.
[25] *See* Commerce's Letter, "Supplemental Questionnaire," dated August 13, 2025 (First La Molisana Remand Supplemental Questionnaire).
[26] *See* La Molisana's Letter, "Response to Department's Remand Questionnaire," dated September 10, 2025 (La Molisana's First Remand Supplemental Response).
[27] *See* La Molisana's First Remand Supplemental Questionnaire at 4.

5

> The actual protein content is not maintained on a package-by-package basis, but rather is determined based on a product line basis. Specifically, La Molisana has a brand standard for each brand and with certain exceptions for specific cuts, La Molisana determines the protein content by examining its purchases of {s}emolina and characterizes each {s}emolina purchase within a specific semolina category. Semolina, a natural product, will have protein (and other physical characteristics such as ashes (ceneri)) that fall within a range and the resultant product will also be within a range. This range, in the case of protein, determines the protein standard for the brand and thus the actual protein content.[28]

La Molisana further stated that it "has no business purpose to know or record the nitrogen content of its products," and that it "derived the nitrogen content for this response by using the reported protein content."[29]

La Molisana submitted revised comparison and U.S. market sales databases calculating the protein content of the merchandise underlying each transaction in the databases.[30] Specifically, La Molisana calculated the actual protein content, measured in grams, and reported the resultant amount per kilogram of pasta, as well as the corresponding percentage of protein in the pasta, for each transaction in the databases.[31] Additionally, La Molisana calculated the nitrogen content of each transaction in both databases, and determined the protein content percentage using both the Italian and American conversion factors (*i.e.*, 5.7110 and 6.2510, respectively).[32] Consequently, La Molisana provided protein content percentages for all comparison and U.S. market sales using three calculation methodologies: grams of protein (*i.e.*, actual protein content), nitrogen content using the Italian conversion factor, and nitrogen content using the American conversion factor. Finally, La Molisana reported revised PROTEIN codes, and CONNUMs, based on each of these methodologies.[33] La Molisana assigned codes "1" or

---

[28] *See* La Molisana's First Remand Supplemental Response at 1-2.
[29] *Id.* at 3-4.
[30] *Id.* at Comparison Market Sales Database and U.S. Market Sales Database.
[31] *Id.* at 5-6.
[32] *Id.* at 3-7.
[33] *Id.* at 7-9.

"2" in each PROTEIN field based on the 12.5 percent threshold delineated in the AD Questionnaire.[34] Moreover, La Molisana submitted revised cost of production (COP) databases using CONNUMs reflecting protein content based on the actual amount of protein, measured in grams.[35]

We find that the information submitted on the record of this remand proceeding is sufficient for Commerce to match La Molisana's sales of the foreign like product to its sales of subject merchandise with identical physical characteristics. Specifically, we find that the record contains three PROTEIN fields (*i.e.*, PROTEIN2H/U, PROTEIN3H/U, and PROTEIN4H/U) in which La Molisana coded the product characteristic in an identical manner in both the comparison and U.S. market databases. Field PROTEIN2H/U determines protein content for both markets based on the actual amount of protein, measured in grams. Additionally, PROTEIN3H/U determines protein content for both markets based on nitrogen content, using the Italian conversion factor (*i.e.*, 5.7110). Furthermore, PROTEIN4H/U determines protein content for both markets based on nitrogen content, using the American conversion factor (*i.e.*, 6.2510). Accordingly, La Molisana assigns product characteristic codes pursuant to calculation methodologies that it consistently applied in both the comparison and U.S. markets, ensuring that Commerce's weighted-average dumping margin calculations compare identical products sold in the comparison and U.S. markets. We further note that the information submitted on the record of this remand proceeding permits Commerce to calculate COP using product characteristic codes that are consistently applied in both the comparison and U.S. markets. Specifically, La

---

[34] *Id.*
[35] *See* La Molisana's Letters, "Response to Department's Second Remand Questionnaire," dated September 29, 2025, at Exhibit R2-1; and "Response to Department's Third Remand Questionnaire," dated November 24, 2025 (La Molisana's Third Remand Supplemental Response), at Exhibit LMR3-1.

Molisana submitted a COP database calculating COP for CONNUMs based on the actual amount of protein, measured in grams (*i.e.*, using field PROTEIN2H/U).[36]

We further find that field PROTEIN2H/U is the most reasonable calculation methodology for the purposes of this remand proceeding. La Molisana explained that it determines and records the actual protein content for each product line or brand sold in the comparison and U.S. markets.[37] Conversely, La Molisana explained that it need not determine or record product-specific nitrogen content in the normal course of business.[38] Notably, La Molisana's nitrogen content data reported in its sales databases is based on the actual protein content.[39] Because La Molisana determines and records actual protein content, but not nitrogen content, in the normal course of business, we find that actual protein content is the most reasonable basis upon which to determine protein content for the purposes of Commerce's model-matching methodology. Moreover, PROTEIN2H/U is the only protein content calculation methodology for which the record contains methodologically consistent sales and COP data in both the comparison and U.S. markets. Accordingly, we find that field PROTEIN2H/U, and, therefore, CONNUM2H/U, provide the most reasonable basis upon which to calculate La Molisana's weighted-average dumping margin for the purposes of this remand proceeding.

## IV.   INTERESTED PARTY COMMENTS

Commerce released its draft results of redetermination on January 13, 2026, in which we provided interested parties the opportunity to submit comments for consideration in these final

---

[36] *See* La Molisana's Third Remand Supplemental Response at Exhibit LMR3-1.
[37] *See* La Molisana's First Remand Supplemental Response at 1-2.
[38] *Id.* at 3-4.
[39] *Id.* at 4.

8

results of redetermination.[40]  La Molisana submitted timely comments on the Draft Redetermination on January 20, 2026.[41]  Specifically, La Molisana argues that 1) Commerce did not address the FDA rounding issue; 2) Commerce's characterization of "actual" protein content is meaningless because it does not recognize nitrogen content differences between Italian and U.S. markets; and 3) Commerce should reject its new differential pricing methodology.  Consequently, La Molisana contends, Commerce should "reject" its Draft Redetermination and "address the deficiencies identified by La Molisana."[42]

After considering La Molisana's comments, we disagree that Commerce should reject its Draft Redetermination, and we have made no changes to the Draft Redetermination.  We summarize and address La Molisana's comments below.

**Comment 1:  Use of Packaging to Determine Protein Content**

*La Molisana's Draft Redetermination Comments*

La Molisana did not provide the requested executive summary regarding this argument.  La Molisana's argument may be found at page 1 of La Molisana's Draft Redetermination Comments.

**Commerce's Position:**

We find that the protein content reported on La Molisana's product packaging, and, therefore, the FDA rounding requirements, does not affect Commerce's weighted-average dumping margin calculations for the purposes of the Draft Redetermination.  In the Draft Redetermination, Commerce found that protein content field PROTEIN2H/U "is the only protein content calculation methodology for which the record contains methodologically consistent sales

---

[40] *See* Draft Results of Redetermination Pursuant to Court Remand, *La Molisana S.p.A. v. United States*, Court No. 21-00291, Slip Op. 23-59 (CIT April 24, 2023), dated January 13, 2026 (Draft Redetermination).
[41] *See* La Molisana's Letter, "Comments on Remand," dated January 20, 2026 (La Molisana's Draft Redetermination Comments).
[42] *Id.* at 4.

9

and COP data in both the comparison and U.S. markets."[43] La Molisana determined the transaction-specific codes reported under PROTEIN2H/U pursuant to the protein content percentages calculated in field PROPERCENTH/U, which is based on the protein content reported in field PROCONTENTH/U.[44] La Molisana calculated the transaction-specific protein content reported in field PROCONTENTH/U based on "the brand standard, which is the data maintained by La Molisana in its books and records."[45] La Molisana further explained that:

> {t}his protein content is based on the Italian standard. This is the standard used by everyone, including the suppliers, in Europe. For those rare situations where a protein content is needed in the {U.S.} standard (primarily for the {U.S.} nutrition label) the protein content is adjusted.[46]

Moreover, La Molisana confirmed that "{t}he actual protein content is not maintained on a package-by-package basis, but rather is determined on a product line basis."[47] Based on the above factors, we find that La Molisana's product packaging, and, by extension, the FDA nutritional label reporting requirements, does not affect the actual protein content maintained in La Molisana's books and records. In the Draft Redetermination, we relied upon field PROTEIN2H/U, for which La Molisana determined codes based on the actual protein content maintained in its books and records.[48] We did not use the product packaging or the FDA rounding in the Draft Redetermination. We therefore find that the protein content reported on La Molisana's product packaging does not affect Commerce's weighted-average dumping margin calculations for the purposes of the Draft Redetermination. Consequently, the Draft Redetermination remedies the FDA rounding issues discussed in the *Remand Opinion*.

---

[43] *See* Draft Redetermination at 8.
[44] *See* La Molisana's First Remand Supplemental Response at 7-8.
[45] *Id.* at 5.
[46] *Id.*
[47] *Id.* at 1-2.
[48] *See* Draft Redetermination at 8.

**Comment 2: Whether Commerce's Protein Content Methodology Remains Deficient**

*La Molisana's Draft Redetermination Comments*

La Molisana did not provide the requested executive summary regarding this argument. La Molisana's argument may be found at pages 2-3 of La Molisana's Draft Redetermination Comments.

**Commerce's Position:**

We disagree with La Molisana that Commerce's "calculation as to what constitutes a gram of protein…is still deficient…."[49] As an initial matter, we disagree with La Molisana's argument that nitrogen content is "highly relevant," and "a fact necessary for evaluation."[50] As discussed in the Draft Redetermination, La Molisana need not determine or record product-specific nitrogen content in the normal course of business, and it calculated its reported nitrogen content based on the actual protein content (*i.e.*, grams) of its products.[51] Moreover, La Molisana reported that it "has no business purpose to know or record the nitrogen content of its products."[52] Rather, La Molisana determines its products' protein content based on independent laboratory testing that "only reports the grams of protein."[53] Notably, La Molisana explained that it no longer possesses the laboratories' testing certificates relevant to the instant POR because "there is no business purpose to retain test certificates for more than 48 months…."[54] We therefore disagree that "the nitrogen content of the gram of protein recorded by La Molisana is highly relevant," and "a fact necessary for evaluation."[55]

We note that La Molisana argues that Commerce "should have clearly stated whether" the 12.5 percent standard used in its protein content field "is based on the {U.S.} standard, the

---

[49] *See* La Molisana's Draft Redetermination Comments at 2.
[50] *Id.*
[51] *See* Draft Redetermination at 8.
[52] *See* La Molisana's First Remand Supplemental Response at 3-4.
[53] *Id.* at 4.
[54] *Id.* at 3.
[55] *See* La Molisana's Draft Redetermination Comments at 2.

11

European standard{,} or some other standard."[56]  As discussed above, La Molisana reported PROTEIN2H/U based on the product line/brand standard "maintained…in its books and records."[57]  La Molisana explained that the protein content recorded in its books and records is the "Italian standard," which "is the standard used by everyone, including the suppliers, in Europe."[58]  This protein content reflects the grams of protein per kilogram of pasta.[59]  As discussed above, we find that La Molisana's product packaging, and, by extension, U.S. nutritional label reporting requirements, does not affect the actual protein content maintained in La Molisana's books and records.[60]  We therefore find that the PROTEIN2H/U coding relied upon in Commerce's Draft Redetermination reflects the Italian/European standard of protein content measurement.  Because La Molisana used the same protein content methodology to report field PROTEIN2H and PROTEIN2U in the comparison and U.S. market sales databases, respectively, we find that the Draft Redetermination accurately and consistently compared sales of the foreign like product with sales of subject merchandise during the POR.

**Comment 3:  Commerce's Differential Pricing Methodology**

*La Molisana's Draft Redetermination Comments*

La Molisana did not provide the requested executive summary regarding this argument.  La Molisana's argument may be found at pages 3-4 of La Molisana's Draft Redetermination Comments.

---

[56] *Id.* at 3.
[57] *See* Comment 1, *infra* (citing La Molisana's First Remand Supplemental Response at 1-2, 5, and 7-8).
[58] *See* La Molisana's First Remand Supplemental Response at 5.
[59] *Id.*
[60] *See* Comment 1, *supra*.

**Commerce's Position:**

Unchanged from the underlying *Final Results*, we applied the Cohen's *d* test in the Draft Redetermination.[61] We therefore disagree with La Molisana's argument that Commerce "applied a differential pricing analysis using a new and different standard than Cohen's {*d*}."[62] Consequently, La Molisana's arguments regarding Commerce's differential pricing analysis are moot. No other party has commented on Commerce's differential pricing analysis in this litigation or raised it as an issue.

## V.   FINAL RESULTS OF REDETERMINATION

We find that a reexamination of the record, in consideration of information submitted on the record in this remand proceeding, supports using actual protein content to determine "the percentage of protein in the pasta sold."[63] Moreover, the record supports using these percentages to assign codes for product characteristic field PROTEIN, which is incorporated into the CONNUM for the purposes of matching sales of the foreign like product to identical sales of subject merchandise. Therefore, we have made certain changes to the margin calculations from the *Final Results*,[64] and Commerce determines that the following weighted-average dumping margins exist:

| Exporter or Producer | Weighted-Average Dumping Margin (percent) |
|---|---|
| La Molisana S.p.A. | 15.14 |
| **Review-Specific Average Rate Applicable to the Following Company Party to the Litigation** | |
| Valdigrano di Flavio Pagani S.r.L. | 15.14 |

---

[61] *See Final Results* IDM at Comment 4; *see also* Memoranda, "Final Results La Molisana Analysis Memorandum for the Final Results of Antidumping Duty Administrative Review; 2018-2019," dated May 20, 2021; and "La Molisana Draft Redetermination Calculation Memorandum," dated January 13, 2026 (La Molisana Calculation Memorandum).
[62] *See* La Molisana's Draft Redetermination Comments at 3.
[63] *See* AD Questionnaire at B-8-9 and C-7.
[64] *See* La Molisana Calculation Memorandum.

Because the estimated weighted-average dumping margin for La Molisana and the review specific average rate for the company party to this litigation listed above differ from those in the underlying *Final Results*, we intend to issue a *Timken* notice[65] with an amended final results should the Court sustain these final results of redetermination.

2/6/2026

X _____
Signed by: CHRISTOPHER ABBOTT
Christopher Abbott
Deputy Assistant Secretary
 for Policy and Negotiations,
  performing the non-exclusive functions and duties
  of the Assistant Secretary for Enforcement and Compliance

---

[65] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).